UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

| | |
|---|---|
| SEVENTH REGIMENT ARMORY<br>CONSERVANCY, INC., | : <br> : <br> : |
| Plaintiff, | :    Case No. _____ <br> : |
| -against- | :    **COMPLAINT FOR DECLARATORY** <br> :    <u>**AND INJUNCTIVE RELIEF**</u> |
| HOPE KNIGHT, in her official capacity as<br>President, Chief Executive Officer, and<br>Commissioner of Empire State Development<br>Corporation, | : <br> : <br> : <br> : |
| | : |
| Defendant. | : |

-----------------------------------------------------------------X

Plaintiff Seventh Regiment Armory Conservancy, Inc. (the "Conservancy"), by and

through its undersigned attorneys, as and for its complaint against Defendant Hope Knight, in her

official capacity as President, Chief Executive Officer, and Commissioner of Empire State

Development Corporation ("ESD"), alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      This action challenges the State of New York's clear abuse of legislative power

through its enactment of two statutory amendments (the "Amendments") that will unlawfully

deprive the Conservancy of an unknown amount of space (but no less than 1,200 square feet)

demised to it in 2006 pursuant to a valid and enforceable 99-year lease with ESD, acting for the

State (the "Lease"),[1] which mandates the Conservancy to preserve and restore a deteriorating

national landmark owned by the State—the Seventh Regiment Armory (the "Armory")—and

give it a sustainable economic life as a cultural center.

---

[1] Attached hereto as <u>Exhibit A</u> is a true and correct copy of the lease agreement between the Conservancy and the State of New York, acting through the Empire State Development Corporation on behalf of the Division of Military and Naval Affairs, dated November 14, 2006.

2.      The Conservancy has more than fulfilled its obligations under the Lease.  To date, the Conservancy has raised and invested more than $174 million into the capital rehabilitation of the Armory, and has spent millions of dollars more in turning it into a thriving cultural institution that provides a free arts education program that serves 5,000-6,000 students annually from under-resourced NYC public schools where 80% of the students live at or below the poverty line; enriches the arts curriculum of eight under-served partner schools; and provides 14,000 hours of mentored and paid internships to students.

3.      New York's Division of Military and Naval Affairs ("DMNA") has confirmed on multiple occasions that the Lease is "a valid contract under New York State law," and the Conservancy's property rights are further protected by a valid and enforceable Subordination, Non-Disturbance, and Attornment Agreement between the Conservancy, the State, and the City of New York who owns the land on which the Armory is sited (the "Non-Disturbance Agreement").[2]

4.      The Amendments, if enforced against the Conservancy's leased space, will cause ESD to override its existing Lease with the Conservancy and permanently convey an open-ended, uncapped portion of the Conservancy's demised space with no upper limit and subject to ESD's sole discretion (and in any event no less than 1,200 square feet) to a single private organization, even though the Conservancy already makes multiple uses of every square foot of space demised to it and, in fact, is forced to rent additional space off site at a steep cost.

5.      Bedrock constitutional principles preclude the State from taking property belonging to one private party to enrich another unless it serves a legitimate public purpose—like the one that is the basis of the Lease between the State and the Conservancy, *i.e.*, rescuing a

---

[2]  Attached hereto as Exhibit B is a true and correct copy of the Subordination, Non-Disturbance and Attorney Agreement between the City of New York, the State of New York acting through ESD on behalf of the DMNA, and the Conservancy, dated November 14, 2006.

major deteriorating landmark and creating a new cultural institution, adding more jobs and economic activity for New York.

6.      The Amendments were enacted not to serve a legitimate public purpose, but rather to benefit a single private organization—the Knickerbocker Greys (the "Greys"), a small Upper East Side-based youth cadet group with approximately 10-14 members who pay $1,800 per year to join and train for three-hours per week eight-months of the year.  Because the Amendments will substantially interfere with the Conservancy's rights under the Lease and Non-Disturbance Agreement, serve the interests of only a single private entity, and lack any legitimate public purpose, they should be declared unconstitutional.

7.      By way of background, in the 1980s and 90s, the landmarked Armory had ceased to be used actively by the New York National Guard and fallen into a state of significant disrepair.  By 2000, the Armory was listed among the World Monument Fund's "100 Most Endangered Sites in the World," along with other iconic historical sites, such as the sanctuary of Machu Picchu in Peru and the Buddhist temple, Angkor Wat, in Cambodia.

8.      In July 2000, the New York State Urban Development Corporation ("UDC") d/b/a ESD issued a request for proposals ("RFP") to find a private entity to manage and fund the restoration and maintenance of the Armory (saving the State taxpayers hundreds of millions of dollars), and to operate it with a use that would make the building economically sustainable on an ongoing basis.  The Conservancy submitted a bid for the Armory's restoration project and was selected for the project in November 2000.

9.      After the public bid process, on November 16, 2005, ESD approved a General Project Plan ("GPP") for "the restoration and renovation of the Seventh Regiment Armory as a cultural center for performing and visual arts" to be carried out by the Conservancy.  To that end,

on November 14, 2006, the Conservancy entered into the 99-year Lease with ESD, acting for the State, as authorized by several laws passed in furtherance of the Armory's revitalization and operation, including Chapter 482 of the Laws of 2004 ("Chapter 482"), Section 180-a of the New York Military Law ("Military Law § 180-a"), and Section 39 of the Urban Development Corporation Act ("UDC Act § 39").

10.     The Conservancy has a protected property interest in the space demised to it under the Lease (the "Demised Premises").  Among other protections, the Lease provides that (i) the Demised Premises would be given "free and clear of any and all tenancies, occupancies, licenses or any other rights to use and occupy any portion of the Demised Premises other than pursuant to or as provided in this Lease" (Ex. A at Art. I); and (ii) "Tenant shall . . . peaceably and quietly have, hold and enjoy the Demised Premises for the term hereby granted without molestation or disturbance by or from Landlord or any Person claiming through Landlord" (Ex. A at Art. 36, "Quiet Enjoyment").  The Conservancy, the State (acting through ESD), and the City of New York also entered into the Non-Disturbance Agreement, confirming the Conservancy's right to occupy and operate the Demised Premises without interference or disturbance.

11.     Consistent with Chapter 482, Military Law § 180-a, and UDC Act § 39, the Lease outlines mandates for the Conservancy:  (i) to restore, repair and maintain the Armory; and (ii) to repurpose it as a thriving arts and culture center for New York.  (Ex. A at Arts. 11-13.)  The Conservancy is to use the Armory "primarily as a not-for-profit art center for performing and visual arts . . . ."  (Ex. A at Art. 23.)

12.     Pursuant to these mandates, the Conservancy has undertaken extraordinary efforts to rescue the Armory from neglect and to create from scratch a thriving new cultural institution

4

that serves the New York community with all the associated cultural and economic benefits. According to *The New York Times*, because of the Conservancy's outstanding contributions, the Armory "has arrived as the most important new cultural institution in New York City." *Time Magazine* proclaimed that the Armory "has turned into New York's undisputed main stage for presenting cutting-edge, visually inventive theater," which creates more jobs and economic activity for New York. Roberta Smith of *The New York Times* wrote: "The restoration of the Park Avenue Armory seems destined to set a new standard not so much for its scale but for its level of respect and imagination."

13.     Today, the Conservancy—a not-for-profit organization that was started by a group of civic-minded citizens who did not want to see a major landmark disappear, and has invested time, money and dedication to save it—is ready to embark on "Phase X," the 10th major capital improvement project that would (through a $73 million investment to renovate the basement and first floor): (i) provide the Armory, for the first time in the building's history, an ADA accessible hands-free entrance and lobby to the building; (ii) replace the antiquated mechanical, electrical, and plumbing ("MEP") infrastructure on the first floor and basement levels; and (iii) expand the space for the Conservancy's burgeoning arts education program that supports the arts curriculum and provides mentored and paid internships for students in some of New York's most under-resourced schools.

14.     But that $73 million capital improvement project, and all of the incredible progress that has been made to revitalize the Armory, is now imperiled by the Amendments that would require ESD (as Landlord) to convey, at its sole discretion, an uncapped portion of the Demised Premises to the Greys, who have no legal claim to occupy space at the Armory, as they

were informed emphatically by DMNA: "your organization has no leasehold, occupancy or other agreement of any kind at the Armory."

15. As a matter of law, ESD cannot convey any portion of the Demised Premises to a third-party because the entire leasehold interest in the Demised Premises has already been conveyed to the Conservancy. But that is exactly what the Amendments compel ESD to do. Pursuant to the Amendments, ESD is preparing to immediately enter into an agreement with the Greys that would permanently cede to them an unknown share of the Demised Premises with no upper limit beyond ESD's view of what is "sufficient and suitable"—an effectively unlimited claim subject to ESD's unilateral discretion, and in any event no less than 1,200 square feet. ESD's imminently forthcoming agreement with the Greys will irreparably impair the Conservancy's existing contract and property rights under the Lease and substantially disrupt the Conservancy's operations, despite its excellent record in fulfilling the mandates of the Lease.

16. The Amendments ignore the Conservancy's demised leasehold rights, disregard the Armory's physical capacity, and interfere with the Conversancy's carefully laid renovation and programming plans. The Amendments also do not advance any legitimate state interest. They do not serve the general welfare, promote public safety, or advance any interest of the citizenry at large. Rather, the Amendments are a targeted political favor—obtained by the Greys through lobbying efforts and influence—to transfer valuable property rights from the Conservancy to the Greys. Such political favoritism of one private party to the detriment of another is precisely what the U.S. Constitution forbids.

17. The Amendments, as applied to the Conservancy's Demised Premises under the Lease, violate at least four fundamental constitutional guarantees, any one of which requires the Amendments to be declared unconstitutional and unenforceable, and further warrants that any

actions taken pursuant to them be permanently enjoined and any contracts purportedly made under their authority be declared void.

18.    *First*, the Amendments violate the U.S. Constitution's Contracts Clause by substantially impairing the Conservancy's contractual rights under its 99-year Lease for the Demised Premises.  The Conservancy entered into the long-term Lease to restore, renovate, and operate the Armory, and the Conservancy has raised hundreds of millions of dollars and spent years of planning in reliance on its contractual rights under the Lease.  The challenged Amendments rewrite the Lease by conferring permanent occupancy rights on a private third-party organization, the Greys, without the Conservancy's consent, interfering with the bargained-for exclusivity of the Demised Premises and interfering with its ability to carry out the mandates of the Lease.  Such a targeted impairment of the Lease—a valid and binding private contract—serves no legitimate public purpose, and in fact interferes with the public purpose described in ESD's General Project Plan that authorized the Lease in 2006.

19.    *Second*, the Amendments violate the U.S. Constitution's Takings Clause by forcing the Conservancy to cede a portion of its valid leasehold interest—a recognized property right—to a private entity, the Greys.  The compelled physical occupation of the Conservancy's leased space by a third-party organization is a *per se* taking under well-established Supreme Court precedent.  The purported taking here is not for any public use or benefit (e.g., saving a major national landmark and creating a new cultural institution to sustain its economic future), but for the exclusive private benefit of the Greys who have approximately 10-14 cadets and who have met three hours a week for seven to eight months of the year for the 13 years the Conservancy granted them licenses.  No just compensation can cure the unconstitutional private purpose of this taking, as it completely undermines the reliability of the Lease, will not allow the

expansion of the arts education program to serve more under-served NYC public school students and will stand in the way of making the building ADA-accessible for the hundreds of thousands of visitors to the Armory every year.

20.     *Third*, the Amendments violate the Conservancy's substantive due process rights because they arbitrarily and irrationally deprive the Conservancy of protected contract and property rights by compelling it to surrender its demised space to a private entity.  The Amendments are not rationally related to any valid public purpose, but instead were enacted solely to favor the Greys at the Conservancy's expense.  Legislation that serves only private beneficiaries, while extinguishing property rights and frustrating contractual expectations, cannot withstand constitutional scrutiny.  The arbitrary entrenchment of the Greys in the Demised Premises to the exclusion of all other groups is likewise an arbitrary exercise of legislative power.

21.     *Fourth*, the Amendments violate the Conservancy's procedural due process rights because they require the cession of an uncapped, open-ended portion of the Demised Premises (and in any event, no less than 1,200 square feet), subject to ESD's sole discretion to the Greys for their permanent use, without providing the Conservancy with proper notice, a hearing, or an opportunity to contest the factual basis or legal justification of the Amendments.  By stark contrast, the leasehold granted to the Conservancy was done so after a full public review process conducted by UDC—the State's economic development agency (now known as ESD)—that took six years to complete between 2000 and 2006.  That process included, among other things, public circulation by the State of an RFP for a developer to rescue and revitalize the Armory; a bidding period and developer selection; preparation and review of an environmental assessment; a

preliminary General Project Plan; public hearings; and a final General Project Plan approving the proposal and setting the mandate for the Lease between the State and the Conservancy.

22.     Unless this Court intervenes, the Conservancy's planned construction and restoration work—years in the making—will be derailed.  Expansion of the art and youth programs will be thwarted.  And the Conservancy's mandate of revitalizing and maintaining a historic cultural site for the benefit of the people of New York will be obstructed.  This harm will occur only because the State inexplicably chose to elevate the narrow interests of a small private group over the vested rights of their tenant, the Conservancy, which has acted in good faith and made notable progress in meeting the mandates of the Lease and the General Project Plan.

23.     The Conservancy has attempted to work in good faith with ESD and the Greys to resolve this dispute, but the Greys were not interested.  In fact, the Greys would not even respond to any of the suggested proposals the Conservancy had to offer.  The Conservancy is therefore left with no choice but to bring this action to protect its fundamental constitutional rights and to enjoin enforcement of the Amendments.

24.     As described in more detail below, the Court should (i) declare that the Amendments, as applied to the Conservancy's Demised Premises under the Lease, violate the U.S Constitution and are therefore unconstitutional and unenforceable; (ii) grant preliminary and permanent injunctive relief enjoining Ms. Knight (in her official capacity exercising all the powers of ESD) from enforcing or giving effect to the Amendments; and (iii) to the extent the Amendments have already been given effect through the execution of an agreement compelling the Greys' physical occupation of the Demised Premises, declare such an agreement void.

## PARTIES

25.     The Conservancy is a not-for-profit corporation duly organized and existing under the laws of the State of New York.  The Conservancy was formed in the mid-1990s by a group of private civically-minded citizens supportive of historic preservation, who recognized the need to address the Armory's deteriorating condition and the State's inability to fund its massive restoration needs and acted to rescue and revitalize the building.

26.     Hope Knight is the President, Chief Executive Officer ("CEO") and Commissioner of ESD, New York State's economic development agency.  She was nominated to the position by Governor Kathy Hochul in October 2021 and confirmed by the New York State Senate in May 2022.  Ms. Knight exercises all the powers granted to ESD.  Pursuant to U.S. Supreme Court case, *Ex parte Young*, 209 U.S. 123 (1908), Ms. Knight is the proper Defendant in this action because in her official capacity as President, CEO, and Commissioner of ESD, she acts under the color of State law and pursuant to an official policy, and is the State official empowered to enforce the Amendments being challenged as unconstitutional.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as the action involves Federal Questions arising under the U.S. Constitution.

28.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this District and the property that is the subject of this action is located in this District.

**FACTUAL BACKGROUND**

A.     **The Armory**

29.     The Armory, leased by the City of New York by the State of New York, is a historic New York City and State landmark built between 1879 and 1881 by the Seventh Regiment of the National Guard (the "Seventh Regiment").  The Seventh Regiment was founded in 1806 as a volunteer militia and included many prominent and successful New Yorkers, including the Astors, Vanderbilts, Schuylers, Roosevelts, and Harrimans.  It is the only privately built armory in the country, as the Seventh Regiment was able to raise funds privately and engage the leading designers of the time, including Louis Comfort Tiffany, Stanford White, the Herter Brothers, Pottier and Stymus, and Kimbel and Cabus.

30.     The Armory was used for military drills and training and storage of arms, but also for music festivals, balls, fundraising events led by Eleanor Roosevelt, royal visits, and as a social club for its members.

31.     The Seventh Regiment was active through the 19th century and into the early 20th century.  It was the first regiment to join President Lincoln at the start of the Civil War and participated bravely in WWI.  In 1922, the State Militia was federalized which began a transformation of the Seventh Regiment that would continue through WWII.  In 1947, when the Federal Government reorganized state national guards, the Seventh Regiment ceased to exist as an active military unit and members were incorporated into the 107th Regiment and given office space at the Armory.

32.     As time passed, the Armory's physical condition began to deteriorate due to decreased use and substantial underfunding.  By the 1990s, the Armory had fallen into a state of severe disrepair, as reported in *The New York Times* in an article entitled "Antique Fortress:  A

Special Report Park Ave Armory is Losing the Battle Within."  An accompanying editorial recommended that the Mayor and Governor review the plans of the Conservancy which might provide a solution after so many years of neglect.

33.     Responding to the public outcry, and in order to restore the Armory and ensure its long-term economic viability, in March 1999, ESD (on behalf of the State) issued an RFP seeking submissions from private organizations who would manage and fund the Armory's restoration and renovation, and revitalize it with a new purpose.

34.     In response to ESD's RFP, the Conservancy submitted a bid for the Armory's restoration project and was subsequently selected for the project in November 2000.  Once selected, the Conservancy focused on fundraising and planning for the Armory's restoration and future as an iconic new cultural space for New York.

**B.      Military Law § 180-a and UDC Act § 39**

35.     In 2004, the New York State Legislature enacted a series of laws in furtherance of the Armory's revitalization.  For example, it enacted Chapter 482, which authorized the UDC, doing business as ESD, to lease the historic Armory to a not-for-profit entity for a term of up to 99 years to operate as a new not-for-profit cultural center for performing and visual arts as outlined in the General Project Plan approved by the UDC on November 16, 2005.

36.     The purpose of Chapter 482 was to facilitate the "[m]ajor and expansive restoration work" needed to prevent the Armory "from being lost to future generations." (Memorandum in Support of Legislation, Bill A1817.)  The statute enabled the State, acting through ESD, "to enter into an effective public-private partnership to restore, maintain and operate the Armory" and "to institute and complete an ambitious program of restoration and upkeep."  (*Id*.)

37.     Military Law § 180-a and UDC Act § 39, were both enacted in connection with Chapter 482.

38.     Military Law § 180-a defined an appropriate lessee of the Armory as a "not-for-profit corporation dedicated to the preservation of the [A]rmory as a historical, civic and cultural facility for the community."  Similarly, UDC Act § 39 provided that the Armory's lessee was required "to undertake a program of repair, restoration and refurbishment of the [A]rmory."

39.     UDC Act § 39 further provided that "[t]he lease shall demise all portions of the [A]rmory other than those reserved for a homeless shelter for women operated by the city of New York pursuant to agreement with the state and for that reserved for military use by [DMNA]."

40.     The Greys are not mentioned anywhere in Chapter 482, Military Law § 180-a, or UDC Act § 39, as originally enacted into law in 2004.

**C.     The Lease**

41.     As authorized by Military Law § 180-a and UDC Act § 39, on November 14, 2006, the Conservancy entered into the Lease with the State acting through ESD.  The Conservancy became the Tenant of the Armory for a term of 99 years for the purpose of "restoration and renovation of the Armory for use as a cultural center for visual and performing arts."  ESD, acting as agent for the State, became the Landlord.

42.     Consistent with UDC Act § 39, ESD leased "all of Landlord's interest in and to the [Armory]" to the Conservancy, excluding only the "DMNA Retained Space" and the "Shelter Retained Space."

43.     The DMNA Retained Space is a portion of the Armory to be used by DMNA for its offices.  The Shelter Retained Space is a portion of the Armory to be used for an

approximately 100-bed women's shelter as was its "current use" at the time of the Lease. Besides the DMNA Retained Space and the Shelter Retained Space, the entire remaining portion of the Armory was demised to the Conservancy.

44.    Under the Lease, the Demised Premises must be "free and clear of any and all tenancies, occupancies, licenses, or any other rights to use and occupy any portion of the Demised Premises." (Ex. A at § 2.02.)

45.    The Conservancy also has the right to quiet enjoyment under the Lease, *i.e.*, to "peaceably and quietly have, hold and enjoy the Demised Premises … without molestation or disturbance by or from Landlord or any Person claiming through Landlord and free of any encumbrance created or suffered by Landlord." (Ex. A at Art. 36.)

46.    Separately, on November 14, 2006, the Conservancy, the State (through ESD), and the City of New York executed the Non-Disturbance Agreement, providing, among other things, that (i) "[n]either [the Conservancy] nor any party claiming by, through or under [the Conservancy] shall be evicted from the Demised Premises;" and (ii) "[the Conservancy's] leasehold estate under the Lease . . . shall not be diminished, interfered with, disturbed or terminated . . . ." (Ex. B.)

### D.    The Conservancy Has Made Enormous Strides In Fulfilling The Lease's Mandates

47.    Since entering the Lease in 2006, due to the tremendous efforts of the Conservancy, the Armory has gone from a run-down building with no clear economic purpose that could sustain the expense of maintaining such an important historic site to a thriving cultural center for the performing and visual arts in a substantially rehabilitated, code-compliant building.

48.     To date, the Conservancy has raised and invested more than $174 million for several major capital improvement projects that brought the Armory back to health, including but not limited to:

- major Drill Hall improvements, including an HVAC system for the first time, designed with acoustics appropriate for a performing arts venue, a power grid and catwalk, reinforcement of the historic truss structure, replacement of windows to meet thermal and acoustic standards, and in-kind replacement of the Drill Hall's 55,000 square foot floor over a new load-bearing, under-floor structure;

- multi-million dollar restorations of historic interiors, including the famed Veterans Room and Board of Officers Room;

- exterior façade repainting, water-proofing and rehabilitation and structural repairs;

- restoration of the grand gates and doorway of the Park Avenue entry;

- roof and parapet repair and replacement including all new flashing and gutters;

- major upgrades of the electrical system and heating plant, including a new mechanical plant on the 5th floor;

- construction of two new vertical circulation cores from the basement to the 5th floor, with new elevators and fire stairs to meet building codes;

- construction of a rehearsal studio on the 5th floor, and restoration of two other important historic rooms;

- construction of new restrooms with 22 stalls and renovation of old restrooms; and

- installation of new acoustically sealed loading doors.

49.     The Conservancy has also developed an Arts Education Program that serves 5,000-6,000 students annually from under-resourced New York City public schools, in which 80% of students live at or below the poverty line and 90% identify as BIPOC (Black, Indigenous, and People of Color).

50.     The Arts Education Program has three main components:  the Production-Based Program, the Partner School Program, and the Youth Corps Program.  These Programs are provided at no cost to students and schools.

51.    The Production-Based Program invites thousands of under-served public school students to student-only performances for every production it offers, which include works by world-class artists of theater, dance, opera, music, and video.  These visits also include attendance at rehearsals and talkbacks with the performers.  Attendance at the productions is complemented by several in-school and on-site workshops led by the artists and teachers.

52.    The Partner School Program offers in-depth, customized residencies that enrich the arts curriculum in eight under-resourced New York City public schools.

53.    The Youth Corps Program provides 14,000 hours per year of mentored and paid internships to high school students, which include job training and skills development.

54.    Since its inception, the Arts Education Program has had 333 artists interact directly with students, 281 Youth Corps participants work 155,104 hours as part of their paid internships, and 58,071 students and families reached through 4,690 workshops.

E.    **The Conservancy's Next Major Capital Improvement Project**

55.    In 2018, the Conservancy began planning for its next major capital improvement project, which would achieve three goals:  (1) to create, for the first time in the Armory's history, a hands-free, ADA accessible entrance and lobby area; (2) to provide critically needed additional space for the Arts Education Program; and (3) to replace the antiquated mechanical, electrical and plumbing ("MEP") on the first floor and in the basement.

56.    The planning has resulted in a $73 million capital improvement plan for the first floor and basement, which was last renovated approximately 50 to 60 years ago, if not longer.

57.    The new ADA entrance will be at grade of East 66th Street, leading into a lobby area with ADA-accessible services, including direct access to ADA-accessible elevators.  The basement work requires relocation of old MEP infrastructure and structural changes to make the

space usable.  When the renovated basement is completed, the amount of space available for the

Arts Education Program workshops will double and thus more students and schools will be

served.

      **F.**    **The Armory is Currently Fully Occupied**

58.    Since the Lease was executed, the Conservancy has substantially expanded in

size.  In December 2006, the Conservancy staff included only eleven members, two of whom

were temporary.  Today, the Conservancy's personnel roster is over 100 people, swelling to over

300 people during productions at the Armory.

59.    Every square foot of the Demised Premises under the Lease is fully used and most

spaces are used for multiple purposes, which means a lot of moving around of furniture.  In fact,

because there is no free space available, the Conservancy has to pay more than $215,000 per year

for off-site storage space and for trucking to load equipment in and out of the Armory.  The

usable area of the Armory (per the standard definition does not include stairs, elevators or

mechanical space) is 106,222 square feet.

- The <u>First Floor</u> uses half the usable area of the Armory and is taken up by the massive Wade Thompson Drill Hall (51,067 square feet), an interior landmark which cannot be sub-divided.  The Drill Hall is the Conservancy's main exhibition and performance space, and is also used for galas and other fund-raisers, arts education programs and art fairs which provide income to support the artistic and arts education programs.  The Drill Hall, which has a capacity of up to 1,760 people, is in use 95% of the year.  The rest of First Floor (known as the Head House) is used as follows:  the wide corridor and lobby are the primary entrance and waiting area for the Armory; the restored Veterans and Board of Officers Rooms are used for performances, exhibitions, public programming, concerts, recital, galas, dinner receptions and arts education programming, as well as intermission lobbies and concessions bars and other rental events.  The Mary Divver, Field and Staff, Superintendents Room and the Library are used as the box office, for concessions, sales of merchandise, as cafés or for opening night parties, and used by the art fairs.  The Colonels Room (19,000 square feet), and the Parlor are used for back-of-house functions, such as green rooms, production offices, star dressing rooms, video screenings, dressing rooms, hair and make-up, production storage, and

technicians' rooms.  They are also often rented for back-up space for catering in art fairs and special events.

- The <u>Second Floor</u> is used for:  arts education workshops, performer dressing rooms, hair and make-up and wardrobe, fund-raising benefits, dressing rooms, artists-in-residence studios for 11 artists; production and performer meals; concession and intermission lobbies for audiences larger than 800 (the Drill Hall can hold up to 1,760 people); and rentals to seven art fairs, which provide revenue to support the Conservancy's artistic and arts education programming.

- The <u>Third Floor</u> are the offices for the Conservancy's staff, contractors and interns; and also includes the IT server room, pumping room, and storage of education and other materials.

- The <u>Fourth Floor</u> is not demised to the Conservancy under the Lease.  It is occupied by the Lenox Hill Neighborhood Women's Shelter and DMNA offices.

- The <u>Fifth Floor</u> contains the mechanical plant that serves the entire building, and the rehearsal studio that supports all the performances during development of the work, during lead-up to the openings and warm-up before every performance.  The rehearsal space is also vital to the arts education program as this is where the students come to see the creative process in real time, and meet and talk to the artists.  It is also where the Armory corps of 30 teaching artists develop their workshops for in-school and on-site student visits.

- The <u>Basement</u> includes mechanical spaces, restrooms for the public and the performers and crew, laundry, archival storage, and storage of elements to build every time the seating, staging and video lighting, sound, and other theatrical grids that are fixed in place in conventional theaters.  In the case of the Conservancy, the theatrical environment in the Drill Hall including seating, staging, and theatrical equipment is built to realize each artist's vision.  The location inside of the component parts close at hand is vital to a cost-efficient set-up and load-out every time a new production comes in.

**G.**    **The Greys' Prior Use of the Armory**

60.    Prior to the Lease's execution in 2006, DMNA had permitted the Greys to use space at the Armory for storage and classes without any formal agreement in place.

61.    To prepare for the renovation and restoration of the Armory and its revitalization as a center for performing and visual arts, DMNA sent notices to vacate to all existing users except itself and the women's shelter, who the state decided to retain.  The notices to vacate were also in accordance with the Lease's provision that the Demised Premises must be "free and clear

of any and all tenancies, occupancies, licenses, or any other rights to use and occupy any portion of the Demised Premises."

62.    The DMNA sent a Notice to Vacate and Remove all Property to the Greys on December 15, 2006 (the "Notice to Vacate"), stating, among other things, that: "inasmuch as your organization has no leasehold, occupancy or other agreement of any kind at the Armory, you are hereby given notice to vacate and remove all personal property rightfully belonging to you from the Armory by January 3, 2007."[3]

63.    Notwithstanding the DMNA's Notice to Vacate, and although it had no obligation or pressure to do so because the Conservancy was just starting, had a very small staff and no programming yet, the Conservancy generously allowed the Greys to use certain space in the Armory's unrenovated basement for free on a temporary, year-to-year basis with the clear understanding that as the Conservancy's new multi-disciplinary cultural institution grew, the Conservancy would need use of the entire Demised Premises for its mandate to create a successful new cultural institution.

64.    To ensure the understanding of temporary use was clear, the Conservancy offered the Greys annual self-expiring licenses (the "Licenses") for the space in the Armory's unrenovated basement, which explicitly stated that "[u]pon the expiration or other termination of this [License], Licensee shall immediately quit and surrender the License Space to Licensor (and have no further right to conduct the weekly meetings referred to in Section 1.2 hereof) … and Licensee shall immediately remove all of its property or equipment."

65.    At that time in early 2007, the Conservancy was developing a cultural institution from scratch and planning major construction for the deteriorated Armory. The Conservancy

---

[3] Attached hereto as <u>Exhibit C</u> is a true and correct copy of the letter to the Knickerbocker Greys, dated December 15, 2006, from the State of New York, acting through ESD on behalf of the DMNA.

thus licensed the basement space to the Greys, on an expressly temporary, year-to-year basis with contractual provisions making it clear that upon expiration, they had no further rights, unless the Conservancy offered them another license.  Although the Conservancy was not using that particular space in the basement at that time, there was always an understanding that the Conservancy would eventually need the basement space to fully evolve into the thriving cultural center envisioned by the State and that it is today; thus, the licenses were yearly, self-expiring, and made clear that the use was temporary and at the Conservancy's discretion.

66.    For 12 years, the Greys signed these temporary self-expiring licenses that contained the same key provisions, *i.e.*, a one-year term, free-of-charge, an in which the Greys agreed to "immediately quit and surrender" the space upon the expiration or termination of the License.

**H.    The Greys Refuse to Vacate the Armory**

67.    By the beginning of 2022, the Conservancy was ready to begin construction as part of the capital improvement project to the Armory's first floor and basement.

68.    In March of 2022, the Conservancy provided notice to the Greys that they needed to remove their belongings from the basement so that the Conservancy could begin the capital improvement project that would provide ADA access, create expansion space for the Conservancy's arts education program workshops, increase patron amenities (coat check, more restrooms) and make substantial MEP improvements.

69.    Based on the terms of 12 years of Licenses signed by the Greys, the Conservancy expected a smooth transition.  Rather than graciously cooperate with the Conservancy, however, the Greys refused to vacate and instead asserted, without legal basis, a right of access to the basement space.

70.    In order to avoid a dispute with the Greys, the Conservancy sought to assist them by identifying several alternative spaces, including ones across the street from the Armory used by other youth groups in the neighborhood and available during the time the Greys held their classes.  The Conservancy also identified an active National Guard armory that was further uptown, which the Greys rejected.  Through the local Councilperson, the Conservancy also offered to pay rent for the Grey's storage for one year and offered to allow the Greys to have their biannual "cadet reviews" at the Armory.  The Greys did not respond to the Conservancy's offers and instead refused to leave the Armory, prompting DMNA to intervene.

71.    On November 22, 2022, DMNA's General Counsel sent a letter to the Greys with Governor Hochul on the letterhead, advising unequivocally:

> The lease makes no reference, actual or implied, to support a claim that the Greys have any rights encumbering the lease or that the Conservancy is obligated to provide the Greys with any access to, or space within, the Armory.
>
> …
>
> DMNA's position is definite: The Conservancy's 99-year lease is a valid contract enforceable under New York State law.  That lease creates no obligation to provide access or space to the Greys.[4]

72.    The Greys still refused to leave the Armory.  The Greys' continued refusal to vacate forced the Conservancy to initiate a holdover proceeding in New York Civil Court on January 5, 2023, *see Seventh Regiment Armory Conservancy, Inc. v. The Knickerbocker Greys*, No. LT-300293-23/NY (N.Y. Civil Ct. 2023) (the "Holdover Proceeding"), which remains pending.

---

[4]  Attached hereto as Exhibit D is a true and correct copy of the letter to the Knickerbocker Greys, dated November 22, 2022, from the State of New York, acting through ESD on behalf of the DMNA.

I.    **The Amendments**

73.    In response to the Holdover Proceeding, and because it knew it had no property rights to use the Armory, the Greys convinced the local State Senator to introduce legislation into the State Senate and Assembly that would impair the Conservancy's existing private contract and property rights under the Lease by forcing the Conservancy to set aside a portion of the Demised Premises for the Greys' permanent use.

74.    For entirely "inside-baseball" political reasons, the State Legislature supported the Greys' use of the Demised Premises, notwithstanding that:

- the State had leased the Demised Premises to the Conservancy because the Armory had been neglected for years and none of the users (including the Greys) had done anything about it as it fell apart around them;

- the Conservancy, a group of concerned citizens, came up with a plan and funding to rescue and revitalize the Armory;

- after a public review and approval by the UDC of the General Project Plan in 2005 and Lease in 2006, the Conservancy had more than lived up to its side of the bargain with the State bringing the physical building back to health and creating from scratch a thriving arts institution with acclaimed programming and a large arts education program for under-resourced public school students; and

- the Conservancy has uncontroverted rights to (i) a "free and clear" tenancy under the Lease (Ex. A at § 2.02), (ii) "hold and enjoy the Demised Premises . . . without molestation or disturbance by or from Landlord or any Person claiming through Landlord (*id.*, Article 36), and (iii) not have its "leasehold estate under the Lease . . . be diminished, interfered with, disturbed or terminated" (Ex. B § 2).

75.    Originally introduced by Senator Liz Krueger on May 18, 2023, the Amendments passed the New York Assembly and Senate in June 2024 and were signed into law by the Governor in December 2024.

76.    The original version of the Amendments, as introduced on May 18, 2023, explicitly named the Greys as the beneficiary of the proposed statutory amendments.[5]   The bill defined "Knickerbocker Greys Program Use," mentioned the Greys five times, and granted the Greys the right to access and use no less than 1,200 square feet of space at the Armory for their headquarters.  After that bill did not pass, a new bill was later introduced and replaced the references to the "Knickerbocker Greys" with the term "legacy cadet corps program," which, as described below, can only refer to the Greys.

77.    The Amendments affected two pre-existing laws.  *First*, UDC Act § 39 was amended to permanently revoke the Conservancy's interest in a portion of the Demised Premises that would be transferred to the Greys and exclude the Conservancy from participating in any agreement governing the Greys' use of such space.  The amended language of UDC Act § 39 is underlined below:

> The lease shall demise all portions of the armory other than those reserved for a homeless shelter for women operated by the city of New York pursuant to agreement with the state, those spaces reserved for use by a legacy cadet corps program pursuant to an agreement between the division and the state of New York, and for that reserved for military use by the division.

UDC Act § 39(b).[6]

78.    The amendment to UDC Act § 39 further added that "[t]he portion of the premises allocated to a legacy cadet corps program shall be sufficient and suitable space for the current and uninterrupted operation, provided that it is no less than twelve hundred square feet for their headquarters."

---

[5]  Attached hereto as Exhibit E is a true and correct copy of Senate bill 7212, which was first introduced by Senator Liz Krueger.

[6]  Attached hereto as Exhibit F is a true and correct copy of the amendment to Section 39 of the Urban Development Corporation Act.

79.     *Second*, Military Law § 180-a was amended to include a definition of "legacy cadet corps program," and further guaranteed their occupancy of a portion of the Demised Premises under an agreement from which the Conservancy is excluded, by adding the following text:

> "Legacy cadet corps program" shall mean a cadet corps or organized militia program that has accessed or used a regimental armory located within a city that has a population of over one million people for over one hundred years during periods which are not periods of civil or military emergency.
>
> …
>
> A legacy cadet corps program use shall be governed by a separate agreement between [DMNA] and the state of New York; such separate agreement shall be executed once a cadet corps program is determined to be a legacy cadet corps program.

MIL § 180-a(1)(I), 3(ii)(e).[7]

80.     The Amendment to Military Law § 180-a further provides that "[i]f a cadet corps program qualifies as a legacy cadet corps program, [ESD] shall designate them as such and immediately begin to enter into a separate agreement with such program."  MIL § 180-a3(ii)(f).

81.     Based on the original version of the bill (Ex. E), the Amendments' definition of "legacy cadet corps program" (Ex. G), and the Sponsor's Memorandum in support,[8] the Amendments were undoubtedly enacted for the sole benefit of the Greys.  Military Law § 180-a only applies to the Seventh Regiment Armory, New York City is the only city that has a population of over one million people in the State of New York, and the Greys are the only cadet organization that has used a regimental armory located within a city of one million people for over one hundred years.  No other organization could possibly meet the definition of "legacy

---

[7]  Attached hereto as <u>Exhibit G</u> is a true and correct copy of the amendment to Section 180-a of the New York Military Law.

[8]  Attached hereto as <u>Exhibit H</u> is a true and correct copy of the Sponsor Memorandum introduced by Senator Liz Kreuger.

cadet corps program."  And if there were any doubt that the Amendments were passed specifically for the Greys, the Sponsor's Memorandum states under "Purpose" that "[t]his bill would provide the Knickerbocker Greys permanent space at and use of the Seventh Regiment Armory."  (Ex. H.)

82.    The Sponsor's Memorandum makes abundantly clear that the Amendments were not passed for any valid public purpose, but rather to adjudicate a private dispute by giving the Conservancy's legally demised property via a valid and enforceable lease to the Greys.

83.    The Sponsor's Memorandum evidences the political motivations underlying the Amendments.  Among other things, the Sponsor's Memorandum details the Conservancy's *legal* attempts to evict the Greys; mischaracterizes a portion of the Armory as "their Space" (referring to the Greys); and incorrectly concludes, without any basis, that the Greys enjoy a legal right of possession to a portion of the Armory.

### J.    The Imminently Forthcoming Agreement Between ESD and the Greys

84.    On March 14, 2025, pursuant to the Amendments, the Greys applied to be designated as a "legacy cadet corps program" within the meaning of Military Law § 180-a.

85.    On May 1, 2025, ESD certified that the Greys qualified as a "legacy cadet corps program" under Military Law § 180-a.  (Ex. I.)[9]

86.    The Conservancy has been informed that ESD will imminently enter into an agreement with the Greys that will convey a portion of the Demised Premises subject to ESD's sole discretion (and in any event,  no less than 1,200 square feet) to the Greys for their permanent use.

---

[9]  Attached hereto as Exhibit I is a true and correct copy of a letter, dated May 1, 2025, from Mr. Bloodworth to the Greys confirming that the Greys meet the definition as a Legacy Cadet Corp Program within the meaning of Section 180-A of the New York State Military Law.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION
Violation of the of the U.S. Constitution's Contracts Clause
42 U.S.C. § 1983 and 28 U.S.C. § 2201

87.     The Conservancy repeats and realleges all preceding paragraphs as if fully set forth herein.

88.     At all relevant times, Ms. Knight acts under the color of State law and pursuant to an official policy.

89.     At all relevant times, the Conservancy is a citizen of the United States within the jurisdiction entitled to commence an action pursuant to 42 U.S.C. § 1983.

90.     Article I, Section 10 of the U.S. Constitution provides:  "[n]o State shall . . . pass any . . . Law impairing the Obligations of Contracts" (the "Contracts Clause").  The Contract Clause "limits . . . the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power."  *See Allied Structure Steel Co. v. Spannaus*, 438 U.S. 234, 242 (1978).  As the U.S. Supreme Court recognized, "[c]ontracts enable individuals to order their personal and business affairs according to their particular needs and interests.  Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them."  *Id.* at 245.

91.     Under the Contracts Clause, state agencies are prohibited from enacting legislation that renders contractual obligations invalid, or releases or extinguishes them.

92.     On November 14, 2006, the Conservancy entered into a valid and binding 99-year Lease with ESD, acting on behalf of the State, for the majority of the historic Armory in Manhattan.

93.     The Lease, which was the result of a public bidding process initiated by ESD in 2000, constitutes a contract within the meaning of Article I, § 10.

26

94.     The Lease sets out the obligations of the Conservancy (as Lessee) in Articles 11-13 and 23, which are to restore, rehabilitate and maintain the historic Armory building, saving the State and State taxpayers hundreds of millions of dollars in capital costs, and to operate the Armory as a cultural center for the performing and visual arts with all the associated economic and cultural benefits.

95.     In reliance on the State's contractual commitments, the Conservancy, with its dedicated Board and staff, has raised and invested more than $174 million to date to restore and rehabilitate the Armory and millions of dollars more to establish it as a world-class cultural institution that *The New York Times* has called the "most important new cultural institution in New York."

96.     Pursuant to the Lease, the Conservancy has protected property interests in, among other things:

      a.  The exclusive right to use and occupy the Demised Premises and the fundamental explicit right to exclude third-parties from the Demised Premises;

      b.  The express contractual guarantee that the Demised Premises be delivered and maintained "free and clear of any and all tenancies, occupancies, licenses or any other rights to use and occupy any portion of the Demised Premises other than pursuant to or as provided in this Lease" (Ex. A at Art. I); and

      c.  The covenant of quiet enjoyment, by which "Tenant shall… peaceably and quietly have, hold and enjoy the Demised Premises for the term hereby granted without molestation or disturbance by or from Landlord or any Person claiming through Landlord" (Ex. A at Art. 36).

97.     Additionally, the State (acting through ESD) and the City entered into the Non-Disturbance Agreement with the Conservancy, confirming the Conservancy's right to occupy and operate the Armory without interference.

98.     At the time of the Lease's execution, the Greys (a small private organization with participation of approximately 10-14 cadets) had no leasehold, occupancy, or contractual rights

27

to use the Armory. DMNA expressly confirmed in writing that the Lease created "no obligation to provide access or space to the Greys."

99.     Nevertheless, on December 21, 2024, the State enacted the Amendments requiring ESD (as Landlord) to convey an uncapped amount of the Demised Premises subject to ESD's sole discretion to the Greys for their permanent use, and enter into a separate agreement (excluding the Conservancy) granting the Greys ongoing occupancy rights.

100.     ESD is preparing to immediately enter into such an agreement with the Greys.

101.     ESD's imminently forthcoming agreement with the Greys will substantially impair the Conservancy's existing contractual rights under the Lease by, among other things:

    a.  Undermining the perception of reliability of the Lease between the Conservancy and the State (through ESD), which is the legal foundation of the Conservancy's work and financial investment over the past 18 years;

    b.  Interfering with the Conservancy's ability to expand the arts education program for under-resourced public schools throughout New York City;

    c.  Interfering with the rehearsal spaces for the performing arts, a vital function served by the Armory;

    d.  Obstructing construction plans to create, for the first time in the history of this important State-owned building, an ADA-compliant hands-free grade-level access for audience members, fair visitors, and students in wheelchairs or with mobility impairments;

    e.  Obstructing construction plans currently in place to replace the antiquated MEP systems on the basement and ground floors of the Armory with more modern, safer systems;

    f.  Interfering with the Conservancy's staging of large-scale artistic productions attended by over 130,000 people annually, which provides a significant source of revenue to operate the Armory;

    g.  Forcing the Conservancy to cede a portion of the Demised Premises to a third-party without the Conservancy's consent;

    h.  Violating the Conservancy's right to exclusive possession and quiet enjoyment of the Demised Premises;

      i.    Undermining the Conservancy's investment-backed expectations and fundraising efforts by introducing uncertainty into the stability of its tenancy;

      j.    Disrupting the Conservancy's reasonable expectations under the Lease; and

      k.    Rendering the portion of the Conservancy's Demised Premises that will be occupied by the Greys valueless.

102.    This impairment caused by the Amendments was neither foreseeable nor a risk assumed by the Conservancy when it entered into the Lease in 2006.  Pursuant to MIL § 180-a(3)(c)(i), the Conservancy retained the irrevocable discretion to deny any group access if their use would "interfere with the use by the lessee."  In reliance on this contractual guarantee, the Conservancy has raised and invested over $174 million to make the Armory a safe and usable community space for the public, and millions more to create a thriving cultural institute.  Additionally, the Conservancy has developed the Armory into a major New York cultural institution that provides free access to arts and youth programming to thousands of students from underserved New York City public schools where 80% of the students are below the poverty line.

103.    For nearly two decades, the State affirmed the Conservancy's exclusive rights of the Demised Premises and never imposed comparable legislative interference.  Indeed, in 2022 the DMNA stated in no uncertain terms in a letter to the Greys that, "DMNA's position is definite:  the Conservancy's 99-year lease is a valid contract enforceable under New York State law.  That lease creates no obligation to provide access or space to the Greys."  (Ex. D.)

104.    The Amendments do not serve any legitimate public purpose, but rather were explicitly enacted for the sole benefit of a private party, the Greys, as confirmed by the Sponsor's Memorandum.  (Ex. H.)

105.    The legislative history further confirms the targeted nature of the Amendments.  (Ex. E.)  The original bill text named the Greys directly, and only later substituted the term

"legacy cadet corps program" after the original bill failed to pass in an apparent attempt to obscure the bill's specific beneficiary. Despite this change in nomenclature, the bill's definition of "legacy cadet corps program" is so narrowly tailored that it could only be referring to the Greys, notwithstanding that the Greys actually do not even meet the definition under MIL § 180-a(3)(c)(i). This deliberate drafting highlights the Amendments' limited applicability.

106.    The Amendments are arbitrary and irrational, targeting the Conservancy's contractual rights to confer a private benefit on the Greys without justification and motivated by retaliatory animus against the Conservancy for exercising its legal right to decline to renew the Grey's annually expiring Licenses. The Amendments do not address any broad or generalized social, health, or economic problem.

107.    The State could achieve its stated goal—providing the Greys with meeting space—by alternative means that do not impair the Conservancy's contractual rights, such as the State offering the Greys space in other State-owned active armories or supporting the Greys financially to pay rent in facilities used by other youth groups.

108.    The forced transfer of a portion of the Conservancy's Demised Premises under the Lease to the Greys is grossly disproportionate to any asserted public benefit and directly undermines the very public purpose the State sought to achieve through the Lease where the benefits to the public are substantial.

109.    Enforcing the Amendments, as applied to the Conservancy's Demised Premises under the Lease, will violate the Contracts Clause of the U.S. Constitution because the Conservancy's contractual rights will be substantially impaired without serving any legitimate public purpose, and without adopting reasonable or necessary measures to achieve such a purpose.

110.    As a direct, immediate, and proximate result of Ms. Knight's acts under color of State law, the Conservancy will be irreparably harmed, including by being deprived of its rights under the Contracts Clause.

111.    The substantial impairment of contractual rights by reason of Ms. Knight enforcing the Amendments include but are not limited to:  (i) substantial disruption of the Conservancy's reasonable expectations under the Lease; (ii) substantial interference with the Conservancy's right to exclusive possession and quiet enjoyment of the Demised Premises; and (iii) the loss of its property interest in a portion of the Demised Premises.

112.    A bona fide and actual controversy exists between the Conservancy and Ms. Knight because the Conservancy alleges, and Ms. Knight (in her official capacity) denies, that enforcement of the Amendment will violate the Contracts Clause.

113.    The Conservancy is entitled to a declaratory judgment that Ms. Knight, by virtue of enforcing the Amendment, as applied to the Conservancy's Demised Premises under the Lease, will violate the Conservancy's rights under the Contracts Clause.

114.    The Conservancy is entitled to an injunction enjoining Ms. Knight (in her official capacity exercising all the powers of the ESD) from enforcing or giving effect to the Amendments, as applied to the Conservancy's Demised Premises under the Lease, or otherwise interfering with the Conservancy's contractual rights under the Lease.

115.    Pursuant to 42 U.S.C. § 1988, the Conservancy is entitled to recover its reasonable attorneys' fees and costs incurred in connection with this action.

**WHEREFORE**, the Conservancy prays for relief as set forth below.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Violation of the Fifth Amendment's Takings Clause**
**42 U.S.C. § 1983 and 28 U.S.C. § 2201**

116.    The Conservancy repeats and realleges all preceding paragraphs as if fully set forth herein.

117.    At all relevant times, Ms. Knight acts under the color of State law and pursuant to an official policy.

118.    At all relevant times, the Conservancy is a citizen of the United States within the jurisdiction entitled to commence an action pursuant to 42 U.S.C. § 1983.

119.    The Takings Clause of the Fifth Amendment to the U.S. Constitution prohibits the State, and those acting on behalf of the State (such as Ms. Knight in her official capacity, exercising all the powers of ESD), from taking private property unless the taking is for a public use.

120.    The Takings Clause was made applicable to the States through the Fourteenth Amendment.

121.    Pursuant to the Lease, the Conservancy has a protected property interest in the Demised Premises including, but not limited to:

    a.    The exclusive right to use and occupy the Demised Premises and the fundamental explicit right to exclude third-parties from the Demised Premises;

    b.    The express contractual guarantee that the Demised Premises be delivered and maintained "free and clear of any and all tenancies, occupancies, licenses or any other rights to use and occupy any portion of the Demised Premises other than pursuant to or as provided in this Lease" (Ex. A at Art. I); and

    c.    The covenant of quiet enjoyment by which "Tenant shall… peaceably and quietly have, hold and enjoy the Demised Premises for the term hereby granted without molestation or disturbance by or from Landlord or any Person claiming through Landlord" (Ex. A at Art. 36).

122.     Additionally, the State (acting through ESD) and the City entered into the Non-Disturbance Agreement with the Conservancy, confirming the Conservancy's right to occupy and operate the Armory without interference.

123.     On December 21, 2024, the State enacted the Amendments requiring ESD (as Landlord) to convey an uncapped amount of the Demised Premises subject to ESD's sole discretion to the Greys for their permanent use, and enter into a separate agreement (excluding the Conservancy) granting the Greys ongoing occupancy rights.

124.     ESD is preparing to immediately enter into such an agreement with the Greys.

125.     As a proximate cause of Ms. Knight's acts under color of State law, the Conservancy will be deprived of its property rights under the Takings Clause because the Conservancy will be dispossessed of its property interest for a private use without any justifying public purpose.

126.     Through the Amendments, Ms. Knight will appropriate a right of access to a portion of the Conservancy's property interest in the Demised Premises.

127.     The Amendments do not serve a legitimate public purpose, but rather were explicitly enacted for the sole benefit of a private party, as confirmed by the Sponsor's Memorandum (Ex. H), at the expense of the Conservancy.

128.     The legislative history further confirms the targeted nature of the Amendments. (Ex. E.)  The original bill text named the Greys directly, and only later substituted the term "legacy cadet corps program" after the original bill failed to pass in an apparent attempt to obscure the bill's specific beneficiary.  Despite this change in nomenclature, the bill's definition of "legacy cadet corps program" is so narrowly tailored that it could only be referring to the

Greys, notwithstanding that the Greys actually do not even meet the definition under MIL § 180-a(3)(c)(i). This deliberate drafting highlights the Amendments' limited applicability.

129.     The Amendments target the Conservancy for exercising its right to lawfully not offer the Grey's another License, as it was never a legal obligation in any of the documents between the State and the Conservancy.

130.     A bona fide and actual controversy exists between the Conservancy and Ms. Knight because the Conservancy alleges, and Ms. Knight (in her official capacity) denies, that enforcement of the Amendments will violate the Takings Clause.

131.     The Conservancy is entitled to a declaratory judgment that Ms. Knight, by virtue of enforcement of the Amendments, as applied to the Conservancy's Demised Premises under the Lease, will violate the Conservancy's rights under the Takings Clause.

132.     The Conservancy is entitled to an injunction enjoining Ms. Knight (in her official capacity, exercising all the powers of ESD) from enforcing or giving effect to the Amendments because ESD's imminently forthcoming agreement with the Greys will take away a portion of the Conservancy's property for an entirely private purpose and therefore is unconstitutional.

133.     Pursuant to 42 U.S.C. § 1988, the Conservancy is entitled to recover its reasonable attorneys' fees and costs incurred in connection with this action.

**WHEREFORE**, the Conservancy prays for relief as set forth below.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Violation of Substantive Due Process as Guaranteed by the**
**Fifth Amendment to the U.S. Constitution**
**42 U.S.C. § 1983 and 28 U.S.C. § 2201**

134.     The Conservancy repeats and realleges all preceding paragraphs as if fully set forth herein.

135.    At all relevant times, Ms. Knight acts under the color of State law and pursuant to an official policy.

136.    At all relevant times, the Conservancy is a citizen of the United States within the jurisdiction entitled to commence an action pursuant to 42 U.S.C. § 1983.

137.    The Amendments, as applied to the Conservancy's Demised Premises under the Lease, will affect a government deprivation of property.

138.    Pursuant to the Lease, the Conservancy has a protected property interest in the Demised Premises including, but not limited to:

     a.  The exclusive right to use and occupy the Demised Premises and the fundamental explicit right to exclude third-parties from the Demised Premises;

     b.  The express contractual guarantee that the Demised Premises be delivered and maintained "free and clear of any and all tenancies, occupancies, licenses or any other rights to use and occupy any portion of the Demised Premises other than pursuant to or as provided in this Lease" (Ex. A at Art. I); and

     c.  The covenant of quiet enjoyment by which "Tenant shall… peaceably and quietly have, hold and enjoy the Demised Premises for the term hereby granted without molestation or disturbance by or from Landlord or any Person claiming through Landlord" (Ex. A at Art. 36).

139.    Additionally, the State (acting through ESD) and the City entered into the Non-Disturbance Agreement with the Conservancy, confirming the Conservancy's right to occupy and operate the Armory without interference.

140.    On December 21, 2024, the State enacted the Amendments requiring ESD (as Landlord) to convey an uncapped amount of the Demised Premises subject to ESD's sole discretion to the Greys for their permanent use, and enter into a separate agreement (excluding the Conservancy) granting the Greys ongoing occupancy rights.

141.    ESD is preparing to immediately enter into such an agreement with the Greys.

142.     Enforcement of the Amendments, as applied to the Conservancy's Demised Premises under the Lease, will infringe on the Conservancy's property rights in an arbitrary and irrational manner, fail to serve any legitimate governmental purpose, and were motivated by retaliatory animus against the Conservancy for exercising its legal right to decline to renew the Grey's annually expiring Licenses, as confirmed by the legislative history and the Sponsors' Memorandum.  (Exs. E, H.)

143.     As a proximate cause of Ms. Knight's acts under color of State law, the Conservancy will be deprived of its substantive due process rights under the Fifth Amendment.

144.     A bona fide and actual controversy exists between the Conservancy and Ms. Knight because the Conservancy alleges, and Ms. Knight (in her official capacity) denies, that enforcement of the Amendments will violate the Conservancy's substantive due process rights.

145.     The Conservancy is entitled to a declaratory judgment that Ms. Knight, by virtue of enforcement of the Amendments, as applied to the Conservancy's Demised Premises under the Lease, will violate the Conservancy's substantive due process rights.

146.     The Conservancy is entitled to an injunction enjoining Ms. Knight (in her official capacity, exercising all the powers of ESD) from enforcing or giving effect to the Amendments, as applied to the Conservancy's Demised Premises under the Lease, to prevent the violation of its fundamental constitutional rights.

147.     Pursuant to 42 U.S.C. § 1988, the Conservancy is entitled to recover its reasonable attorneys' fees and costs incurred in connection with this action.

**WHEREFORE**, the Conservancy prays for relief as set forth below.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Violation of the Procedural Due Process as Guaranteed by the**
**Fifth Amendment to the U.S. Constitution**
**42 U.S.C. § 1983 and 28 U.S.C. § 2201**

148.    The Conservancy repeats and realleges all preceding paragraphs as if fully set forth herein.

149.    At all relevant times, Ms. Knight acts under color of State law and pursuant to an official policy.

150.    At all relevant times, the Conservancy is a citizen of the United States within the jurisdiction entitled to commence an action pursuant to 42 U.S.C. § 1983.

151.    The Fourteenth Amendment to the U.S. Constitution prohibits the State, and those acting on behalf of the State (such as Ms. Knight in her official capacity), from depriving any person of property without due process of law, including notice and an opportunity to be heard.

152.    Pursuant to the Lease, the Conservancy has a protected property interest in the Demised Premises including, but not limited to:

    a.    The exclusive right to use and occupy the Demised Premises and the fundamental explicit right to exclude third-parties from the Demised Premises;

    b.    The express contractual guarantee that the Demised Premises be delivered and maintained "free and clear of any and all tenancies, occupancies, licenses or any other rights to use and occupy any portion of the Demised Premises other than pursuant to or as provided in this Lease" (Ex. A at Art. I); and

    c.    The covenant of quiet enjoyment by which "Tenant shall… peaceably and quietly have, hold and enjoy the Demised Premises for the term hereby granted without molestation or disturbance by or from Landlord or any Person claiming through Landlord" (Ex. A at Art. 36).

153.    Additionally, the State (acting through ESD) *and the City* entered into the Non-Disturbance Agreement with the Conservancy, confirming the Conservancy's right to occupy and operate the Armory without interference.

154.     The Amendments constitute an adjudicatory action rather than a general legislative enactment.

155.     The Amendments were not the product of a general policy applicable to all similarly situated entities, but rather were specifically crafted to resolve a private dispute between the Conservancy and the Greys regarding access to the Armory.

156.     The State's decision to enact the Amendments was based on specific facts concerning private parties, including the Conservancy's legal right not to renew the Greys' annually expiring Licenses, and the Greys' lobbying efforts and political influence.

157.     In fact, the Sponsor's Memorandum explicitly states that the State enacted the Amendments to resolve the private dispute between the Conservancy and the Greys:

> Since the COVID pandemic, the Conservancy has [legally] attempted to evict the Knickerbocker Greys from their space at the Armory.
>
> …
>
> This bill would acknowledge and confirm the Knickerbocker Greys' place in the history of New York and the Seventh Regiment Armory by ensuring that the Greys have adequate and permanent space at the Armory to meet and hold their events as long as the Armory stands.  The bill would further protect the Greys by permanently securing their right to maintain their headquarters in the Armory, where the Greys have flourished for over 120 years.

(Ex. H at 3.)

158.     The Amendments, if enforced against the Conservancy's Demised Premises under the Lease, will therefore adjudicate a private dispute in favor of the Greys by requiring the transfer of an uncapped amount of the Demised Premises subject to ESD's sole discretion to the Greys for their permanent use, without providing the Conservancy with proper notice, a hearing, or an opportunity to contest the factual basis or legal justification of the Amendments.

159.    As a result, the Conservancy will be deprived of its property rights through an adjudicatory process disguised as legislation, in violation of its procedural due process rights.

160.    A bona fide and actual controversy exists between the Conservancy and Ms. Knight because the Conservancy alleges, and Ms. Knight (in her official capacity) denies, that enforcement of the Amendments will violate the Conservancy's procedural due process rights.

161.    The Conservancy is entitled to a declaratory judgment that Ms. Knight, by virtue of enforcement of the Amendments, as applied to the Conservancy's Demised Premises under the Lease, will violate the Conservancy's procedural due process rights under the U.S. Constitution.

162.    The Conservancy is entitled to an injunction enjoining Ms. Knight (in her official capacity, exercising all the power of ESD) from enforcing or giving effect to the Amendments, as applied to the Conservancy's Demised Premises under the Lease, to prevent the violation of its fundamental constitutional rights.

163.    Pursuant to 42 U.S.C. § 1988, the Conservancy is entitled to recover its reasonable attorneys' fees and costs incurred in connection with this action.

**WHEREFORE**, the Conservancy prays for relief as set forth below.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, the Conservancy requests that this Court enter judgment in its favor and against Ms. Knight as follows:

    a.  Declaring that the Amendments, as applied to the Conservancy's Demised Premises under the Lease, violate the U.S Constitution and are therefore unconstitutional and unenforceable;

    b.  Preliminary and permanently enjoining Ms. Knight (in her official capacity exercising all the powers of ESD) from enforcing, implementing, maintaining, or giving effect to the Amendments as applied to Demised Premises under the

Lease, including but not limited to (i) conveying or permitting the conveyance of any portion of the Conservancy's Demised Premises to the Greys or any other third party, (ii) interfering with the Conservancy's exclusive possession, quiet enjoyment, or contractual rights under the Lease, and (iii) taking any action that would result in the physical occupation, use, or transfer of the Conservancy's Demised Premises.

c.  To the extent the Amendments have already been given effect through the execution of an agreement compelling the Greys' physical occupation of the Demised Premises, declaring such an agreement void;

d.  Awarding the Conservancy its reasonable attorneys' fees and costs incurred in connection with this action, pursuant to 42 U.S.C. § 1988; and

e.  Awarding any and all other relief to the Conservancy as the Court deems just and proper.


Dated:  New York, New York
        September 5, 2025

Respectfully submitted,

LOEB & LOEB LLP

By: _/s/ Joshua E. Hollander_____

Joshua E. Hollander
Katherine C. Gauthier
Jacob M. Sievers
345 Park Avenue
New York, New York 10154
jhollander@loeb.com
kgauthier@loeb.com
jsievers@loeb.com
(212) 407-4000

*Attorneys for Plaintiff Seventh Regiment Armory Conservancy, Inc.*