# EXHIBIT A

EXECUTION COPY

AGREEMENT OF LEASE

between

THE PEOPLE OF THE STATE OF NEW YORK,

Landlord,

acting through

NEW YORK STATE URBAN DEVELOPMENT CORPORATION, d/b/a
EMPIRE STATE DEVELOPMENT CORPORATION,
as agent,

and

SEVENTH REGIMENT ARMORY CONSERVANCY, INC.

Tenant,

<u>Demised Premises</u>

A Portion of the Seventh Regiment Armory
101-129 East 66th Street, 100-126 East 67th Street,
888-898 Lexington Avenue and 641-649 Park Avenue
New York, New York
Manhattan Block 1401, Lot 1

As of November 14, 2006

## TABLE OF CONTENTS

**Page**

ARTICLE 1    DEFINITIONS ............................................................................2

ARTICLE 2    DEMISED PREMISES AND TERM OF LEASE ................................15

ARTICLE 3    BASE RENT, ADDITIONAL CHARGES ...........................................16

ARTICLE 4    IMPOSITIONS ...........................................................................19

ARTICLE 5    LATE CHARGES ........................................................................21

ARTICLE 6    ORDER OF PREFERENCE.............................................................22

ARTICLE 7    INSURANCE ..............................................................................23

ARTICLE 8    CASUALTY; USE OF INSURANCE PROCEEDS;
             RESTORATION ..........................................................................29

ARTICLE 9    CONDEMNATION.......................................................................32

ARTICLE 10   ASSIGNMENT, SUBLETTING, MORTGAGES, ETC. ......................35

ARTICLE 11   MAJOR CONSTRUCTION WORK.................................................45

ARTICLE 12   REPAIRS; MAINTENANCE OF DEMISED PREMISES AND
             PUBLIC AREAS.........................................................................54

ARTICLE 13   CHANGES, ALTERATIONS AND ADDITIONS ..............................56

ARTICLE 14   REQUIREMENTS OF PUBLIC AUTHORITIES AND OF
             INSURANCE UNDERWRITERS AND POLICIES...........................57

ARTICLE 15   EQUIPMENT .............................................................................58

ARTICLE 16   DISCHARGE OF LIENS; BONDS .................................................59

ARTICLE 17   REPRESENTATIONS; POSSESSION...............................................60

ARTICLE 18   LANDLORD NOT LIABLE FOR INJURY OR DAMAGE,
             ETC............................................................................................60

ARTICLE 19   MUTUAL INDEMNIFICATION ...................................................61

ARTICLE 20   RIGHT OF INSPECTION, ETC. ....................................................64

ARTICLE 21   LANDLORD'S RIGHT TO PERFORM TENANT'S
             COVENANTS .............................................................................64

ARTICLE 22   NET LEASE; NO ABATEMENT OF BASE RENT OR
             ADDITIONAL CHARGES.............................................................65

ARTICLE 23   PERMITTED USE; NO UNLAWFUL OCCUPANCY ......................65

ARTICLE 24   EVENTS OF DEFAULT; CONDITIONAL LIMITATIONS,
             REMEDIES, ETC.........................................................................67

ARTICLE 25   NOTICES ...................................................................................74

Doc #:NY6:491877.32

                                                                                 Page

ARTICLE 26      FINANCIAL AND VENDOR RESPONSIBILITY REPORTS ............75

ARTICLE 27      DMNA OCCUPANCY .........................................................................77

ARTICLE 28      [INTENTIONALLY OMITTED] ..........................................................80

ARTICLE 29      STREET WIDENING ...........................................................................80

ARTICLE 30      SUBORDINATION AND NON-DISTURBANCE.............................80

ARTICLE 31      EXCAVATIONS AND SHORING ......................................................81

ARTICLE 32      CERTIFICATES BY LANDLORD AND TENANT ..........................82

ARTICLE 33      CONSENTS AND APPROVALS........................................................82

ARTICLE 34      SURRENDER AT END OF TERM ....................................................83

ARTICLE 35      WAIVER OF AIR RIGHTS ................................................................84

ARTICLE 36      QUIET ENJOYMENT ........................................................................84

ARTICLE 37      INVALIDITY OF CERTAIN PROVISIONS .....................................84

ARTICLE 38      ENVIRONMENTAL PROVISIONS ..................................................85

ARTICLE 39      RECORDING OF MEMORANDUM; TRANSFER TAXES ..............89

ARTICLE 40      NO DISCRIMINATION .....................................................................90

ARTICLE 41      MISCELLANEOUS ............................................................................91

ARTICLE 42      PUBLIC GOALS.................................................................................96

Doc #:NY6:491877.32

                                                                              Page

EXHIBITS

LAND                                                                          A
ADMINISTRATION BUILDING AND DRILL HALL                                        B
DMNA RETAINED SPACE – CURRENT                                                 C-1
DMNA RETAINED SPACE – FUTURE – AND COMMON AREAS                               C-2
SHELTER RETAINED SPACE – CURRENT                                              C-3
SHELTER RETAINED SPACE – FUTURE                                               C-4
[INTENTIONALLY OMITTED]                                                       D
[INTENTIONALLY OMITTED]                                                       E
TITLE MATTERS                                                                 F
MEMORANDUM OF LEASE                                                           G
NON-DISCRIMINATION AND AFFIRMATIVE ACTION CONSTRUCTION
CONTRACT PROVISIONS                                                           H
MAJOR CAPITAL REPAIR AND REPLACEMENT ITEMS                                    I
[INTENTIONALLY OMITTED]                                                       J
PUBLIC GOALS                                                                  K
MAJOR CONSTRUCTION SCHEDULE                                                   L
MAJOR CONSTRUCTION WORK                                                       M
EXISTING PHYSICAL CONDITIONS ASSESSMENT                                       N-1
ENVIRONMENTAL CONDITIONS DOCUMENT REVIEW                                      N-2
PHASE II ENVIRONMENTAL SITE ASSESSMENT                                        N-3
ADDENDUM REPORT                                                               N-4
VENDOR RESPONSIBILITY QUESTIONNAIRE                                           O

APPENDICES

STANDARD CLAUSES FOR NEW YORK STATE CONTRACTS                                 A

Doc #:NY6:491877.32

AGREEMENT OF LEASE made as of the 14th day of November, 2006 between THE PEOPLE OF THE STATE OF NEW YORK (the "State"), as landlord ("Landlord"), acting by and through its agent, New York State Urban Development Corporation d/b/a Empire State Development Corporation ("ESDC"), which agent is a corporate governmental agency of the State of New York, constituting a public benefit corporation and a political subdivision thereof, having an office at 633 Third Avenue, 36th floor, New York, New York 10017, and SEVENTH REGIMENT ARMORY CONSERVANCY, INC., a New York not-for-profit corporation, having an office at 643 Park Avenue, New York, New York 10021, as tenant ("Tenant").

W I T N E S S E T H:

WHEREAS, The City of New York (the "City") owns in fee simple those certain parcels of land located at 101-129 East 66th Street, 100-126 East 67th Street, 888-898 Lexington Avenue and 641-649 Park Avenue, in the County of New York, State of New York and identified as Block 1401, Lot 1 on the tax map of the City of New York, as more particularly described on Exhibit A attached hereto and made a part hereof (the "Land");

WHEREAS, the City leased the Land to the Field Officers of the Seventh Regiment of the National Guard of the State of New York (the "Officers") pursuant to those certain Ground Leases dated as of September 22, 1874 and April 23, 1879 between the City, as landlord, and the Officers, as tenant (as amended, collectively, the "City Lease");

WHEREAS, under the New York Military Law the Division of Military and Naval Affairs ("DMNA") operates the armory building erected upon the Land (the "Armory"; the Land and the Armory being hereinafter collectively called the "Property") and utilizes the Armory for military use, as well as cultural, artistic and civic functions; and

WHEREAS, the Armory is one of the most important historic landmarks in New York City and contains the country's most intact Aesthetic Movement interior rooms representing the work of Louis Comfort Tiffany, Stanford White, the Herter Brothers and other important designers of the period, as well as being a prominent venue historically used for arts, cultural, social, sports and other events;

WHEREAS, the Armory is in urgent need of repair and restoration;

WHEREAS, the State, acting through ESDC on behalf of DMNA, issued a Request for Proposals ("RFP") in June, 2000 seeking a developer/operator capable of restoring, redeveloping and operating the Armory and Tenant responded with a proposal to restore, preserve and manage the Armory as a not-for-profit arts and cultural center for performing and visual arts and other similar cultural exhibitions; art and antique shows, food services; offices; and other uses incidental or ancillary thereto, in addition to maintaining military use therein ("Project"); and

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM   INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59   Case 1:25-cv-07373-GBD   Document 1-1   Filed 09/05/25   Page 7 of 163   RECEIVED NYSCEF: 05/25/2023

2

WHEREAS, in September, 2001, Landlord designated Tenant as Preferred Developer of the Project in response to the RFP and Tenant's proposal for the Project;

WHEREAS, Tenant will commit private funds to initiate much-needed restoration work of the Armory and to assist Landlord with its goals of restoring and maintaining this important landmark building;

WHEREAS, in order to facilitate the Project, the Governor of the State of New York signed into law Chapter 482 of Laws of 2004, which amended Article 9 of the Military Law of the State of New York to add a new Section 180-A, and amended Section 1 of chapter 174 of the laws of 1968 constituting the New York state urban development corporation act to add a new section 39, each such new section governing the lease and operation of the Seventh Regiment Armory (the "Legislation");

WHEREAS, pursuant to the Legislation, ESDC is acting solely as an agent for the State and shall have no obligation or liability hereunder;

WHEREAS, in order to assist Landlord in achieving Landlord's goals with respect to the Armory and pursue the Public Goals set forth herein, Landlord and Tenant desire to enter into this Lease for the Property;

NOW, THEREFORE, in consideration of the mutual agreements contained in this Agreement, Landlord and Tenant agree as follows:

## ARTICLE 1

## DEFINITIONS

The terms defined in this Article 1 shall, for all purposes of this Lease and all agreements supplemental hereto, have the meanings herein specified.

"Accounting Principles" shall mean generally accepted accounting principles consistently applied (GAAP), as applicable to real estate and property management.

"Additional Charges" shall have the meaning set forth in Section 3.01(e).

"Adjusted for Inflation" shall mean adjusted by the percentage increase, if any, in the Consumer Price Index for an adjustment period commencing on June 1, 2005 and being the most current index available on the date of the particular event or for such other period that may be provided.

"Administration Building" shall mean that portion of the Building other than the Drill Hall consisting of a 5-story building and located in the westerly portion of the Building, as more particularly described on Exhibit B attached hereto and made a part hereof.

"Affiliate" shall mean any Person (hereinafter defined) which, directly or indirectly, controls, is controlled by or is under common control with any other Person. "Control" shall be deemed to mean either (i) ownership of more than fifty percent (50%) of all of the legal or equitable interests in any entity or (ii) the possession of the power, directly or indirectly, to cause the direction of management and policy of a corporation, partnership, trust or other business entity, whether through voting securities, by contract or common directors, officers or trustees or otherwise; provided that another not-for-profit entity shall not be deemed to be an Affiliate of the Seventh Regiment Armory Conservancy, Inc. unless more than fifty percent (50%) of the members of the board of directors of such entity are also officers or directors of Seventh Regiment Armory Conservancy, Inc. or any of the officers, including but not limited to the president, vice president, executive director, director, treasurer or secretary, of such other entity are officers or directors of the Seventh Regiment Armory Conservancy, Inc.

"AIA Form Agreement" shall have the meaning provided in Section 11.03(a).

"Approved Engineer" shall have the meaning provided in Section 8.03(a)(i).

"Architect" shall mean one or more architectural firms selected by Tenant to perform services with respect to the Project, and any successor(s) thereto.

"Base Rent" shall have the meaning provided in Section 3.01(a).

"Breakpoint" shall have the meaning provided in Section 3.01(b)(ii).

"Budget" shall mean the budget of hard costs for any Phase of the Major Construction Work being undertaken, prepared by Tenant and submitted to Landlord pursuant to Section 11.03(a), Section 11.04(a) or Section 11.05(a), and certified by a professional estimator or construction manager selected by Tenant and approved by the Landlord to be complete and sufficient to complete such Phase.

"Building" shall mean the building (including footings and foundations), Equipment, sidewalks, landscaping, utilities, vaults (other than vaults which are maintained by a utility company) and all other improvements and appurtenances of every kind and description now located or hereafter erected, constructed, or placed upon the Land, and any and all alterations and replacements thereof, additions thereto and substitutions therefor.

"Business Days" shall mean any day which is not a Saturday, Sunday or a day observed as a holiday by either the State of New York or the Federal government.

"Casualty" shall have the meaning set forth in Section 8.01.

"City" shall have the meaning set forth in the Recitals.

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 39
RECEIVED NYSCEF: 05/25/2023

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 9 of 163

4

"Capital Improvement" shall have the meaning provided in Section 13.01.

"Certificate of Occupancy" shall mean, if applicable, a temporary or permanent certificate of occupancy issued by the Department of Buildings of New York City pursuant to Section 645 of the New York City Charter or other similar certificate issued by a department or agency of New York City.

"Certified Public Accountant" or "CPA" shall mean any reputable public accounting firm with recognized expertise in real estate at least one of whose principals is licensed as a certified public accountant by the New York State Department of Education.

"City" shall have the meaning provided in the Recitals to this Lease.

"Commencement Date" shall mean the date on which both (i) and (ii) have occurred: (i) all of the New York State Office of the Attorney General, Comptroller of the State of New York and DMNA shall have approved this Lease, as evidenced by the execution by such entities of this Lease, and (ii) either (x) Landlord shall have given written notice to Tenant that the Demised Premises are free and clear of any and all tenancies, occupancies, licenses or any other rights to use and occupy any portion of the Demised Premises other than pursuant to or as provided in this Lease (such non-permitted occupancies, "Non-Permitted Occupancies" and any party claiming a Non-Permitted Occupancy, a "Non-Permitted Occupant"), or (y) Tenant shall have delivered written notice to Landlord accepting possession of the Demised Premises pending Landlord's completion of its obligations under Section 2.02 hereof to remove Non-Permitted Occupancies.

"Commencement of Major Construction" shall mean the date upon which the first Phase of Major Construction Work shall commence.

"Commercial User" shall mean either (i) a Direct User that is neither a not-for-profit entity nor a governmental entity; or (ii) an Intermediary User that is neither a not-for-profit entity nor a governmental entity, but only to the extent any entity which is performing or showing works or otherwise using or benefiting from a performance or show within the Demised Premises through or pursuant to an agreement with such Intermediary User is also neither a not-for-profit entity nor a governmental entity. By way of example, but without limitation, the following types of Intermediary Users shall not be deemed Commercial Users:  (x) a for-profit producer that produces a performance by a not-for-profit performing arts group, (y) a for-profit producer that sponsors a performance (regardless of the nature of the performer) primarily for the benefit of a not-for-profit entity, or (z) a not-for-profit producer that produces a performance or show by an entity which is a for-profit entity.

"Common Areas" shall mean those portions of the Administration Building which, by their location, are legally required or are otherwise necessary and appropriate for pedestrian ingress or egress by Tenant, DMNA and the Shelter and their respective agents, representatives, licensees, employees and invitees to and from the Demised Premises, the DMNA Retained Space and/or the Shelter Retained Space, as

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59 RECEIVED NYSCEF: 05/25/2023

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 10 of 163

5

applicable, and for any other legally required or necessary and appropriate purposes, including, without limitation, the elevator, common stairways, entrance hall, stair halls, common hallways and sidewalks. The Common Areas are more particularly depicted in Exhibit C-2.

"Common Area Operating Expenses" shall mean all costs and expenses paid or incurred by Tenant in operating, cleaning, equipping, protecting, lighting, heating, air conditioning, insuring, repairing and maintaining the Common Areas exclusively and other costs paid or incurred by Tenant reasonably related exclusively to the operation of the Common Areas. "Common Area Operating Expenses" shall include, but not be limited to, those reasonable costs incurred by Tenant in providing the following to the Common Areas: utilities; supplies; janitorial services; compensation and benefits for on-site non-management employees of Tenant to the extent they provide maintenance and repair services to the Common Areas; garbage, snow and ice removal; maintenance and repairs, including those to elevators and any utility, security or lighting system located within the Common Areas; landscaping; painting; lighting; amortization of equipment used in operation and maintenance of the Administration Building; amortization of capital expenditures which as of the date incurred were either required to enable the Common Areas to comply with laws and/or were reasonably intended and expected by Tenant to reduce the Common Area Operating Expenses of the Administration Building; maintenance and repair of sprinkler systems. Notwithstanding anything to the contrary stated in this Lease, Common Area Operating Expenses shall not include any Excluded Costs.

"Completion of Construction Date" shall mean the date upon which the Major Construction Work shall be completed.

"Condemning Authority" shall have the meaning provided in Section 9.04.

"Construction Agreements" shall mean all agreements for the construction, Restoration, Capital Improvement, rehabilitation, alteration, repair or demolition of all or any part of the Demised Premises, including, without limitation, the Major Construction Contract, performed pursuant to this Lease and all modifications thereof and supplements thereto made in accordance with Article 11.

"Construction Documents" shall have the meaning provided in Section 11.05(a).

"Construction Document Submission" shall have the meaning provided in Section 11.05(a).

"Consumer Price Index" shall mean the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the United States Department of Labor, New York, New York - Northeastern New Jersey Area, All Items (1982-1984 = 100), or any successor index thereto, appropriately adjusted.

"Contract Documents" shall have the meaning provided in Section 11.10.

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                                    RECEIVED NYSCEF: 05/25/2023

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 11 of 163

6

"Contractor" shall mean any construction manager, contractor, subcontractor, laborer or materialman who shall supply goods, services, labor or materials in connection with the development, construction, management, maintenance or operation of any part of the Project.

"Default" shall mean any condition or event which constitutes or would, after notice or lapse of time, or both, constitute an Event of Default.

"Deficiency" shall have the meaning provided in Section 24.04(c).

"Demised Premises" shall mean all of Landlord's interest in and to the Property, excluding the DMNA Retained Space and the Shelter Retained Space.

"Depositary" shall mean (x) a savings bank, a savings and loan association or a commercial bank or trust company which would qualify as an Institutional Lender, designated by Tenant and reasonably approved by ESDC, or (y) the Mortgagee, during any period when the Building shall be encumbered by a Mortgage. Such depositary shall serve as Depositary pursuant to this Lease.

"Design Development Documents" shall have the meaning provided in Section 11.04.

"Design Development Submission" shall have the meaning provided in Section 11.04.

"Direct User" shall have the meaning provided in Section 10.04(a).

"Disposition Plan" shall have the meaning provided in Section 2.03.

"DMNA Retained Space" shall mean that space in the Building which is used and occupied from time to time by the DMNA, and is excluded from the Demised Premises. The current configuration of the DMNA Retained Space is depicted in Exhibit C-1. No later than the Completion of Construction Date, DMNA shall relocate into the space depicted in Exhibit C-2, and such space shall thereafter constitute the DMNA Retained Space, unless the DMNA shall at any time determine that it does not want a portion of the space depicted in Exhibit C-2, in which event such portion shall cease to comprise part of the DMNA Retained Space and shall become part of the Demised Premises.

"Drill Hall" shall mean that portion of the Demised Premises originally used as a drill hall located in the easterly portion of the Building, as more particularly described on Exhibit B.

"Due Date" shall mean, (i) with respect to any Taxes or Imposition, the last date on which such Taxes or Imposition can be paid without any fine, penalty, interest or cost being added thereto or imposed by law for the non-payment thereof and

Case 1:25-cv-07373-GBD   Document 1-1   Filed 09/05/25   Page 12 of 163

(ii) with respect to Base Rent, the date on which such payments are required to be made under this Lease without taking into account any grace periods.

"Emergency Repairs" shall have the meaning provided in Section 12.02.

"Emergency Use" shall have the meaning provided in Section 9.04.

"Environment" shall have the meaning provided in Section 38.01.

"Environmental Complaint" shall have the meaning provided Section 38.04.

"Environmental Condition" shall have the meaning provided in Section 38.01.

"Environmental Damages" shall have the meaning provided in Section 38.01.

"Environmental Laws" shall have the meaning provided in Section 38.01.

"Equipment" shall mean all fixtures incorporated in the Demised Premises, including, without limitation, all machinery, boilers, heating and lighting equipment, pumps, tanks, motors, air conditioning compressors, pipes, conduits, fittings, ventilating and communications apparatus, elevators, escalators and garbage compactors, except to the extent any of the foregoing shall be owned by Users, concessionaires or Contractors. "Equipment" shall not include any fixture or utilities owned by any utility company.

"ESDC" shall mean the New York State Urban Development Corporation d/b/a Empire State Development Corporation or any successor thereto.

"Event of Default" shall have the meaning provided in Section 24.01.

"Excluded Costs" shall mean (i) Base Rent and Additional Charges, (ii) any capital improvement and any cost or expense that would be treated as a capital expenditure under GAAP; provided, that any such capital expenditure which as of the date incurred were either required to enable the Common Areas to comply with laws and/or were reasonably intended and expected by Tenant to reduce the Common Area Operating Expense of the Administration Building shall be amortized on a straight-line basis over the useful life of such capital item, and the amortized amount shall be included on an annual basis in Common Area Operating Expenses, (iii) depreciation and amortization (except as specifically provided above in the definition of "Common Area Operating Expenses", (iii) interest on, amortization of, and other costs incurred by Tenant in connection with any financings for purposes other than to finance expenditures on items which are includible in Common Area Operating Expenses, (iv) advertising and promotional expenditures, (v) leasing or brokerage commissions, or fees, attorneys' fees, appraisal fees or accountants' fees, (vi) legal or accounting fees in connection with tax

returns, tax reporting or accounting of Tenant; provided, however, that Tenant shall be permitted to include in Common Area Operating Expenses (x) amounts paid to outside accountants to perform any review of Tenant's books and records in connection with the preparation of a Common Area Operating Expense statement, and (y) the costs of negotiating and preparing agreements that relate directly to and facilitate the repair, maintenance, cleaning, operation and/or security of the Common Areas, (vii) any costs incurred for the purpose of effecting an assignment of this Lease or subletting of all or a portion of the Demised Premises permitted under Article 10, whether or not any such transaction is consummated, (viii) payments of any amounts to any person (including DMNA and/or the Shelter) seeking recovery for breaches of contract, negligence or other torts committed by Tenant, including any associated attorneys' fees and disbursements, (ix) costs of Tenant's charitable and political contributions, (x) damages and attorneys' fees and disbursements and any other costs in connection with any proceeding, judgment, settlement or arbitration award resulting from any liability of Tenant and fines or penalties against Tenant, (xi) Tenant's overhead and administrative costs, (xii) costs incurred by reason of any fire or other casualty, and (xiii) costs of Tenant's compliance with its obligations under Section 38.03 hereof.

"Existing Environmental Condition" shall have the meaning provided in Section 38.01.

"Expiration Date" shall mean the Scheduled Expiration Date or such earlier date upon which this Lease may be terminated as provided herein.

"Full Operation Date" shall mean the earlier of (i) the eleventh (11th) anniversary of the Commencement Date and (ii) the first date on which all of the following shall have occurred (x) the Demised Premises shall have been open for business to the general public following the Substantial Completion of all Phases of the Major Construction Work and (y) at least eighty percent (80%) of the gross leasable area of the Demised Premises, including without limitation the Drill Hall and first and second floors of the Administration Building, shall be open for business and leased to Users pursuant to their respective User Agreements, and such User Agreements shall be in effect.

"Governmental Authority (Authorities)" shall mean the United States of America, the State of New York, The City of New York and any agency, department, corporation, commission, board, bureau, instrumentality or political subdivision of any of the foregoing, now existing or hereafter created, having or exercising jurisdiction over the Demised Premises or any portion thereof including, without limitation, jurisdiction over the administration or enforcement of any Environmental Law, to the extent that such entity is acting in its capacity as a governmental authority rather than in its capacity as Landlord or a principal in Landlord.

"Gross Revenues from Commercial Operations" shall have the meaning provided in Section 3.01(b)(i).

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 39                                                                    RECEIVED NYSCEF: 05/25/2023
Case 1:25-cv-07373-GBD   Document 1-1   Filed 09/05/25   Page 14 of 163

9

"Imposition" or "Impositions" shall have the meaning provided in Section 4.01.

"Improvement Approvals" shall have the meaning provided in Section 13.01(a).

"Indemnitees" shall mean any Landlord Indemnitees and/or Tenant Indemnitees.

"Institutional Lender" shall mean a savings bank, a savings and loan association, a commercial bank or trust company (whether acting individually or in a fiduciary capacity), an insurance company, a real estate investment trust, a religious, educational or eleemosynary institution, a governmental agency, body or entity, an employee, benefit, pension or retirement plan or fund, a commercial credit corporation, an investment bank, a commercial bank or trust company acting as trustee for bondholders in a public or private placement of bonds, securities or other debt instrument, or as fiduciary for pension funds or tax-exempt funds, or a corporation or other entity which is owned wholly by any other Institutional Lender, or any combination of the foregoing; provided, that such entity shall (i) have an office for the conduct of business in New York City, (ii) be organized and existing under the laws of the United States or any state thereof, (iii) shall not be a Prohibited Party and (iv) except for a governmental agency, body, or entity, or a religious, educational or eleemosynary institution, shall have consolidated assets of not less than Ten Billion Dollars ($10,000,000,000). Such government agency, body or entity, or religious, educational or eleemosynary institution, shall have consolidated assets of not less than two hundred million ($200,000,000.00) dollars.

"Intermediary User" shall have the meaning provided in Section 10.04(a).

"Involuntary Rate" shall mean the Prime Rate plus four percent (4%) per annum but, in no event, in excess of the maximum applicable permissible interest rate then in effect in the State of New York.

"Land" shall mean the parcel of land described in Exhibit A and all easements and other rights pertaining thereto, whether presently existing or hereafter created.

"Landlord" shall mean The People of the State of New York, acting by and through ESDC solely as agent, subject to Section 41.13.

"Landlord-Funded Remediation Work" shall have the meaning provided in Section 38.02(b).

"Landlord Indemnitees" shall have the meaning provided in Section 19.01.

"Landlord Personalty" shall have the meaning set forth in Section 2.03.

"Landlord's Mortgage" shall have the meaning provided in Section 30.02.

"Lease" shall mean this Agreement of Lease including all Exhibits hereto and all amendments, modifications and supplements hereof.

"Lease Year" shall mean a calendar year, all or any portion of which falls within the Term. Any Lease Year only a portion of which falls within the Term shall be a partial Lease Year.

"Major Construction Schedule" shall mean the schedule for the Major Construction Work set forth on Exhibit L attached hereto and made a part hereof, prepared by Tenant and approved by Landlord (provided that Tenant may amend or modify such major Construction Schedule from time to time subject to Landlord's consent, not to be unreasonably withheld, conditioned or delayed), including milestones for the progress of construction and, if applicable, phasing of the Major Construction Work over two or more sequential Phases, and all modifications thereof and supplements thereto.

"Major Construction Work" shall mean the construction work to be performed by Tenant pursuant to this Lease for the restoration and/or renovation of the Building, and shall include without limitation the restoration, renovation and/or replacement of all items set forth in Exhibit I, and of the interiors of the Demised Premises other than those interiors on the Third and Fifth Floors of the Administration Building. Major Construction Work is set forth in more detail in Exhibit M attached hereto and made a part hereof, prepared by Tenant and approved by Landlord (provided that Tenant may amend or modify such description from time to time subject to Landlord's consent, not to be unreasonably withheld, conditioned or delayed.)

"Mortgage" shall mean any mortgage which constitutes a lien on Tenant's interest in this Lease and the leasehold estate created hereby.

"Mortgagee" shall mean the holder of any Mortgage that is (a) an Institutional Lender or (b) Tenant, but only in connection with a permitted assignment by Tenant of Tenant's interest in this Lease; provided that, at the time in question, such Person is not an Affiliate of Tenant.

"Non-Disturbance Agreement" shall have the meaning provided in Section 30.03.

"OPRHP" shall mean the New York State Office of Parks, Recreation and Historic Preservation, or any successor agency thereto which regulates the historic preservation of State-owned properties.

"Permits" shall mean all authorizations, consents, decrees, permits, waivers, privileges, approvals from and filings with all applicable Governmental Authorities necessary for the realization of the transactions contemplated herein.

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59
Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 16 of 163    RECEIVED NYSCEF: 05/25/2023

11

"Permitted Uses" shall have the meaning provided in Section 23.01(a).

"Person" shall mean and include an individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any Federal, State, County or municipal government, bureau, department or agency thereof, and any other entity.

"Phase" shall have the meaning provided in Section 11.01.

"Primary Use" shall have the meaning provided in Section 23.01(a).

"Prime Rate" shall mean the rate announced from time to time by Citigroup, Inc. or any successor thereto at its principal office as its "base rate." If Citigroup, Inc. no longer announces a "base rate," the Prime Rate shall mean a comparable rate announced from time to time by a comparable institution selected in writing by Landlord.

"Prohibited Party" shall mean the following: (i) any person (a) that is in default or in breach, beyond any applicable grace period, of its obligations under any written agreement with ESDC, the State or the City or (b) that, directly or indirectly controls, is controlled by, or is under common control with a Person that is in default or in breach, beyond any applicable grace period, of its obligations under any written agreement with ESDC, the State or the City, unless such default or breach has been cured by such Person or waived in writing by ESDC, the State or the City, as the case may be; (ii) any person (a) that has been convicted in a criminal proceeding for a felony or any crime involving moral turpitude or that is an organized crime figure or is reputed (as determined by Landlord in its sole discretion) to have substantial business or other affiliations with an organized crime figure, or (b) that, directly or indirectly, controls, is controlled by, or is under common control with a Person (or is reputed to be an affiliate thereof) that has been convicted in a criminal proceeding for a felony or any crime involving moral turpitude or that is an organized crime figure or is reputed to have substantial business or other affiliations with an organized crime figure; (iii) any government, or any Person which is directly or indirectly controlled by a government, which is finally determined, beyond right to appeal, by the Federal Government or any agency, branch or department thereof to be in violation of (including, but not limited to, any participant in an international boycott in violation of) the Export Administration Act of 1979, as amended, or any successor statute, or the regulations issued pursuant thereto, or any government which is, or any Person which, directly or indirectly, is controlled (rather than only regulated) by a government which is, subject to the regulations or controls thereof (which control shall not be deemed to exist in the absence of a determination to that effect by a Federal court or by the Federal Government or any agency, branch or department thereof); (iv) any government, or any Person which, directly or indirectly, is controlled (rather than only regulated) by a government, the effects of the activities of which are regulated or controlled pursuant to regulations of the United States Treasury Department or executive orders of the President of the United States of America issued pursuant to the Trading with the Enemy Act of 1917, as amended; and (v) any Person acting or reputed to be acting, directly or indirectly, on

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                                    RECEIVED NYSCEF: 05/25/2023

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 17 of 163

12

behalf of terrorists or terrorist organizations, including those persons or entities that are included on any relevant lists maintained by the United Nations, North Atlantic Treaty Organization, Organization for Economic Cooperation and Development, Financial Action Task Force, U.S. Office of Foreign Assets Control, U.S. Securities and Exchange Commission, U.S. Federal Bureau of Investigation, U.S. Central Intelligence Agency, and the U.S. Internal Revenue Service, all as may be amended from time to time.

"Project" shall have the meaning provided in the Recitals.

"Property" shall have the meaning provided in the Recitals.

"Public Goals" shall mean the goals described in Section 42.01 and set forth in Exhibit K.

"Repairs" shall have the meaning provided in Section 12.01.

"Requirements" shall have the meaning provided in Section 14.01.

"Restoration" shall have the meaning provided in Section 8.02.

"Restoration Funds" shall have the meaning provided in Section 8.03(a).

"Restore" shall have the meaning provided in Section 8.02.

"Scheduled Expiration Date" shall mean the day preceding the 99th anniversary of the Commencement Date.

"Schematic Design Documents" shall have the meaning provided in Section 11.03(a).

"Schematic Design Submission" shall have the meaning provided in Section 11.03(a).

"Shelter" shall mean the women's shelter currently operated under license from the City and currently located on the portions of the third and fifth floors of the Administration Building.

"Shelter Retained Space" shall mean that space in the Building which is used and occupied by the Shelter pursuant to that certain License Agreement to be executed immediately prior to the date hereof by and among Tenant, the State and the City, acting by and through the Department of Homeless Services, and is excluded from the Demised Premises. The current configuration of the Shelter Retained Space is depicted in Exhibit C-3. No later than the Completion of Construction Date, the Shelter shall relocate into the space depicted in Exhibit C-4, and such space shall thereafter constitute the Shelter Retained Space, provided that any Shelter Retained Space which is permanently vacated (other than a vacation due to temporary repairs, casualty or a taking by any lawful power or authority for an Emergency Use) shall, immediately upon such vacating in broom-clean condition, with all personal property removed and with no

remaining subtenancies or occupancies, automatically and without further writing be deemed added to the Demised Premises upon all of the terms and conditions of this Lease.

"Significant Sub-occupant" shall mean any subtenant, Tenant's licensee, Tenant's assignee or User, including but not limited to Direct Users or Intermediary Users, with which Tenant, pursuant to Article 10, enters into a sublease, license, assignment of Lease or User Agreement for a term of more than nineteen (19) consecutive or non-consecutive weeks in any year.

"Subject to Appropriation" shall mean, with respect to Landlord's obligations hereunder, subject to (i) the enactment into law of an appropriation for the applicable budget year of an appropriation sufficient to cover such obligations, and (ii) such appropriated funds actually being made available to Landlord.

"Substantial Completion of the Major Construction Work" shall be deemed to have occurred upon (i) completion of all Phases of the Major Construction Work, other than minor details of construction and mechanical adjustment which do not materially interfere with the use and operation of the Demised Premises for the Permitted Uses, and (ii) a temporary or permanent certificate of occupancy has been issued for the use and occupancy of the first and second floors of the Administration Building and the Drill Hall.

"Substantial Completion of a Phase of the Major Construction Work" shall be deemed to have occurred upon (i) completion of a particular Phase of the Major Construction Work, other than minor details of construction and mechanical adjustment which do not materially interfere with the use and operation of the Demised Premises for the Permitted Uses, and (ii) all construction sign-offs, use permits, occupancy permits, including, if applicable, an amended temporary or permanent certificate of occupancy, have been issued for the use and occupancy of the applicable Phase and the portion of the Demised Premises affected thereby.

"Substantial Portion of the Demised Premises" shall have the meaning provided in Section 9.01(b).

"Superior Lease" shall have the meaning provided in Section 30.02, and shall mean and include the City Lease.

"Superior Lessor" shall have the meaning provided in Section 30.02, and shall mean and include the City, as lessor under the City Lease.

"Taxes" shall have the meaning provided in Section 3.05(a).

"Tenant" shall mean Seventh Regiment Armory Conservancy, Inc. or any successor to its interest permitted in accordance with the terms of this Lease.

"Tenant Indemnitees" shall have the meaning provided in Section 19.02.

"Tenant's Insurance" shall have the meaning provided in Section 7.01(a).

"Tenant's Net Income or Net Loss" means the net excess (or deficiency) of revenues and public support over expenses for a Fiscal Year.

"Tenant's Property Insurance" shall have the meaning provided in Section 7.01(a)(vi).

"Term" shall mean the term of this Lease as set forth in Article 2.

"Threatened Release" shall have the meaning provided in Section 38.01.

"Title Matters" shall mean those matters affecting title to the Land and/or the Demised Premises set forth in Exhibit F hereto.

"Unavoidable Delays" shall mean delays incurred due to (a) strikes, lockouts and work stoppages due to labor jurisdictional disputes, acts of God, inability to obtain labor or materials due to governmental restrictions, military action, enemy action, civil commotion, fire, casualty or other similar causes beyond the control of Landlord or Tenant, as the case may be, but excluding any strikes or lockouts that are specific to Tenant or the Building, (b) acts of any Non-Permitted Occupants, (c) the occupancy of all or a portion of the Demised Premises for Emergency Use, (d) impacts on construction logistics or scheduling due to the occupancy of the Shelter Retained Space, including the residential usage of such space, pursuant to the Shelter Agreement (such as a delay in construction caused by the inability to shut off utilities servicing the Shelter Space), provided that Tenant may not claim Unavoidable Delay on account of this clause (d) for more than 60 days in the aggregate during the Term), (e) the failure of any utility company to provide and maintain utilities, services, water and sewer lines and power transmission lines which are required for the rehabilitation or occupancy of the Building or for other obligations of Landlord or Tenant, as the case may be, (f) any unforeseen condition which shall prevent or require a redesign or change in the construction of the Major Construction Work, (g) the failure of any Governmental Authority, except Landlord acting in its capacity as Landlord under this Lease, or any agent, employee, or representative thereof, to grant any approval or to furnish any information which is required to commence the Major Construction Work prior to the dates contemplated herein or (h) the failure of Landlord to comply timely with its obligations under this Lease with respect to Major Construction Work; provided that in all instances, Tenant shall promptly notify Landlord of the occurrence of any Unavoidable Delay and shall use commercially reasonable efforts to mitigate the effects of Unavoidable Delays on the progress of the Project.

"User" shall mean any permitted user under a User Agreement.

"User Agreement" shall mean any sublease, license agreement, or other written agreement entered into by Tenant in accordance with the provisions of Section 10.04 allowing any permitted party other than Tenant to use or occupy all or any portion of the Demised Premises for a Permitted Use.

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59          Case 1:25-cv-07373-GBD   Document 1-1   Filed 09/05/25   Page 20 of 163   RECEIVED NYSCEF: 05/25/2023

15

"User Pledge" shall mean a pledge by User to Tenant to contribute towards Major Construction Work or otherwise commit to invest in improvements to the Demised Premises an amount of not less than $1,000,000 (Adjusted for Inflation on each twenty-year anniversary of the Commencement Date); provided that (i) such contributions or investments are in cash or cash equivalents and not "in-kind", (ii) such contributions are used for Major Construction Work, reimbursement of Landlord for Capital Replacements, Capital Improvements or operations of the Demised Premises, and (iii) such pledge shall include a requirement to be funded, and shall in fact be funded, within five (5) years from the date of such pledge.

"Work Contract" shall have the meaning set forth in Section 7.01(a)(viii)(D)1).

"Zoning Resolution" shall mean the Zoning Resolution of the City of New York, or any successor statute or regulation in effect at the time in question.

## ARTICLE 2

## DEMISED PREMISES AND TERM OF LEASE

Section 2.01    Demise. Landlord hereby demises and leases to Tenant, and Tenant hereby hires and takes from Landlord the Demised Premises, subject to the Title Matters, TO HAVE AND TO HOLD unto Tenant, its permitted successors and assigns, for a term (the "Term") which shall commence on the Commencement Date and shall expire on the Expiration Date.

Section 2.02    Non-Permitted Occupancies. Landlord shall undertake all actions reasonably necessary prior to the Commencement Date to remove from the Demised Premises all actual or claimed occupancies of or within the Demised Premises other than as created pursuant to this Lease, and shall deliver the Demised Premises to Tenant on the Commencement Date free and clear of any and all tenancies, occupancies, licenses, or any other rights to use and occupy any portion of the Demised Premises other than as created pursuant to this Lease.

Section 2.03    Landlord Personalty. Tenant shall work diligently with DMNA to develop within six (6) months of the Commencement Date a master plan (the "Disposition Plan") for the method and timing of the disposition of all personal property of Landlord remaining on the Demised Premises as of the Commencement Date (such personal property, other than any personal property which is incorporated in, attached or affixed to walls, ceilings, floors or other parts of the Demised Premises, the "Landlord Personalty"). The Disposition Plan shall designate those items of Landlord Personalty to remain on the Demised Premises and those items to be removed from the Demised Premises, and shall comply with applicable Requirements. DMNA shall implement the Disposition Plan in a manner so as not unreasonably to interfere with Tenant's use and enjoyment of the Demised Premises, and Tenant shall reasonably cooperate with DMNA in the implementation of the Disposition Plan. Landlord shall promptly repair or restore any damage to the Demised Premises caused by the

implementation of the Disposition Plan. Tenant shall utilize reasonable efforts to safeguard any Landlord Personalty remaining on the Demised Premises following the implementation of the Disposition Plan. Except for damages arising from Tenant's willful acts or negligence, Tenant shall have no liability arising from the loss, damage or destruction of any such Landlord Personalty. At the end of the Term, Tenant shall leave within the Demised Premises any Landlord Personalty then located on the Demised Premises.

## ARTICLE 3

## BASE RENT, ADDITIONAL CHARGES

Section 3.01    Base Rent and Additional Charges.

(a)    Tenant shall pay to Landlord, in currency which, at the time of payment, is legal tender for public and private debts in the United States of America, without notice or demand, "<u>Base Rent</u>", which shall be payable on the seventh (7th) anniversary of the Full Operation Date and on each anniversary thereafter, and which shall be an amount equal to 20% of Gross Revenues from Commercial Operations from the Armory, its renovation or site in excess of Breakpoint for the immediately preceding Lease Year.

(b)    <u>Definitions</u>. As used herein, the following terms have the following definitions:

(i)    "<u>Gross Revenues from Commercial Operations</u>" shall mean all revenues of whatever kind or nature, including without limitation base rent and percentage rent, received by Tenant from Commercial Users under User Agreements in connection with their use of the Demised Premises or any portion thereof. Notwithstanding the foregoing, Gross Revenues from Commercial Operations shall exclude (i) security deposits received from Commercial Users (except to the extent applied toward the payment of rent or other charges due under related User Agreements), and (ii) pass-through charges and reimbursements, including reasonable and customary overhead, mark-up and/or sales or excise taxes thereon, received by Tenant on account of operating expenses charged to a Commercial User, or for provision of goods or services by Tenant or its agents to a Commercial User in connection with its use of the Demised Premises, whether such goods or services are made available directly to Commercial Users and/or directly by Tenant to patrons, invitees or members of the general public in connection with the use of the Demised Premises by a Commercial User (including, by way of example but without limitation, security, labor, utilities and other services provided to a Commercial User by Tenant or by a service provider with whom Tenant has contracted, or catering or concessions provided to patrons, invitees or members of the general public in connection with the use of the Demised Premises by a Commercial User by Tenant or by a service provider with whom Tenant or the Commercial User has contracted).

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                                    RECEIVED NYSCEF: 05/25/2023

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 22 of 163

17

      (ii)    "Breakpoint" shall mean $9,000,000.00, as Adjusted for Inflation through the end of the Lease Year with respect to which the calculation of Base Rent is made.

      (c)    Tenant shall deliver to Landlord within one hundred fifty (150) days after the close of each Lease Year, a statement of Gross Revenues from Commercial Operations for the preceding Lease Year which shall conform to and be in accordance with Accounting Principles and this Section 3.01. The annual statement shall be accompanied by the signed certificate of an independent Certified Public Accountant stating specifically that (i) they have examined the report of Gross Revenues from Commercial Operations for the preceding Lease Year, (ii) their examination included such tests of Tenant's books and records as they considered necessary or appropriate under the circumstances, (iii) such report presents fairly the Gross Revenues from Commercial Operations of the preceding Lease Year, and (iv) the said Gross Revenues from Commercial Operations conform with and are computed in compliance with the definition of Gross Revenues from Commercial Operations contained in this Section 3.01. Tenant shall pay the Base Rent due simultaneously with the submission to Landlord of its annual statement of Gross Revenues from Commercial Operations. At any time or from time to time upon not less than ten (10) days notice to Tenant, Landlord or its agents or accountants shall have the right to examine such books and records, including without limitation all records required by this Section 3.01, as may be necessary to certify the amount of Tenant's Gross Revenues from Commercial Operations for such Lease Year and Tenant shall make all such books and records available for examination and copying in the Borough of Manhattan.

      (d)    For the purpose of permitting verification by Landlord of any amounts due as Base Rent, Tenant will preserve for at least six (6) years, and during the Term shall keep at the Demised Premises, a general ledger, copies of User Agreements with for-profit, commercial Users, records and other supporting documentation, together with original or duplicate books and records, which shall disclose all information required to determine Tenant's Gross Revenues from Commercial Operations and which shall conform to and be in accordance with Accounting Principles. At any time or from time to time after reasonable advance notice to Tenant, Landlord or its agents and accountants shall have the right during business hours to make any examination or audit of such books and records which Landlord may desire. If such audit shall disclose a liability in any Lease Year for Base Rent in excess of the Base Rent theretofore paid by Tenant for such period, Tenant shall promptly pay such liability. Should any such liability for Base Rent equal or exceed five percent (5%) of Base Rent previously paid for such Lease Year, Tenant shall promptly pay the cost of audit and interest at the Involuntary Rate on all additional Base Rent then payable, from the date such additional Base Rent was due and payable.

      (e)    "Additional Charges" shall consist of all other sums of money as shall become due and payable from Tenant to Landlord hereunder, and shall be paid on or before the respective due dates of such sums.

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 23 of 163

Section 3.02    Proration of Rent Payments. Rent of whatever kind that is due for any partial month, year or other applicable period shall be appropriately prorated.

Section 3.03    Net Lease. It is the purpose and intention of Landlord and Tenant, and the parties hereto agree that, except as expressly set forth herein, Base Rent and Additional Charges shall be net to Landlord without abatement, deduction, counterclaim, set-off or offset.

Section 3.04    Rental. All of the amounts payable by Tenant pursuant to this Lease, including, without limitation, Base Rent and Additional Charges, Impositions and all other sums, costs, expenses or deposits which Tenant in any of the provisions of this Lease assumes or agrees to pay and/or deposit (such amounts, "Rental") shall constitute rent under this Lease and, in the event of Tenant's failure to pay Rental after the expiration of any applicable notice and cure periods, Landlord shall have all of the rights and remedies provided for herein or under applicable law in the case of non-payment of rent. All Rental shall be payable at Landlord's address first above set forth or as Landlord may from time to time direct.

Section 3.05    Taxes.

(a)    For the purposes of this Lease, the following terms shall have the following meanings:

"Tax Year" shall mean each tax fiscal year of New York City (such fiscal year being July 1 through June 30 on the date of this Lease).

"Taxes" shall mean the real property taxes assessed and levied against the Demised Premises or any part thereof pursuant to the provisions of Chapter 58 of the Charter of the City of New York and Chapter 17, Title E, of the Administrative Code of the City of New York, as the same may now or hereafter be amended, or any statute or ordinance in addition thereto or in lieu thereof in whole or in part and which would otherwise be payable if the Demised Premises or any part thereof or the owner thereof were not exempt therefrom; subject, in any event, to any abatement of, or deferral or exemption from, Taxes that would be available to the Demised Premises if the Demised Premises were owned by an entity that is not exempt from the payment of Taxes.

(b)    Landlord represents and warrants that as of the date hereof the Demised Premises are fully exempt from Taxes arising from Landlord's ownership and/or long-term lease thereof.

Section 3.06    Method for Payment of Rent. All payments of Base Rent and Additional Charges shall be paid to Landlord in lawful money of the United States by good and sufficient check (subject to collection) drawn on a bank organized and existing under the laws of the United States or any state thereof with a banking office in New York City, and delivered to Landlord at its office, or such other place as Landlord shall designate by notice to Tenant.

Section 3.07     Proration for Partial Month. If the Commencement Date occurs on a day other than the first day of a calendar year or the Expiration Date occurs on a day other than the last day of a calendar year, Base Rent and Additional Charges for such month shall be pro-rated on a per diem basis, computed on the basis of a 365-day year.

Section 3.08     Partial Payment. No payment by Tenant or receipt or acceptance by Landlord of a lesser amount than the correct Base Rent and Additional Charges shall be deemed to be other than a payment on account, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance or pursue any other remedy provided in this Lease or at law or in equity.

Section 3.09     Rent Restrictions. If any Base Rent and Additional Charges payable under the terms and provisions of this Lease shall be or become uncollectible, reduced or required to be refunded because of any act or law enacted by a Governmental Authority, Tenant shall enter into such agreement(s) and take such other steps and Additional Charges as Landlord may reasonably request and as may be legally permissible to permit Landlord to collect the maximum amounts which from time to time during the continuance of such legal rent restriction may be legally permissible (provided that such amounts are not in excess of the amounts reserved therefor under this Lease). Upon the termination of such legal rent restriction, (i) Base Rent and Additional Charges shall become and thereafter be payable in accordance with the amounts reserved herein for the periods following such termination and (ii) Tenant shall pay Landlord, to the maximum extent legally permissible, an amount equal to the Base Rent and Additional Charges that would have been paid pursuant to this Lease but for such legal rent restriction less the Base Rent and Additional Charges actually paid by Tenant during the period such legal rent restriction was in effect.

## ARTICLE 4

## IMPOSITIONS

Section 4.01     Impositions. Except as otherwise expressly provided in this Lease, or unless Tenant shall be exempt therefrom either on account of Tenant's not-for-profit status or Landlord's exempt status, Tenant shall pay, as hereinafter provided, all of the following items (collectively, "Impositions") imposed by any Governmental Authority: (a) real property assessments and business improvement district charges (not including Taxes), (b) occupancy and rent taxes, (c) water, water meter and sewer rents, rates and charges, (d) license and permit fees, (e) other municipal liens, charges and assessments, (f) fines, penalties and other similar or like governmental charges applicable to the foregoing and any interest or costs with respect thereto and (g) except for Taxes, any and all other governmental levies, fees, rents, assessments or taxes and charges, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever, and any interest or costs with respect thereto, which at any time during the Term are (A) assessed, levied,

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 39                                                    RECEIVED NYSCEF: 05/25/2023

20

Case 1:25-cv-07373-GBD   Document 1-1   Filed 09/05/25   Page 25 of 163

confirmed, imposed upon or in respect of the Demised Premises or the use and occupancy thereof by Tenant and (B) encumbrances or liens on (i) the Demised Premises or any appurtenances of the Demised Premises, (ii) any personal property of Tenant or (iii) the Base Rent and Additional Charges (or any portion thereof) payable by Tenant hereunder. Impositions shall not, however, include any property tax, sales tax, income tax, water or sewer charges, other municipal service charges, or other tax or municipal charge from which Landlord is exempt from the payment thereof, it being agreed that Tenant shall, to the extent legally possible, enjoy the benefit of all of the exemptions to which Landlord is entitled in respect of the Demised Premises by virtue of Landlord's ownership or lease thereof. Each such Imposition, or installment thereof, during the Term shall be paid on or prior to the Due Date therefor. However, if, by law, any Imposition may at the option of the taxpayer be paid in installments (whether or not interest shall accrue on the unpaid balance of such Imposition), Tenant, after notice to Landlord, may exercise the option to pay the same in such installments and shall be responsible for the payment of such installments only, together with applicable interest, if any, provided that all such installment payments together with applicable interest, if any, relating to periods prior to the Expiration Date shall be made prior to the Expiration Date.

Section 4.02     Receipts. Tenant, from time to time upon request of Landlord, shall promptly furnish to Landlord official receipts of the appropriate imposing authority, or other evidence reasonably satisfactory to Landlord, evidencing the payment thereof.

Section 4.03     Proration for Beginning and End of Term. Any Imposition relating to a period a part of which is included within the Term and a part of which is included in a period of time before the Commencement Date or after the Expiration Date shall be apportioned between Landlord and Tenant as of the Commencement Date or Expiration Date so that Tenant shall pay that portion of such Imposition which that part of such fiscal period included in the period of time after the Commencement Date and before the Expiration Date, bears to such fiscal period, and Landlord shall pay the remainder thereof.

Section 4.04     Sales Tax Exemption. To the extent permitted under applicable law, Tenant and its Contractors and agents shall be entitled to purchase all labor, materials and tangible personal property incorporated or installed in the Demised Premises as part of the Major Construction Work and any Capital Improvements utilizing Landlord's sales and use tax exemption therefor. At Tenant's request, Landlord shall issue to Tenant a letter, which may be utilized by Tenant and its Contractors and agents in the purchase of such labor, materials and personal property, evidencing such exemption.

Section 4.05     Contest. (a)     Tenant shall have the right to contest the amount or validity, in whole or in part, of any Imposition by appropriate proceedings diligently conducted in good faith, in which event, notwithstanding the provisions of Section 4.01, payment of such Imposition shall be postponed if, and only as long as:

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                                                                    RECEIVED NYSCEF: 05/25/2023

21

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 26 of 163

(i)     neither Landlord nor Tenant would by reason thereof be subject to any civil or criminal liability;

(ii)    neither the Demised Premises nor any part thereof, or interest therein or any income therefrom or any other assets of or funds appropriated to Landlord would, by reason of such postponement or deferment, be in imminent danger of being forfeited or lost or subject to any lien, encumbrance or charge; and

(iii)   if the contested amount exceeds $250,000, Adjusted for Inflation, Tenant shall have delivered to Landlord a cash deposit or a bond of a surety company satisfactory to Landlord, in form and substance reasonably satisfactory to Landlord, in an amount equal to the sum of (i) the contested amount and (ii) the criminal or civil fines or penalties that may be reasonably expected to accrue by reason of such non-compliance.

(b)     Upon the termination of such proceedings, it shall be the obligation of Tenant to pay the amount of such Imposition or part thereof as finally determined in such proceedings, the payment of which may have been deferred during the prosecution of such proceedings.

Section 4.06    <u>Reduction in Valuation</u>. Tenant shall have the right to seek a reduction in the valuation of the Demised Premises assessed for Taxes and to prosecute any action or proceeding in connection therewith, provided that no such action or proceeding shall postpone Tenant's obligation, if any, to pay any Taxes or Imposition except in accordance with the provisions of <u>Section 4.05</u>.

Section 4.07    <u>Landlord Participation in Proceeding</u>. Landlord shall not be required to join in any proceedings referred to in <u>Section 4.05</u> or <u>Section 4.06</u> unless (i) the provisions of any Requirements at the time in effect shall require that such proceedings be brought by or in the name of Landlord and (ii) Landlord determines, based on the requirements of <u>Section 4.05</u>, that such proceedings are reasonable and have been brought in a timely manner, in which event, Landlord shall join and cooperate in such proceedings or permit the same to be brought in its name. Landlord shall reasonably cooperate with Tenant in such proceeding provided that Landlord shall not be obligated to incur any third-party expense, other than a de minimis amount, with respect to such proceeding.

## ARTICLE 5

## LATE CHARGES

In the event that any payment of Base Rent shall remain unpaid for sixty (60) days beyond the Due Date thereof or any payment of Additional Charges shall remain unpaid for ninety (90) days beyond the Due Date thereof or if no such date is set forth in this Lease for such Additional Charges, then such Due Date for purposes of this <u>Article 5</u> shall be deemed to be thirty (30) days after the date upon which such additional charges accrue, such late payment shall bear interest at the Involuntary Rate for the

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59 RECEIVED NYSCEF: 05/25/2023

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 27 of 163

22

period from the Due Date to the date of actual payment thereof to Landlord, together with such interest. Such interest shall constitute Additional Charges hereunder and shall be due and payable by Tenant on demand. No failure by Landlord to insist upon the strict performance by Tenant of its obligations to pay late charges shall constitute a waiver by Landlord of its right to enforce the provisions of this <u>Article 5</u> in any instance thereafter occurring.

## ARTICLE 6

### ORDER OF PREFERENCE

Section 6.01     The terms and conditions set forth in the following documents are hereby incorporated into the Lease as if set forth herein at length.

(a)     "Appendix A Standard Clauses for New York State Contracts" attached hereto as <u>Appendix A</u>.

(b)     The provisions contained in <u>Exhibits A to O</u> other than the <u>Appendix A</u> to this Lease.

(c)     Request for Proposals issued by ESDC as agent for DMNA in June of 2000.

(d)     Response by The Seventh Regiment Armory Conservancy, Inc. to the ESDC RFP of June 2000.

Section 6.02     <u>Conflict of Clauses, Order of Preference</u>. In the event of a conflict between the terms of this Lease , including any and all attachments, exhibits and appendices thereof, such conflict shall be resolved in the following order of precedence:

(a)     <u>Appendix A</u>, Standard Clauses for New York State Contracts.

(b)     The provisions contained in the body of this Lease.

(c)     The provisions contained in the Exhibits to this Lease other than the <u>Appendix A</u> to this Lease.

(d)     Request for Proposals issued by ESDC as Agent for DMNA in June of 2000.

(e)     Response by The Seventh Regiment Armory Conservancy, Inc. to ESDC RFP of June 2000.

Case 1:25-cv-07373-GBD   Document 1-1   Filed 09/05/25   Page 28 of 163

23

# ARTICLE 7

# INSURANCE

Section 7.01      Required Coverages of Tenant.

(a)      Tenant, throughout the Term, or as otherwise required by this Lease, shall obtain and maintain in full force and effect, the following insurance (collectively, "Tenant's Insurance") with limits not less than those set forth below and as required by the terms and provisions of this Lease, or as required by law, whichever is greater (provided that limits may be provided through a combination of primary and umbrella/excess policies):

(i)      Commercial General Liability Insurance with a limit of not less than $25,000,000 per occurrence. Such insurance shall be written on the Insurance Service Office's (ISO) occurrence form CG 00 01, or a substitute form providing equivalent coverages, and shall cover liability arising from the operation of the Demised Premises, independent contractors, products-completed operations and broad form property damage (including completed operations, personal and advertising injury, cross liability coverage, and liability assumed in a contract). The limit for Fire Damage Legal shall not be less than $100,000. If such insurance contains an aggregate limit, it shall apply separately to the Demised Premises.

(ii)      Workers Compensation, Employers Liability, and Disability Benefits as required by applicable law. If employees will be working on, near or over navigable waters, US Longshore and Harbor Workers Compensation Act endorsement shall also be included.

(iii)      Comprehensive Business Automobile Liability Insurance with a limit of not less than $5,000,000 per accident. Such insurance shall cover liability arising out of any automobile including owned, leased, hired and non-owned automobiles.

(iv)      If Tenant or any User or any other Person acting by, through or under Tenant uses, stores, handles, processes or disposes of Contaminants, then Tenant shall maintain in full force and effect through the Term, Environmental Impairment Liability insurance with limits of not less than $3,000,000, providing coverage for bodily injury, property damage or damage of actual, alleged or threatened emission, discharge, dispersal, seepage, release or escape of pollutants, including any loss, cost or expense incurred as a result of any cleanup of pollutants or in the investigation, settlement or defense of any claim, suit, or proceedings against the State, arising from Tenant's use, storage, handling, processing or disposal of Contaminants.

(v)      If Tenant or any User or any other Person acting by, through or under Tenant sells, distributes, serves or furnishes alcoholic beverages, then Tenant shall maintain in full force and effect through the Term, Liquor Liability Insurance with limits of not less than $5,000,000.

(vi)     Commercial Property Insurance covering loss or damage by fire and other hazards to the Demised Premises commonly included in insurance policies with All Risk coverage, including, if reasonably available, coverage for loss or damage due to water, flood, subsidence, earthquake, collapse, vandalism and malicious mischief, with limits in an amount sufficient to permit Tenant to fulfil its obligations to Restore the Demised Premises pursuant to Section 8.02(a), including, an "agreed amount" endorsement and any increase in value from increased costs of construction, demolition and contingent liability from operation of building laws; and including broad form boiler and machinery insurance (including business interruption coverage) in an amount not less than $10,000,000, Adjusted for Inflation, per accident on a combined basis, covering direct property loss and loss of income and loss of rents and covering all steam, mechanical and electrical equipment, including, without limitation, all boilers and other pressure vessels or systems, whether fired or unfired, air conditioning equipment, elevators, piping and wirings ("Tenant's Property Insurance");

(vii)     Insurance covering loss or damage to Tenant's personal property, furniture and equipment stored in and/or used in the operations of the Demised Premises, in an amount equal to the full insurable value thereof;

(viii)     In addition to the foregoing, during the performance of any Major Construction Work or Capital Improvements, (x) Tenant shall carry builder's risk insurance, on a completed value form, in the amount of the total construction cost of the Major Construction Work or Capital Improvements, and (y) Tenant shall cause all Contractors to obtain and maintain in full force and effect the following insurance with limits not less than those set forth below (provided that limits may be provided through a combination of primary and umbrella/excess policies):

(A)     Commercial General Liability Insurance with a limit of not less than (x) $25,000,000 per occurrence for any Contractor that serves as the construction manager or general contractor for such Major Construction Work or Capital Improvements, and (y) $3,000,000 per occurrence for any other Contractor, in each case with coverage as designated in clause (i) above. General Liability Additional Insured Endorsement shall be on Insurance Service Office's (ISO) form number CG 20 10 11 85.

(B)     Business Automobile Liability Insurance with a limit of not less than $5,000,000 per accident with coverage as designated in clause (ii) above.

(C)     If such Major Construction Work or Capital Improvement involves abatement, removal, repair, replacement, enclosure, encapsulation and/or disposal of any petroleum, petroleum product or other Contaminant, Contractor shall maintain in full force and effect throughout the performance of such Major Construction Work or Capital Improvement hereof, pollution legal liability insurance with limits of not less than $5,000,000 providing coverage for bodily injury and property

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                                                        RECEIVED NYSCEF: 05/25/2023

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 30 of 163

25

damage, including loss of use of damaged property or of property that has not been physically injured. Such policy shall provide coverage for actual, alleged or threatened emission, discharge, dispersal, seepage, release or escape of Contaminants, including any loss, cost or expense incurred as a result of any cleanup of pollutants or in the investigation, settlement or defense of any claim, suit, or proceedings against Landlord arising from Contractor's work.

1) All policies must be written on an occurrence basis . If occurrence coverage cannot be obtained and after Landlord's prior written approval, which such approval shall not be unreasonably withheld, coverage is written on a claims-made policy, any applicable retroactive date shall precede the effective date of the contract pursuant to which such Contractor is engaged by Tenant (a "Work Contract"); and continuous coverage will be maintained, or an extended discovery period exercised, for a period of not less than ten (10) years from the time work under such Work Contract is completed.

2) If such Major Construction Work or Capital Improvement includes disposal of materials from the job site, Contractor must furnish to Landlord, evidence of pollution legal liability insurance with a limit of not less than $2,000,000 maintained by the disposal site operator for losses arising from the disposal site accepting waste resulting from such Major Construction Work or Capital Improvement.

3) If automobiles are to be used for transporting Contaminants, Contractor shall provide pollution liability broadened coverage for covered automobiles (endorsement CA 99 48) as well as proof of MCS 90.

(D) If providing professional services, Contractor shall maintain, or if subcontracting professional services, subcontractor shall maintain, errors and omissions liability insurance with a limit of not less than $2,000,000 per loss.

1) Such insurance shall apply to professional errors, acts, or omissions arising out of the scope of services covered by the applicable Work Contract and may not exclude pollution or asbestos related claims, testing, monitoring, measuring, or laboratory analyses.

2) If coverage is written on a claims-made policy, any applicable retroactive date shall precede the effective date of the applicable Work Contract; and continuous coverage will be maintained, or an extended discovery period

exercised, for a period of not less than two (2) years from the time work under is completed.

(E)     Prior to the commencement of construction, Tenant shall cause any Contractor to file with Landlord policies of insurance evidencing compliance with all requirements contained in this Section 7.1. Such policies shall be of form and substance reasonably acceptable to Landlord. Acceptance and/or approval of such policies by Landlord does not and shall not be construed to relieve Contractor or Tenant of any obligations, responsibilities or liabilities under this Lease.

(F)     All Contractor's insurance (i) shall be obtained at the sole cost and expense of Contractor; (ii) shall be maintained with insurance carriers licensed to do business in New York State, and reasonably acceptable to Landlord; (iii) shall be primary and non-contributing to any insurance or self-insurance maintained by Landlord; (iv) shall be endorsed to provide written notice be given to Landlord, at least thirty (30) days prior to the cancellation, non-renewal, or material alteration of such policies, subject to insurance company approval, and (v) except with respect to workers compensation, employers liability and disability benefits and professional liability, shall name the State, its officers, agents, and employees as additional insureds thereunder. The general liability additional insured endorsement shall be on then-current insurance service office's (ISO) form for such coverage.

(G)     Contractor shall be solely responsible for the payment of all deductibles and self insured retentions to which such policies are subject. Deductibles and self insured retentions shall be subject to approval by Landlord, such approval not to be unreasonably withheld.

(H)     Each insurance carrier shall be rated at least "a-" class "vii" in the most recently published Best's Insurance Report. If, during the term of a policy, a carrier's rating falls below "a-" class "vii", the insurance policy provided by such carrier shall be replaced no later than the renewal date of such policy with a policy from an insurer reasonably acceptable to landlord and rated at least "a-" class "vii" in the most recently published Best's Insurance Report.

(I)     Tenant shall cause all Contractor's insurance to be in full force and effect as of the commencement of construction and to remain in full force and effect throughout the construction period and as further required by this Lease. Contractor shall not take any action, or omit to take any action that would suspend or invalidate any of the required coverages during the period of time such coverages are required to be in effect.

(J)      Not less than five (5) days prior to the expiration date or renewal date of any policy, Tenant shall supply Landlord updated replacement certificates of insurance and amendatory endorsements.

(K)      <u>Waiver of Claims; Waiver of Subrogation</u>. Contractor shall include in Contractor's Property Insurance a waiver of the insurer's right of subrogation against Landlord, or, if such waiver is unobtainable (i) an express agreement that such policy shall not be invalidated if Tenant or Contractor waives or has waived before the casualty the right of recovery against Landlord or (ii) any other form of permission for the release of Landlord, provided such waiver, agreement or permission is obtainable under normal commercial insurance practice at the time. If such waiver, agreement or permission shall not be obtainable without additional charge, Tenant shall pay such additional charge, which such charge shall be deemed prepaid Base Rent for which Tenant shall receive a credit against the next due installment(s) of Base Rent and Additional Charges until such credit is extinguished. So long as Contractor's Property Insurance includes the waiver of subrogation or agreement or permission to release liability referred to in above, Tenant shall cause Contractor to waive, for Contractor and those claiming through and under Contractor, any right of recovery against Landlord for any loss occasioned by fire or other insured casualty. If at any time Contractor's Property Insurance shall not include such or similar provisions because the same are not obtainable, the waiver set forth in the foregoing sentence shall be of no further force or effect.

(ix)      Landlord shall have the right from time to time during the Term to update the minimum insurance limits and coverages required pursuant to clauses (i) through (viii) of this <u>Section 7.01(a)</u> to limits and coverages which are then reasonably available and customarily carried by tenants of property which are similar in location and use to the Demised Premises.

(b)      Prior to the Commencement Date, Tenant shall file with Landlord policies of insurance evidencing compliance with all requirements contained in this <u>Section 7.01</u>. Such policies shall be of form and substance reasonably acceptable to Landlord. Acceptance and/or approval of such policies by Landlord does not and shall not be construed to relieve Tenant of any obligations, responsibilities or liabilities under this Lease.

(c)      All Tenant's Insurance (i) shall be obtained at the sole cost and expense of Tenant (other than insurance maintained and obtained by Contractors or sub-contractors pursuant to <u>Section 7.01(a)(viii)</u> hereof); (ii) shall be maintained with insurance carriers licensed to do business in New York State, and reasonably acceptable to Landlord; (iii) shall be primary and non-contributing to any insurance or self-insurance maintained by Landlord; (iv) shall be endorsed to provide written notice be given to Landlord, at least thirty (30) days prior to the cancellation, non-renewal, or

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59    Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 33 of 163    RECEIVED NYSCEF: 05/25/2023

28

material alteration of such policies, subject to insurance company approval, and (v) except with respect to Workers Compensation, Employers Liability and Disability Benefits and Professional Liability, shall name the State, its officers, agents, and employees as additional insureds thereunder. The General Liability Additional Insured Endorsement shall be on then-current Insurance Service Office's (ISO) form for such coverage.

(d)     Tenant shall be solely responsible for the payment of all deductibles and self insured retentions to which such policies are subject. Deductibles and self insured retentions shall be subject to approval by Landlord, such approval not to be unreasonably withheld.

(e)     Each insurance carrier for Tenant's Insurance shall be rated at least "A-" Class "VII" in the most recently published Best's Insurance Report. If, during the term of a policy, a carrier's rating falls below "A-" Class "VII", the insurance policy provided by such carrier shall be replaced no later than the renewal date of such policy with a policy from an insurer reasonably acceptable to Landlord and rated at least "A-" Class "VII" in the most recently published Best's Insurance Report.

(f)     Tenant shall cause all Tenant's Insurance to be in full force and effect as of the Commencement Date and to remain in full force and effect throughout the Term and as further required by this Lease. Tenant shall not take any action, or omit to take any action that would suspend or invalidate any of the required coverages during the period of time such coverages are required to be in effect.

(g)     Not less than five (5) days prior to the expiration date or renewal date of any policy, Tenant shall supply Landlord updated replacement certificates of insurance and amendatory endorsements.

Section 7.02     No Required Coverage of Landlord.  In no event shall Landlord be required during the Term to carry any property insurance with respect to the Demised Premises.

Section 7.03     Waiver of Claims; Waiver of Subrogation.  Tenant shall include in Tenant's Property Insurance a waiver of the insurer's right of subrogation against Landlord, or, if such waiver is unobtainable (i) an express agreement that such policy shall not be invalidated if Tenant waives or has waived before the casualty the right of recovery against Landlord or (ii) any other form of permission for the release of Landlord, provided such waiver, agreement or permission is obtainable under normal commercial insurance practice at the time. If such waiver, agreement or permission shall not be obtainable without additional charge, Tenant shall pay such additional charge, which such charge shall be deemed prepaid Base Rent for which Tenant shall receive a credit against the next due installment(s) of Base Rent and Additional Charges until such credit is extinguished. So long as Tenant's Property Insurance includes the waiver of subrogation or agreement or permission to release liability referred to in above, Tenant hereby waives, for itself and those claiming through and under it, any right of recovery against Landlord for any loss occasioned by fire or other insured casualty. If at any time

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59    Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 34 of 163    RECEIVED NYSCEF: 05/25/2023

29

Tenant's Property Insurance shall not include such or similar provisions because the same are not obtainable, the waiver set forth in the foregoing sentence shall be of no further force or effect.

## ARTICLE 8

## CASUALTY; USE OF INSURANCE PROCEEDS; RESTORATION

Section 8.01     Notice of Damage. If all or any part of any of the Demised Premises shall be destroyed or damaged in whole or in part by fire or other casualty of any kind or nature (including any casualty for which insurance was not obtained or obtainable), ordinary or extraordinary, foreseen or unforeseen (a "Casualty"), Tenant shall give to Landlord immediate notice thereof.

Section 8.02     Obligation to Restore.

(a)     Tenant Obligation to Restore. In the event of a Casualty, Tenant shall be obligated to repair, alter, restore, replace and rebuild (collectively, "Restore" and the act of Restoring, a "Restoration") the Demised Premises, including the historic interiors and exteriors, to the Standards of the Secretary of the Interior for the Demised Premises and make the Demised Premises as nearly as possible equal to the condition, quality, character and class of the Demised Premises existing immediately prior to such occurrence. In the event that the Demised Premises are damaged or destroyed to such an extent that it is impossible or impractical to Restore the Demised Premises to such condition, quality, character or class, then Landlord and Tenant shall cooperate to determine by mutual agreement a scope of Restoration which is feasible and practical to accommodate the Permitted Uses and achieve the goals and objectives of this Lease, taking into account the extent of such damage or destruction, the importance of any features or elements which were so damaged or destroyed, the feasibility and utility of the proposed Restoration and any other matters related thereto. In the event that portions of the Building outside the Demised Premises shall be damaged or destroyed , and the Tenant shall be obligated hereunder to Restore the portions of the Building outside the Demised Premises, then the Tenant shall also be obligated to Restore the portions of the Building outside of the Demised Premises in a timely fashion so as to enable timely Restoration of the Demised Premises pursuant to this Lease. Landlord may oversee and coordinate on behalf of Tenant the time and manner of Tenant's performance of the Restoration, in order to ensure that the Restoration is performed in a manner that is consistent with the terms of this Lease and, if applicable, will minimize interference with the operation of the Demised Premises pursuant to the terms of this Lease.

(b)     No Obligation of Landlord to Restore. Landlord shall have no obligation to Restore the Demised Premises.

Section 8.03     Restoration Funds.

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                                    RECEIVED NYSCEF: 05/25/2023

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 35 of 163

30

(a)     In the event of a Restoration which is subject to <u>Section 8.02(a)</u>, Tenant shall cause to be deposited in the Depositary all proceeds of Tenant's Property Insurance. Subject to the satisfaction by Tenant of the terms and conditions of this <u>Article 8</u>, and receipt of the written approval of the Landlord, which such approval shall not be unreasonably withheld, Depositary shall pay over to Tenant from time to time, any monies which may be received by Depositary from Tenant's Property Insurance (the "<u>Restoration Funds</u>"), to be utilized by Tenant solely for the purpose of the Restoration, such payments to be made in accordance with the following provisions of this <u>Section 8.03</u>:

(i)     Prior to commencing any Restoration, Tenant shall furnish Landlord with an estimate of the cost of such Restoration, prepared by an independent licensed professional engineer or registered architect selected by Tenant and reasonably approved by Landlord (the "<u>Approved Engineer</u>).

(ii)     The Restoration Funds shall be paid to Tenant in installments as the Restoration progresses, subject to <u>Section 8.03(a)(iii)</u>. If any vendor's, mechanic's, laborer's, or materialman's lien is filed against the Demised Premises or any part thereof, or Tenant's leasehold interest therein, Tenant shall promptly satisfy or discharge such lien (by bonding or otherwise).

(iii)     Upon completion of and payment for the Restoration by Tenant, subject to the rights of any Mortgagee, after receipt of the written approval of the Landlord, which such approval shall not unreasonably be withheld, Depositary shall pay the balance of the Restoration Funds, if any, to Tenant.

(b)     The following shall be conditions precedent to each payment made to Tenant as provided in <u>Section 8.03(a)</u> above:

(i)     The Restoration shall be carried out under the supervision of the Approved Engineer and there shall be submitted to Depositary and Landlord the certificate of the Approved Engineer stating that (i) the materials and other items which are the subject of the requisition have been incorporated in the Demised Premises, free and clear of all liens and encumbrances, and no unsatisfied or unbonded mechanic's or other liens have been claimed, except for any mechanic's lien for claims that will be discharged with funds to be received pursuant to such requisition; provided that a release of such lien is delivered to Depositary in accordance with <u>Section 8.03(a)(ii)</u>; (ii) the sum then requested to be withdrawn either has been paid by Tenant or is due and payable to Contractors, engineers, architects or other Persons (whose names and addresses shall be stated), who have rendered or furnished services or materials for the work and giving a brief description of such services and materials and the principal subdivisions or categories thereof and the several amounts so paid or due to each of such Persons in respect thereof, and stating in reasonable detail the progress of the work up to the date of such certificate; (iii) no part of such expenditures has been or is being made the basis, in any previous or then pending requisition, for the withdrawal of Restoration Funds or has been made out of the Restoration Funds received by Tenant; (iv) the sum then requested does not exceed the value of the services and materials

described in the certificate; (v) the work relating to such requisition has been performed in accordance with the approved plans and specifications for such Restoration, and all Permits and other Requirements; (vi) the balance of the Restoration Funds held by Depositary or otherwise provided for in a manner reasonably acceptable to Landlord will be sufficient upon completion of the Restoration to pay for the same in full, and stating in reasonable detail an estimate of the cost of such completion; and (vii) in the case of the final payment to Tenant, the Restoration has been completed in accordance with the approved plans and specifications, and all Requirements.

(ii)    There shall be furnished to Landlord an official search, or a certificate of a title insurance company reasonably satisfactory to Landlord, showing that there has not been filed any vendor's, mechanic's, laborer's, or materialman's statutory or other similar lien affecting the Demised Premises, or any part thereof, or any public improvement lien with respect to the Demised Premises or the Restoration created or permitted to be created by Tenant affecting Landlord, or the assets of or funds appropriated to Landlord, which had not been discharged of record (by bonding or otherwise), except for any mechanic's lien for claims that will be discharged with funds to be received pursuant to the requisition then under consideration; provided that a release of such lien is delivered to Depositary in accordance with Section 8.03(a)(ii).

(iii)    At the time of the final payment to Tenant, there shall be furnished to Landlord an amended Certificate of Occupancy including the Restoration if required by any Governmental Authority, and lien waiver issued by each Contractor who shall have performed services or provided materials for the Restoration.

(c)    It is expressly understood that the requirements of this Article 8 are for the benefit only of Landlord, and no Contractor or other person shall have or acquire any claim against Tenant as a result of any failure of Tenant actually to undertake or complete any Restoration as provided in Section 8.02 or to obtain the evidence, certifications and other documentation provided for herein.

Section 8.04    No Termination or Abatement. Except as hereinafter expressly provided, this Lease shall not terminate or be forfeited or be affected in any manner by reason of damage to or total, substantial or partial destruction of any of the Building or any part thereof or by reason of the untenantability of the same or any part thereof, for or due to any reason or cause whatsoever, and Tenant, notwithstanding any law or statute present or future, waives any and all rights to quit or surrender any part of the Demised Premises thereof. Notwithstanding the foregoing, (i) in the event that a Casualty occurs which renders seventy-five percent (75%) or more of the area of the Demised Premises untenantable for the Permitted Uses, then this Lease shall automatically terminate as of the date of such Casualty, and/or (ii) in the event that a Casualty occurs which renders either or both of the Administration Building and/or the Drill Hall substantially untenantable for the Permitted Uses, and the proceeds of Tenant's Property Insurance are insufficient to Restore the Premises to the condition provided in Section 8.02(a), and neither Landlord nor Tenant elects (in each case at its sole option), within 12 months following the date of casualty, to provide additional

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 37 of 163

funds sufficient to Restore the Premises to such condition, then this Lease shall automatically terminate upon the first anniversary of the date of such Casualty, or at such earlier date as Landlord and Tenant may mutually elect. Upon the termination of this Lease pursuant to clause (i) or (ii) of the preceding sentence, Tenant shall vacate and deliver to Landlord the Demised Premises in its then-current condition together with any proceeds of Tenant's Property Insurance actually received by Tenant and an assignment of Tenant's right to receive any such additional proceeds, and neither Party shall have any further obligation to the other under this Lease except for the obligations that are expressly provided in this Lease to survive the termination of this Lease. Tenant shall carry commercial rent loss and business interruption insurance in an amount sufficient to reimburse Tenant for any rent loss during the Restoration Period and shall continue to pay rent to the Landlord as if the Demised Premises in an amount equal to the amount the Tenant should have paid Landlord on the date of such Casualty. Except as provided in this <u>Section 8.04</u>, the existence of any present or future law notwithstanding, Tenant waives all rights to quit or surrender all or any part of the Demised Premises by reason of any casualty whatsoever to the Demised Premises. It is the intention of Landlord and Tenant that the foregoing is an "express agreement to the contrary" as provided Section 227 of the Real Property Law of the State of New York.

## ARTICLE 9

## CONDEMNATION

Section 9.01        Taking of a Substantial Portion of Demised Premises.

(a)        If the whole or a Substantial Portion of the Demised Premises shall be taken (excluding a taking of the fee interest in the Demised Premises, or any leasehold interest superior to that of the Tenant's or otherwise constituting an interest in the Demised Premises if after such taking, Tenant's rights and obligations under this Lease are not affected) for any public or quasi-public purpose by any lawful power or authority by the exercise of the right of condemnation or eminent domain or by agreement among Landlord, Tenant and those authorized to exercise such right, this Lease and the Term shall terminate and expire on the date of such taking and the Breakpoint shall be equitably adjusted as of the date of such taking. In the event of a taking which is less than the whole or a Substantial Portion of the Demised Premises, this Lease and the Term shall continue without abatement and the Breakpoint shall be equitably adjusted as of the date of such taking.

(b)        The term "<u>Substantial Portion of the Demised Premises</u>" shall mean such portion of the Demised Premises as, when so taken, would leave remaining a balance of the Demised Premises which, due either to the area so taken or the location of the part so taken in relation to the part not so taken, would not permit the Restoration of the Building so as to constitute a complete, rentable building or buildings capable of producing a fair and reasonable net annual income proportional to the number of square feet not so taken. Without limiting the foregoing, any taking that includes any portion (other than a de minimis portion) of the first and/or second floors of the

Administration Building and/or the Drill Hall shall constitute a taking of a Substantial Portion of the Demised Premises.

(c) If the whole or a Substantial Portion of the Demised Premises shall be taken or condemned as provided in Section 9.01(a), the award, awards or damages in respect thereof shall be apportioned as follows: (i) there shall first be paid to any Mortgagee who shall hold a first priority Mortgage on Tenant's interest in this Lease and who shall have complied with the first sentence of Section 10.10(a), so much of the portion of the award attributable to the Building as shall be required to pay the unpaid principal balance of such Mortgage (not to exceed total costs incurred by Tenant in connection with the Major Construction Work), plus interest accrued thereon from the date of taking to the date of payment to such Mortgagee, at the rate of interest payable in the condemnation proceedings, (ii) there shall then be paid to Tenant the costs of Tenant's major capital improvements to the Building (not to exceed total costs incurred by Tenant in connection with the Major Construction Work, plus any Capital Improvements, less any amounts apportioned to any Mortgagees under clause (i) hereof, and, in the event such taking or condemnation occurs during or following the fiftieth Lease Year, depreciated on a straight-line basis over the period from the first day of the fiftieth Lease Year to the last day of the Term), and (iii) there shall then be paid to Landlord the balance, if any, of such award.

Section 9.02    Date of Taking. For purposes of this Article 9, the date on which a taking shall occur shall be deemed to be the earlier of (i) the date on which actual possession of the whole or a Substantial Portion of the Demised Premises, or a part thereof, as the case may be, is acquired by any lawful power or authority pursuant to the provisions of the applicable federal or New York State law or (ii) the date on which title to the Demised Premises or the aforesaid portion thereof shall have vested in any lawful power or authority pursuant to the provisions of the applicable federal or New York State law.

Section 9.03    Taking of Less than a Substantial Portion of Demised Premises. If less than a Substantial Portion of the Demised Premises shall be so taken, this Lease and the Term shall continue as to the portion of the Demised Premises remaining without abatement of the Base Rent or Additional Charges or diminution of any of Tenant's obligations hereunder; provided, however, that Landlord acknowledges that Base Rent is calculated and paid solely on the basis of a percentage of Gross Revenues from Commercial Operations in excess of the Breakpoint, and therefore the Breakpoint shall be equitably adjusted as set forth in Section 9.01. Tenant shall utilize the award received by it to Restore any remaining part of the Demised Premises not so taken so that the latter shall be complete, operable, self-contained architectural units in good condition and repair, to the extent feasible in light of the amount of the award so received. Tenant's obligation to restore shall be contingent on Landlord's restoration of any portion of the Building so taken which is not part of the Demised Premises. In the event of any taking pursuant to this Section 9.03, the Tenant's portion shall be paid to Tenant to be applied to Restoration of the Building if under $2,000,000 Adjusted for Inflation and to Depositary if $2,000,000 Adjusted for Inflation or more and, in either case, shall be applied to the cost of Restoration of the part of the Demised Premises not

so taken. Subject to the provisions and limitations in this <u>Article 9</u>, Depositary shall, after receipt of the written approval of the Landlord make available to Tenant as much of that portion of the award as is actually received and held by Depositary, if any, as may be necessary to pay the cost of Restoration of the part of the Demised Premises remaining.

Section 9.04 <u>Emergency Use of Demised Premises; Temporary Taking</u>. If the temporary use of the whole or any portion of the Demised Premises shall be taken for any public or quasi-public purpose, including military use in the event of a national or state declaration of emergency ("<u>Emergency Use</u>"), by any lawful power or authority whether by the exercise of the right of condemnation or otherwise (the "<u>Condemning Authority</u>") due to the status of the Building as an armory, (i) unless prohibited by law, the Term and all dates and deadlines set forth herein shall be tolled during the period of the Emergency Use or temporary taking, plus any additional period as shall be equitable taking into account the additional time required for Tenant to re-schedule and re-commence any activities in the Demised Premises which were disrupted by the Emergency Use or temporary taking, (ii) Breakpoint shall be equitably adjusted during the period of Emergency Use and/or temporary taking, and until the first anniversary of the date on which the Full Operation Date shall have been achieved following the period of Emergency Use. The provisions of this Lease which entitle Landlord to use the Demised Premises for Emergency Use shall not be deemed to diminish Tenant's rights to receive any condemnation award arising under applicable law or to assert a claim for compensation and reimbursement under applicable law, regardless of whether Landlord is the Condemning Authority.

Section 9.05 <u>Change of Grade</u>. In case of any governmental action, not resulting in the taking or condemnation of any portion of the Demised Premises but creating a right to compensation therefor, such as the changing of the grade of any street upon which the Demised Premises abut, this Lease shall continue in full force and effect without reduction or abatement of Base Rent and Additional Charges and the award shall be paid to Landlord.

Section 9.06 <u>Negotiated Sale in Lieu of Condemnation</u>. In the event of a negotiated sale of all or a portion of the Demised Premises in lieu of condemnation, subject to the approval reasonably exercised of Landlord and Tenant, the proceeds shall be distributed as provided as in cases of condemnation.

Section 9.07 <u>Landlord's Right to Participate</u>. Landlord, Tenant and any Mortgagee shall be entitled to file any claim permitted to such party pursuant to this <u>Article 9</u> and otherwise participate in any condemnation or similar proceeding and all hearings, trials and appeals in respect thereof.

Section 9.08 <u>Trade Fixtures</u>. Notwithstanding anything to the contrary contained in this <u>Article 9</u>, in the event of any permanent or temporary taking of all or any part of the Demised Premises, Tenant and its Users shall have the exclusive right to assert claims for any trade fixtures and personal property so taken which were the property of Tenant or its Users (but not including any Equipment) and

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                                      RECEIVED NYSCEF: 05/25/2023

35

Case 1:25-cv-07373-GBD   Document 1-1   Filed 09/05/25   Page 40 of 163

for relocation expenses of Tenant or its Users, and all awards and damages in respect thereof shall belong to Tenant and its Users, and Landlord hereby waives any and all claims to any part thereof; provided, however, that if there shall be no separate award or allocation for such trade fixtures or personal property or relocation expenses, then such claims of Tenant and its Users, or awards and damages, shall be subject and subordinate to Landlord's claims under this Article 9.

## ARTICLE 10

## ASSIGNMENT, SUBLETTING, MORTGAGES, ETC.

Section 10.01    No Assignment; Subletting Permitted.

(a)    Except as otherwise provided in this Article 10, Tenant shall not, without the prior written consent of Landlord and the State Comptroller assign or otherwise transfer Tenant's rights, title and interest under this Lease or the term and estate hereby granted. Furthermore, except as otherwise provided in this Article 10, Tenant shall not, without the prior written approval of the Landlord (i) sublet, permit any other person to use or occupy, or enter into any User Agreement with respect to the Demised Premises or any part thereof, (ii) mortgage, pledge or encumber this Lease or (iii) permit any User to sublet or sublicense any portion of the Demised Premises or assign any User Agreement to any other Person (it being understood that this clause (iv) shall not prevent a User under a User Agreement which provides for the booking of shows, performances, and the like from entering into such booking arrangements pursuant to its User Agreement). Any of the arrangements in clauses (i)-(iv) above entered into in violation of this Article 10 shall be null and void. For the purposes of this Article 10, the merger or consolidation of Tenant into or with another entity or transfer of control of the Tenant to any other entity shall be deemed an assignment of this Lease.

(b)    Notwithstanding anything to the contrary set forth herein, Tenant shall not assign its interest in this Lease, nor sublet or enter into any User Agreement for any portion of the Demised Premises, to any person or entity which is a Prohibited Party, nor allow any such Prohibited Party to use or occupy all or any portion of the Demised Premises. Landlord or Tenant may terminate any assignment, sublease, User Agreement or licensed use of the Demised Premises or any part thereof, in the event that any assignee, sublessee, assignee or User, their officers, directors, managers, employees, or operators meets the definition of a Prohibited Party at any time during the term of such assignment, sublease, User Agreement or licensed use of the Demised Premises or any part thereof. Tenant shall cause any written agreement for the assignment, sublease or licensed use of the Demised Premises, or any part thereof, and any User Agreement to contain a provision providing for Landlord's and Tenant's right to terminate such agreement as described in the proceeding sentence.

(c)    Tenant shall require any subtenant, Tenant's licensee, or Tenant's assignee, who is a Significant Sub-occupant, to execute and deliver to Tenant and/or Landlord a Vendor Responsibility Questionnaire on the form hereto attached as Exhibit O or any successor or replacement form required by the Landlord or the Office

of the State Comptroller. No occupancy or sub-occupancy agreement of any type with a Significant Sub-occupant (other than User Agreements with Significant Sub-occupants, which shall be governed by Section 10.04) shall be effective until Landlord approves the Significant Sub-occupant. Nothing in this Article 10 shall relieve any Significant Sub-occupant from complying with any and all approval requirements imposed by any City, State or Federal statute, ordinance, rule or regulation.

Section 10.02    Certain Permitted Assignments. Notwithstanding the provisions of Section 10.01(a), Landlord shall not unreasonably withhold, delay or condition its consent to the following:

(a)    a sale, assignment or transfer of Tenant's interest in this Lease to (i) a for-profit entity of which the Tenant or an Affiliate has and maintains management control for the purpose of obtaining the federal historic rehabilitation tax credit for the Major Construction Work, or (ii) an Affiliate in connection with any other financing to be obtained by Tenant for the Major Construction Work;

(b)    an assignment of the Lease to any proposed tenant that was the holder of a Recognized Mortgage or that is the affiliated nominee of the former holder of a Recognized Mortgage following either a foreclosure of a Recognized Mortgage or the acceptance by the holder of a Recognized Mortgage (or its nominee) of an assignment of the mortgagor's interest in the Lease in lieu of foreclosure or any purchaser at a sale in a foreclosure of the Recognized Mortgage, its successors and assigns;

provided that such assignee is not a Prohibited Person and meets the vendor responsibility requirements of the State of New York or other applicable Requirements; provided further that, Tenant and the proposed assignee shall execute such documents evidencing the sale, assignment or transfer as Landlord shall reasonably request; provided further that in the event that Landlord fails to respond within one hundred twenty (120) days to a written request by Tenant, or one hundred twenty (120) days to a written request by a Recognized Mortgagee, to sell, assign or transfer the Lease to an entity described in this Section 10.02, Landlord shall be deemed to have consented to such assignment.

Section 10.03    Procedure for Approval of Assignments or Subleases Which Do Not Constitute User Agreements.

(a)    For any proposed assignment or sublease of all or any portion of the Demised Premises in an arrangement which does not constitute a User Agreement, Tenant shall request, in writing, the approval of the Landlord, and, where the State Comptroller's approval is required by Section 10.01(a), the approval of the State Comptroller, setting forth in Tenant's request the identity of the proposed assignee or sublessee, information about the business, character and financial capacity of the proposed assignee or sublessee, and any other information that Landlord shall reasonably request in connection with its determination. Except as otherwise provided in Section 10.02, Landlord shall have one hundred twenty (120) days from the date that

Tenant requests, in writing, approval of a proposed assignment or subletting of all or any portion of the Demised Premises under this Article 10 to notify Tenant whether it approves or disapproves thereof. No assignment which requires the approval of the State Comptroller will be effective until a written approval of such assignment, has been delivered to the Tenant by the State Comptroller.

(b)      From and after the tenth (10th) anniversary of the Commencement Date and provided that no Event of Default has occurred and is continuing, Tenant may deliver a notice (a "Recapture Request") to Landlord requesting Landlord to terminate the Lease and take possession of the Demised Premises as of a date specified in the Recapture Request (the "Recapture Date"), which date shall not be sooner than ninety (90) days nor later than three hundred sixty (360) days from the date of the Recapture Request. Within one hundred twenty (120) days from the delivery of the Recapture Request, Landlord, in Landlord's sole determination, shall deliver a written notice to Tenant granting such Recapture Request (a "Recapture Approval") or denying such Recapture Request (a "Recapture Denial"). In the event that Landlord elects to grant the Recapture Request, on the Recapture Date or such other date set forth in the Recapture Approval and reasonably agreed to by Tenant, Tenant shall surrender the Demised Premises to Landlord, this Lease shall terminate and the rights and obligation of the parties to the other shall be the same as if such date were the Scheduled Expiration Date. In the event that Landlord elects to deny the Recapture Request, Tenant shall have a period of one (1) year from the date of the Recapture Denial to request Landlord's approval in writing (an "Assignment Request") to assign this Lease to a not-for-profit entity with experience and financial capacity sufficient to operate the Demised Premises pursuant to this Lease and that is not a Prohibited Person (a "Proposed Assignee"), which approval shall be in the sole discretion of the Landlord, conditioned or delayed. In the event that Landlord approves such Assignment Request, the parties shall share any payments received from the Proposed Assignee with respect to such assignment (i) on a pari passu basis up to the amount of the sum of (x) Landlord's Contribution (which shall be payable to Landlord), and (y) the total cost incurred by Tenant in connection with the Major Construction Work and any other Capital Improvement, less Landlord's Contribution (which shall be payable to Tenant) and (ii) equally on any amounts thereafter.

(c)      Any consent or approval by Landlord under this Section 10.03 shall apply only to the specific transaction thereby authorized and shall not relieve Tenant from the requirement of obtaining the prior written consent of Landlord to any further assignment of this Lease or subletting of the Demised Premises in an arrangement which does constitute a User Agreement.

(d)      No assignment of this Lease or subletting of the Demised Premises in an arrangement which does not constitute a User Agreement shall have any validity except upon compliance with the provisions of this Section 10.03.

(e)      No approved assignment of this Lease or subletting of the Demised Premises in an arrangement which does not constitute a User Agreement shall become effective until there shall have been delivered to Landlord (i) an executed

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 39                                                        RECEIVED NYSCEF: 05/25/2023

38

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 43 of 163

counterpart of the sublease or the instrument of assignment of this Lease, in recordable form, containing inter alia, the name, address and telephone number of the assignee or User, and (ii) in the case of an assignment, an executed instrument of assumption by said assignee, in recordable form, whereby assignee expressly assumes all of the obligations of Tenant under this Lease.

(f)     Upon any approved assignment of this Lease and assumption of the obligations of the Tenant hereunder by the assignee, the assignor shall be relieved of all obligations first arising under this Lease following the effective date of the assumption. Nothing herein shall relieve the assignor of any obligations hereunder which are expressly stated in this Lease or in the Landlord's consent to assignment to survive the assignment.

Section 10.04    User Agreements with Respect to Portions of the Demised Premises.

(a)     Notwithstanding the provisions of Section 10.01(a), Tenant may, from time to time demise any portion(s) of the Demised Premises under subleases, occupancy agreements or licenses and/or enter into service or concession agreements, with a term not to exceed fifteen (15) years, for actual use and occupancy by the sublessee or licensee (a "Direct User"), or for production or presentation by the sublessee or licensee of events or other productions (an "Intermediary User"), hereinafter collectively referred to as User Agreements. Neither a Direct User nor an Intermediary User shall be an Affiliate of the Tenant. All User Agreements with Significant Sub-occupants shall be subject to the provisions of Section 10.04(c). All User Agreements shall include a provision requiring the User to use the subleased, licensed, occupied or concessioned space solely for Permitted Uses. Tenant shall perform and observe all of the terms and conditions to be observed by the landlord or licensor under the User Agreements, and shall cause the users, operators, licensees, concessionaires and other occupants (collectively "Users") to comply with their obligations under their User Agreements and shall enforce all of the rights of such landlord or licensor in accordance with the terms thereof.

(b)     All User Agreements must be in writing and meet the following criteria: (i) the use permitted under the User Agreement must be a Permitted Use and shall further the Public Goals set forth in Exhibit K hereto; (ii) the User Agreement shall comply with the Lease and with the requirements of all applicable governmental authorities and all policies of insurance covering the Demised Premises; (iii) the User and the User's officers, directors, managers, employees or operators shall not be Prohibited Parties, and Landlord and/or Tenant may terminate any User Agreement in the event that any User, its officers, directors, managers, employees or operators meet the definition of Prohibited Parties at any time during the term of the user Agreement, (iv) the User Agreement shall be subject and subordinate to the Lease, and shall provide that upon the termination of this Lease, Landlord, at its sole option, may terminate the User Agreement or enforce the User Agreement and the User will attorn to, or enter into a direct lease with Landlord on the same terms and conditions as are contained in the User Agreement for the then remainder of the User Agreement term,

Case 1:25-cv-07373-GBD   Document 1-1   Filed 09/05/25   Page 44 of 163

subject, however, to the matters contained in Section 10.07 hereof, (v) the User shall obtain and keep in force adequate Commercial General Liability coverage providing Demised Premises liability, products completed operations, broad form property damage, independent contractors, and blanket contractual including written and oral contracts and otherwise meeting the requirements of Article 7 hereof.

(c)      Any other provision of this Article 10 to the contrary notwithstanding, Tenant shall require any Direct or Intermediary User that is a Significant Sub-occupant, to execute and deliver to Tenant and Landlord a Vendor Responsibility Questionnaire on the form hereto attached as Exhibit O or any successor or replacement form required by the Landlord or the Office of the State Comptroller. In the event that Landlord reasonably determines that the applicable Significant Sub-occupant does not meet the vendor responsibility requirements of the State of New York, Landlord shall notify Tenant of such determination and Tenant shall terminate the applicable User Agreement. Nothing in this Section 10.04 (c) shall relieve any Significant Sub-occupant from complying with any and all approval requirements imposed by any City, State or Federal statute, ordinance, rule or regulation.

(d)      Within 30 days following execution, Tenant shall deliver to Landlord a fully executed copy of the User Agreement and all ancillary agreements, together with such other documentation and information as Landlord shall reasonably request to evidence that the criteria set forth in paragraph (b) have been satisfied.

(e)      Upon and subject to the terms and conditions of Article 19 hereof, Tenant shall indemnify Landlord against, and shall hold Landlord harmless from, any and all liabilities, claims and causes of action arising under the terms and conditions of any User Agreements affecting the Demised Premises or any part thereof.

(f)      The fact that a violation or breach of any of the terms, provisions or conditions of this Lease results from or is caused by an act or omission by any of the Users shall not relieve Tenant of Tenant's obligation to cure, or liability for, the same. Tenant shall take all necessary and reasonable steps to prevent any such violation or breach. Landlord shall afford Tenant a reasonable time in which to enforce Tenant's rights against any User which is in violation or breach of its User Agreement, provided Tenant is diligently proceeding with its remedies against such User.

Section 10.05      Landlord's Right to Collect Rent Under User Agreements. Subject to the rights of a Recognized Mortgagee, Landlord, after an Event of Default by Tenant, may collect subrent and all other sums due under User Agreements and apply the net amount collected to the Rental payable by Tenant hereunder, but no such collection shall be, or be deemed to be, a waiver of any agreement, term, covenant or condition of this Lease or the acceptance by Landlord of any User as Tenant hereunder, or a release of Tenant from performance by Tenant of its obligations under this Lease.

Section 10.06      Assignment to Landlord of Tenant's Interest in User Agreements. To secure the prompt and full payment by Tenant of Rental and the

faithful performance by Tenant of all the other terms and conditions herein contained on its part to be kept and performed, Tenant hereby assigns, transfers and sets over unto Landlord (subject to the conditions hereinafter set forth and subject and subordinate to the rights of the holder of any Recognized Mortgage), all of Tenant's right, title and interest in and to all User Agreements affecting the Demised Premises or any part thereof and hereby confers upon Landlord, its agents and representatives, a right of entry by any lawful means in, and sufficient possession of, the Demised Premises to permit and insure the collection by Landlord of said rentals and other sums payable under the User Agreements, and further agrees that the exercise of said right of entry and qualified possession by Landlord shall not constitute an eviction of Tenant from the Demised Premises or any portion thereof; provided, however, that such assignment shall become operative and effective only in the event that this Lease and the term hereof shall be cancelled or terminated pursuant to the terms, covenants and conditions hereof, or in the event of repossession under a dispossess warrant or other re-entry or repossession by Landlord under the provisions hereof, if an Event of Default by Tenant shall occur hereunder and then only such User Agreements as the Landlord may additionally elect to take over and assume. At any time and from time to time upon Landlord's demand, Tenant shall promptly deliver to Landlord a schedule of all User Agreements setting forth the names of all Users, with a photostatic copy of each of such User Agreements.

Section 10.07     Recognition of Certain Users by Landlord.

(a)     Landlord covenants and agrees, for the benefit of any User having a User Agreement with a term of ten (10) years or more (excluding renewal options) which meets the requirements of Section 10.04 hereof and which User has the right under such User Agreement to occupy or use either (x) more than fifty percent (50%) of any floor of the Administration Building, or (y) the entire Drill Hall, provided that in the case of occupancy or use of the Drill Hall, Tenant certifies to Landlord that such User has delivered a User Pledge to Tenant, Landlord will execute and deliver an agreement in recordable form pursuant to which Landlord agrees to recognize such User as the direct tenant of Landlord upon the termination of this Lease pursuant to any of the provisions of Article 24 hereof, subject to such User fulfilling the terms of its User Pledge in all material respects and paying to Landlord the entire balance of the User Pledge, if any, upon such termination, and agreeing that Landlord will not (x) join the User as a party defendant in any action or proceeding which may be commenced by Landlord to terminate this Lease or (y) evict the User from the portion of the Demised Premises demised to it, or affect any of the User's rights under its User Agreement by reason of any default by Tenant under this Lease; provided, however, that at the time of the termination of this Lease (A) no default exists under the User's User Agreement which at such time would then permit the landlord thereunder to terminate the same or to exercise any dispossess remedy provided for therein, (B) Landlord elects to continue to operate the Demised Premises for the Permitted Uses, (C) Landlord shall not be bound by any provision of the User Agreement which would require Landlord to perform any action or incur any obligation which cannot legally be performed or incurred by a governmental entity, or which would require the payment by Landlord to, or performance by Landlord of any work for the benefit of, the User in excess of the

aggregate of sums actually received by Landlord under such User Agreement and all other attorned User Agreements but only to the extent such sums received are actually available for payment after Landlord has paid any necessary expenses for the Demised Premises and has established any reasonable and customary reserve accounts, and (D) the User shall deliver to Landlord an instrument confirming the agreement of such User to attorn to Landlord and to recognize Landlord as the User's landlord under its User Agreement as required by Section 10.04 hereof, which instrument shall provide that neither Landlord, nor anyone claiming by, through or under Landlord shall be:

(i)     liable for any act or omission of any prior landlord (including, without limitation, the then defaulting landlord); or

(ii)    subject to any offsets or defenses which the User may have against any prior landlord (including, without limitation, the then defaulting landlord); or

(iii)   bound by any payment of rent which the User might have paid for more than the current month to any prior landlord (including, without limitation, the then defaulting landlord); or

(iv)    bound by any covenant to undertake or complete any construction of the Demised Premises demised by the User Agreement; or

(v)     bound by any obligation to make any payment to the User or to expend any money in connection with the development, maintenance, operation or management of the Demised Premises, except to the extent such sums received are actually available for payment after Landlord has paid any necessary expenses for the Demised Premises and has established any reasonable and customary reserve accounts); or

(vi)    bound to perform any action or incur any obligation which Landlord is legally prohibited from incurring or performing because of its status as a governmental entity.

(vii)   required to use the Demised Premises for the Permitted Uses.

Section 10.08    Mortgage of Leasehold Interests.

(a)     Tenant shall not mortgage, assign or encumber this Lease or Tenant's interest herein, without Landlord's prior written consent, which consent shall not be unreasonably withheld, delayed or conditioned provided such proposed mortgagee qualifies as a Mortgagee.

(b)     No Mortgage(s) or any extension thereof shall extend to or affect the estate and interest of Landlord in and to the Land or Building or any part thereof.

Section 10.09   <u>Required Provisions in Mortgages</u>. No Mortgage of this Lease or of Tenant's interest herein, shall be valid or of any force or effect, as against Landlord, unless and until a photostatic copy of the original of each instrument creating and affecting such Mortgage, and written notice containing the name and post office address of the holder of such Mortgage, shall have been delivered to Landlord, and unless the Mortgage shall contain, in substance, the following provisions:

(a)    "This mortgage is executed upon the condition that no purchaser at any foreclosure sale shall acquire any right, title or interest in or to the Lease hereby mortgaged, unless the said purchaser, or the person, firm or corporation to whom or to which such purchaser's right has been assigned, shall, in the instrument transferring to such purchaser or to such assignee the interest of Tenant under the Lease, assume and agree, in accordance with the provisions of said Lease, to perform all of the terms, covenants and conditions of said Lease to be observed or performed on the part of Tenant and moreover, that no further or additional mortgage or assignment of said Lease shall be made except in accordance with the applicable provisions contained in <u>Article 10</u> of the Lease, and that a duplicate original of said instrument containing such assumption agreement, duly executed and acknowledged by such purchaser or such assignee and in recordable form, is delivered to Landlord immediately after the consummation of such sale, or, in any event, prior to taking possession of the Demised Premises demised thereby;" and

(b)    "The mortgagee shall not retain and apply the proceeds of any insurance or the proceeds of any condemnation award toward payment of the sum secured by this mortgage to the extent such proceeds are required for the repair or restoration of the mortgaged Demised Premises in accordance with the provisions of the Lease hereby mortgaged."

Section 10.10    Notice and Cure Period to Recognized Mortgagee for Tenant's Defaults Under the Lease.

(a)    If at any time there shall be a Mortgage to which Landlord has consented pursuant to <u>Section 10.08(a)</u> of this Lease (a "<u>Recognized Mortgage</u>"), Landlord shall give to the holder of such Recognized Mortgage, at the address set forth in the notice mentioned in <u>Section 10.09</u> hereof, a copy of each notice of default by Tenant given by Landlord under this Lease at the same time as, and whenever, any such notice of Default shall thereafter be given by Landlord to Tenant, and no such notice of default by Landlord shall be deemed to have been duly given to Tenant unless and until a copy thereof shall have been so given to the holder of a Recognized Mortgage of this Lease. The holder of such Recognized Mortgage (i) shall thereupon have a period of thirty (30) days more, after such notice is given to it, for remedying the default, or causing the same to be remedied, or causing action to remedy a default of the nature set forth in <u>Section 24.01(c)</u> to be commenced, than is given Tenant after such notice is given to it, and (ii) shall, within such period and otherwise as herein provided, have the right to remedy such default, cause the same to be remedied or cause action to remedy a default of the nature set forth in <u>Section 24.01(c)</u> to be commenced. Landlord will accept performance by the holder of a Recognized Mortgage of any covenant, condition, or

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59          Case 1:25-cv-07373-GBD          Document 1-1          Filed 09/05/25          Page 48 of 163          RECEIVED NYSCEF: 05/25/2023

43

agreement on Tenant's part to be performed under this Lease with the same force and effect as though performed by Tenant.

(b)      Notwithstanding the provisions of paragraph (a) hereof, no default by Tenant under an this Lease shall be deemed to exist as long as the holder of a Recognized Mortgage shall, in good faith, have commenced promptly either (i) to cure the default and to diligently and continuously prosecute the same to completion, or (ii) if possession of the Demised Premises is required in order to cure the default, to institute foreclosure proceedings and obtain possession directly or through a receiver, to prosecute such proceedings with diligence and continuity and, upon obtaining such possession, commence promptly to cure the default and to prosecute the same to completion with diligence and continuity, provided, however, that the holder of a Recognized Mortgage shall have delivered to Landlord, in writing, its agreement to take the action described in clause (i) or (ii) herein, and that during the period in which such action is being taken (and any foreclosure proceedings are pending) all of the other obligations of Tenant under this Lease, to the extent they are susceptible of being performed by the holder of such Recognized Mortgage, are being duly performed. However, at any time after the delivery of the aforementioned agreement, the holder of such Recognized Mortgage may notify Landlord, in writing, that it has relinquished possession of the Demised Premises or that it will not institute foreclosure proceedings or, if such proceedings have been commenced, that it has discontinued them, and in such event the holder of such Recognized Mortgage shall have no further liability under such agreement from and after the date it delivers such notice to Landlord (except for any obligations accruing prior to the date it delivers such notice), and thereupon Landlord shall have the unrestricted right to terminate this Lease and to take any other action it deems appropriate by reason of any default by Tenant, and upon any such termination the provisions of Section 10.11 hereof shall be applicable.

(c)      Anything herein contained to the contrary notwithstanding, except in the event of a condemnation or governmental takings, the effects of which shall be governed by Article 8, hereof, so long as a Recognized Mortgage remains outstanding, if the interests in the Demised Premises of Landlord and Tenant shall simultaneously be owned by the same Person, this Lease, and the leasehold estate created thereby shall not be deemed merged into the fee estate in the Demised Premises, or to have been extinguished, but shall continue nevertheless with the same force and effect as if Landlord and Tenant were different Persons.

(d)      Notwithstanding any other provision of this Lease, or any assumption agreement required hereunder, to the contrary, no holder of any Recognized Mortgage shall become liable under the provisions of this Lease (except to the extent provided in (b)) unless and until such time as it becomes, and then only for as long as it remains, the owner of the leasehold estate created thereby.

Section 10.11      Recognized Mortgagee's Rights Upon Termination of this Lease.

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59    Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 49 of 163    RECEIVED NYSCEF: 05/25/2023

44

(a)      In case of termination of this Lease by reason of any default or for any other reason, Landlord shall give prompt notice thereof to the holders of any Recognized Mortgages which are a lien thereon. Landlord, on written request of the holder of the Recognized Mortgage most senior in lien priority (or of any junior Recognized Mortgagee in successive order of priority, if a senior Recognized Mortgagee shall have transferred or assigned its rights to such junior Recognized Mortgagee or shall have failed to exercise its rights hereunder within the applicable period of time) made any time within thirty (30) days after the giving of such notice by Landlord, shall execute and deliver a new lease of the portion of the Demised Premises demised under this Lease to the holder of such Recognized Mortgage, or its nominee, for the remainder of the term of this Lease, upon all the covenants, conditions, limitations and agreements therein contained, provided that the holder of such Recognized Mortgage shall not be a Prohibited Party and shall pay to Landlord, simultaneously with the delivery of such new lease, all unpaid Rental due under this Lease up to and including the date of the commencement of the term of such new lease and all expenses including, but not limited to, reasonable attorneys' fees and disbursements and court costs incurred by Landlord in connection with the default by Tenant, the termination of this Lease and the preparation of the new lease.

(b)      Any such new lease and the leasehold estate thereby created shall, subject to the same conditions contained in this Lease, continue to maintain the same priority as the terminated Lease with regard to any lien, charge or encumbrance on Landlord's interest in the Demised Premises. Concurrently with the execution and delivery of such new lease, Landlord shall assign to the tenant named therein all of its right, title and interest in and to moneys (including insurance and condemnation proceeds), if any, then held by or payable to Landlord (or Depositary, as applicable), which Tenant would have been entitled to receive but for the termination of this Lease, and any sums then held by or payable to Landlord shall be deemed to be held by or payable to it as Landlord under the new lease.

(c)      Upon the execution and delivery of a new lease under this Section 10.11, all User Agreements which theretofore may have been assigned to Landlord thereupon shall be assigned and transferred, without representation or recourse (except that Landlord shall represent that it has not previously assigned or transferred the same), by Landlord to the tenant named in such new lease. Between the date of termination of this Lease and (i) the last date on which the holders of Recognized Mortgages constituting a lien thereon shall have failed to exercise their rights to obtain a new lease, or (ii) the date of execution and delivery of the new lease, if the holder of a Recognized Mortgage shall have requested such new lease as provided in paragraph (a) of this Section, whichever of (i) or (ii) is later, Landlord will not cancel any User Agreements or accept any cancellation, termination or surrender thereof (unless such termination shall be effected as a matter of law on the termination of this Lease) without the consent of the holder of such Recognized Mortgage, except for default as permitted in the User Agreement.

(d)      Notwithstanding anything to the contrary contained in this Section 10.11, the holder of a Recognized Mortgage shall have no obligation to cure any

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 50 of 163

default of Tenant of the nature set forth in subparagraphs (d) and (e) of <u>Section 24.01</u> of this Lease.

Section 10.12    <u>Additional Recognized Mortgagee Protective Clauses</u>. In addition to the other rights, notices and cure periods afforded to the holders of any Recognized Mortgage on this Lease approved by Landlord, Landlord further agrees that:

(i)    This Lease will not be modified or amended without the prior written consent of any holder of a Recognized Mortgage if such modification or amendment would have a material adverse effect on such holder.

## ARTICLE 11

## MAJOR CONSTRUCTION WORK

Section 11.01    Tenant shall comply with all applicable statutes, rules, and regulations of the City, State and Federal governments relating to the performance of the Lease and the construction work and any restoration work to be performed thereunder.

Section 11.02    <u>Major Construction Schedule.</u> Annexed to this Lease as <u>Exhibit M</u> and made a part hereof is a description of the Major Construction Work which has been approved by Landlord. Annexed to this Lease as <u>Exhibit L</u> is a schedule for the performance of the Major Construction Work, which sets forth the estimated timing of commencement and of Substantial Completion of each phase (a "<u>Phase</u>") of the Major Construction Work, and identifies with specificity the work to be undertaken in each Phase, which has been approved by Landlord ("<u>Major Construction Schedule</u>.")

Section 11.03    Schematic Design Submission.

(a)    Prior to the commencement of any Phase of the Major Construction Work, Tenant shall submit to Landlord the following items (the "<u>Schematic Design Submission</u>"): (i) an update to the Major Construction Schedule, identifying any changes proposed from the previously-approved Major Construction Schedule as a result of the Major Construction Work that Tenant intends to undertake during such Phase, (ii) an updated description of the Major Construction Work that Tenant intends to undertake during such Phase, identifying any changes proposed from the previously approved description of Major Construction Work, and (iii) schematic drawings, a scope of work description and a Budget with respect to the proposed Phase that Tenant intends to undertake (such documents, collectively, the "<u>Schematic Design Documents</u>"). Such Schematic Design Documents shall be in compliance with all Requirements. Tenant's submission of Schematic Design Documents shall be deemed complete and ready for Landlord review provided the Schematic Design Documents constitute "<u>Schematic Design Documents</u>" as defined in the then-current edition of the AIA Standard Form of Agreement between Owner and Architect, B141 (the "<u>AIA Form Agreement</u>").

(b)      Landlord shall have the right to review and approve each element comprising the Schematic Design Submission; provided that Landlord shall not unreasonably withhold, delay or condition its consent thereto so long as: (i) with respect to the description of the Major Construction Work, any proposed revisions do not materially reduce the scope of the Major Construction Work below the previously-approved description of the Major Construction Work (taking into account that elements of the Major Construction Work may be performed in a later Phase), (ii) with respect to the Major Construction Schedule, any proposed revisions do not materially delay the overall date for Substantial Completion of the Major Construction Work beyond the Outside Completion Date, and (iii) with respect to the Schematic Design Documents, the work shown therein (1) is in accordance with the description of the Major Construction Work, (2) is of good professional engineering/architectural design and incorporates into the Building first-quality equipment and materials, (3) would not jeopardize or adversely affect the structural integrity of the Building, the major Building systems or the roof, and (4) otherwise provides for a quality of design, equipment, materials and techniques that are commensurate in quality with the historic significance of the Building and are in accordance with the restoration standards applicable to a building of this type and significance. Landlord shall notify Tenant within twenty (20) days whether Landlord approves or disapproves of the Schematic Design Submission in whole or in part, which notice shall identify with specificity any matters disapproved (time being of the essence). Tenant shall resubmit to Landlord revised elements of the Schematic Design Submission addressing the matters as to which Landlord notified Tenant of its disapproval, and Landlord shall review and respond to all such revised elements within twenty (20) days (time being of the essence). In the event that Landlord fails to respond to any submission within such twenty-day period, Tenant shall deliver a second notice to Landlord requesting Landlord to review and respond to the Schematic Design Submission or revised Schematic Design Submission within fifteen (15) days (time being of the essence), which notice shall state prominently "LANDLORD RESPONSE TO THE BELOW SUBMISSION IS REQUIRED WITHIN FIFTEEN (15) DAYS FROM THE DATE OF THIS NOTICE OR LANDLORD APPROVAL WILL BE DEEMED GIVEN." Any Schematic Design Submission or revised Schematic Design Submission to which Landlord has not notified Tenant of its approval or disapproval within such fifteen (15) day period following such second notice shall be deemed to have been approved by Landlord. Tenant shall consult with OPRHP with respect to the Schematic Design Documents as required by applicable law and/or agreement between Tenant and OPRHP, and Landlord shall cooperate with Tenant with respect to such consultation.

Section 11.04    Design Development Submission.

(a)      Following Landlord's approval of the Schematic Design Submission and prior to the commencement of any Phase of Major Construction Work, Tenant shall submit to Landlord the following items (the "Design Development Submission"), identifying any changes in such items from the Landlord-approved Schematic Design Submission: (i) an update to the Major Construction Schedule, (ii) an updated description of the Major Construction Work, and (iii) design development drawings, a scope of work description and a Budget with respect to the proposed Phase

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59    Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 52 of 163    RECEIVED NYSCEF: 05/25/2023

47

that Tenant intends to undertake (such documents, the "Design Development Documents"). Such Design Development Documents shall be in compliance with all Requirements. Tenant's submission of Design Development Documents shall be deemed complete and ready for Landlord review provided the Design Development Documents constitute "Design Development Documents" as defined in the AIA Form Agreement.

(b)    Landlord shall have the right to review and approve any elements of the Design Development Submission which represent changes (and not merely the course of progression of design detail) from the Landlord-approved Schematic Design Submission; provided that Landlord shall not unreasonably withhold, delay or condition its consent thereto so long as the submission meets the standards enumerated in Section 11.04(a). Landlord shall notify Tenant within 10 days whether Landlord approves or disapproves of the Design Development Submission, in whole or in part, with respect to such portions of the Design Development Submission related to HVAC, electrical, utility, fire/life safety and other mechanical systems (collectively "Mechanical Systems") and 20 days for all other portions, which notice shall identify with specificity any matters disapproved (time being of the essence). Landlord may not disapprove any items in the Design Development Submission which were previously approved by Landlord in the Schematic Design Submission (except with respect to previously approved items that are inconsistent with subsequent modifications made to such items in the Design Development Submission). Tenant shall resubmit to Landlord revised elements of the Design Development Submission addressing the matters as to which Landlord notified Tenant of its disapproval, and Landlord shall review and respond to all such revised elements within 10 days with respect to revisions related to Mechanical Systems, or 20 days with respect to revisions related to other items (time being of the essence). In the event that Landlord fails to respond to any submission within such 10-day or 20-day period, as applicable, Tenant shall deliver a second notice to Landlord requesting Landlord to review and respond to the Design Development Submission or revised Design Development Submission within 10 days with respect to revisions related to Mechanical Systems, or 20 days with respect to revisions related to other items (time being of the essence), which notice shall state prominently "LANDLORD RESPONSE TO THE BELOW SUBMISSION IS REQUIRED WITHIN 10 DAYS FROM THE DATE OF THIS NOTICE OR LANDLORD APPROVAL WILL BE DEEMED GIVEN," or, "LANDLORD RESPONSE TO THE BELOW SUBMISSION IS REQUIRED WITHIN 20 DAYS FROM THE DATE OF THIS NOTICE OR LANDLORD APPROVAL WILL BE DEEMED GIVEN," as applicable. Any Design Development Submission or revised Design Development Submission to which Landlord has not notified Tenant of its approval or disapproval within such 10-day or 20-day period, as applicable, following such second notice shall be deemed to have been approved by Landlord. Tenant shall consult with OPRHP with respect to the Design Development Documents as required by applicable law and/or agreement between Tenant and OPRHP, and Landlord shall cooperate with Tenant with respect to such consultation.

Section 11.05    Construction Document Submission.

(a)     Following Landlord's approval of the Design Development Submission and prior to the commencement of any Phase of Major Construction Work, Tenant shall submit to Landlord the following items (the "Construction Document Submission"), identifying any changes in such items from the Landlord-approved Design Development Submission: (i) an update to the Major Construction Schedule, (ii) an updated description of the Major Construction Work, and (iii) construction drawings and specifications, a scope of work description and a Budget with respect to the proposed Phase that Tenant intends to undertake (such documents, the "Construction Documents"). Such Construction Documents shall be in compliance with all Requirements. Tenant's submission of Construction Documents shall be deemed complete and ready for Landlord review provided that the Construction Documents constitute "Drawings and Specifications" with respect to the "Construction Documents Phase" as defined in the AIA Form Agreement.

(b)     Landlord shall have the right to review and approve any elements of the Construction Document Submission which represent changes (and not merely the course of progression of design detail) from the Landlord-approved Design Development Submission; provided that Landlord shall not unreasonably withhold, delay or condition its consent thereto so long as the submission meets the standards enumerated in Section 11.03(b). If there are no changes in the Construction Document Submission from the Design Development Submission, no consent of Landlord shall be required. With respect to any changes, Landlord shall notify Tenant within five (5) Business Days whether Landlord approves or disapproves of such changed elements of the Construction Document Submission, which notice shall identify with specificity any matters disapproved (time being of the essence). Landlord may not disapprove any items in the Construction Document Submission which were previously approved by Landlord in the Design Development Submission (except with respect to previously approved items that are inconsistent with subsequent modifications made to such items in the Construction Document Submission). Tenant shall resubmit to Landlord revised elements of the Construction Document Submission addressing the matters as to which Landlord notified Tenant of its disapproval, and Landlord shall review and respond to all such revised elements within five (5) Business Days (time being of the essence). In the event that Landlord fails to respond to any submission within such five (5)-Business Day period, Tenant shall deliver a second notice to Landlord requesting Landlord to review and respond to the Construction Document Submission or revised Construction Document Submission within five (5) Business Days (time being of the essence), which notice shall state prominently "LANDLORD RESPONSE TO THE BELOW SUBMISSION IS REQUIRED WITHIN 5 BUSINESS DAYS FROM THE DATE OF THIS NOTICE OR LANDLORD APPROVAL WILL BE DEEMED GIVEN."  Any Construction Document Submission or revised Construction Document Submission to which Landlord has not notified Tenant of its approval or disapproval within such five (5)-Business Day period following such second notice shall be deemed to have been approved by Landlord. Tenant shall consult with OPRHP with respect to the Construction Documents as required by applicable law and/or agreement between Tenant and OPRHP, and Landlord shall cooperate with Tenant with respect to such consultation.

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                                    RECEIVED NYSCEF: 05/25/2023
Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 54 of 163

49

Section 11.06    <u>Modifications of Previously Approved Submissions</u>. Tenant shall submit to Landlord from time to time any modifications to the Schematic Design Documents, Design Development Documents and Construction Documents. If any such modifications affect any items as to which Landlord has previously granted or is deemed to have granted its approval, Landlord shall have the same review rights with respect to such modifications as are set forth in the applicable of <u>Section 11.03(b), 11.03(b) and 11.04(b),</u> except that Landlord's review periods shall be shortened by five (5) days each, provided that in no event shall any such review period be shortened to less than five (5) Business Days. Landlord shall cooperate with Tenant in coordinating communications with OPRHP with respect to modifications to the Schematic Design Documents, Design Development Documents and Construction Documents.

Section 11.07    [Intentionally Deleted].

Section 11.08    <u>Tenant's Compliance with Requirements</u>. Tenant shall ensure that the Schematic, Design Development Documents and Construction Documents comply with the Requirements. Landlord's review of any plans pursuant to Sections <u>11.03</u>, <u>11.04</u> and <u>11.05</u> shall not be, nor be construed as being a determination that such plans comply with Requirements.

Section 11.09    <u>Landlord's Right to Use Field Personnel</u>. Landlord's designees may inspect the Demised Premises at all reasonable times to observe Tenant's Major Construction Work then being undertaken. No such observation by Landlord's personnel or designees shall impose on Landlord any responsibility for any failure by Tenant to observe any Requirements or safety practices in connection with such construction, preclude in any way any governmental authority having jurisdiction thereof from enforcing any Requirements or constitute an acceptance of any work which does not comply in all respects with the provisions of this Lease. Such designees shall not direct or interfere with any demolition work or Major Construction Work being conducted by Tenant and shall comply with any reasonable instructions of Tenant intended to avoid such interference or injury to such designees while at the Demised Premises (including telephonic or other reasonable notice to Tenant's construction officials prior to entering the actual construction site and checking in with such officials upon such entry). Tenant shall designate a high-level construction official to provide liaison with such designees.

Section 11.10    <u>Additional Conditions to Major Construction Work</u>. In addition to any other items required hereunder, Tenant shall deliver to Landlord the following items in connection with the Major Construction Work prior to the commencement of each Phase of Major Construction Work:

(i)    copies of all documents which have been stamped or otherwise approved by the `Buildings Department;

(ii)    executed counterparts and collateral assignments with agreements to perform for Landlord of the Architect's agreement, the general contractor agreement and any other construction contract agreements between Tenant and

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 55 of 163

Contractors, construction managers, vendors, suppliers and other Persons involved in such Phase of Major Construction Work (collectively, the "Contract Documents");

(iii)      evidence that payment and performance bonds, contractor guaranties, letters of credit, or other construction security have been deposited with Tenant, and collateral assignments of the same to Landlord;

(iv)      all documents required for compliance with OPRHP Requirements;

(v)      at least fifteen (15) days prior to the commencement of such Phase of Major Construction Work, certified copies or certificates of the policies of insurance required under Section 7.01; and

(vi)      a financial plan which demonstrates that the funding necessary to complete such Phase of Major Construction Work shall be funded in a timely manner to allow for the diligent and continuous performance and completion of such Phase of the Major Construction Work, which such plan shall be consistent with prudent and customary standards then employed by not-for-profit institutions in undertaking major capital construction projects to be funded by capital fundraising campaigns.

Section 11.11    Requirements During Major Construction Work. Tenant shall submit to Landlord the following in connection with the Major Construction Work during the construction thereof:

(i)      copies and approvals of all structural and mechanical system test reports conducted by or for Tenant, its contractors and subcontractors, or the Architect as promptly as the same are obtained;

(ii)      copies of progress schedules once every two (2) months;

(iii)      progress photos once every two (2) months;

(iv)      two (2) sets of copies of (a) all documents filed with the Buildings Department, including, without limitation, application and amendment forms as promptly as the same are filed, (b) all amendments approved by the Buildings Department as promptly as the same are obtained and (c) all permits, consents, and other certificates issued pursuant to the Building Code of New York City or New York State as promptly as the same are obtained; and

(v)      all documents required for compliance with OPRHP Requirements.

Section 11.12    Requirements Upon Substantial Completion. Tenant shall submit to Landlord, as promptly following Substantial Completion of each Phase

of Major Construction Work as the same are available, copies of the following items in connection with such Phase of Major Construction Work:

(i)    all guarantees or certifications called for under any and all Contract Documents or otherwise received by Tenant, in each case to the extent separate from the Contract Documents; and

(ii)    all certificates required by the New York City Building Code or the Buildings Department to be filed with the Buildings Department;

(iii)    as-built plans prepared by Architect (which plans may, if as-builts are not prepared, consist of the Construction Documents accurately marked to show all changes made in actual execution of such Phase of Major Construction Work); and

(iv)    a certification by Tenant of the total hard and soft costs incurred by Tenant in connection with such Phase of Major Construction Work, identifying the amount of Landlord's Contribution expended in such Phase.

Section 11.13    Commencement and Completion of Major Construction Work.

(a)    Subject to Unavoidable Delay, commencement of Major Construction Work shall take place no more than four (4) years after the Commencement Date, such date to be extended to the extent necessary to obtain any approvals described in subsection (h) of the definition of Unavoidable Delay. All Major Construction Work, once commenced, shall be diligently and continuously pursued, and shall be completed in a good and workmanlike manner and substantially in accordance with the Construction Documents therefor, with Substantial Completion of the Major Construction Work to occur no later than (x) the tenth (10th) anniversary of the Commencement Date, if not performed in Phases, or (y) the fifteenth (15th) anniversary of the Commencement Date, if performed in Phases, subject to Unavoidable Delay during or in connection with the commencement of the Major Construction Work (the "Outside Completion Date"). Tenant shall, with reasonable diligence, apply and prosecute the application for a certificate of occupancy for all Major Construction Work as to which, under applicable Requirements, a new or revised certificate of occupancy is required, and shall promptly deliver to Landlord a copy of such certificate of occupancy upon issuance thereof.

Section 11.14    Fire Safety Planning. Tenant, at Tenant's cost and expense, shall retain or cause the Architect to retain a qualified fire protection planning firm or mechanical engineering firm qualified in fire protection planning, and to utilize the services of such firm in the preparation of a fire protection plan, and for fire protection consultation during performance of any Major Construction Work. Such fire protection plan shall be submitted to Landlord for its information simultaneously with the submission of the fire protection plan to the Department of Buildings.

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 57 of 163

Section 11.15    Conditions Precedent to Tenant's Commencement of All Major Construction Work.

(a)    <u>Permits and Insurance</u>. Tenant shall not commence any Major Construction Work unless and until it shall have obtained and delivered to Landlord (i) true copies of all necessary permits, consents, certificates and approvals of all governmental authorities to be issued pursuant to the Building Code of New York City, the New York State Building Code or any other applicable law for such demolition and construction and (ii) certified copies of the policies of insurance required to be carried pursuant to the provisions of <u>Article 7</u> hereof.

(b)    <u>Cooperation of Landlord in Obtaining Permits</u>. Landlord, in its proprietary capacity, shall reasonably cooperate with Tenant in obtaining any permits, consents, certificates and approvals of governmental authorities required under this <u>Article 11</u> and shall execute and, where required, acknowledge any applications made by Tenant which are required to obtain such permits, consents, certificates and approvals.

(c)    <u>OPRHP Approval of Construction Documents; Other Submissions</u>. Tenant shall not commence any Phase of Major Construction Work unless and until (i) OPRHP shall have approved the Construction Documents and (ii) Tenant shall have satisfied the requirements of Sections <u>11.08</u>, <u>11.10</u>, <u>11.14</u> and this <u>Section 11.15</u>.

Section 11.16    <u>Required Submissions Upon Completion of Major Construction Work</u>. Promptly upon Substantial Completion of the Major Construction Work, or any Phase thereof, Tenant shall furnish Landlord with a certification of the Architect (certified to Landlord and Tenant) that it has examined the applicable plans and specifications (which shall include the Construction Documents and any other plans and specifications required to be delivered to Landlord) and that, in its best professional judgment to its best knowledge and belief, all Major Construction Work has been Substantially Completed in accordance with the Construction Documents.

Section 11.17    <u>Title to the Materials, Fixtures and Equipment</u>. Materials, fixtures and Equipment to be incorporated in the Building (which shall not include, however, personal property and fixtures of Tenant or any Users that are permitted to be removed by them pursuant to this Lease or User Agreements, at the end of the terms thereof) shall, effective upon their purchase and at all times thereafter, constitute the property of Landlord and shall constitute a portion of the Demised Premises covered by this Lease. However, Landlord shall not be liable in any manner for payment or otherwise to any contractor, subcontractor, laborer or supplier of materials in connection with the purchase of any such materials, fixtures or Equipment, nor shall Landlord have any obligation to pay any compensation to Tenant or any User by reason of Landlord's acquisition of title to the materials, fixtures or Equipment. Notwithstanding the foregoing or anything to the contrary elsewhere contained in this Lease, Landlord hereby agrees that, for income tax purposes, Tenant (or, to the extent provided in any User Agreement, a User) shall be considered to have all of the benefits

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59     Case 1:25-cv-07373-GBD     Document 1-1     Filed 09/05/25     Page 58 of 163     RECEIVED NYSCEF: 05/25/2023

53

and burdens of ownership with respect to the Demised Premises or improvements therein and that Landlord will not claim any deduction or credit on its income tax returns with respect to the Demised Premises or improvements therein and will not otherwise take any action in connection with the Demised Premises or improvements therein which would disentitle Tenant (or a User, where applicable) to claim the deductions and credits that it would otherwise be entitled to claim as the owner of the Buildings for income tax purposes.

Section 11.18     <u>Contractors Not Prohibited Parties</u>. Tenant shall ensure that all Persons with whom Tenant contracts for any portion of any Phase of Major Construction Work ("<u>Contractors</u>"), and all Persons with whom any Contractor contracts for labor or materials for any portion of any Phase of Major Construction Work, and all other Persons who have been solicited by others to perform any labor or other services or supply any materials in connection with any portion of any Phase of Major Construction Work are not Prohibited Parties.

Section 11.19     <u>Required Clauses in Contract Documents</u>. All Contract Documents shall include the following provisions:

(i)     "["Contractor"]/["Subcontractor"]/["Materialman"] hereby agrees that immediately upon the purchase by ["contractor"]/["subcontractor"]/ ["materialman"] of any building materials, fixtures or Equipment to be incorporated in the Buildings (as defined in the lease pursuant to which the owner acquired a leasehold interest in the property (the "<u>Lease</u>"), such materials, fixtures or Equipment shall become the sole property of The State of New York, notwithstanding that such materials, fixtures or Equipment have not been incorporated in, or made a part of, such Buildings at the time of such purchase; provided, however, that Landlord shall not be liable in any manner for payment or otherwise to ["contractor"]/["subcontractor"]/["materialman"] in connection with the purchase of any such materials, fixtures or Equipment and Landlord shall have no obligation to pay any compensation to ["contractor "]/["sub-contractor"]/ ["materialman"] by reason of such materials, fixtures or Equipment becoming the sole property of Landlord, provided, however, that nothing contained herein shall prejudice any rights which ["contractor"]/["subcontractor"]/["materialman"] may have under the Lien Law of the State of New York; and provided, further, however, that the risk of loss shall not transfer to Landlord or Tenant prior to the incorporation of such materials, fixtures and Equipment by reason of such ownership."

(ii)     "["Contractor"]/["Subcontractor"]/["Materialman"] hereby agrees that notwithstanding that ["contractor"]/["subcontractor"]/["materialman"] performed work at the Demised Premises (as such term is defined in the Lease) or any part thereof, Landlord shall not be liable in any manner for payment or otherwise to ["contractor"]/["subcontractor"]/["materialman"] in connection with the work performed at the Demised Premises, provided, however, that nothing contained herein shall prejudice any rights which ["contractor"]/["subcontractor"]/["materialman"] may have under the Lien Law of the State of New York."

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                                    RECEIVED NYSCEF: 05/25/2023

54

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 59 of 163

(iii)    "["Contractor"]/["Subcontractor"]/["Materialman"] hereby agrees to make available for inspection by Landlord, upon reasonable notice and during reasonable business hours, ["contractor's"]/["subcontractor's"]/["materialman's"] books and records relating to Major Construction Work (as defined in the Lease) being performed or the acquisition of any materials, fixtures or Equipment to be incorporated into the Buildings."

(iv)    "["Contractor"]/["Subcontractor"]["Materialman"] shall comply with all applicable statutes, rules, and regulations of the city, state and federal governments relating to the performance of the contract and the construction work and any restoration work to be performed thereunder."

(v)    "The agreements made in [clauses (i)-(iii) above] hereunder shall be deemed to be made for the benefit of the Landlord under the Lease and shall be enforceable by said Landlord."

Section 11.20    <u>Rights and Licenses</u>. Tenant shall have the right to acquire, create or grant temporary rights or licenses reasonably required in connection with the construction, installation, maintenance, operation or restoration of the Demised Premises or any utility lines, pipes, ducts, conduits or other equipment or facilities servicing any of the same, provided (a) any such right or license which is acquired by Tenant shall become part of the Demised Premises for all of the purposes of this Lease for so long as such right or license exists, (b) no such right or license, whether acquired, granted or created, may impose any charge on Landlord or lien upon the Demised Premises in respect of any cost or charges in connection therewith, other than for unpaid charges for utilities supplied to the Demised Premises through any such right or license, (c) no such right or license, or any rights granted thereunder, shall, unless Landlord and the City, as Superior Lessor under the City Lease, elect otherwise in writing, survive the termination of the Lease, and (d) no such right or license shall be effective unless and until Tenant delivers a notice to Landlord with a copy of such right or license. At Tenant's request, Landlord will join with Tenant in the acquisition, creation or granting of any such right or license (subject to the limitations hereinabove described), provided Landlord does not thereby incur any liability.

## ARTICLE 12

## REPAIRS; MAINTENANCE OF DEMISED PREMISES AND PUBLIC AREAS

Section 12.01    Tenant's Repair and Maintenance Obligations.

(a)    Tenant shall take good care of the Demised Premises and, subject to <u>Section 12.02</u>, make all repairs therein and thereon, interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen, necessary or appropriate to keep the same in a good condition and repair consistent with the "<u>Standards for Treatment of Historic Properties</u>" established by the United States Secretary of the Interior, and whether or not necessitated by wear, tear, obsolescence or defects, latent or otherwise. Tenant shall not commit or suffer, and shall use all

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59        Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 60 of 163    RECEIVED NYSCEF: 05/25/2023

55

reasonable precaution to prevent, waste, damage or injury to the Demised Premises. When used in this <u>Section 12.01</u>, the term "<u>repairs</u>" shall include all necessary replacements, alterations and additions. All repairs made by Tenant shall be made in compliance with all Requirements and the provisions of this Lease.

       (b)    Tenant shall keep clean and free from dirt, snow, ice, rubbish, obstructions and encumbrances, the sidewalks, landscaped areas, chutes and sidewalk hoists comprising, in front of, or adjacent to, the Demised Premises.

       (c)    Landlord shall not be required to furnish any services, utilities or facilities whatsoever to the Demised Premises, nor shall Landlord have any duty or obligation to make any alteration, change, improvement, replacement, Restoration or repair to, nor to demolish, any Building.

       (d)    Tenant shall not clean nor require, permit, suffer nor allow any window in the Building to be cleaned from the outside in violation of Section 202 of the Labor Law or of the rules of the Industrial Board or other state, county or municipal department, board or body having jurisdiction.

       Section 12.02   <u>Emergency Repairs</u>. Prior to the Substantial Completion of the Major Construction Work for the respective items which are listed in <u>Exhibit I</u>, Tenant shall perform, at its sole cost and expense, all imminent and necessary repairs to those items listed in <u>Exhibit I</u> which are broken or severely deteriorated, and which require imminent repair or maintenance in order to maintain the Property in a functional condition which is safe and sound ("<u>Emergency Repairs</u>"). To the extent possible, Tenant will cause such Emergency Repairs to be timely performed in order to maintain the safe and sound functionality of the Building. It is acknowledged and agreed that Emergency Repairs are intended to be performed in as economical a manner possible consistent with Requirements, and are intended merely to maintain the Building in safe and functional condition pending the performance by Tenant of the Major Construction Work. In no event are Emergency Repairs intended to include work to maintain or restore the interior decorative finishes of the Demised Premises, regardless of whether such finishes were damaged by reason of an item which is the subject of an Emergency Repair. As an example, but without limitation, Emergency Repairs would include the patching (but not the replacement) of a portion of the roof to stop water leaks, and would not include repair or restoration of decorative wall, floor or other interior surfaces which were damaged by reason of the water leaks. Notwithstanding the foregoing, Tenant shall perform Emergency Repairs in compliance with all Requirements and the provisions of this Lease. To the extent that any Emergency Repair would constitute a Capital Improvement if it was undertaken from and after the Completion of Construction Date, Tenant shall also comply with the provisions of <u>Article 13</u>. In the event that it is not reasonably practicable for Tenant to comply with such provisions prior to the performance of such Emergency Repair, the Tenant shall be permitted to perform such Emergency Repair without compliance with such provisions. In such instance, Tenant shall notify Landlord, in writing, of any Emergency Repairs performed by Tenant as soon as practical but in no event less than the end of the Business Day following such Emergency Repair, and shall thereafter take

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                                      RECEIVED NYSCEF: 05/25/2023

Case 1:25-cv-07373-GBD   Document 1-1   Filed 09/05/25   Page 61 of 163

56

all steps reasonably necessary to comply with such provisions. Any costs incurred by Tenant with respect to any Emergency Repairs shall be deemed prepaid Base Rent for which Tenant shall receive a credit against the next due installment(s) of Base Rent and Additional Charges until such credit is extinguished, provided that the aggregate amount of credit to which Tenant shall be entitled under this <u>Section 12.02</u> for Emergency Repairs shall not exceed $3 million Adjusted for Inflation.

        Section 12.03    <u>Electric Power</u>. To the extent available to the Building, electric power for the Demised Premises shall continue to be purchased by Landlord from the New York Power Authority at its lowest applicable rate as currently supplied, and Landlord shall be reimbursed by Tenant as Additional Charges for the cost of such electric power. In the event that such electric power from the New York Power Authority becomes unavailable to the Building, Tenant shall obtain electrical power for the Demised Premises directly from the applicable public utility supplier.

## ARTICLE 13

## CHANGES, ALTERATIONS AND ADDITIONS

        Section 13.01    <u>Capital Improvements</u>. From and after the Completion of Construction Date, Tenant shall not demolish, replace or materially alter the Demised Premises, or any part thereof, or make any addition thereto, other than (a) interior, non-structural work which is either decorative or temporary in nature (such as lighting, sound system, stage or partitions for the "run of a show"), (b) ordinary repairs performed with materials of type and quality similar to those then existing, or (c) replacements of items which are outdated or deteriorated with new items of a type and quality similar to those then existing (items other than in clauses (a), (b) or (c), "<u>Capital Improvement</u>"), unless Tenant shall comply with the following requirements and, if applicable, with the additional requirements set forth in <u>Section 13.02</u>:

        (a)      No Capital Improvement shall be undertaken unless and until Tenant shall have obtained and delivered to Landlord copies of final plans and specifications for such Capital Improvement, and Permits for the proposed Capital Improvement which are required to be obtained prior to the commencement of the proposed Capital Improvement (collectively, "<u>Improvement Approvals</u>") and the original polices of insurance, or duplicate originals thereof in accordance with <u>Section 11.15</u>. For the avoidance of doubt, required Improvement Approvals shall include consultation by Tenant with OPRHP. In the case of a Capital Improvement which is subject to Section 13.02, Tenant shall also obtain Landlord's approval to the performance of such Capital Improvement prior to undertaking the same. Landlord shall join or otherwise cooperate in the application for any such Improvement Approvals with respect to which Landlord's approval is not required or which Landlord has approved, provided that Landlord shall not be obligated to incur third-party expenses in connection therewith other than a de minimis cost. True copies of all such Improvement Approvals shall be delivered by Tenant to Landlord prior to the commencement of the proposed Capital Improvement.

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                                    RECEIVED NYSCEF: 05/25/2023

57

(b)     All Capital Improvements, when completed, shall be of such a character as not to reduce the value of the Demised Premises below its value immediately before construction of such Capital Improvement.

(c)     All Capital Improvements shall be made with diligence and continuity and in a good and workmanlike manner and in compliance with (i) all Improvement Approvals, (ii) the plans and specifications for such Capital Improvement (iii) the Requirements, and (iv) the applicable provisions of this Lease.

(d)     No construction of any Capital Improvement shall be commenced until Tenant shall have delivered to Landlord insurance policies issued by responsible insurers, bearing notations evidencing the payment of premiums or accompanied by other evidence satisfactory to Landlord of such payments, for the insurance required under this Lease.

Section 13.02     <u>Material Capital Improvement</u>. If the estimated cost of any proposed Capital Improvement would either (i) exceed $250,000 Adjusted for Inflation, or (ii) involve alterations to the Major Construction Work which are inconsistent with the previously-approved Major Construction Work, Tenant shall comply with the provisions of Sections <u>11.01</u> through <u>11.06</u> and <u>11.10</u> through <u>11.15</u> in respect of such Capital Improvement, including making all submissions described therein and obtaining Landlord's approvals as provided therein.

Section 13.03     <u>Completion Obligations</u>. Upon completion of any Capital Improvement, Tenant shall furnish to Landlord (a) where applicable, a Certificate of Occupancy or Sign Off from the New York City Department of Buildings therefor issued by the New York City Department of Buildings, to the extent a modification thereof was required, and (b) lien waivers, in form satisfactory to Landlord, issued by each Contractor, with respect to services performed and materials provided in connection with the Capital Improvement.

Section 13.04     <u>Title to Improvements</u>. Title to all additions, alterations, improvements and replacements made to the Building, including, without limitation, the Capital Improvements, shall forthwith vest in Landlord as provided in <u>Section 11.17</u>, without any obligation by Landlord to pay any compensation therefor to Tenant.

## ARTICLE 14

## REQUIREMENTS OF PUBLIC AUTHORITIES AND
## OF INSURANCE UNDERWRITERS AND POLICIES

Section 14.01     <u>Compliance with Requirements</u>. Tenant promptly shall comply with (a) any and all applicable present and future, foreseen and unforeseen, laws, rules, orders, ordinances, regulations, statutes, requirements, permits, consents, certificates, approvals, codes and executive orders of all Governmental Authorities now existing or hereafter created, and of any and all of their departments and bureaus (including, without limitation, the New York City Department of Buildings), including,

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM
INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 39
Case 1:25-cv-07373-GBD   Document 1-1   Filed 09/05/25   Page 63 of 163
RECEIVED NYSCEF: 05/25/2023

58

without limitation, the State of New York Building Code, the Americans with Disabilities Act (ADA) Accessibility Guidelines for Buildings and Facilities, all Environmental Laws, and requirements of any applicable Fire Rating Bureau or other body exercising similar functions, affecting the Demised Premises or any portion(s) thereof and (b) any and all present and future, foreseen and unforeseen, provisions and requirements of any liability or other insurance policy required to be carried by Tenant under the provisions of this Lease and shall not violate any restrictions or requirements set forth in the Title Matters (all of the foregoing collectively, the "Requirements").

Section 14.02   Contest of Requirements. Tenant shall have the right to contest the validity of any Requirements or the application thereof. During such contest, compliance with any such contested Requirements may be deferred by Tenant upon condition that (a) such deferral, in Landlord's reasonable judgment, shall not adversely affect all or any portion of the Building or pose a hazard or danger to any Persons or property or place any portion of the Property in danger of being forfeited or lost or place Landlord in danger of any civil and/or criminal liability or penalty, (b) Tenant shall undertake to Landlord the payment of all interest, penalties, fines and fees in connection therewith, and (c) if an adverse decision in such proceeding or the failure to pay any judgment resulting from such adverse decision could result in the imposition of any lien against the Demised Premises, then before the commencement of such contest, Tenant shall furnish to Landlord the bond of a reputable surety company, or other deposit or security in an amount equal to 125% of the anticipated amount of the monetary risk of loss. Tenant shall keep Landlord informed as to the status of any such contest. Notwithstanding the foregoing, Tenant promptly shall comply with any such Requirements and compliance shall not be deferred if at any time the Demised Premises, or any part thereof, shall be in danger of being forfeited or lost or if Landlord shall be in danger of being subjected to civil and/or criminal liability or penalty by reason of noncompliance therewith. Landlord shall cooperate with Tenant in any such contest provided that Landlord shall not required to exercise any governmental powers and shall not be obligated to incur third-party expenses in connection therewith (other than a de minimis amount).

## ARTICLE 15

## EQUIPMENT

Section 15.01   Property of Landlord. All Equipment shall be and shall remain the property of Landlord. Tenant shall not have the right, power or authority to, and shall not, remove any Equipment from the Demised Premises without the consent of Landlord, which consent shall not be unreasonably withheld; provided, however, that such consent shall not be required in connection with repairs, cleaning or other servicing, or if the same is promptly replaced by Equipment which is at least equal in utility and value to the Equipment being removed.

Section 15.02   Maintenance and Replacement. Tenant shall keep all Equipment in good order and repair and shall replace the same when necessary with items at least equal in utility and value to the Equipment being replaced.

Notwithstanding any provision of this <u>Article 15</u>, Tenant shall not be required to replace any Equipment which performed a function which has become obsolete or otherwise is no longer necessary or desirable in connection with the use or operation of the Demised Premises, unless such failure to replace would reduce the value of the Demised Premises or would result in a reduced level of maintenance of the Demised Premises, in which case Tenant shall be required to install such Equipment as may be necessary to prevent such reduction in the value of the Demised Premises or in the level of maintenance.

## ARTICLE 16

## DISCHARGE OF LIENS; BONDS

Section 16.01    <u>No Liens</u>. Subject to the provisions of <u>Section 16.02</u>, except as otherwise expressly provided in this Lease, Tenant shall not create or permit to be created any lien, encumbrance or charge upon the Demised Premises or any part thereof or any interest therein, or the Property or any part thereof, the income therefrom or any assets of, or funds appropriated to, Landlord, and Tenant shall not suffer any other matter or thing whereby the estate, right and interest of Landlord in the Demised Premises or any part thereof might be impaired.

Section 16.02    <u>Tenant's Obligation to Discharge</u>. If any mechanic's, laborer's or materialman's lien (other than a lien arising out of any work performed by Landlord) at any time shall be filed in violation of the obligations of Tenant pursuant to <u>Section 16.01</u> against the Demised Premises or any part thereof or any interest therein or the Property, or, if any public improvement lien created or permitted to be created by Tenant shall be filed against any assets of, or funds appropriated to, Landlord, Tenant, within thirty (30) days after notice of the filing thereof, shall cause the same to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction or otherwise. Notwithstanding the foregoing provisions of this <u>Section 16.02</u>, Tenant shall not be required to discharge any such lien if (i) Tenant is in good faith contesting the same, (ii) Tenant has undertaken to Landlord to pay such lien with interest and penalties and shall deliver to Landlord the bond of a reputable surety company, or other deposit or security in an amount equal to 125% of the amount of the lien, (iii) neither the Demised Premises nor the Property, nor any part thereof, shall be in danger of being forfeited or lost and (iv) Landlord is not in danger of being subjected to civil and/or criminal liability or penalty by reason thereof.

Section 16.03    <u>No Consent to Liens</u>. Nothing contained in this Lease shall be deemed or construed in any way as constituting the consent or request of Landlord, express or implied, by inference or otherwise, to any contractor, subcontractor, laborer or materialman for the performance of any labor or the furnishing of any materials for any specific improvement, alteration to or repair of the Demised Premises or the Property or any part thereof, nor as giving Tenant any right, power or authority to contract for or permit the rendering of any services or the furnishing of materials that would give rise to the filing of any lien against Landlord's interest in the Demised Premises or any part thereof, or any assets of, or funds

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59          Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 65 of 163    RECEIVED NYSCEF: 05/25/2023

60

appropriated to, Landlord. Notice is hereby given, and Tenant shall cause all Construction Agreements to provide, that Landlord shall not be liable for any work performed or to be performed at the Demised Premises for Tenant or any User for any materials furnished or to be furnished at the Demised Premises for any of the foregoing, and that no mechanic's or other lien for such work or materials shall attach to or affect the estate or interest of Landlord in and to the Demised Premises, the Property or any part thereof, or any assets of, or funds appropriated to, Landlord.

Section 16.04    No Lien on Landlord's Interest. Tenant shall have no power to do any act or make any contract which may create or be the foundation of any lien, mortgage or other encumbrance upon the estate or assets of, or funds appropriated to, Landlord or of any interest of Landlord in the Demised Premises.

Section 16.05    Intentionally Deleted

## ARTICLE 17

## REPRESENTATIONS; POSSESSION

Section 17.01    Except as otherwise expressly set forth in this Lease, no representations, statements, or warranties, express or implied, have been made by or on behalf of Landlord in respect of Demised Premises, the status of title thereof, the physical condition thereof, the zoning or other laws, regulations, rules and orders applicable thereto, taxes, or the use that may be made thereof.

## ARTICLE 18

## LANDLORD NOT LIABLE FOR INJURY OR DAMAGE, ETC.

Section 18.01    Landlord Not Liable. Landlord shall not be liable for any injury or damage to Tenant or to any other Person happening on, in or about the Demised Premises and its appurtenances, nor for any injury or damage to the Demised Premises or to any property belonging to Tenant or to any other Person which may be caused by the use, misuse or abuse of any of the Demised Premises (including, but not limited to, any of the common areas within the Building, Equipment, elevators, hatches, openings, installations, stairways, hallways, or other common facilities), or the sidewalk area within the Demised Premises or which may arise from any other cause whatsoever, except in any such case to the extent caused by (i) Landlord's gross negligence or willful acts, (ii) conditions at the Building located in the DMNA Retained Space and Shelter Retained Space, but excluding loss or injury caused by acts or omissions of the Shelter or the residents thereof, or (iii) all other matters for which Landlord is expressly liable under any other provision of this Lease.

Section 18.02    Failure of Services. Landlord shall not be liable to Tenant or to any other Person claiming through or under Tenant for any failure of water supply, gas or electric current, nor for any injury or damage to any property of Tenant or of any other Person or to the Demised Premises caused by or resulting from gasoline,

oil, steam, gas, electricity, or hurricane, tornado, flood, wind or similar storms or disturbances, or water, rain or snow which may leak or flow from the street, sewer, gas mains or subsurface area or from any part of the Demised Premises, or from any other place, or caused by any public or quasi-public work, except in any such case to the extent caused by (i) Landlord's gross negligence or willful acts or (ii) conditions at the Building located in the DMNA Retained Space and Shelter Retained Space, but excluding loss or injury caused by acts or omissions of the Shelter or the residents thereof.

Section 18.03    <u>Landlord Retained Liability</u>. Notwithstanding the foregoing, Landlord shall only be liable for (i) Landlord's gross negligence or willful acts and (ii) conditions at the Building located in the DMNA Retained Space and Shelter Retained Space, but excluding loss or injury caused by acts or omissions of the Shelter.

Section 18.04    <u>Exclusion of Consequential Damages</u>. In no event shall Landlord be liable for special or consequential damages under this Lease.

## ARTICLE 19

## MUTUAL INDEMNIFICATION

Section 19.01    <u>Indemnification by Tenant</u>. Tenant shall not do, or permit any User, or any employee, agent, Contractor or invitee of Tenant or of any User, to do any act or thing upon the Demised Premises or elsewhere in the Building which may subject Landlord to any liability or responsibility for injury or damage to persons or property, or to any liability by reason of any violation of any Requirements, and shall exercise such control over the Demised Premises so as to fully protect Landlord against any such liability. Tenant, to the fullest extent permitted by law, shall indemnify and save Landlord, DMNA, the State, the City, and their respective agents, Contractors, affiliates, licensees, invitees, trustees, members, directors, shareholders, partners, officers, employees and disclosed and undisclosed principals (collectively, the "<u>Landlord Indemnitees</u>"), harmless from and against any and all actions, liabilities, suits, judgments, obligations, fines, damages, penalties, claims, costs, charges and expenses, including, without limitation, engineers', architects' and attorneys' fees and disbursements, which may be imposed upon or incurred by or asserted against any of the Landlord Indemnitees arising out of or in connection with the Demised Premises or the ownership, leasing, operation, management, maintenance, repair, rebuilding, use or occupation of the Demised Premises, or the Building, including, without limitation, any of the matters set forth in clauses (a) through (k) of this <u>Section 19.01</u> during the Term (or prior to the commencement or following the expiration of the Term if Tenant shall be in occupancy or control of the Demised Premises or any portion thereof during such periods):

(a)    Performance of the Major Construction Work or any other work performed by or on behalf of Tenant or any User, or any employee, agent,

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 67 of 163

Contractor, invitee of Tenant or any User in or around Building, including, without limitation, the Demised Premises, or any part thereof;

(b)     any use, non-use, possession, occupation, alteration, replacement, repair, condition, operation, maintenance or management of the Demised Premises or any part thereof;

(c)     any negligent or tortious act or failure to act, whether real or alleged, in or around Building, including, without limitation, the Demised Premises, on the part of Tenant or any agent, contractor or employee of Tenant;

(d)     any accident, injury (including death at any time resulting therefrom) or damage to any Person or property occurring in or on the Demised Premises or any part thereof;

(e)     any failure on the part of Tenant to perform or comply with any of the covenants, agreements, terms or conditions contained in this Lease on its part to be performed or complied with;

(f)     any lien or claim which may have arisen out of any act of Tenant or any agent, Contractor, servant or employee of Tenant against or on the Building, including, without limitation, the Demised Premises, or any lien or claim created or permitted to be created by Tenant in respect of the Building, including, without limitation, the Demised Premises, against any assets of, or funds appropriated to any of the Landlord Indemnitees under the laws of any Governmental Authority or any liability which may be asserted against any of the Landlord Indemnitees with respect thereto;

(g)     any failure on the part of Tenant to keep, observe and perform any of the terms, covenants, agreements, provisions, conditions or limitations contained in the Construction Agreements, User Agreements, or other contracts and agreements affecting the Demised Premises, on Tenant's part to be kept, observed or performed;

(h)     any tax or recording charge attributable to the execution, delivery or recording of this Lease, any User Agreement or any assignment of this Lease;

(i)     any contest by Tenant permitted pursuant to the provisions of this Lease;

(j)     any claim for brokerage commissions, fees or other compensation by any Person who alleges to have acted or dealt with Tenant in connection with this Lease or any User Agreement or otherwise; and

(k)     any work performed by or on behalf of Tenant.

Tenant shall not be liable for, and there shall be excluded from the foregoing indemnity, matters arising from (i) Landlord's gross negligence or willful acts, (ii) conditions at the Building located in the DMNA Retained Space and Shelter Retained Space (unless caused by Tenant's negligence, willful acts, or defaults under this Lease), but excluding loss or injury caused by acts or omissions of the Shelter or the residents thereof.

Section 19.02    <u>Indemnification by Landlord</u>. To the fullest extent provided by law, including appropriation if legally required, and consistent with Section 8 of the State Court of Claims Act, Landlord shall hold Tenant, each member thereof in the event Tenant is a partnership or joint venture, and their respective agents, Contractors, affiliates, licensees, invitees, trustees, members, directors, shareholders, partners, officers, employees and disclosed and undisclosed principals (collectively, the "<u>Tenant Indemnitees</u>") harmless from and indemnify it for any final judgment of a court of competent jurisdiction to the extent the event giving rise to the judgment is solely attributable to the gross negligence or intentional acts of Landlord (including, without limitation, DMNA) or of Landlord's officers or employees when acting within the course and scope of their employment.

Section 19.03    <u>Payment of Obligations</u>. The obligations of Landlord and Tenant under this <u>Article 19</u> shall not be affected in any way by the absence in any case of covering insurance or by the failure or refusal of any insurance carrier to perform any obligation on its part under insurance policies affecting the Demised Premises. All amounts owed to any Indemnitees under this <u>Article 19</u> shall be paid on demand following the date any indemnified amount was paid by such Indemnitees and shall (if owed by Tenant) constitute Additional Charges.

Section 19.04    <u>Defense Process</u>. If any claim, action, or proceeding is made or brought against any of the Indemnitees by reason of any event which is the subject of the indemnifications in Sections <u>19.01</u> or <u>19.02</u>, as the case may be, then, upon demand by the indemnified party, the indemnifying party shall resist or defend such claim, action or proceeding (in such Indemnitee's name, if necessary) by the attorneys for the indemnifying party's insurance carrier (if such claim, action or proceeding is covered by insurance) or (in all other instances) by such attorneys as the indemnifying party shall select and the indemnified party shall approve, which approval shall not be unreasonably withheld. The indemnifying party shall not enter into any settlement of such claims without the prior consent of the indemnified party, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, the indemnified party may engage its own attorneys to assist in its defense and such party shall pay the fees and disbursements of such attorneys.

Section 19.05    <u>Exclusion of Consequential Damages</u>. In no event shall either Landlord or Tenant be liable for special or consequential damages under this <u>Article 19</u>.

Section 19.06    <u>Survival</u>. The provisions of this <u>Article 19</u> and all other indemnity provisions contained elsewhere in this Lease shall survive the termination of

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 69 of 163

this Lease with respect to acts and omissions occurring prior to the Expiration Date of this Lease, regardless of whether the claims relating to such acts or omissions are made before or after the Expiration Date of this Lease, but in any event subject to the applicable statute of limitations.

## ARTICLE 20

## RIGHT OF INSPECTION, ETC.

Section 20.01    Right of Inspection. Tenant shall permit Landlord and its agents or representatives to enter the Demised Premises at all reasonable times (except in cases of emergency, in which case Landlord may enter at any time ) for the purpose of (a) inspecting the same, (b) determining whether or not Tenant is in compliance with its obligations hereunder, (c) constructing, maintaining and inspecting any of Landlord's improvements and (d) making any necessary repairs to the Demised Premises and performing any work therein pursuant to Landlord's obligations under this Lease.

Section 20.02    No Interference. Landlord, during the progress of any work referred to in Section 20.01, shall use reasonable efforts to minimize any inconvenience, annoyance, disturbance, loss of business or other damage to Tenant, any User or other occupant of the Building by reason of making such repairs or the performance of any such work, or on account of bringing materials, tools, supplies and equipment into the Demised Premises during the course thereof and the obligations of Tenant under this Lease shall not be affected thereby. To the extent that Landlord undertakes such work or repairs, such work or repairs shall be commenced promptly and completed diligently in a good and workmanlike manner, in accordance with Requirements, and in such a manner as not to unreasonably interfere with the conduct of business in or use of such. The parties shall reasonably cooperate to determine, as necessary, an on-site or off-site storage area for materials, tools, supplies and equipment during the progress of any work referred to in Section 20.01.

## ARTICLE 21

## LANDLORD'S RIGHT TO PERFORM TENANT'S COVENANTS

Section 21.01    Landlord's Right to Cure. If Tenant at any time shall be in Default and shall not have cured such Default within thirty (30) days after notice thereof or, provided Tenant is proceeding diligently to cure such Default, within a reasonable time to effect such cure (which notice and cure period shall not apply in an emergency), Landlord, without waiving or releasing Tenant from any obligation of Tenant contained in this Lease, may (but shall be under no obligation to) perform such obligation on Tenant's behalf and any costs or expenses incurred by Landlord in the performance of such obligation shall be Additional Charges payable by Tenant with interest at the Involuntary Rate.

Case 1:25-cv-07373-GBD   Document 1-1   Filed 09/05/25   Page 70 of 163

65

Section 21.02    No Waiver. Any payment or performance by Landlord pursuant to Section 21.01 shall not be nor be deemed to be a waiver or release of any Default of Tenant with respect thereto or of the right of Landlord to terminate this Lease, institute summary proceedings or take such other action as may be permissible hereunder if an Event of Default by Tenant shall have occurred.

## ARTICLE 22

## NET LEASE; NO ABATEMENT OF BASE
## RENT OR ADDITIONAL CHARGES

Section 22.01    Net Lease. This Lease is intended to be and shall be construed as being an absolutely net lease, whereby under all circumstances and conditions, foreseen and unforeseen, except as expressly set forth herein, Base Rent and Additional Charges shall be net to Landlord without abatement, deduction, counterclaim, set-off or offset.

Section 22.02    No Set-Off. Except as expressly provided to the contrary in this Lease, there shall be no abatement, off-set, diminution or reduction of Base Rent or Additional Charges payable by Tenant hereunder or of the other obligations of Tenant hereunder under any circumstances.

## ARTICLE 23

## PERMITTED USE; NO UNLAWFUL OCCUPANCY

Section 23.01    Permitted Uses.

(a)    Subject to the Requirements and this Lease, Tenant shall occupy, and shall cause all Users and other occupants of the Demised Premises, to occupy the Demised Premises only for the following uses (which the parties acknowledge represent long-established and continuing uses of the Property), subject to the further terms and conditions of this Agreement: (i) primarily as a not-for-profit cultural center for performing and visual arts and other similar cultural exhibitions, including without limitation art and antiques shows (the "Primary Use"), and (ii) incidentally, as uses related to the Primary Use, including activities the purposes of which are to support the Conservancy's not-for-profit activities, as well as catering, offices, and other incidental uses that promote the mission of the Conservancy and the Public Goals of the Project (the "Permitted Uses"). Nothing in this Section shall prevent the use of the Demised Premises, in the event of a national or state emergency, for Emergency Use as set forth in Section 23.04.

(b)    Tenant shall use diligent efforts to maintain activity constituting Permitted Uses in the Demised Premises as close to 330 days per year as possible, subject to reasonable periods of closing for casualty and Restoration, repairs and maintenance, the performance of the Major Construction Work and any Capital Improvements, loading, set-up and breakdown time for shows, and Emergency Use.

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 71 of 163

(c)     Landlord shall cause the portions of the Building which are excluded from the Demised Premises to be used only as follows: (i) within the DMNA Retained Space, as offices and facilities for DMNA, (ii) within the Shelter Retained Space, as the Shelter, and (iii) in the event of a national or state emergency, for emergency use as set forth in <u>Section 23.04</u>.

(d)     Tenant shall obtain and maintain throughout the Term all authorizations, permits, licenses and consents necessary to operate the Demised Premises for the Permitted Uses in accordance with this Lease.

Section 23.02     <u>No Illegal Uses</u>. Tenant shall not use or occupy the Demised Premises and shall neither permit nor suffer the Demised Premises or any part thereof to be used or occupied for any unlawful or illegal business, activity, use or purpose.

Section 23.03     <u>Drill Hall Use by DMNA</u>. With respect to use requested by DMNA of the Drill Hall or other portions of the Demised Premises outside of the DMNA Retained Space (other than for Emergency Use), such bookings shall be subject to Tenant's usual procedures for booking space, and DMNA shall pay for such use at then-applicable governmental rates.

Section 23.04     <u>Emergency Use</u>. Landlord and Tenant agree and acknowledge that in the event of a national or state emergency, the Demised Premises may be used and occupied for Emergency Use, upon and pursuant to the provisions of <u>Section 9.04</u> hereof and this <u>Section 23.04</u>. During the period of any Emergency Use, Tenant's rights and obligations hereunder shall be suspended to the extent necessary to comply with the terms of the emergency order with respect to the Demised Premises. Tenant shall in no event be responsible for any loss, cost, damage or expense, including without limitation costs of operating the Demised Premises during the period of such Emergency Use. Upon termination or cessation of such emergency, the Demised Premises shall be restored by Landlord or the party utilizing the Demised Premises during the emergency as nearly as practicable to its physical condition prior to the emergency, and Tenant shall resume the operations of the Demised Premises in accordance with the terms of this Agreement. Nothing herein shall diminish the rights of Tenant, its permitted sublessees or assignees or any User to seek compensation under applicable law for any loss, cost, damage or expense incurred by such party during the pendency or arising out of an Emergency Use.

Section 23.05     <u>Nuisance Uses</u>. Tenant shall not use or occupy, nor permit or suffer the Demised Premises or any part thereof to be used or occupied for any unlawful, illegal or extra hazardous business, use or purpose, or in such manner as to constitute a nuisance of any kind (public or private) or that Landlord, in its reasonable judgment, deems offensive by reason of odors, fumes, dust, smoke, noise or other pollution, or for any purpose or in any way in violation of any Requirements, or which may make void or voidable any insurance then in force on the Demised Premises. Tenant shall take, immediately upon the discovery of any such unpermitted,

unlawful, illegal or extra hazardous use, all necessary actions, legal and equitable, to compel the discontinuance of such use.

Section 23.06    Adverse Possession. Tenant shall not knowingly suffer or permit the Demised Premises or any portion thereof to be used by the public in such manner as might reasonably tend to impair title to the Demised Premises or any portion thereof, or in such manner as might reasonably make possible a claim or claims of adverse usage or adverse possession by the public, as such, or of implied dedication of the Demised Premises or any portion thereof.

## ARTICLE 24

## EVENTS OF DEFAULT;
## CONDITIONAL LIMITATIONS, REMEDIES, ETC.

Section 24.01    Events of Default. Each of the following events shall be an "Event of Default" hereunder:

(a)    if Tenant shall fail to pay any installment of Base Rent or Additional Charges, or any part thereof, when the same shall become due and payable and such failure shall continue for twenty (20) days after notice of such default is given to Tenant;

(b)    if Tenant shall fail to observe or perform one or more of the other terms, conditions, covenants or agreements contained in this Lease and such failure shall continue for a period of thirty (30) days after notice thereof by Landlord to Tenant specifying such failure (unless such failure requires work to be performed, acts to be done, or conditions to be removed which cannot by their nature reasonably be performed, done or removed, as the case may be, within such thirty (30) day period, in which case no Event of Default shall be deemed to exist as long as Tenant shall have commenced curing the same within such thirty (30) day period and shall diligently and continuously prosecute the same, subject to Unavoidable Delays);

(c)    if Tenant shall make an assignment for the benefit of creditors;

(d)    if Tenant shall file a voluntary petition under Title 11 of the United States Code or if such petition is filed against it, and an order for relief is entered, or if Tenant shall file any petition or answer seeking, consenting to or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy code or any other present or future applicable federal, state or other statute or law, or shall seek or consent to or acquiesce in or suffer the appointment of any trustee, receiver, custodian, assignee, sequestrator, liquidator or other similar official of Tenant, or of all or any substantial part of its properties or of the Demised Premises or any interest therein of Tenant, or if Tenant shall take any corporate action in furtherance of any action described in Section 24.01(d), (e) or (f);

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 73 of 163

(e)      if within ninety (90) days after the commencement of any proceeding against Tenant seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy code or any other present or future applicable federal, state or other statute or law, such proceeding shall not have been dismissed, or if, within ninety (90) days after the appointment, without the consent or acquiescence of Tenant, of any trustee, receiver, custodian, assignee, sequestrator, liquidator or other similar official of Tenant or of all or any substantial part of its properties or of the Demised Premises or any interest therein of Tenant, such appointment shall not have been vacated or stayed on appeal or otherwise, or if, within ninety (90) days after the expiration of any such stay, such appointment shall not have been vacated;

(f)      if Tenant shall abandon the Demised Premises; or

(g)      if this Lease or the estate of Tenant hereunder shall be assigned or encumbered in violation of the terms of this Lease.

Section 24.02      [intentionally omitted].

Section 24.03      Conditional Limitation.

(a)      If any Event of Default shall occur, Landlord, at any time thereafter, may, at its option, give notice to Tenant stating that this Lease and the Term shall expire and terminate on the date specified in such notice, which date shall be not less than five (5) days after the giving of such notice, and the Term and all rights of Tenant under this Lease shall expire and terminate as of the date specified in such notice, as if such date were the date herein fixed for the expiration of the Term and Tenant immediately shall quit and surrender the Demised Premises.

(b)      If an Event of Default described in Section 24.01(c), Section 24.01(d) or Section 24.01(e) shall occur, or this Lease shall be terminated as provided in Section 24.03(a), Landlord, without notice, may re-enter and repossess the Demised Premises and may dispossess Tenant by summary proceedings or otherwise.

(c)      If an Event of Default shall occur and the Lease shall be terminated, Landlord may elect to declare due and payable a sum equal to the amount by which the Base Rent and Additional Charges reserved in this Lease for the unexpired portion of the Term exceeds the fair and reasonable rental value of the Demised Premises for the same period, both discounted to present worth at a rate of three percent (3%), such sum shall be due and payable ten (10) days after notice by Landlord to Tenant of such election. For purposes of the foregoing, it shall be deemed that Base Rent for the unexpired portion of the Term shall equal the average Base Rent payable by Tenant over the five-year period immediately preceding the date of termination, escalated by the average annual change in the Consumer Price Index during such five-year period over the unexpired portion of the Term. Landlord may also elect to proceed by appropriate judicial proceedings, either at law or in equity, to enforce performance or

observance by Tenant of the applicable provisions of this Lease and/or to recover damages for breach thereof.

Section 24.04    Landlord's Rights on Termination. If this Lease shall be terminated as provided in Section 24.03(a) or Tenant shall be dispossessed by summary proceedings or otherwise as provided in Section 24.03(b) hereof:

(a)    Tenant shall pay to Landlord all Base Rent and Additional Charges payable by Tenant under this Lease to the date upon which this Lease and the Term shall have expired and come to an end or to the date of re-entry upon the Demised Premises by Landlord, as the case may be;

(b)    Landlord may complete all construction required to be performed by Tenant hereunder and may repair and alter the Demised Premises in such manner as Landlord may deem necessary or advisable (and may apply to the foregoing all funds, if any, then held by Depositary pursuant to Articles 9 and 10 and by Landlord under any provision of this Lease) without relieving Tenant of any liability under this Lease or otherwise affecting any such liability, and/or let or relet the Demised Premises or any parts thereof for the whole or any part of the remainder of the Term or for a longer period, in Landlord's name or as agent of Tenant, and out of any rent and other sums collected or received as a result of such reletting Landlord shall: (i) first, pay to itself the cost and expense of terminating this Lease, re-entering, retaking, repossessing, completing construction and repairing or altering the Demised Premises, or any part thereof, and the cost and expense of removing all persons and property therefrom, including in such costs brokerage commissions, legal expenses and attorneys' fees and disbursements, (ii) second, pay to itself the costs and expense sustained in securing any new tenants and other occupants, including in such costs brokerage commissions, legal expenses and attorneys' fees and disbursements and other expenses of preparing the Demised Premises for reletting, and, if Landlord shall maintain and operate the Demised Premises, the cost and expense of operating and maintaining the Demised Premises, and (iii) third, pay to itself any balance remaining on account of the liability of Tenant to Landlord. Landlord in no way shall be responsible or liable for any failure to relet the Demised Premises or any part thereof, or for any failure to collect any rent due on any such reletting, and no such failure to relet or to collect rent shall operate to relieve Tenant of any liability under this Lease or to otherwise affect any such liability;

(c)    if Landlord shall not have declared all Base Rent and Additional Charges due and payable pursuant to Section 24.03 (c), Tenant shall be liable for and shall pay to Landlord, as damages, any deficiency (referred to as "Deficiency") between the Base Rent and Additional Charges reserved in this Lease for the period which otherwise would have constituted the unexpired portion of the Term and the net amount, if any, of rents collected under any reletting effected pursuant to the provisions of Section 24.04(b) for any part of such period (first deducting from the rents collected under any such reletting all of the payments to Landlord described in Section 24.04(b)); any such Deficiency shall be paid in installments by Tenant on the days specified in this Lease for payment of installments of Base Rent and Additional Charges, and Landlord shall be entitled to recover from Tenant each Deficiency installment as the same shall

arise, and no suit to collect the amount of the Deficiency for any installment period shall prejudice Landlord's right to collect the Deficiency for any subsequent installment period by a similar proceeding. For purposes of the foregoing, it shall be deemed that Base Rent for the unexpired portion of the Term shall equal the average Base Rent payable by Tenant over the five-year period immediately preceding the date of termination, escalated by the average annual change in the Consumer Price Index during such five-year period over the unexpired portion of the Term; and

(d)      if Landlord shall not have declared all Base Rent and Additional Charges due and payable pursuant to Section 24.03 (c), and whether or not Landlord shall have collected any Deficiency installments as aforesaid, Landlord shall be entitled to recover from Tenant, and Tenant shall pay to Landlord, on demand, in lieu of any further Deficiencies, as and for liquidated and agreed final damages (it being agreed that it would be impracticable or extremely difficult to fix the actual damage), a sum equal to the amount by which the Base Rent and Additional Charges reserved in this Lease for the period which otherwise would have constituted the unexpired portion of the Term exceeds the then fair and reasonable rental value of the Demised Premises for the same period, both discounted to present worth at a rate of three percent (3%) less the aggregate amount of Deficiencies theretofore collected by Landlord pursuant to the provisions of Section 24.04(c) for the same period; it being agreed that before presentation of proof of such liquidated damages to any court, commission or tribunal, if the Demised Premises, or any part thereof, shall have been relet by Landlord for the period which otherwise would have constituted the unexpired portion of the Term, or any part thereof, the amount of rent reserved upon such reletting shall be deemed, prima facie, to be the fair and reasonable rental value for the part or the whole of the Demised Premises so relet during the term of the reletting. For purposes of the foregoing, it shall be deemed that Base Rent for the unexpired portion of the Term shall equal the average Base Rent payable by Tenant over the five-year period immediately preceding the date of termination, escalated by the average annual change in the Consumer Price Index during such five-year period over the unexpired portion of the Term.

(e)      Suit or suits for the recovery of damages, or for a sum equal to any installments or installments of Base Rent and Additional Charges payable hereunder or any Deficiencies or other sums payable by Tenant to Landlord pursuant to this Article 24, may be brought by Landlord from time to time at Landlord's election, and nothing herein contained shall be deemed to require Landlord to await the date whereon this Lease or the Term would have expired had there been no Event of Default by Tenant and termination.

Section 24.05      Survival. No termination of this Lease pursuant to this Article 24 or taking possession of or reletting the Demised Premises, or any part thereof, pursuant to this Article 24, shall relieve Tenant of its liabilities and obligations hereunder, all of which shall survive such expiration, termination, repossession or reletting.

Section 24.06      Bankruptcy Damages. Nothing contained in this Article 24 shall limit or prejudice the right of Landlord to prove and obtain as

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 39                                                      RECEIVED NYSCEF: 05/25/2023

71

liquidated damages in any bankruptcy, insolvency, receivership, reorganization or dissolution proceeding an amount equal to the maximum allowed by statute or rule of law governing such proceeding and in effect at the time when such damages are to be proved.

Section 24.07    <u>No Reinstatement</u>. No receipt or acceptance of moneys by Landlord from Tenant after the termination of this Lease, or after the giving of any notice of the termination of this Lease, shall reinstate, continue or extend the Term or affect any notice theretofore given to Tenant, or operate as a waiver of the right of Landlord to enforce the payments of Base Rent and Additional Charges payable by Tenant hereunder or thereafter falling due, or operate as a waiver of the right of Landlord to recover possession of the Demised Premises by proper remedy, except as herein otherwise expressly provided, it being agreed that after the service of notice to terminate this Lease or the commencement of any suit or summary proceedings, or after a final order or judgment for the possession of the Demised Premises, Landlord may demand, receive and collect any moneys due or thereafter falling due without in any manner affecting such notice, proceeding, order, suit or judgment, all such moneys collected being deemed payments on account of the use and operation of the Demised Premises or, at the election of Landlord, on account of Tenant's liability hereunder.

Section 24.08    <u>Waivers by Tenant</u>. Except as otherwise expressly provided herein or as prohibited by applicable law, Tenant hereby expressly waives the service of any notice of intention to re-enter provided for in any statute, or of the institution of legal proceedings to that end, and Tenant, for and on behalf of itself and all persons claiming through or under Tenant, also waives any and all right of redemption provided by any law or statute now in force or hereafter enacted or otherwise, or re-entry or repossession or to restore the operation of this Lease in case Tenant shall be dispossessed by a judgment or by warrant of any court or judge or in case of re-entry or repossession by Landlord or in case of any expiration or termination of this Lease. Tenant hereby waives and shall waive trial by jury in any action, proceeding or counterclaim brought by Landlord against Tenant on any matter whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Demised Premises, or any claim of injury or damage. The terms "<u>enter</u>," "<u>re-enter</u>," "<u>entry</u>" or "<u>re-entry</u>," as used in this Lease are not restricted to their technical legal meaning.

Section 24.09    No Waiver.

(a)    No failure by Landlord or any prior landlord to insist upon the strict performance of any covenant, agreement, term or condition of this Lease or to exercise any right or remedy consequent upon a breach thereof, and no acceptance of full or partial Base Rent or Additional Charges during the continuance of any such breach, shall constitute a waiver of any such breach or of such covenant, agreement, term or condition. No covenant, agreement, term or condition of this Lease to be performed or complied with by Tenant, and no breach thereof, shall be waived, altered or modified except by a written instrument executed by Landlord and Tenant. No waiver of any breach shall affect or alter this Lease, but each and every covenant, agreement,

term and condition of this Lease still continue in full force and effect with respect to any other then existing or subsequent breach thereof.

(b)      No failure by Tenant to insist upon the strict performance of any covenant, agreement, term or condition of this Lease or to exercise any right or remedy consequent upon a breach thereof and no payment of full or partial Base Rent or Additional Charges during the continuance of any such breach, shall constitute a waiver of any such breach or of such covenant, agreement, term or condition. No covenant, agreement, term or condition of this Lease to be performed or complied with by Landlord, and no breach thereof, shall be waived, altered or modified except by a written instrument executed by Landlord and Tenant. No waiver of any breach shall affect or alter this Lease, but each and every covenant, agreement, term and condition of this Lease shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

Section 24.10    <u>Injunction</u>. In the event of any breach or threatened breach by Tenant of any of the covenants, agreements, terms or conditions contained in this Lease, Landlord shall be entitled to enjoin such breach or threatened breach and shall have the right to invoke any rights and remedies allowed at law or in equity or by statute or otherwise as though re-entry, summary proceedings, and other remedies were not provided for in this Lease.

Section 24.11    <u>Remedies Cumulative</u>. Each right and remedy of Landlord provided for in this Lease shall be cumulative and shall be in addition to every other right or remedy provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by Landlord of any one or more of the rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by Landlord of any or all other rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise.

Section 24.12    <u>Bankruptcy Rights</u>. If an order for relief is entered or if a stay of proceedings or other acts becomes effective in favor of Tenant or Tenant's interest in this Lease in any proceeding which is commenced by or against Tenant under the present or any future federal bankruptcy code or any other present or future applicable federal, state or other statute or law, Landlord shall be entitled to invoke any and all rights and remedies available to it under such bankruptcy code, statute, law or this Lease, including, without limitation, such rights and remedies as may be necessary to adequately assure the complete and continuous future performance of Tenant's obligations under this Lease. Adequate protection of Landlord's right, title and interest in and to the Demised Premises, and adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease, shall include, without limitation, the following requirements:

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                                         RECEIVED NYSCEF: 05/25/2023

73

Case 1:25-cv-07373-GBD   Document 1-1   Filed 09/05/25   Page 78 of 163

(a)      that Tenant shall comply with all of its obligations under this Lease, including without limitation Tenant's obligation to continue to pay any Base Rent and Additional Charges;

(b)      that Tenant shall continue to use the Demised Premises in the manner required by this Lease;

(c)      that Landlord shall be permitted to supervise the performance of Tenant's obligations under this Lease;

(d)      that Tenant shall pay to Landlord within thirty (30) days after entry of such order or the effective date of such stay, as adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease, a security deposit as may be required by law or ordered by the court;

(e)      that Tenant has and will continue to have unencumbered assets after the payment of all secured obligations and administrative expenses to assure Landlord that sufficient funds will be available to fulfill the obligations of Tenant under this Lease;

(f)      that if Tenant's trustee, Tenant or Tenant as debtor-in-possession assumes this Lease and proposes to assign the same (pursuant to Title 11 U.S.C. § 365, as the same may be amended) to any Person who shall have made a bona fide offer to accept an assignment of this Lease on terms acceptable to the trustee, Tenant or Tenant as debtor-in-possession, then notice of such proposed assignment, setting forth (i) the name and address of such person, (ii) all of the terms and conditions of such offer, and (iii) the adequate assurance to be provided Landlord to assure such Person's future performance under the Lease, including, without limitation, the assurances referred to in Title 11 U.S.C. § 365(b)(3) (as the same may be amended), shall be given to Landlord by the trustee, Tenant or Tenant as debtor-in-possession no later than twenty (20) days after receipt by the trustee, Tenant or Tenant as debtor-in-possession of such offer, but in any event no later than ten (10) days prior to the date that the trustee, Tenant or Tenant as debtor-in-possession shall make application to a court of competent jurisdiction for authority and approval to enter into such assignment and assumption, and Landlord shall thereupon have the prior right and option, to be exercised by notice to the trustee given at any time prior to the effective date of such proposed assignment, to accept an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such Person, less any brokerage commissions which may be payable out of the consideration to be paid by such Person for the assignment of this Lease.

Section 24.13    Landlord Costs and Expenses. Tenant shall pay to Landlord all costs and expenses incurred by Landlord by reason of a Default of Tenant under this Lease, including, without limitation, attorneys' fees and disbursements, incurred by Landlord in enforcing any of the covenants and provisions of this Lease, together with interest thereon at the Involuntary Rate, unless a court of competent jurisdiction shall have rendered a non-appealable judgment that Tenant did not violate

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM    INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                          RECEIVED NYSCEF: 05/25/2023

74

such covenants and provisions. All of the sums paid or obligations paid by Landlord pursuant to this Section 24.13 shall be paid by Tenant to Landlord upon demand by Landlord and shall constitute Additional Charges hereunder.

## ARTICLE 25

## NOTICES

Section 25.01     Notices. Whenever it is provided in this Lease that a notice, demand, request, consent, approval or other communication shall or may be given to or served upon either of the parties by the other and whenever either of the parties shall desire to give or serve upon the other any notice, demand, request, consent, approval, or other communication with respect hereto or the Demised Premises, each such notice, demand, request, consent, approval, or other communication shall be in writing (whether or not so stated elsewhere in this Lease) and, any law or statute to the contrary notwithstanding, shall be effective for any purpose only if given or served as follows:

(a)     if by Landlord, by hand delivering or by mailing the same to Tenant by registered or certified mail, postage prepaid, return receipt requested, or by sending by nationally recognized overnight courier service, addressed to Tenant at its address first set forth above, attention: President, Seventh Regiment Armory Conservancy or to such other parties and addresses as Tenant may from time to time designate by notice given as aforesaid;

(b)     if by Tenant, DMNA or any other agency of Landlord (other than ESDC), by hand delivering or by mailing the same to Landlord by registered or certified mail, postage prepaid, return receipt requested, or by sending by nationally recognized overnight courier service, addressed to Landlord at:

> New York State Urban Development Corporation
> d/b/a Empire State Development Corporation
> 633 Third Avenue
> New York, New York 10017
> Attention: Senior Vice President,
> Legal/General Counsel

or to such other parties and addresses as Landlord may from time to time designate by notice given as aforesaid;

(c)     during the period that Tenant's leasehold estate in this Lease is subject to a Mortgage, or Tenant's leasehold estate in this Lease is acquired by the Mortgagee because of a default under such Mortgage, copies of all notices given by Landlord to Tenant shall be sent to the Mortgagee in the manner provided for notices in this Article 25 at the address (or to such other parties and addresses) as the Mortgagee may from time to time designate by notice given as aforesaid; and

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 80 of 163    RECEIVED NYSCEF: 05/25/2023

75

(d)      in the event the subject of any notice concerns the obligations or rights of DMNA under this Lease, Landlord and/or Tenant, as the case may be, shall send a copy of such notice to DMNA in the manner provided for notices in this Article 25 at the following address:

> Division of Military and Naval Affairs
> 330 Old Niskayuma Road
> Latham, New York 12110-2224
> Attention:  Director of Facilities Management and Engineering

or to such other parties and addresses as DMNA may from time to time designate by notice given as aforesaid.

Section 25.02    Timing. Every notice, demand, request, consent, approval, or other communication hereunder shall be deemed to have been given or served only when hand delivered against a signed receipt, or if mailed, on the earliest to occur of (a) five (5) Business Days after the date that the same shall have been deposited in the United States mails, postage prepaid, in the manner aforesaid, (b) the date of actual receipt thereof and (c) the date of refusal by the addressee to accept such mailing or delivery.

# ARTICLE 26

## FINANCIAL AND VENDOR RESPONSIBILITY REPORTS

Section 26.01    Financial Statements. Tenant shall, at its own cost and expense, furnish to Landlord, the following:

(a)      as soon as practicable after the end of each fiscal year of Tenant, but in any event within one-hundred fifty (150) days thereafter, financial statements of Tenant and of the operations of the Demised Premises, including, without limitation, a statement of Gross Revenues from Commercial Operations, balance sheets and income and expense statements, all in detail reasonably satisfactory to Landlord and examined and certified by a Certified Public Accountant in accordance with generally accepted Accounting Principles who shall render a written report thereof certified as complete and accurate to the Landlord ; and

(b)      as soon as practicable after the end of each fiscal year of Tenant, but in any event within one hundred fifty (150) days thereafter, Tenant shall send to Landlord a schedule of all User Agreements (including any amendments thereto), setting forth the name of each User thereunder, the original rent to be paid under each such User Agreement and any increases (including the basis for calculating such increases) in rent since the date of such User Agreement certified by the chief financial officer or managing general partner of Tenant; and

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 81 of 163

(c)      such other information respecting the business, property, condition and operations, financial of otherwise, of the Demised Premises, Tenant and any entity comprising Tenant as Landlord may reasonably request.

Section 26.02    <u>Books and Records</u>. Tenant shall keep and maintain at an office in New York City complete and accurate books and records of accounts of the operations of the Demised Premises from which Landlord may determine for each fiscal year of Tenant (all or any portion of which falls within the Term) the items to be shown or set forth on the statements to be delivered by Tenant to Landlord pursuant to <u>Section 26.01</u> and in accordance with any applicable provision of any Mortgage and shall preserve, for a period of at least six (6) years after the end of each applicable period of time, such books and records. However, if, at the expiration of such six (6) year period, Landlord is seeking to contest or is contesting any matter relating to such records or any matter to which such records may be relevant, Tenant shall preserve these until one (1) year after the final adjudication, settlement or other disposition of any such contest.

Section 26.03    Landlord Review and Audit.

(a)      Landlord or Landlord's agent or designee shall have the right from time to time during regular business hours, upon five (5) Business Days' notice, to inspect, audit and, at its option, duplicate, at Landlord's expense, and retain copies of all of Tenant's books and records relating in any manner to the operation of the Demised Premises or to matters covered by this Lease. Tenant shall produce them upon request of Landlord, Landlord's agent or designee.

(b)      Should any audit performed by Landlord or Landlord's agent or designee disclose that any payment of Base Rent or Additional Charges was understated, Landlord shall notify Tenant, of the amount of the underpayment by a statement showing in reasonable detail the reasons why such payment of Base Rent and/or Additional Charges was understated. Within thirty (30) days after Tenant has received notice of such underpayment from Landlord, Tenant shall either pay to Landlord the amount by which such payment was understated, with interest to the extent provided below, or deliver to Landlord a statement contesting Landlord's determination of underpayment and giving the reasons therefor in reasonable detail. Within thirty (30) days after it is determined by agreement between Landlord and Tenant or otherwise that a payment of Base Rent and Additional Charges was understated, Tenant shall pay to Landlord the amount of the deficiency with interest to the extent provided below and, in the event that the amount of the deficiency is greater than five percent (5%) of the correct amount owed, Tenant shall reimburse Landlord for the reasonable costs of such audit. Any payment of a deficiency pursuant to this <u>Section 26.03(b)</u> shall bear interest at the Involuntary Rate from the date of the underpayment to the date of the payment of the deficiency, which interest shall constitute Additional Charges hereunder.

Section 26.04    <u>Survival</u>. The obligations of Tenant under <u>Sections 26.01</u> through <u>26.03</u> shall survive the termination of this Lease for a period of six (6) years. However, if at the end of such six (6) year period, Landlord is seeking to contest

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59    Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 82 of 163    RECEIVED NYSCEF: 05/25/2023

77

or is contesting any matter under such surviving Sections, the obligations of Tenant shall not terminate until final adjudication, settlement or other disposition of any such contest.

Section 26.05    <u>Vendor Responsibility</u>. Tenant shall notify Landlord in writing with respect to any change in Tenant's vendor responsibility disclosure as required by the Procurement and Disbursement Guidelines set forth in Bulletin No. G-221 and related materials issued by the New York State Office of the State Comptroller, and any successor requirements.

# ARTICLE 27

# DMNA OCCUPANCY

Section 27.01    <u>DMNA Retained Space</u>. The Demised Premises excludes certain space located in the Building and described and depicted with particularity in <u>Exhibits C-1</u> and <u>C-2</u>, and referred to as the "<u>DMNA Retained Space</u>". The current location and configuration of the DMNA Retained Space is depicted in <u>Exhibit C-1</u>. No later than the Completion of Construction Date, DMNA shall relocate into the space depicted in <u>Exhibit C-2</u>, and such space shall thereafter constitute the DMNA Retained Space, unless the DMNA shall at any time determine that it does not want a portion of the space depicted in <u>Exhibit C-2</u>, in which event such portion shall cease to comprise part of the DMNA Retained Space and shall become part of the Demised Premises. DMNA shall use and occupy the DMNA Retained Space under an arrangement with Landlord for use as an military use pursuant to Article IX of the New York Military Law as modified by the Laws of 2004, Chapter 482 and in accordance with the terms of the City Lease. DMNA shall at all times maintain a sufficient presence of personnel in occupancy of the DMNA Retained Space such that the Building continues to function as an armory for purposes of Article IX of the New York Military Law as modified by the Laws of 2004, Chapter 482 and the City Lease.

Section 27.02    Maintenance and Operation of DMNA Retained Space.

(a)    Except as set forth in <u>Section 27.02(b)</u>, DMNA shall be solely responsible for the maintenance, operation, cleaning, repair, replacement and upkeep of the DMNA Retained Space, and Tenant shall have no liability therefor. DMNA shall take good care of the DMNA Retained Space and make all repairs therein, ordinary and extraordinary, foreseen and unforeseen, as necessary or appropriate to keep the same in a good condition, and whether or not necessitated by wear, tear, obsolescence or defects, latent or otherwise, or resulting from a casualty or condemnation. DMNA shall not commit or suffer, and shall use all reasonable precaution to prevent, waste, damage or injury to the DMNA Retained Space and the Demised Premises. When used herein, the term "<u>repairs</u>" shall include all necessary replacements, alterations and additions. All repairs made by DMNA shall be made in compliance with all Requirements and the provisions of this Lease. Tenant shall not be required to furnish any services, utilities or facilities whatsoever to the DMNA Retained

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 39                                          RECEIVED NYSCEF: 05/25/2023

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 83 of 163

78

Space, nor shall Tenant have any duty or obligation to make any alteration, change, improvement, replacement, Restoration or repair to, the DMNA Retained Space.

(b)     DMNA shall be entitled to use the electric power supplied to the Building by Landlord pursuant to <u>Section 12.03</u>. DMNA shall pay to Tenant within ten (10) days following demand by Tenant, DMNA's pro rata share of the cost of such electric power as billed to Tenant by Landlord, with such pro rata share to be calculated as 1.4% [the ratio of square footage of the DMNA Retained Space to the square footage of the Administration Building] (the "<u>DMNA Pro Rata Share</u>").

(c)     DMNA shall pay to Tenant, on an annual basis throughout the Term, DMNA's Pro Rata Share of Common Area Operating Expenses for the Building.

(d)     The DMNA Retained Space shall be used for offices and related uses. DMNA shall not use or occupy, nor permit or suffer the DMNA Retained Space or any part thereof to be used or occupied for any unlawful, illegal or extra hazardous business, use or purpose, or in such manner as to constitute a nuisance of any kind (public or private), including for the storage of live ammunition therein on other than a temporary basis, or that Tenant, in its reasonable judgment, deems offensive by reason of odors, fumes, dust, smoke, noise or other pollution, or for parking or storage of vehicles or for any purpose or in any way in violation of any Requirements, or which may make void or voidable any insurance then in force on the Demised Premises. DMNA shall take, immediately upon the discovery of any such unpermitted, unlawful, illegal or extra hazardous use, all necessary actions, legal and equitable, to compel the discontinuance of such use.

Section 27.03    Cross-Easements for Access, Emergency and Communications Purposes.

(a)     DMNA shall have a permanent easement for access of individuals across the Demised Premises to allow for ingress and egress from the Building main door located on Park Avenue to the DMNA Retained Space, and to allow for emergency egress from the DMNA Retained Space through all egress stairs located in the Building which service the DMNA Retained Space. DMNA employees, visitors and business invitees may pass through such easement areas as necessary for such ingress and egress to the DMNA Retained Space. Tenant shall be entitled to maintain security procedures, including limited access, hours of operation, and screening of visitors, to and through the Demised Premises. Notwithstanding the preceding sentence, DMNA, ESDC and the Landlord's employees, agents and assigns shall have unfettered access to the DMNA Retained Space at all times.

(b)     Tenant, its employees, visitors and business invitees shall have an easement for the Term of this Lease for access to and across the DMNA Space in the event of an emergency, or as may be required to perform and services which Tenant is performing in the Building or to fulfill any obligation of Tenant under this Lease.

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59    Case 1.25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 84 of 163    RECEIVED NYSCEF: 05/25/2023

79

(c)    DMNA shall have an easement for the Term of this Lease to install and maintain wiring, cabling, fiber optic or other electrical and communications lines, within conduits, chases, risers, or concealed within or behind walls, ceilings or floors, through the Demised Premises to and from the DMNA Retained Space.

Section 27.04    Exculpation.

(a)    Tenant shall not in any event whatsoever be liable for any injury or damage to any Person happening on, in or about the DMNA Retained Space and its appurtenances, nor for any injury or damage to the DMNA Retained Space or to any property belonging to DMNA or to any other Person which may be caused by any fire or breakage, or by the use, misuse or abuse of any of the DMNA Retained Space unless caused by Tenant, or its agents, assignees, sublessees, Users or invitees.

(b)    <u>Failure of Services</u>. Tenant shall not be liable to DMNA or to any other Person claiming through or under DMNA for any failure of water supply, gas or electric current, nor for any injury or damage to any property of DMNA or of any other Person or to the DMNA Retained Space caused by or resulting from gasoline, oil, steam, gas, electricity, or hurricane, tornado, flood, wind or similar storms or disturbances, or water, rain or snow which may leak or flow from the street, sewer, gas mains or subsurface area or from any part of the DMNA Retained Space or the Demised Premises, or from any other place, or caused by any public or quasi-public work, except in any such case to the extent caused by Tenant's negligence or improper acts.

Section 27.05    <u>Insurance</u>. Landlord is, and shall throughout the Term be, self-retained with respect to liabilities arising from DMNA's occupancy of the DMNA Retained Space pursuant to this <u>Article 27</u> and under <u>Section 19.02</u>. In the event that at any time Landlord ceases to be self-retained with respect to such liabilities, (i) Landlord shall, or shall cause DMNA to, obtain insurance or to self-insure with respect to its obligations under <u>Section 19.02</u>, (i) such insurance or self-insurance shall provide the coverages described in <u>Section 7.01,</u> which insurance or self-insurance shall specifically cover the indemnifications set forth in <u>Section 19.02</u> and otherwise meet all of the requirements set forth in <u>Section 7.01</u> of insurance to be carried by Tenant, (ii) Landlord, Tenant and any Mortgagee, shall be named as additional insureds on all policies of liability insurance, if any, maintained by DMNA, and (iii) in the event that Landlord and/or DMNA carries property insurance (or is self-insured for property coverage) on its personal property, each such policy of property insurance shall expressly include a waiver of all rights of subrogation and permission to release liability against Tenant and any Mortgagee; provided that if an insurer will not include such a provision in such policy or if the inclusion of such a provision would involve an additional premium, Landlord shall use all reasonable efforts to cause such a provision to be so included at Landlord's expense.

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                                    RECEIVED NYSCEF: 05/25/2023

80

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 85 of 163

## ARTICLE 28

## [INTENTIONALLY OMITTED]

## ARTICLE 29

## STREET WIDENING

If at any time during the Term, any proceedings are instituted or orders made by any Governmental Authority for the widening or other enlargement of any Street requiring removal of any projection or encroachment on, under or above any such Street, or any changes or alterations upon the Demised Premises, or in the sidewalks, vaults (other than vaults which are under the control of, or are maintained or repaired by, a utility company), gutters, curbs or appurtenances, Tenant, with reasonable diligence shall comply with such requirements, and on Tenant's failure to do so, Landlord may comply with the same in accordance with the provisions of Article 21. Tenant shall be permitted to contest in good faith any proceeding or order for street widening instituted or made by any Governmental Authority in accordance with Section 14.02. Any widening or other enlargement of any such Street and the award or damages in respect thereto shall be deemed a partial condemnation and be subject to the provisions of Article 9.

## ARTICLE 30

## SUBORDINATION AND NON-DISTURBANCE

Section 30.01    Landlord's Interest Not Subordinate. Neither Landlord's interest in the Demised Premises nor Landlord's interest in this Lease, as this Lease may be modified, amended or supplemented, or any part thereof, shall be subject or subordinate to (a) any mortgage now or hereafter placed upon Tenant's interest in this Lease or (b) any other liens or encumbrances hereafter affecting Tenant's interest in this Lease.

Section 30.02    Tenant's Interest Subordinate. This Lease, and all rights of Tenant hereunder, are and shall be subject and subordinate in all respects to all future ground leases, overriding leases and underlying leases of the Land and/or the Building hereafter existing (a "Superior Lease") and to any mortgages held by an Institutional Lender on Landlord's Interest in the Land and Building (a "Landlord's Mortgage"); provided that with respect to any such Superior Lease or Landlord's Mortgage, there shall have been delivered to Tenant a Non-Disturbance Agreement. In confirmation of such subordination, Tenant shall promptly execute, acknowledge and deliver to Landlord, the lessor under any such Superior Lease (a "Superior Lessor") or the holder of any such Landlord's Mortgage or any of their respective successors in interest any further instruments to evidence such subordination; provided that Tenant shall have received a Non-Disturbance Agreement and that any such instruments of subordination are not inconsistent with the terms of the Non-Disturbance Agreement or this Lease. Tenant shall execute, acknowledge and deliver the Non-Disturbance Agreement to Superior Lessor or holder of Landlord's Mortgage within ten (10) Business Days after

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                                        RECEIVED NYSCEF: 05/25/2023

81

Case 1:25-cv-07373-GBD   Document 1-1   Filed 09/05/25   Page 86 of 163

Tenant's receipt thereof. Notwithstanding anything to the contrary contained in this Article 30, this Lease shall be subordinate to a Superior Lease or Landlord's Mortgage only during the period in which the Non-Disturbance Agreement between Tenant and the Superior Lessor or holder of the Landlord's Mortgage, as the case may be, is in full force and effect.

Section 30.03    A "Non-Disturbance Agreement" shall mean an agreement, in form and substance, reasonably satisfactory to Landlord, Tenant and the Superior Lessor or holder of Landlord's Mortgage, and executed by Tenant and by the Superior Lessor or holder of Landlord's Mortgage, whereby such superior party agrees that (a) as long as Tenant is not in default beyond any applicable grace period, Tenant shall not be named or joined as a party defendant (unless deemed a necessary party under any applicable law) in any suit, action or proceeding to terminate a Superior Lease or Landlord's Mortgage, as the case may be, by reason of a default thereunder, and (b) Tenant's leasehold estate in this Lease shall not be disturbed by reason of such termination or foreclosure and Tenant agrees to attorn to such superior party and any successor thereto, on the terms and conditions of this Lease, subject to the terms referred to in clauses (i) through (vii) of Section 10.07(a) and such other commercially customary and reasonable provisions as such superior party shall customarily include in its non-disturbance and attornment agreements.

## ARTICLE 31

## EXCAVATIONS AND SHORING

If any excavation shall be made or contemplated to be made for construction or other purposes upon property adjacent to the Property, Tenant shall afford to Landlord or, at Landlord's option, to the person or persons causing or authorized to cause such excavation the right to enter upon the Demised Premises in a reasonable manner for the purpose of doing such work as may be necessary to preserve any of the walls or structures of the Building from injury or damage and to support the same by proper foundations; provided that Tenant shall have approved of the plans and specifications for such work and Tenant shall be indemnified from and against all loss and damage resulting from such work. Tenant's approval shall be limited to determining that the work is safely planned and shall not be unreasonably withheld. If Tenant shall not have approved or disapproved of such plans and specifications within twenty (20) days after they shall have been delivered to Tenant, Tenant shall be deemed to have approved of such plans and specifications. Tenant shall not, by reason of any such excavation or work, have any claim against Landlord for suspension, diminution, abatement, offset or reduction of Base Rent or Additional Charges or, except as set forth in this Article 31, for damages or for indemnity.

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59          Case 1:25-cv-07373-GBD          Document 1-1          Filed 09/05/25          Page 87 of 163          RECEIVED NYSCEF: 05/25/2023

82

## ARTICLE 32

### CERTIFICATES BY LANDLORD AND TENANT

Section 32.01    <u>Tenant Certificates</u>. At any time and from time to time upon not less than ten (10) days notice by Landlord, Tenant shall execute, acknowledge and deliver to Landlord or any other party specified by Landlord a statement certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same, as modified, is in full force and effect and stating the modifications) and the date to which Base Rent and Additional Charges have been paid, and stating whether or not to the best knowledge of Tenant, Landlord is in default in the performance of any covenant, agreement or condition contained in this Lease, and, if so, specifying each such default of which Tenant may have knowledge.

Section 32.02    <u>Landlord Certificates</u>. At any time and from time to time upon not less than ten (10) days notice by Tenant, Landlord shall execute, acknowledge and deliver to Tenant or any other party specified by Tenant a statement certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same, as modified, is in full force and effect and stating the modifications) and the date to which Base Rent and Additional Charges have been paid, and stating whether or not to the best knowledge of Landlord, Tenant is in Default in the performance of any covenant, agreement or condition contained in this Lease, and, if so, specifying each such Default of which Landlord may have knowledge.

## ARTICLE 33

### CONSENTS AND APPROVALS

Section 33.01    <u>Consents in Writing</u>. All consents and approvals which may be given under this Lease shall, as a condition of their effectiveness, be in writing and otherwise satisfy the requirements of <u>Article 25</u>. The granting of any consent or approval by a party to perform any act requiring consent or approval under the terms of this Lease, or the failure on the part of a party to object to any such action taken without the required consent or approval, shall not be deemed a waiver by the party whose consent was required of its right to require such consent or approval for any further similar act.

Section 33.02    <u>Reasonableness</u>. Except as provided below in this <u>Section 33.02</u>, in no event shall Tenant be entitled to any damages for any unreasonable withholding by Landlord of its consent or approval. Tenant's sole recourse against Landlord for the unreasonable withholding of Landlord's consent or approval in those instances in which such recourse is permitted under this <u>Section 33.02</u> shall be limited to an action for declaratory relief that the withholding of such consent or approval was unreasonable and that, accordingly, Tenant may proceed as if such consent or approval had been granted by Landlord, except that Tenant shall be entitled to damages solely in the case where a court of competent jurisdiction has reached a final, non-appealable verdict stating that Landlord's withholding of consent was not done in good faith. If

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                                          RECEIVED NYSCEF: 05/25/2023

83

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 88 of 163

Tenant is delayed in performing its obligations under this Lease because Landlord has unreasonably or in bad faith refused to give its consent as determined in accordance with this <u>Section 33.02</u>, all time periods shall be tolled for Tenant hereunder during the pendency of the action for declaratory relief or damages provided for in this <u>Section 33.02</u>. If, pursuant to the terms of this Lease, any consent or approval by Landlord or Tenant is not to be unreasonably withheld, such consent or approval shall, in addition, not be unreasonably delayed, unless specific time periods are provided therefor, in which event such specific time periods shall govern, or unreasonably conditioned.

## ARTICLE 34

## SURRENDER AT END OF TERM

Section 34.01    <u>Surrender of Premises</u>. On the last day of the Term or upon any earlier termination of this Lease, or upon a re-entry by Landlord upon the Demised Premises pursuant to <u>Article 24</u>, Tenant shall well and truly surrender and deliver to Landlord the Demised Premises in good order, condition and repair, reasonable wear and tear excepted and subject to the provisions of <u>Article 8</u>, free and clear of all lettings, occupancies, liens and encumbrances other than the Title Matters and those created by or consented to by Landlord. Tenant hereby waives any notice now or hereafter required by law with respect to vacating the Demised Premises on any such termination date.

Section 34.02    <u>Delivery of Documents</u>. On the last day of the Term or upon any earlier termination of the Lease, or upon a re-entry by Landlord upon the Demised Premises pursuant to <u>Article 24</u> hereof, Tenant shall deliver to Landlord Tenant's executed counterparts of all User Agreements and any service and maintenance contracts then affecting the Demised Premises, true and complete maintenance records for the Demised Premises, all original Permits then pertaining to the Demised Premises, permanent or temporary Certificates of Occupancy then in effect for the Building, and all warranties and guarantees then in effect which Tenant has received in connection with any work or services performed or Equipment installed in the Building, all financial reports, books and records required by <u>Article 26</u> hereof and any and all other documents of every kind and nature whatsoever relating to the Demised Premises, together with a duly executed assignment thereof to Landlord.

Section 34.03    <u>Delivery of Plans</u>. The Contract Documents, and any and all other plans, drawings, specifications and models prepared in connection with construction at the Demised Premises, any Restoration and any Capital Improvement, shall become the sole and absolute property of Landlord upon the Expiration Date or any earlier termination of this Lease. Tenant shall deliver all such documents to Landlord promptly upon the Expiration Date or any earlier termination of this Lease.

Section 34.04    <u>Personal Property</u>. Any personal property of Tenant or of any User which shall remain on the Demised Premises for thirty (30) days after the termination of this Lease and after the removal of Tenant or such User, from the Demised Premises, may, at the option of Landlord, be deemed to have been abandoned

by Tenant or such User and either may be retained by Landlord as its property or be disposed of, without accountability, in such manner as Landlord may see fit. Landlord shall not be responsible for any loss or damage occurring to any such property owned by Tenant or any User.

Section 34.05     Survival. The provisions of this Article 34 shall survive any termination of this Lease.

## ARTICLE 35

## WAIVER OF AIR RIGHTS

Tenant being a "Party in interest" (as defined in Section 12-10(d) of the Zoning Resolution of the City of New York effective December 15, 1961, as amended) with respect to the Land more particularly described in Exhibit A, annexed hereto, does hereby waive its right to execute, and any right or interest it may have now or in the future with respect to (i) Declarations of Zoning Lot Restrictions or modifications, amendments, additions, replacements, reinstatements or consolidations thereof that relate or pertain to the Land and/or (ii) Transfers of Development Rights and Notice of Restrictions Pursuant to Section 974-79 et seq. or other applicable provisions of the Zoning Resolution, or modifications, amendments additions, replacements, restatements or consolidation thereof that relate or pertain to the Land.

## ARTICLE 36

## QUIET ENJOYMENT

Landlord covenants that Tenant shall and may (subject, however, to the exceptions, reservations, terms and conditions of this Lease) peaceably and quietly have, hold and enjoy the Demised Premises for the term hereby granted without molestation or disturbance by or from Landlord or any Person claiming through Landlord and free of any encumbrance created or suffered by Landlord, except those encumbrances, liens or defects of title, created or suffered by Tenant and the Title Matters.

## ARTICLE 37

## INVALIDITY OF CERTAIN PROVISIONS

If any term or provision of this Lease or the application thereof to any Person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

## ARTICLE 38

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM   INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                      RECEIVED NYSCEF: 05/25/2023

Case 1:25-cv-07373-GBD   Document 1-1   Filed 09/05/25   Page 90 of 163

85

## ENVIRONMENTAL PROVISIONS

Section 38.01 <u>Definitions</u>. For the purpose of this Lease, the following terms shall have the following meanings:

"<u>Contaminants</u>" shall mean (a) any toxic substance or hazardous waste, substance or related material, or any pollutant or contaminant; (b) radon gas, lead, asbestos in any form which is or could become friable, urea formaldehyde foam insulation, transformers or the equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of federal, state or local safety guidelines, whichever are more stringent; (c) any substance, gas, material or chemical which is or may hereafter be defined as or included in the definition of "hazardous substances," "toxic substances," "hazardous materials," "hazardous wastes" or words of similar import under any Environmental Law or Requirements; and (d) any other chemical, material, gas, vapor, energy, radiation or substance, the exposure to or release of which is or may hereafter be prohibited, limited or regulated by any Governmental Authority having jurisdiction over the Demised Premises or the operations or activity at the Demised Premises.

"<u>Environment</u>" shall mean the Land and surrounding parcels, including without limitation the soil, ground waters, Building and Improvements, surface or subsurface strata and ambient air.

"<u>Environmental Condition</u>" shall mean any condition with respect to the Environment which (i) affects the Demised Premises or (ii) which affects other property and originates from or results from the occupancy of the Demised Premises, and which results in Environmental Damages, but excluding any condition which was caused or first arose (x) prior to the Commencement Date or after the Expiration Date, or (y) by a Person other than Tenant or any Person claiming through or under Tenant.

"<u>Environmental Damages</u>" shall mean all claims, judgments, damages (including punitive damages) losses, penalties, fines, liabilities (including strict liability), encumbrances, liens, costs and expenses of investigation and defense of any claim, whether or not such is ultimately defeated, and of any settlement or judgment, of whatever kind or nature, contingent or otherwise, matured or unmatured, foreseeable or unforeseeable, any of which are incurred at any time as a result of (i) an Environmental Condition, (ii) the existence of Contaminants on, about or beneath the Demised Premises or which have migrated to or from the Demised Premises, (iii) the Release or Threatened Release of Contaminants into the Environment or (iv) the violation or threatened violation of any Environmental Law pertaining to the Demised Premises, and including:

(i) damages for personal injury, disease or death or injury to property or natural resources occurring on or off the Demised Premises (excluding lost profits, consequential damages, the cost of demolition and rebuilding of any improvements);

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 91 of 163

(ii)     reasonable fees incurred for the services of attorneys, consultants, Contractors, experts, laboratories and all other reasonable costs incurred in connection with the investigation, required cleanup or remediation, including the preparation of any feasibility studies or reports and the performance of any required cleanup, remedial, removal, abatement, containment, closure, restoration or monitoring work; and

(iii)     liability to any person or entity to indemnify such person or entity for costs expended in connection with the items referenced in this Section 38.01.

"Environmental Laws" shall mean all Requirements relating to the protection of human health or the Environment, including, without limitation:

(i)     all Requirements relating to reporting, licensing, permitting, investigation or remediation of emissions, discharges, Releases, Threatened Releases or the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Contaminants, including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9061, et seq.; the Hazardous Materials Transportation Act, as amended 49 U.S.C. § 1801, et seq.; the Resource Conservation and Recovery Act, as amended 42 U.S.C. § 6901, et seq.; the Federal Water Pollution Control Act, as amended, 33 U.S.C. § 1251, et seq.; analogous state environmental statutes and local ordinances; and any regulations promulgated under any of the foregoing; and

(ii)     all Requirements pertaining to the protection of the health and safety of employees or the public.

"Existing Environmental Condition" shall mean any Environmental Condition which was first caused or first arose prior to the Commencement Date, whether or not the same was known of as of the Commencement Date. All Existing Environmental Conditions which are currently known to Landlord are set forth in the following reports (collectively, the "Environmental Reports"):  (i) Appendix 5 Existing Physical Conditions Assessment of the Seventh Regiment Armory Request for Proposals, sponsored by ESDC and DMNA, which has been delivered by Landlord to Tenant and a copy of which is attached hereto as Exhibit N-1, (ii) Environmental Conditions Document Review, dated December 30, 2003, by AKRF Environmental and Planning Consultants ("AKRF"), which has been delivered by Tenant to Landlord and a copy of which is attached hereto as Exhibit N-2, (iii) Phase II Environmental Site Assessment, dated July 12, 2004, by Warren & Panzer Engineers, P.C., which has been delivered by Tenant to Landlord and is attached hereto as Exhibit N-3, and (iv) Addendum Report, dated April 12, 2006, by AKRF, which has been delivered by Tenant to Landlord and is attached hereto as Exhibit N-4.

"Landlord's Acts" shall mean the affirmative acts or negligence of the State, Landlord, their respective agents, contractors or tenants of the Demised Premises

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59    Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 92 of 163    RECEIVED NYSCEF: 05/25/2023

87

(other than Tenant or User) which occur prior to or after the Commencement Date and which create an Environmental Condition.

"Release" shall mean any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing or dumping of any Contaminant into the Environment.

"Tenant's Acts" shall mean the affirmative acts or negligence of the Tenant, any User, or any agent or contractor thereof which create an Environmental Condition.

"Threatened Release" shall mean a substantial likelihood of a Release which requires action to prevent or mitigate damage to the Environment which may result from such Release.

Section 38.02    Landlord's Representations; the Tenant's Remediation Work Obligation.

(a)    Except as otherwise set forth in the Environmental Reports, Landlord hereby represents and warrants to Tenant and Tenant warrants to the Landlord that, to the best of Landlord's and Tenant's information, knowledge and belief, at the date hereof and at all times prior to the Commencement Date,: (i) there are no Existing Environmental Conditions, (ii) the Demised Premises are and were free from Contaminants, and otherwise in compliance with Environmental Laws in all material respects and (iii) such party has received no violations, suits, notices, claims or charges which are still outstanding which either (x) claim liability for any Environmental Damages or (y) allege that the Demised Premises are not in compliance with Environmental Laws in any material respect.

(b)    With respect to all Existing Environmental Conditions, Tenant, at its sole cost and expense, shall commence remediation of all hazardous materials which exist at the Armory as of the Commencement Date in accordance with a workplan to be developed by Tenant in compliance with all Environmental Laws ("Remediation Work"), and thereafter diligently perform such remediation through to completion . The performance of such Remediation Work shall be scheduled in coordination with Tenant's Major Construction Work, in order to minimize disruption to operations of the Demised Premises. Such Remediation Work shall be conducted by a reputable environmental remediation firm, and shall be conducted in accordance with all Environmental Laws. Tenant shall file or cause to be filed all necessary applications and reports with all Governmental Authorities required under Environmental Laws in connection with such Remediation Work, and shall deliver a copy to Landlord of all such filings. Landlord shall cooperate with Tenant in the making of all such filings and shall execute any such filings upon request by Tenant. At the conclusion of such Remediation Work, Tenant shall deliver to Landlord one or more certifications, in form(s) required by Environmental Laws (including, in the event that Tenant is performing asbestos removal, an ACP-5 certificate for filing with the NYC Department of Buildings), evidencing that such Remediation Work has been completed in

accordance with all Environmental Laws and that the Demised Premises are free from Contaminants.

        (c)     Tenant reserves the right to apply to the Landlord for contributions to the cost of such Remediation Work; however, any such contribution by the Landlord will be Subject to Appropriation and the Landlord (i) shall have no obligation to seek such Appropriation, and (ii) shall have no liability for any such contributions unless funds for such purpose are appropriated.

        Section 38.03   <u>Compliance with Environmental Laws</u>. Except to the extent related to or arising from Environmental Conditions that are not caused by Tenant's Acts, Tenant, at its sole cost and expense, shall comply with all Environmental Laws which are applicable to the Demised Premises or Tenant. Tenant shall not by any act, omission or negligence violate or cause or permit to be violated any Environmental Law. Tenant shall not cause or permit any Contaminant, (except ordinary cleaning and maintenance materials) to be manufactured, processed, distributed, used, treated, stored, disposed of, transported or handled on, in or about the Demised Premises without the prior written consent of Landlord, which Landlord shall not unreasonably withhold as long as Tenant demonstrates to Landlord's reasonable satisfaction that such Contaminant is necessary or useful to Tenant's business or the business of Tenant's Users, is of a kind customarily used in connection with such business and will be used, kept, stored, disposed of, transported and handled in a manner that complies with all Environmental Laws. Tenant shall use, keep, store, dispose of, transport and handle all ordinary cleaning and maintenance materials for which Landlord's prior consent is not required in a manner that complies with all Environmental Laws..

        Section 38.04   <u>Notice of Environmental Complaint</u>. If Tenant acquires any knowledge or receives any notice of a Release, Threatened Release or Environmental Condition or notice with regard to air emissions, water discharges, noise emissions, recycling, violations or threatened violation of any Environmental Law or any other environmental, health or safety matter affecting the Demised Premises other than arising from an Existing Environmental Condition (an "<u>Environmental Complaint</u>"), on its own, or independently or from any person or entity, including any Governmental Authority, then Tenant shall give prompt notice of the same to Landlord detailing all relevant facts and circumstances.

        Section 38.05   <u>Landlord Self-Help</u>. Tenant shall promptly take all actions Tenant reasonably deems necessary to cleanup, remove, resolve or minimize the impact of or otherwise deal with any Environmental Complaint upon its obtaining knowledge of such matters. If Tenant shall fail to take (or to commence and diligently pursue) such actions within thirty (30) days after notice thereof from Landlord, the provisions of Section <u>21.01</u> and <u>21.02</u>shall apply and Landlord shall have the right, but not the obligation, to enter into the Demised Premises and take such actions; provided, however, that Landlord shall not be liable to Tenant, User(s), occupant(s) or any other person(s) or entity(ies) by or through Tenant for entering the Demised Premises or

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                                    RECEIVED NYSCEF: 05/25/2023

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 94 of 163

89

taking such actions, except for liability arising from Landlord's Acts. Notwithstanding the foregoing, no notice shall be required in an emergency.

Section 38.06    Mutual Indemnities.

(a)    Tenant hereby indemnifies and holds harmless the Landlord Indemnitees from and against any and all Environmental Damages arising from or related to any Environmental Conditions attributable to Tenant's Acts and/or Remediation Work. This obligation shall include the burden and expense of defending all claims, suits and administrative proceedings (with counsel reasonably satisfactory to Landlord) even if such claims, suits or proceedings are groundless, false or fraudulent, and conducting all negotiations of any description, and paying and discharging, when and as the same become due, any and all judgments, penalties or other sums due against the Landlord Indemnitees. Without limiting the foregoing, Tenant shall promptly take all actions at its sole cost and expense, as are necessary to return the Demised Premises to a condition acceptable to any Governmental Authority and the Landlord if there is a Release or Environmental Condition on, from or at the Demised Premises; provided that Landlord's approval of such actions shall first be obtained, which approval shall not be unreasonably withheld. Tenant's indemnification obligations shall not apply with respect to Environmental Damages caused by Landlord's Acts

(b)    Notwithstanding anything to the contrary in Articles 18 or 19, Landlord hereby indemnifies and holds harmless the Tenant Indemnitees from and against Environmental Damages which were incurred prior to the Commencement Date, regardless of whether claims for such Environmental Damages are brought prior to or following the Commencement Date. This obligation shall include the burden and expense of defending all claims, suits and administrative proceedings (with counsel reasonably satisfactory to Tenant) even if such claims, suits or proceedings are groundless, false or fraudulent, and conducting all negotiations of any description, and paying and discharging, when and as the same become due, any and all judgments, penalties or other sums due against the Tenant Indemnitees.

Section 38.07    Survival. The provisions of this Article 38 shall survive the Expiration Date or any earlier termination of this Lease with respect to acts and omissions occurring prior to the termination of this Lease; provided that the indemnification provisions of this Article 38 shall survive the Expiration Date of this Lease regardless of whether the claims relating to such acts or omissions are made before or after the Expiration Date of this Lease, but in any event subject to the applicable statute of limitations.

## ARTICLE 39

## RECORDING OF MEMORANDUM; TRANSFER TAXES

Section 39.01    Memorandum of Lease. Neither Landlord nor Tenant shall record this Lease or cause the same to be placed of record without the consent of the other party. Landlord and Tenant agree that concurrently with the execution of this

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                                      RECEIVED NYSCEF: 05/25/2023

90

Case 1:25-cv-07373-GBD   Document 1-1   Filed 09/05/25   Page 95 of 163

Lease, the parties shall join in the execution of, and record, a memorandum of lease in the form annexed as <u>Exhibit G</u> hereto and made a part hereof.

Section 39.02   <u>Transfer Taxes</u>. Landlord and Tenant agree to complete any and all forms required by Article 31 of the New York State Tax Law, Chapter 21 of Title 11 of the Administrative Code of the City of New York and all other tax laws promulgated by any Governmental Authority in connection with the recording of the memorandum of this Lease (and any future amendment thereto), and any future sale, assignment, subletting or other transfer. Tenant agrees to timely pay any applicable taxes to the appropriate Governmental Authority.

Section 39.03   <u>Survival</u>. The obligations arising under this <u>Article 39</u> shall survive the termination of this Lease.

## ARTICLE 40

## NO DISCRIMINATION

Section 40.01   <u>No Discrimination</u>. Tenant, in the sale, transfer or assignment of its interest under this Lease, or in its use, operation or occupancy of the Demised Premises and employment and conditions of employment in connection therewith, or in the subletting of the Demised Premises or any part thereof, or in connection with the erection, maintenance, repair, Restoration, alteration or replacement of, or addition to, any Building shall (a) not discriminate nor permit discrimination against any person by reason of race, creed, color, religion, national origin, ancestry, sex (including gender identity or expression), age, disability, sexual orientation, military status, genetic predisposition or carrier status or marital status and (b) comply with all Requirements.

Section 40.02   <u>Contractor Provisions</u>. Tenant shall be bound by and shall include the following paragraphs (a) through (e) of this <u>Section 40.02</u> in all agreements with Contractors.

(a)      Contractor shall not discriminate against employees or applicants for employment because of race, creed, color, religion, national origin, ancestry, sex, age, disability or marital status, shall comply with all applicable Requirements prohibiting such discrimination or pertaining to equal employment opportunities and shall undertake programs of affirmative action to ensure that employees and applicants for employment are afforded equal employment opportunities without discrimination. Such action shall be taken with reference to, but not limited to, recruitment, employment, job assignment, promotion, upgrading, demotion, transfer, layoff or termination, rates of pay or other forms of compensation, and selection for training or retraining, including apprenticeship and on-the-job training.

(b)      Contractor shall request each employment agency and authorized representative of workers with which it has an agreement or understanding to furnish it with a written statement that such employment agency or representative will

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 96 of 163

not discriminate because of race, creed, color, religion, national origin, ancestry, sex, age, disability or marital status and that such agency or representative will cooperate in the implementation of Contractor's obligations hereunder.

(c)      Contractor shall state in all solicitations or advertisements for employees placed by or on behalf of contractor that all qualified applicants shall be afforded equal employment opportunities without discrimination because of race, creed, color, religion, national origin, ancestry, sex, age, disability or marital status.

(d)      Contractor shall comply with all of the provisions of the Civil Rights Law of the State of New York and Sections 291-299 of the Executive Law of the State of New York, shall upon reasonable notice furnish all information and reports deemed reasonably necessary by Landlord and shall permit access to its relevant books, records and accounts for the purpose of monitoring compliance with the Civil Rights Law and such sections of the Executive Law.

(e)      Contractor shall include in all agreements with subcontractors the foregoing provisions of Sections (a) through (d) in such a manner that said provisions shall be binding upon the subcontractor and enforceable by Contractor, Tenant and Landlord. Contractor shall take such action as may be necessary to enforce the foregoing provisions. Contractor shall promptly notify Tenant and Landlord of any litigation commenced by or against it arising out of the application or enforcement of these provisions, and Tenant and Landlord may intervene in any such litigation.

Section 40.03      Affirmative Action. Tenant shall comply with the Non-Discrimination and Affirmative Action Construction Contract Provisions, a copy of which is annexed hereto as Exhibit H. Tenant shall, and shall cause each of its agents, Contractors and employees to, promptly and diligently carry out its obligations under such Provisions in accordance with the terms thereof.

# ARTICLE 41

## MISCELLANEOUS

Section 41.01      Captions. The captions of this Lease are for convenience of reference only and in no way define, limit or describe the scope or intent of this Lease or in any way affect this Lease.

Section 41.02      Table of Contents. The Table of Contents is for the purpose of convenience of reference only and is not to be deemed or construed in any way as part of this Lease or as supplemental thereto or amendatory thereof.

Section 41.03      Pronouns. The use herein of the neuter pronoun in any reference to Landlord or Tenant shall be deemed to include any individual Landlord or Tenant, and the use herein of the words "successors and assigns" or "successors or assigns" of Landlord or Tenant shall be deemed to include the heirs, legal representatives and assigns of any individual Landlord or Tenant.

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 97 of 163

Section 41.04    <u>Depositary Charges</u>. Depositary may pay to itself out of the monies held by Depositary pursuant to this Lease charges for services rendered hereunder, which shall not exceed customary charges for a depositary performing the services of Depositary in New York City, and Tenant shall pay any deficiency.

Section 41.05    <u>Multiple Tenants</u>. If more than one entity is named as or becomes Tenant hereunder, Landlord may require the signatures of all such entities in connection with any notice to be given or action to be taken by Tenant hereunder except to the extent that any such entity shall designate another such entity as its attorney-in-fact to act on its behalf, which designation shall be effective until receipt by Landlord of notice of its revocation executed by all of them. Each entity named as Tenant shall be fully liable for all of Tenant's obligations hereunder. Any notice by Landlord to any entity named as Tenant shall be sufficient and shall have the same force and effect as though given to all parties named as Tenant. If all such parties designate in writing one entity to receive copies of all notices, Landlord agrees to send copies of all notices to that entity.

Section 41.06    Limitations on Liability.

(a)    Notwithstanding anything in this Lease to the contrary, Tenant agrees and acknowledges that ESDC is acting solely as agent for Landlord and has no liability under or with respect to this Lease. None of the members, directors, officers, employees, agents or servants of ESDC or of Landlord shall have any liability (personal or otherwise) hereunder, and no other property or assets of the members, directors, officers, employees, agents or servants of either shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies hereunder. Tenant agrees that it shall look solely to Landlord, and not to ESDC, for any claim against Landlord under any provision of this Lease.

(b)    No member, shareholder, director, officer or employee of Tenant (collectively, the "<u>Protected Parties</u>") shall have any liability (personal or otherwise) hereunder, and no property or assets of any such Protected Party shall be subject to levy, execution or other enforcement procedure for the satisfaction of Landlord's remedies hereunder. Nothing contained in this <u>Section 41.06(b)</u>, however, shall relieve any Protected Party from personal liability for fraud or breach of trust or misapplication or misappropriation of any Proceeds (as hereinafter defined). As used herein, the term "<u>Proceeds</u>" shall mean, collectively, all rents and other income derived from the Demised Premises, condemnation awards, insurance proceeds, proceeds of any assignment or subletting, security of Users and proceeds of title insurance.

Section 41.07    <u>No Merger</u>. Except in the event of a condemnation or governmental taking of the leasehold estate created by this Lease, there shall be no merger of this Lease or the leasehold estate created hereby with the fee estate, the Demised Premises or any part thereof by reason of the same Person acquiring or holding, directly or indirectly, this Lease or the leasehold estate created hereby or any interest in this Lease or in such leasehold estate as well as the fee estate in the Demised Premises.

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59    Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 98 of 163    RECEIVED NYSCEF: 05/25/2023

93

Section 41.08    <u>No Brokers</u>. Each of the parties represents to the other that it has not dealt with any broker, finder or like entity in connection with this Lease. If any claim is made by any Person who shall claim to have acted or dealt with Tenant or Landlord in connection with this transaction, Tenant or Landlord, as the case may be, will pay the brokerage commission, fee or other compensation to which such Person is entitled, shall indemnify and hold the other party hereto harmless from and against any claim asserted by such Person for any such brokerage commission, fee or other compensation and shall reimburse such other party for any costs and expenses, including, without limitation, attorneys' fees and disbursements, incurred by such other party in defending itself against claims made against it for any such brokerage commission, fee or other compensation.

Section 41.09    <u>Modifications in Writing</u>. This Lease may not be changed, modified, or terminated orally, but only by a written instrument of change, modification or termination executed by the party against whom enforcement of any change, modification or termination is sought.

Section 41.10    <u>Governing Law</u>. This Lease shall be governed by and construed in accordance with the internal laws of the State of New York without regard to conflicts of laws principles.

Section 41.11    <u>Successor and Assigns</u>. The agreements, terms, covenants and conditions herein shall be binding upon, and shall inure to the benefit of, Landlord and Tenant and (except as otherwise provided herein) their respective successors and assigns. Except as set forth in the immediately preceding sentence, nothing contained in this Lease shall be deemed to confer upon any Person any right or benefit, including any right to insist upon, or to enforce against Landlord or Tenant, the performance of such party's obligations hereunder.

Section 41.12    <u>References</u>. All references in this Lease to "<u>Articles</u>" or "<u>Sections</u>" or "<u>Exhibits</u>" shall refer to the designated Article(s), Section(s) or Exhibit(s), as the case may be, of this Lease, unless otherwise stated.

Section 41.13    <u>Landlord from Time to Time</u>. The term "<u>Landlord</u>" as used in this Lease means only the owner of the Demised Premises so that if the Landlord named herein or any successor to its interest hereunder ceases to have any interest in the Demised Premises under this Lease or there is at any time or from time to time any sale or sales or disposition or dispositions or transfer or transfers of the Landlord's or any successor's interest in the Demised Premises, the Landlord named herein or any such successor, as the case may be, shall be and hereby is entirely freed and relieved of all agreements, covenants and obligations of Landlord hereunder to be performed on or after the date of such sale or transfer, and it shall be deemed and construed without further agreement between the parties or their successors in interest or between the parties and the Person who acquires or owns the Landlord's interest in the Demised Premises under this Lease, including, without limitation, the purchaser or transferee in any such sale, disposition or transfer, that, subject to the provisions of <u>Section 41.06</u>, such Person has assumed and agreed to carry out any and all agreements,

covenants and obligations of Landlord hereunder to be performed from and after the date of such acquisition, sale or transfer.

Section 41.14    <u>No Joint Venture</u>. Nothing herein is intended nor shall be deemed to create a joint venture or partnership between Landlord and Tenant, nor to make Landlord in any way responsible for the debts or losses of Tenant.

Section 41.15    ESDC Name; Publicity; Name of Armory.

(a)    Tenant shall not have the right to use the names "<u>Empire State Development Corporation</u>," "<u>ESDC</u>," "<u>State of New York</u>," "<u>SONY</u>," "<u>NYS</u>" or any variants thereof in any advertising and promotional materials in connection with the leasing of the Building or in any press releases or media events or otherwise, without obtaining the prior written approval of Landlord, which approval shall not be unreasonably withheld. If Landlord shall not have approved or disapproved of any advertising or promotional materials submitted to it for approval within ten (10) Business Days after submission, Landlord shall be deemed to have approved of such advertising or promotional materials.

(b)    Tenant shall not change the name of the Building from "<u>The Seventh Regiment Armory</u>" or "<u>The Park Avenue Armory</u>," without obtaining the prior written approval of Landlord. Notwithstanding the foregoing, Tenant shall have the right, without Landlord's consent, (i) to name individual rooms or other locations within the Demised Premises (including, without limitation, the Drill Hall), or (ii) to name one or more performance venues within the Demised Premises (such as, solely by way of example, "The _____ Performing Arts Center at the Park Avenue Armory"); provided, however, in no event shall any such room, location or performance venue be named for a Prohibited Party.

Section 41.16    <u>Entire Agreement</u>. This Lease, together with the Exhibits hereto, contains all the promises, agreements, conditions, inducements and understandings between Landlord and Tenant relative to the Demised Premises and there are no promises, agreements, conditions, understandings, inducements, warranties, or representations, oral or written, expressed or implied, between them, other than as herein or therein set forth. The Exhibits to this Lease are hereby made a part of this Lease.

Section 41.17    <u>Execution of Lease</u>. Submission by Landlord of this Lease for review and execution by Tenant shall confer no rights nor impose any obligation upon either party unless and until both Landlord and Tenant shall have executed this Lease and duplicate originals thereof shall have been delivered to the respective parties hereto or their respective attorneys.

Section 41.18    <u>ESDC Role; Project Fee</u>. ESDC shall represent Landlord in all negotiations for Lease, shall assist the Conservancy in seeking required State and local governmental approvals for the project, and shall administer the Lease on behalf of Landlord. Without limiting the foregoing, whenever Landlord has a right

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 100 of 163

under this Lease to grant or withhold consent to a matter, such right shall be exercised by ESDC on behalf of Landlord, and ESDC is hereby fully authorized and directed so to act. Tenant shall pay to ESDC a Project Fee (the "Project Fee") on account of ESDC services and third-party expenses incurred in connection with this Lease in the amount of $100,000 per annum, commencing with the fiscal year of Landlord in which the Commencement Date occurs (or such later date as ESDC and Tenant may agree) until the earlier of (i) the fiscal year of Landlord in which Substantial Completion of the Major Construction Work occurs or (ii) the tenth fiscal year of Landlord thereafter, each such payment to be made on the last day of the fiscal year of Landlord. In no event shall Tenant be required to reimburse ESDC for expenses except to the extent of the Project Fee payable pursuant to this Section 41.18, or as elsewhere expressly provided in this Lease. The amount of the Project Fee shall be reduced in any year to the extent of any State appropriation received by ESDC for the purpose of covering expenses related to the Project (other than legal expenses). The Project Fee payable by Tenant shall cover all costs incurred by ESDC in administering the Project, including without limitation third-party costs, other than legal expense. Tenant will reimburse ESDC for legal expenses incurred to outside counsel at the customary ESDC billing rates for the negotiation of the Lease and any funding agreement arising from any such contribution described in clause (i) above and will enter into a cost agreement with Landlord with respect thereto.

Section 41.19    Project-Related Litigation. Tenant will indemnify, defend and hold harmless ESDC in connection with any litigation arising from the grant of the Lease to Tenant, and related challenges to the Project, with counsel selected by Tenant and reasonably satisfactory to ESDC (it being agreed that Paul, Weiss, Rifkind, Wharton & Garrison LLP, litigation counsel to the Conservancy, is reasonably acceptable to ESDC). In the event that ESDC reasonably determines there to be a conflict of interest between ESDC and Tenant in any such litigation such that representation by the same counsel would not be appropriate, or that the adequate protection of ESDC's interests otherwise warrants separate representation from Tenant, ESDC shall be entitled to engage separate counsel for such representation, and Tenant shall pay or reimburse ESDC for reasonable legal fees and expenses incurred by it in connection with such representation, at rates not to exceed normally and customarily paid by ESDC to outside counsel. ESDC agrees that it shall engage the Office of the Attorney General of New York State to represent ESDC in instances where ESDC reasonably determines that its interests warrant separate counsel from the Conservancy, and that representation by the Attorney General is both available to ESDC and provides adequate protection to ESDC's interests.

Section 41.20    Publicity. Subject to Section 41.15, ESDC and Tenant shall cooperate in the issuance of press releases with respect to the undertaking and commencement of the Project and ESDC's participation therein.

Section 41.21    Enforcement of Shelter Agreement. Upon notice from Tenant, Landlord shall use diligent efforts to enforce the performance obligations of the Shelter under the agreement between Landlord and the City of New York with respect to the Shelter, with the objective that the proper operations of the Shelter, as conducted

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM    INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59    RECEIVED NYSCEF: 05/25/2023

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 101 of 163

96

in accordance with such agreement, shall not interfere with Tenant's use and enjoyment of the Demised Premises pursuant to this Lease. Tenant shall reasonably cooperate with Landlord in Landlord's efforts to enforce such agreement, including providing such information or evidence as may be in Tenant's possession with respect to an enforcement matter. Tenant acknowledges that notwithstanding Landlord's foregoing obligation, Landlord shall not be liable for acts, omissions or defaults of the Shelter under such agreement.

Section 41.22    Use of Project Revenues. Tenant shall apply all revenues generated by operations of the Demised Premises to pay or provide for costs of repairs, restoration, refurbishment, operation, maintenance and/or programming of the Demised Premises and the uses therein and the activities of the Tenant with respect thereto, and shall not apply any such revenues for any other purpose.

## ARTICLE 42

## PUBLIC GOALS

Section 42.01    Public Goals. Landlord and Tenant hereby adopt the public goals set forth in Exhibit K annexed hereto (the "Public Goals"), which Public Goals set forth Landlord's and Tenant's goals for the development, use and occupancy of the Demised Premises pursuant to this Lease. Tenant shall use diligent efforts to operate the Demised Premises in accordance with the Public Goals.

Section 42.02    Modification of Public Goals. From time to time, Tenant may submit to Landlord a proposal for initiating proceedings to modify the Public Goals, based on a significant change in circumstances affecting the conditions at the Premises, or other relevant economic or demographic factors. Neither Landlord nor Tenant shall be obligated to make any modification to such Public Goals, it being the sole intent of this Section 42.02 to afford both parties flexibility, in light of the long term duration of this Lease, to maintain appropriate levels of activity at the Premises by adapting the Public Goals to changing conditions. If Landlord and Tenant both agree to modify the Public Goals, Landlord shall use reasonable efforts to initiate such proceedings as are then legally necessary or desirable to effectuate such modification, it being understood that Landlord cannot guarantee that such modification will be effectuated. If Landlord and Tenant are unable to agree upon any proposed modification of the Public Goals, either party may submit such matter to non-binding mediation. Any User Agreements which pre-exist an approved modification of the Public Goals shall not be affected by any subsequent modification of the Public Goals, unless a modification of any particular User Agreement is agreed to in writing by Tenant and the applicable User.

Section 42.03    Tenant's Annual Certification of Promotion of Public Goals. After Substantial Completion of the Major Construction Work, within thirty (30) days after the end of each Lease Year, Tenant shall in good faith submit to Landlord a written statement, duly executed by the President or Chairman of the Board of Directors of Tenant, certifying to Landlord that the then current uses for the Demised

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 102 of 163

Premises promote the Public Goals then in effect, together with a detailed description indicating how each of the Public Goals is being met. If for any reason Tenant shall be unable to submit such certification to Landlord, or the certification submitted by Tenant certifies that the then current uses for the Armory do not promote the Public Goals, or if Landlord shall dispute that Tenant's certification was submitted in good faith or that the then current uses for the Armory promote the Public Goals, Landlord may notify Tenant that Tenant is in default under its obligations under this <u>Article 42</u>, specifying the nature of such default.

*(Remainder of page intentionally left blank.)*

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 103 of 163

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.

THE PEOPLE OF THE STATE OF NEW YORK, ACTING BY AND THROUGH ITS AGENT, NEW YORK STATE URBAN DEVELOPMENT CORPORATION D/B/A EMPIRE STATE DEVELOPMENT CORPORATION

By: _Eilee Mildenberg_____

Name: Eileen Mildenberger

Title: Chief Operating Officer

SEVENTH REGIMENT ARMORY CONSERVANCY, INC.

By:_____

Name:

Title:

Approved as to form:

ATTORNEY GENERAL OF THE STATE OF NEW YORK

By: _Henry A. Dototir_

Assistant Attorney General  11/10/06

Approved:

COMPTROLLER OF THE STATE OF NEW YORK

By: _John B. Morael  11/14/06_

DIVISION OF MILITARY AND NAVAL AFFAIRS OF THE STATE OF NEW YORK

By:_____  11/08/06

Joseph J. Taluto
Major General, NY Army National Guard
The Adjutant General

[Signature Page for Agreement of Lease]

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.

THE PEOPLE OF THE STATE OF NEW YORK, ACTING BY AND THROUGH ITS AGENT, NEW YORK STATE URBAN DEVELOPMENT CORPORATION D/B/A EMPIRE STATE DEVELOPMENT CORPORATION

By:_____
   Name:
   Title:

SEVENTH REGIMENT ARMORY CONSERVANCY, INC.

By:_____
   Name: REBECCA ROBERTSON
   Title: PRESIDENT & CHIEF EXECUTIVE OFFICER

Approved as to form:

ATTORNEY GENERAL OF THE STATE OF NEW YORK

By: _____

Approved:

COMPTROLLER OF THE STATE OF NEW YORK

By: _____

DIVISION OF MILITARY AND NAVAL AFFAIRS OF THE STATE OF NEW YORK

By: _____

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 105 of 163

STATE OF NEW YORK                        )
                                         ) SS.:
COUNTY OF New York                       )

On this _22nd_ day of _Rebbr_____, 2006, before me personally came
Eileen Mildenberger, to me known and known to me to be the person described in and
who executed the foregoing instrument and he acknowledged to me that he executed the
same.

                                    _____
                                                         Notary Public
                                    LAWRENCE M. GERSON
                                    Notary Public, State of New York
                                    No. 31-4610195
                                    Qualified in Nassau County
                                    Commission Expires _____ 30, 2009


STATE OF NEW YORK                        )
                                         ) SS.:
COUNTY OF                                )

On this _____day of_____, 2006, before me personally came
Rebecca Robertson, to me known and known to me to be the person described in and
who executed the foregoing instrument and he acknowledged to me that he executed the
same.

                                    _____
                                                         Notary Public


[Acknowledgment Page for Agreement of Lease]

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                                    RECEIVED NYSCEF: 05/25/2023

Case 1.25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 106 of 163

STATE OF NEW YORK              )
                              ) SS.:
COUNTY OF                     )

On this _____ day of _____, 2006, before me personally came Eileen Mildenberger, to me known and known to me to be the person described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

STATE OF NEW YORK              )
                              ) SS.:
COUNTY OF                     )

On this __1st__ day of __November__, 2006, before me personally came Rebecca Robertson, to me known and known to me to be the person described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

MEREDITH J. KANE
Notary Public, State of New York
No. 02KA5025795
Qualified in New York County
Commission Expires April 4, 2010

[Acknowledgment Page for Agreement of Lease]

EXHIBIT A

LAND

Street Address: 641 Park Avenue, New York, NY (Manhattan Block 1401, Lot 1)

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, and County of New York, City and State of New York, described as being bounded and situated between Sixty Sixth Street and Sixty Seventh Street and Fourth Avenue and Lexington Avenue and the Armory of the 7th Regiment erected thereon.

EXHIBIT B

ADMINISTRATION BUILDING AND DRILL HALL

[Attached behind.]

EXHIBIT B

SEVENTH REGIMENT ARMORY

North

DRILL HALL

FIRST FLOOR PLAN

ADMINISTRATION BUILDING

DRILL HALL

NOTE: INFORMATION ON DRAWING RELATES SOLELY TO DELINEATION OF DRILL HALL AND ADMINISTRATION BUILDING.

Pla    d Dovell White
Arch.    LP

20 West 22nd Street
New York, NY 10010
212.691.2440
212.633.0144 fax
www.gbd-w.com

Structural Engineer
Robert Silman Associates, P.C.
88 University Place
New York, New York 10003
212.620.7970
212.620.8167 fax

MEP Engineer
AKF Engineers
1501 Broadway, Suite 700
New York, New York 10036
212.354.5656
212.354.5668 fax

Construction Manager
Tishman Construction
666 Fifth Avenue
New York, New York 10103
212.399.3600
212.843.5991 fax

Building & Zoning Consultant
Will Dailey
441 West 43rd Street
New York, New York 10036
212.586.2114
212.586.2226 fax

Project
7th Regiment
Armory

Drawn by
Checked by
Scale        1/32"=1'-0"
Project no.    06476.2
Date        06.14.06

Sheet title
Existing Cond.
Basement Plan

Sheet no.
A-100

A-101

Existing Cond.
First Floor Plan

Project
7th Regiment
Armory



Platt
Dovell White
Archts.

90 West 72nd Street
New York, NY 10010
212.691.2440
212.633.3144 fax
www.pdw.com

Structural Engineer

Robert Silman Associates, P.C.
88 University Place
New York, New York 10003
212.620.7970
212.620.8187 fax

MEP Engineer

AKF Engineers
1001 Broadway, Suite 700
New York, New York 10008
212.354.5656
212.354.5688 fax

Construction Manager

Tishman Construction
666 Fifth Avenue
New York, New York 10103
212.299.3900
212.643.3891 fax

Building & Zoning Consultant

Will Daley
441 West 43rd Street
New York, New York 10036
212.268.2116
212.268.2200 fax

Project

7th Regiment
Armory

Drawn by

Checked by

Scale        1/32"=1'-0"
Project no.   05476.3
Date          06.14.05

Sheet title

Existing Cond.
First Fl. Mezz. Plan

Sheet no.

A-101M

EXHIBIT F

TITLE MATTERS

Taxes, tax liens, tax sales, water rates, sewer rents and assessments due and payable after the date of this Lease pursuant to any Requirement or any agreement between Landlord and Tenant.

The terms, reservations and conditions of the City Lease.

The terms, restrictions and conditions of the Assignment of the City Lease, dated March 29, 1984, from Louis Fitzgerald, Emmons Clark and Edward Kemp, as Trustees of the Seventh Regiment Armory Fund to Daniel Appleton, George Moore Smith, William H. Hepp and James C. Abrams, constituting Field Officers of the Seventh Regiment of the National Guard of the State of New York.

The terms and conditions of this Lease.

Rights and easements, whether or not of record, of public or private utility companies to construct or maintain and operate equipment, poles, wires, conduits, lines, cables, and similar items and appurtenances in, on, over, under or across the Demised Premises.

All Requirements.

Any state of facts an accurate survey and site inspection may show.

The rights of the Shelter pursuant to the Shelter Agreement and this Lease and the rights of DMNA pursuant to this Lease.

Landmark Designation dated July 16, 1987 and recorded in Record Liber 209 page 147. Designates Block 1401 Lot 1 (the Seventh Regiment Armory Building) as a Landmark Site and therefore subject to the restricted use as set forth in the New York City Charter and Administrative Code of the City of New York. Also notes that the building is owned by the City of New York.

The Premises have been designated as part of the Upper East Side Historic District by Notice of Designation and recorded in the office of the New York City Register, New York County, on July 2, 1982 in Reel 629, page 739 and are therefore subject to the restricted use as set forth in the New York City Charter and in the Administrative Code of the City of New York.

The Premises have been designated as a Landmark Site, and the building thereon a Landmark, by Notice of Designation made by the Landmarks Preservation Commission, and recorded in the office of the New York City Register, New York County, on October 7, 1994 in Reel 2144, page 1439 and are therefore subject to the restricted use as set forth in the New York City Charter and in the Administrative Code of the City of New York.

F-1

# MEMORANDUM OF AGREEMENT OF LEASE

between

### THE PEOPLE OF THE STATE OF NEW YORK,

Landlord,

acting through

## NEW YORK STATE URBAN DEVELOPMENT CORPORATION, d/b/a EMPIRE STATE DEVELOPMENT CORPORATION,

as agent,

and

### SEVENTH REGIMENT ARMORY CONSERVANCY, INC.

Tenant,

County: Manhattan

Block and Lot: Block 1401, Lot 1

Record and Return to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention: Meredith J. Kane, Esq.

*Dates to be filled in upon Commencement Date.*

1

## MEMORANDUM OF AGREEMENT OF LEASE

This Memorandum of Agreement of Lease (this "Memorandum") is made and recorded pursuant to Section 291-c of the Real Property Law of the State of New York. The Agreement of Lease is referred to herein as the "Lease." All capitalized terms used herein and not defined herein shall have the respective meanings given to such terms in the Lease.

LANDLORD:       The People of the State of New York, acting by and through its agent, New York State Urban Development Corporation d/b/a Empire State Development Corporation, which is a corporate governmental agency of the State of New York, constituting a public benefit corporation and a political subdivision thereof, having an address at 633 Third Avenue, 36th floor, New York, New York 10017.

TENANT:     Seventh Regiment Armory Conservancy, Inc., a New York not-for-profit corporation, having an address at 643 Park Avenue, New York, New York 10021.

DATE OF EXECUTION
OF THE LEASE:       As of November 14, 2006.

DESCRIPTION OF THE DEMISED PREMISES IN
THE FORM CONTAINED IN THE LEASE:
See Schedule A annexed hereto and made a part hereof.

THE TERM OF THE LEASE
AS TO THE DEMISED PREMISES:       The Demised Premises are leased for a term of approximately ninety-nine (99) years, commencing on Dec. 19 , 2006 (the "Commencement Date") and ending on Dec. 18, 2105 (the "Expiration Date).

        This Memorandum has been executed by Landlord and Tenant solely for the purpose of recordation and giving notice of the Lease and is subject in its entirety to the terms, covenants and conditions contained therein.

        Tenant, being a "party in interest" as defined in Section 12-10(d) of the Zoning Resolution of the City of New York effective December 15, 1961, as amended, with respect to the Land more particularly described in Schedule "A" annexed hereto, does hereby waive its right to execute now or in the future, any and all (i) Declarations of Zoning Lot Restrictions or modifications, amendments, additions, replacements, restatements or consolidations thereof that relate or pertain to the Land and/or (ii) Transfers of Development Rights and Notice of Restrictions Pursuant to Section 74-79 et seq. or other applicable provisions of the Zoning Resolution, or modifications, amendments, additions, replacements, restatements or consolidations thereof that relate or pertain to the Land.

Doc #:NY6:491877.32

Case 1:25-cv-07373-GBD     Document 1-1     Filed 09/05/25     Page 116 of 163

SCHEDULE A

LAND

Street Address: 641 Park Avenue, New York, NY (Manhattan Block 1401, Lot 1)

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of
Manhattan, and County of New York, City and State of New York, described as being
bounded and situated between Sixty Sixth Street and Sixty Seventh Street and Fourth
Avenue and Lexington Avenue and the Armory of the 7th Regiment erected thereon.

Doc #:NY7:266494.1

IN WITNESS WHEREOF, this Memorandum has been executed as of _____ ___, 2006.

LANDLORD:

THE PEOPLE OF THE STATE OF NEW YORK, ACTING BY AND THROUGH ITS AGENT, NEW YORK STATE URBAN DEVELOPMENT CORPORATION D/B/A EMPIRE STATE DEVELOPMENT CORPORATION

By: _____

Print Name: _____

Print Title: _____

TENANT:

SEVENTH REGIMENT ARMORY CONSERVANCY, INC.

By: _____

Print Name: _____

Print Title: _____

Doc #:NY7:266494.1

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 118 of 163

IN WITNESS WHEREOF, this Memorandum has been executed as of _____ ___, 2006.

LANDLORD:

THE PEOPLE OF THE STATE OF NEW YORK, ACTING BY AND THROUGH ITS AGENT, NEW YORK STATE URBAN DEVELOPMENT CORPORATION D/B/A EMPIRE STATE DEVELOPMENT CORPORATION

By: _____

Print Name: _____

Print Title: _____

TENANT:

SEVENTH REGIMENT ARMORY CONSERVANCY, INC.

By: _____

Print Name: REBECCA ROBERTSON

Print Title: PRESIDENT

3

EXHIBIT H

NON-DISCRIMINATION AND AFFIRMATIVE ACTION
CONSTRUCTION CONTRACT PROVISIONS

**I.      Policy**

It is the policy of the Seventh Regiment Armory Conservancy to provide equal opportunity to all its employees, consultants, and contractors. The Conservancy prohibits discrimination against any employee or applicant of employment because of race, color, creed, religion, ancestry, national origin, sex, sexual orientation, disability, age, marital status, or other characteristic protected by applicable federal, state, or local law. The Conservancy takes affirmative actions to prevent discrimination in employment practices. Furthermore, affirmative action will be taken to ensure that opportunities afforded by the Conservancy are fully available to persons with disabilities, women, covered veterans, and minorities. Any employee that does not comply with the Conservancy's policies may be subject to disciplinary actions, up to and including termination. The Seventh Regiment Armory Conservancy is committed to providing a work environment free from unlawful harassment, including unlawfully intimidating, hostile, or offensive conduct. Harassment that is based on sex, race, religion, sexual orientation, disability, age, or any other protected basis is against the Conservancy's policy and will not be tolerated.

(1)      The Conservancy represents that its equal employment opportunity policy statement incorporates, at a minimum, the policies and practices set forth below:

(a)      Tenant shall (i) not discriminate against employees or applicants for employment because of race, creed, color, national origin, sex, sexual orientation, age, disability or marital status, (ii) undertake or continue existing programs of affirmative action to insure that Minority Group Members and women are afforded equal employment opportunities without discrimination, and (iii) make and document its conscientious and active efforts to employ and utilize Minority Group Members and women in its workforce or Contracts. Such action shall be taken with reference to, but not limited to, recruitment, employment, job assignment, promotion, upgrading, demotion, transfer, layoff or termination, rates of pay or other forms of compensation, and selection for training or retraining, including apprenticeship and on-the-job training.

(b)      At the request of the AAO, Tenant shall request each employment agency or authorized representative of workers with whom it has an agreement or understanding, to furnish a written statement that such employment agency or representative does not unlawfully discriminate, and that such representative will affirmatively cooperate in the implementation of Tenant's obligations herein.

(2)      Tenant shall include, or cause to be included, the provisions of clauses (a) in every Contract that Tenant enters into in order to fulfill its obligations under the Lease, in such a manner that such provisions will be binding upon each and every Contracting Party with respect to any Contract or Subcontract.

H-1

Case 1:25-cv-07373-GBD     Document 1-1     Filed 09/05/25     Page 120 of 163

## II.     Goals for Minority and Women-Owned Business Enterprise Participation

(a)     The Seventh Regiment Armory Conservancy will use its best efforts to achieve not less than 20% Minority/Women-owned Business Enterprise (M/WBE) contractor and/or subcontractor participation during the development of the project, which includes any preconstruction, construction and operation-maintenance phases.

(b)     The Conservancy shall include, or cause to be included, the provisions of clause (a) in every Contract that Tenant enters into in order to fulfill its obligations under the Lease, in such a manner that such provisions will be binding upon each and every Contracting Party with respect to any Contract or Subcontract.

## III.     Goals for Minority and Female Workforce Participation

(a)     The Conservancy will use its best efforts to achieve the overall goal of 25% minority and female workforce (M/FWF) participation in the work performed pursuant to Contracts.

(b)     The M/FWF participation goals are expressed as a percentage equal to the person hours of training and employment of minority or female workers, as the case may be, used by any Contracting Party, divided by the total person hours of training and employment of all workers (including supervisory personnel).

(c)     The required participation for minority and female employment and training must be substantially uniform throughout the work.

(d)     The Conservancy shall not participate in the transfer of minority or female employees or trainees from employer-to-employer or from project-to-project for the sole purpose of meeting its obligations herein.

(e)     In striving to achieve the goals for M/FWF participation, the Conservancy shall use its best efforts to identify and employ qualified minority and female supervisory personnel and journey persons.

(f)     The non-working hours of trainees or apprentices may not be considered in meeting the goals for M/FWF participation contained herein unless: (i) such trainees or apprentices are employed by Contracting Party during the training period; (ii) Tenant has made a commitment to employ the trainees or apprentices at the completion of their training, subject to the availability of employment opportunities; and (iii) the trainees are trained pursuant to an approved training program.

(g)     The Conservancy shall include, or cause to be included, the provisions of clauses (a) through (f) in every Contract that it enters into in order to fulfill its obligations under the Lease, in such a manner that such provisions will be binding upon each and every Contracting Party with respect to any Contract or Subcontract.

Doc #:NY6:491877.32

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                                              RECEIVED NYSCEF: 05/25/2023

Case 1:25-cv-07373-GBD     Document 1-1     Filed 09/05/25     Page 121 of 163

## IV.      Reporting Requirements

(a)      The Conservancy will submit a Workforce Employment Utilization Report **(Schedule to be included)** of the workforce actually utilized on the project, itemized by ethnic background, gender, and Federal Occupational Categories or other appropriate categories specified by ESD and shall update such schedule quarterly upon request.

(b)      The Conservancy will also include with the first Workforce Employment Utilization Report and as part of the documentation required for final payment, such data describing the total number of company employees at commencement of the project, the total number of company employees at the completion of the project, and any net increases in the number of employees in the company. Net increases in employment shall be further classified by ethnicity, gender, and occupation code.

<u>NON-DISCRIMINATION AND AFFIRMATIVE ACTION DEFINITIONS</u>

### <u>Affirmative Action</u>

Shall mean the actions to be undertaken by Tenant and any Contracting Party in connection with Contracts to ensure non-discrimination and Minority/Women-owned Business Enterprise and minority/female workforce participation, as set forth in Sections II and III herein, and developed by ESD.

### <u>Affirmative Action Officer ("AAO")</u>

Shall mean ESD's Affirmative Action Officer or his/her designee, managing the affirmative action program for ESD.

### <u>Contract</u>

Shall mean a written agreement or purchase order instrument, or amendment thereto, executed by or on behalf of a Contracting Party and relating to the construction of the Building, the foundation of the Building and the foundation of the Section 202 Building, providing for a total expenditure in excess of $5,000 for labor, services, supplies, equipment, materials or any combination of the foregoing.

### <u>Contracting Party</u>

Shall mean the Tenant and any Contractor, as defined in the Lease, of which this Exhibit is a part.

### <u>Subcontract</u>

Shall mean an agreement providing for a total expenditure in excess of $1,500 between a Contracting Party and any individual or business enterprise, for goods or services rendered in connection with the construction of the Building, the foundation of the Building and the foundation of the Section 202 Building.

Doc #:NY6:491877.32

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59                                                    RECEIVED NYSCEF: 05/25/2023

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 122 of 163

### Minority Business Enterprise ("MBE")

Shall mean a business enterprise, including a sole proprietorship, partnership or corporation that is an enterprise certified by New York State as a minority business.

### Minority Group Member

Shall mean a United States citizen or permanent resident alien who is and can demonstrate membership in one of the following groups: (i) Black persons having origins in any of the Black African racial groups; (ii) Hispanic persons of Mexican, Puerto Rican, Dominican, Cuban, Central or South American descent of either Indian or Hispanic origin, regardless of race; (iii) Asian and Pacific Islander persons having origins in any of the Far East countries, South East Asia, the Indian subcontinent or the Pacific Islands; and (iv) Native American or Alaskan native persons having origins in any of the original peoples of North America.

### Women-owned Business Enterprise ("WBE")

Shall mean a business enterprise, including a sole proprietorship, partnership or corporation that is an enterprise certified by New York State as woman-owned.

### Best Efforts - Minority and Women-owned Business Enterprise Participation

Best efforts are not limited to the efforts specified herein, and the role of M/WBE firms is not restricted to that of a subcontractor/subconsultant. Where applicable, M/WBE firms should be considered for roles as prime contractors. Such best efforts shall include at least the following:

(a)    Dividing the contract work or subcontract work into smaller portions in such a manner as to permit subcontracting to the extent that it is economically and technically feasible to do so;

(b)    Actively and affirmatively soliciting bids from qualified M/WBEs, including circulation of solicitations to minority and women's trade associations. Each Contracting Party shall maintain records detailing the efforts made to provide for meaningful M/WBE participation in the work. Such record keeping must include the names and addresses of all M/WBEs contacted and, if an M/WBE is the low bidder and is not selected for such work or portion thereof, the reasons for such decision;

(c)    Making plans and specifications for prospective work available to M/WBEs in sufficient time for review;

(d)    Utilizing the services and cooperating with those organizations providing technical assistance to the Contracting Party in connection with potential M/WBE participation on the Contract;

(e)    Utilizing the resources of the AAO to identify New York State certified M/WBE firms for the purpose of soliciting bids and subcontracts;

(f)     Encouraging the formation of joint ventures, associations, partnerships, or other similar entities, where appropriate, to ensure that the Contracting Party will meet its obligations herein; and

(g)     Remitting payment in a timely fashion.

### **Best Efforts - Minority Group Member and Female Workforce Participation**

Best efforts to provide for meaningful Minority Group Member and female workforce participation shall include at least the following in connection with the work:

(a)     Ensure and maintain a working environment free of harassment, intimidation, and coercion at the Demised Premises. The Contracting Party shall specifically ensure that all foremen, superintendents, and other on-site supervisory personnel are aware of and carry out the obligation to maintain such a working environment, with specific attention to Minority Group Member or female individuals working at the Demised Premises;

(b)     State in all solicitations or advertisement for employees that all qualified applicants will receive consideration for employment without regard to race, creed, color, national origin, sex, sexual orientation, age disability or marital status;

(c)     Send to each representative of workers with which an agreement or understanding is in place, a notice advising the said workers' representative of commitments under this Section, and post copies of the notice in conspicuous places available to employees and applicants for employment;

(d)     Establish and maintain a current list of Minority Group Member and female recruitment sources and community organizations, and provide written notification to them when employment opportunities are available. Maintain a record of the organization's responses;

(e)     Maintain a current file of the name, address and telephone number of each Minority Group Member and female applicant and any referrals from a recruitment source or community organization, and of the action taken with respect to each individual.

(f)     Disseminate the Contracting Party's equal employment opportunity policy by providing notice of the policy to training programs and requesting their cooperation in meeting its Equal Employment Opportunity obligations, by including it in any policy manual and collective bargaining agreement, by publicizing it in the company newspaper, annual report, and other similar items, by specific review of the policy with all management personnel and with all Minority Group Member and female employees at least once a year, and by posting the company Equal Employment Opportunity policy on bulletin boards accessible to all employees at each location where work is performed under this Contract;

(g)     Disseminate the Contracting Party's Equal Employment Opportunity policy externally by including it in any advertising in the news media, specifically including

H-5

Minority Group Member and female news media, and provide written notification to and discussing the Equal Employment Opportunity policy with any contractor with whom the Contracting Party does or anticipates doing business; and,

(h)     Ensure that all facilities and company activities are non-segregated except that separate or single-user toilets and necessary changing facilities shall be provided to assure privacy between the sexes.

EXHIBIT I

MAJOR CAPITAL REPAIR AND REPLACEMENT ITEMS

- Building structure and exterior, including roofing, masonry and façade.
- Building heating and ventilating systems, including boiler and fan systems, ductwork and piping, as necessary.
- Building equipment, including sump pumps, circulating pumps, fire pumps, water heaters and chillers, as necessary.
- Elevator and related equipment.
- Building electrical systems, including transformers, motor control centers, distribution panels, but excluding exterior and house lighting fixtures, starters, breakers and fuses.
- Building utility systems, including sanitary drainage, building drainage, and hot and cold water supply systems.
- Fire/life safety systems, except items requiring regular maintenance (e.g. hoses, tanks, testing, sprinkler heads).

Doc #:NY6:491877.32

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 126 of 163

EXHIBIT J

[INTENTIONALLY DELETED]

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 127 of 163

EXHIBIT K

PUBLIC GOALS

To restore the historic interiors and exterior of the Seventh Regiment Armory to the standards of the Secretary of the Interior Guidelines, reflecting the Armory's importance as a local, State and National landmark

To maintain the restored interiors and exteriors at the standards appropriate to a landmark of this importance

To create and operate, through a not-for-profit institution, a unique destination for the New York public that offers a combination of the highest quality cultural programming in the setting of a world class restored landmark

To serve the not-for-profit visual and/or performing arts, promoting artistic expression and creativity, adding diversity and richness to New York's cultural base and strengthening New York's role as the cultural capital of the country

To generate activity in the Armory as close to 330 days a year as possible

To offer interpretive and/or educational programs related to the social aesthetic and military history of the building and other topics to the extent practicable

To implement a model of cross-subsidy to support the not-for-profit cultural programming and the on-going care and maintenance of the building through revenue producing ancillary activities.

Doc #:NY6:491877.32

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 128 of 163

EXHIBIT L

MAJOR CONSTRUCTION SCHEDULE

[Attached behind.]

Case 1.25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 129 of 163

EXHIBIT M

MAJOR CONSTRUCTION WORK

The full Seventh Regiment Armory Project Scope is currently contemplated in five phases. Each phase with scope, budget, and schedule is listed in the attached documents.

Doc #:NY6:491877.32

**Phase 1:**      **Fourth Floor Renovations for Homeless Shelter**

**Estimated Duration:**      Design      July 2006 – September 2006

Construction    October 2006 – December 2006

**Summary:**      The Conservancy has come to an agreement with the New York City Department of Homeless Services to perform certain work within the fourth floor of the Administration Building in anticipation of the shelter's relocation in summer 2007. This work includes contracting for and overseeing construction and general responsibility for the design, renovation and relocation of the floor slabs in the two multi-level rooms on the east side to create a handicapped accessible one level room. The Conservancy will also contract for and oversee construction of the replacement of the 18 windows currently located in the multi-level rooms, which shall be replaced with larger windows appropriate for dormitory use. The windows will be designed to be complimentary to the historic façade (most of them are hidden from view behind the third floor parapet). NYC DHS will perform any and all other work required to create a new Shelter on the fourth floor after the slab work and window work are complete.

**Estimated Total Cost:**      **$896,090**

**Estimated Budget:**

**Preliminary Construction Budget**

| Trade | Unit | Cost |
|---|---|---|
| Testing/Inspections | Allow | 6,500 |
| Demolition | Budget | 148,500 |
| Scaffolding | Budget | 60,000 |
| Masonry | Budget | 13,700 |
| Fireproofing | Allow | 15,000 |
| Rough Carpentry | Budget | 68,250 |
| Structural Steel and Decking | Budget | 65,000 |
| Concrete | Budget | 19,825 |
| Flooring | Budget | 12,400 |
| Electrical | Allow | 3,580 |
| Temporary Protection | Allow | 4,100 |
| Cutting & Patching | Allow | 5,900 |
| Trade Contingency, 10% | Allow | 42,276 |
| | | |
| Subtotal | | 465,031 |
| | | |
| General Conditions, 15% | | 69,755 |
| Insurance, 2% | | 10,696 |
| CM Fee, 4% | | 21,391 |
| | | |
| **Total Slab Construction Budget** | | **566,872** |

| | | |
|---|---|---|
| **Total Estimated Window Replacement** | | **150,000** |
| Subtotal | | 716,872 |
| Soft costs @ 25% | 0.25 | 179,218 |
| **Total Budget** | | **$896,090** |

## Estimated Scope of Work:

1) Provide temporary protective scaffold on the 3rd floor level, installed to minimize disturbance of 3rd floor tenant. Protect adjacent floors and finishes as required.
2) Complete demolition and removal of both 4th floor concrete slabs and support steel.
3) Install new steel transfer beams at 4th floor.
4) Provide new metal C-joists and corrugated metal deck, supported on existing masonry bearing walls.
5) New concrete slab, reinforced with 1.8x1.8 WWF.
6) Install new VCT flooring on slab.

## Consultants/Sources:

Beyer Blinder Belle Architects and Planners
Sciame Construction

**Phase 2:**          **Drill Hall HVAC Installation**

**Estimated Duration:**          January 2006 – April 2007

**Preliminary Scope of Work:**          Phase 2 work will be completed to allow a one-time performing arts production to take place in the space in April 2007. The main component of the work relates to the installation of an HVAC system to service the 1,100 audience for a five-hour production by Lincoln Center, Inc. in the Drill Hall space of the Seventh Regiment Armory. The new HVAC system will be integrated into the theater development portion of the future project (Phase 5), and will require input from an architect, acoustician, and other consultants as required. Schematic drawings, specifications, and a cost estimate for the mechanical and electrical portions of the project have already been prepared by AKF Engineers. Major elements of the project include: installation of roof-top packaged chillers and air handlers; installation of a new electrical service and a new high pressure steam service to the building and distribution to new equipment (including theater performance-related equipment as required); installation of ductwork that meets an NC-30 rating; installation of a control package including a building management system; installation of fire alarm components; and structural reinforcement of drill hall roof. A preliminary environmental site assessment was completed in July, 2004. Further environmental assessment work will be conducted in January 2006 and may affect the scope and timing of the drill hall HVAC installation work. All ductwork within the envelope of the Drill Hall will be of a temporary, non-intrusive design. The permanent distribution system and appearance will be determined as part of the Phase 5 design.

<u>Air Handling Units</u>

The Concert Hall will be air conditioned by two roof top air handling units. The units will be located on the roof above the existing stairs within the corner towers located on the Lexington avenue side of the building. In order to install the air handling units above the stairs, new mechanical equipment dunnage will have to be provided. The air distribution system for the Concert Hall will consist of a low velocity constant volume system. A modular chiller will be located on the roof of the Drill Hall at the west end abutting the rear wall of the Administration Building within an enclosure designed to mimic the historic material of the roof and clerestory.

<u>Automatic Temperature Control</u>

A direct digital control and monitoring system will be provided. It will have a personal computer based central console display monitor and it will be located in the engineer's office.

<u>Smoke Purge System</u>

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59 RECEIVED NYSCEF: 05/25/2023

Case 1:25-cv-07373-GBD   Document 1-1   Filed 09/05/25   Page 133 of 163

In order to comply with the New York City code requirement for the mechanical exhaust of 6 air changes per hour from the Drill Hall, the existing exhaust ventilation fans and the new return/exhaust fans will be used to meet the NYC code requirement.

<u>Low Velocity Air Distribution System</u>

The low velocity air distribution system will be designed in jointly with the architect selected to design the interior of the Drill Hall. The low velocity air distribution system will be energy efficient, meeting the NC-25 acoustical requirement and will satisfy the environmental comfort conditions in the Drill Hall.

**Estimated Cost:**       **$10,778,701**

**Budget:**

|  |  |  |
|---|---|---|
| **Total Direct Costs** |  | **6,665,810** |
| Design Contingency | 10.00% | 666,581 |
| Construction Contingency | 10.00% | 666,581 |
| Sub-total |  | 7,998,972 |
| General Conditions and Fee | 15.50% | 1,239,841 |
| Sub-total |  | 9,238,813 |
| General Liability Insurance | 1.25% | 115,485 |
| Sub-total |  | 9,354,298 |
| Escalation | 0% | 0 |
| Sub-total |  | 9,354,298 |
| **Total Hard Costs** |  | **9,354,298** |
| **Other Costs** |  |  |
| Logistics | 5.00% | 100,000 |
| **Total Construction Costs** |  | **9,454,298** |
| **Total Soft Costs** |  | **1,324,403** |
| **Total Project Costs** |  | **10,778,701** |

**Consultants/Sources:**
AKF Engineers
Cost Concepts, Inc. Construction Consultants

M-5

**Phase 3:**   **Lead & Asbestos Abatement in Basement Firing Range**

**Estimated Duration:**    Draft Specification    December 2005 – March 2006
Decontamination    April 2006 – June 2006

**Summary:**    The abatement of the lead contamination within the basement firing range and the removal of all basement asbestos will be necessary for the installation of the Drill Hall HVAC. Therefore, the Conservancy plans to conduct the decontamination as soon as possible so as not to hinder the start of construction for the environmental control system. The abatement scope includes cleaning and decontamination of all floors, walls and ceilings, removal of all bullets, sand and various items left within the range, the disposal of all ventilation ducts with lead contamination and the removal of all asbestos insulation, both spray on and pipe insulation. The final scope and cost estimate are to be completed by February 2006.

**Estimated Cost:**    **Approximately $500,000**

**Estimated Scope and Budget:**

### LEAD DECONTAMINATION (RIFLE RANGE) COST ESTIMATE

| (a)    Type of Activity | EEstimated Quantity | CCost |
|---|---|---|
| Cleaning/Decon of Headhouse Cellar floors | 8,000 sq. ft. | $10,000 |
| Cleaning/Decon of Pistol & Rifle Range floors & surfaces | 40,000 sq. ft. | $100,000 |
| Removal and Disposal of Lead bullet debris of Pistol Range | 1,000 lbs. | $10,000 |
| Removal and Disposal of sand from Rifle Range target traps | 50 cubic yards | $30,000 |
| Removal and Disposal of lead contaminated items (lockers, supplies, furniture, etc.) | 100 cubic yards | $60,000 |
| Removal and disposal of Ventilation ductwork | 200 ln. ft. | $30,000 |
| | **TOTAL** | **$240,000** |

## ASBESTOS SUMMARY TABLE

| Location | Type of Material | Condition | Estimated Quantity | Estimated Cost |
|---|---|---|---|---|
| Section 42.04    Drill Hall | | | | |
| Cellar Level (rifle range and fallout shelter area) | Spray on insulation | Poor | 10,000 square feet | $150,000 |
| Main Level (north side storage rooms) | Corrugated Pipe Insulation | Good | 800 linear feet | $ 13,000 |
| Section 42.05    Headhouse | | | | |
| Cellar Level | | | | |
| Kitchen outside Pistol Range | Corrugated Pipe Insulation | Poor | 8 linear feet | in above |
| Bathrooms on Westside (inside ceiling cavity) | Corrugated Pipe Insulation | Good | 10 linear feet | in above |

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 59 RECEIVED NYSCEF: 05/25/2023

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 135 of 163

**Source:** Warren & Panzer Engineers P.C.

**Phase 4:**          **Initial Improvements**

**Estimated Duration:**          July 2006 – April 2007

**Summary:**     Upon possession of the Armory, the Conservancy plans to undertake a series of smaller improvements to quickly raise the condition and appearance of the building. Most of the work can be described as cleaning, maintenance and general repair. This includes cleaning of all surfaces within the first two stories and basement of the Administration Building and the floor area of the Drill Hall, replacing of lightbulbs, new plantings and landscaping, and new exterior lighting which will not require ESDC or SHPO review. Other aspects of this phase will involve small capital improvements and documentation will be submitted as required per the lease.

**Estimated Cost:**          **$612,415**

**Preliminary Scope and Budget:**

| Project | Scope | Total |
|---|---|---|
| **Refurbishment Park Avenue entry** | Clean exterior entry vestibule | 10,600 |
| | a. Remove dirt and graffiti (1 week) | |
| | b. Clean brick (weather dependant  2 weeks) | |
| | c. Repaint ceiling (1 week) | 2,120 |
| | d. Restore/relamp/rewire pendant lighting fixture | 3,180 |
| | Refurbish wood doors and metal gates | 26,500 |
| | Rewire lighting on canopy | 6,360 |
| | Improve guard station at Park Ave entrance, inc new desk | 5,300 |
| **Extermination** | | 3,710 |
| **Upgrade Basement Restrooms** | Rehang/repair all bathroom partitions | 2,120 |
| | Bathrooms painted, basement | 6,360 |
| | Clean bathrooms & shape up bathroom accessories | 8,480 |
| | New lighting | 3,180 |
| **Initial cleaning** | Historic Rooms in Admin Bldg. By Contractor | 37,100 |
| | General cleaning of interior surfaces of Drill Hall and Non-landmarked rooms by staff | 2,650 |
| | Replace light bulbs in 1st and 2nd floor rooms and corridors | 4,240 |
| **Exterior cleaning and restoration** | 1. Clean Park Avenue facade entire | 165,625 |
| | granite at entry up to second floor (season dependant) | |
| | a. Determine mock-up effective technique (chemical or micro-abrasive) | |
| | b. Execute cleaning | |

M-8

Case 1.25-cv-07373-GBD     Document 1-1     Filed 09/05/25     Page 137 of 163

| | | |
|---|---|---|
| **Exterior lighting** | Exterior Lighting (will require Landmarks and or NYC DOT approval) | |
| | Exterior lighting of Park Avenue facade: | 198,750 |
| | Light facade between towers with lights from the areaway below \ | |
| | Light center tower from top of cornice and from street poles in median | |
| **Interior lighting fixture repair** | Identify wiring at light fixtures and condition. | |
| | Restore interior light fixtures at entry lobby and corridor | |
| | Restoration work on fixtures | 47,700 |
| | Center fixture to incorporate added light sources at the top of fixture | 7,420 |
| **Relighting central hall** | Relighting of full hallway | |
| | Relighting of doorway into Drill Hall | |
| | Appropriate light bulbs in all fixtures and sconces | 5,300 |
| **Landscaping** | Trim trees away from facade | 10,600 |
| | Trim bushes | |
| | Clear undergrowth | |
| | Lay down mulch | |
| | Test condition of damaged trees | |
| **Historic interior cleaning and repair by contractor** | General cleaning of all interior surfaces in first 2 floors, entrance hall & staircases | 0 |
| | Clean brass vestibule doors (interior glass set, weather barrier) | 5,830 |
| | Identify tile flooring beneath entry carpet, remove carpet & clean | 530 |
| | Remove covering over radiators at entry | 1,060 |
| | Remove water fountains and install temporary panel. | 2,650 |
| **Hall Floors on 1st/2nd** | Clean and refinish wood floors on first two floors and entry way | 32,330 |
| | Replace carpeting in 1st floor corridor with more appropriate material | 21,200 |
| | Replace entryway rubber mats | 1,060 |
| | Install slip resistant strips at interior entry vestibule | 1,060 |
| **TOTAL** | | **612,415** |

## Source:

Beyer Blinder Belle Architects and Planners

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 138 of 163

**Phase 5:        Full Renovation / Restoration of Drill Hall & Administration Building**

**Estimated Duration:**

| | |
|---|---|
| Concept Development | March 2006 to June 2006 |
| Schematic Design | August 2006 to February 2007 |
| Design Development | March 2007 to October 2007 |
| Construction Drawings | November 2007 to August 2008 |
| Bid and Award Construction Contracts | September 2008 to October 2008 |
| Construction | November 2008 to May 2010 |

**Preliminary Scope of Work:**        The goal is to accomplish and complete all remaining restoration and renovation work proposed to the State of New York in 2000. The scope of work may be divided into multiple phases dependent upon timing and the funds available. Whether to complete the work at one time as described herein or to phase the work will be determined during the design period. Schematic design plans will be submitted to ESDC upon completion.

The scope of the renovation includes the restoration and renovation of the Armory's interiors and exteriors, the installation of new and upgraded mechanical, electrical and plumbing systems and new circulation systems. The leased premises shall be brought into compliance with current codes while being sensitive to the historic nature of the building. Any interventions of environmental controls, fire protection, egress, lighting, and wiring will be integrated into the décor in as harmonious a manner as possible. The Armory's exterior will be structurally stabilized, rebuilt, repaired and repointed. Mortar repairs, masonry rebuilding, and relief joints will be made where necessary. New drainage and roofing will be installed where necessary. Compatible and unobtrusive graphics will be designed and installed and a discrete and focused lighting system installed which will respect the surrounding residential neighbors.

The Drill Hall will be designed to adapt to many arts installations. Seating and technical equipment will be impermanent and visually identifiable as modern. New required egress, environmental controls, and other life safety measures will be inserted and designed in as complementary and unobtrusive a manner as possible.

The goal of the restoration plan for the first and second floors of the Administration Building is to restore the decorative wall, ceiling and floor finishes in accordance with Secretary of the Interior's Standards. In addition, the Conservancy also plans to restore, to the extent possible, the furnishings and decorative fixtures and fabrics that contribute to the spaces. The third floor of the Armory will serve for the administration offices, continuing DMNA offices, and exhibition galleries. The fourth floor of the Armory will house the existing New York City homeless shelter for women. The fifth floor will serve for rehearsal and back-of-house areas to support the Armory's artistic programming.

**Estimated Cost:**        **$119,909,818**

Doc #:NY6:491877.32

**Estimated Budget:**

|  | *% Mark-up* | Budget |
|---|---|---|
| **Total Direct Costs** |  | **35,416,419** |
| Design Contingency | 15.00% | 5,312,463 |
| Construction Contingency | 15.00% | 5,312,463 |
| Sub-total |  | 46,041,345 |
| General Conditions and Fee | 15.50% | 7,136,408 |
| Sub-total |  | 53,177,753 |
| General Liability Insurance | 1.25% | 664,722 |
| Sub-total |  | 53,842,475 |
| Escalation |  | 28,001,951 |
| Sub-total |  | 81,844,426 |
| Contractor Bond | 1.04% | 852,000 |
| **Total Hard Costs** |  | 82,696,426 |
| **Total Soft Costs** | 35.00% | 28,943,749 |
| **Total Construction Costs** |  | 111,640,176 |
| **Other Costs** |  |  |
| Shelter Coordination/Logistics | 10.00% | 8,269,643 |
| FF+E |  | TBD |
| Logistics Premium |  | TBD |
| Haz-Mat |  | TBD |
| Relocation/Swing Space |  | TBD |
| **Total Other Costs** |  | 8,269,643 |
| **Total Project Costs** |  | **119,909,818** |

1. Escalation is based on 3% from September 2000 through 2003; 55 in 2003-2005; and 6% to start of construction in August 2008

**Sources:**
Conceptual Design by Beyer Blinder Belle Architects and Planners
Cost estimation by Sciame Construction

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM
NYSCEF DOC. NO. 59
INDEX NO. LT-300293-23/NY [HO]
RECEIVED NYSCEF: 05/25/2023

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 140 of 163

EXHIBIT N-1

EXISTING PHYSICAL CONDITIONS ASSESSMENT

[Attached behind.]

Doc #:NY6:491877.32

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 141 of 163

EXHIBIT N-2

ENVIRONMENTAL CONDITIONS DOCUMENT REVIEW

[Attached behind.]

Doc #:NY6:491877.32

EXHIBIT N-3

PHASE II ENVIRONMENTAL SITE ASSESSMENT

# PHASE II ENVIRONMENTAL SITE ASSESSMENT

of

THE SEVENTH REGIMENT ARMORY
643 Park Avenue
New York NY 10169

performed for

Seventh Regiment Armory Conservancy
200 Madison Avenue, 5th Floor
New York, NY 10016

July 1, 2004

prepared by



**Warren & Panzer Engineers, P.C.**
228 East 45th Street-10th Floor
New York, NY 10017

WP PROJECT NO: 1199.01.01

Doc #:NY6:491877.32

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 143 of 163

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................ 1

ASBESTOS INVESTIGATION ...................................................................... 1

ASBESTOS SUMMARY TABLE..................................................................... 4

LEAD BASED PAINT INVESTIGATION...................................................... 5

LEAD BASED PAINT SUMMARY ................................................................ 6

LEAD CONTAMINATION INVESTIGATION (RIFLE RANGE) ................ 7

OTHER ENVIRONMENTAL ISSUES..... …………………………………………...8

ABATEMENT COST ESTIMATES ............................................................... 9

CONCLUSION…………………………………………………………………..10

DISCLAIMER................................................................................................ 10

APPENDICES

Appendix A – Phase I Environmental Assessment
Appendix B – Laboratory Report of Asbestos Analysis
Appendix C – Laboratory Report of Lead Paint Chip Analysis
Appendix D – Laboratory Report of Lead Dust Wipe Analysis
Appendix E – Laboratory Report of TCLP Analysis for Lead

Doc #:NY6:491877.32

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 144 of 163

INTRODUCTION

The Seventh Regiment Armory, constructed between 1877 and 1881 consists of two main sections, the Headhouse and the Drill Hall. The Headhouse is a 5 story, castle-like building, and the Drill Hall is a large open structure with an 80 foot high truss roof. The Drill Hall has open floor space (without columns) of approximately 55,000 square feet. The Drill Hall and the Headhouse are connected and occupy the entire city block of East 66th and East 67th Streets between Lexington and Park Avenues.

Warren & Panzer Engineers, P.C. (W&P) has been retained by the Seventh Regiment Armory Conservancy to investigate the property for the presence of Lead-based paint (LBP) and Asbestos-containing materials (ACM). A limited Phase I Environmental Assessment was conducted by AKRF in December 2003 (a copy is provided at Appendix A). The Phase I report identified locations of past asbestos abatement, lead dust contamination in the rifle range and several other areas with current potential asbestos and lead issues. The goals of W&P's Phase II investigation were to further characterize and quantify the types of ACM and LBP present throughout the entire Armory Facility.

The lead dust contamination investigation included an inspection and environmental sampling of the cellar areas in order to determine lead contamination from the rifle range. W&P conducted a full site survey and sample collection from June 14 to 16, 2004. Mr. James Scullin of W&P, a NYS and NYC licensed asbestos inspector and an EPA NYS licensed Lead Paint Risk Assessor conducted the survey and sampling. During the course of the survey a limited inspection for the presence of other environmental issues (such as PCBs and mercury) was also performed.

**ASBESTOS INVESTIGATION**

*Drill Hall*

Cellar Level – Spray on insulation material in the rifle range and fall out shelter area was sampled and analyzed. Analysis reveled the insulation to be ACM. The spray on material was located on columns and ceiling areas of the middle section of the rifle range. The insulation is in generally poor condition with several areas of loose, crumbling material. The amount of ACM present is approximately 10,000 square feet.

Main Level – Corrugated pipe insulation was observed on two lines of overhead pipes located in the storage rooms along the north side of the Drill Hall. Overhead pipes on the south side of the drill hall were bare and not insulated. Samples of the material from the north side were collected and analysis revealed the insulation to be ACM. The insulation is overall in good condition. The amount of ACM present is approximately 800 linear feet.

*Headhouse*

Cellar Level – Fiberglass insulation material was observed on overhead pipes throughout the entire east side of basement (with the exception of the kitchen area outside the Pistol Range). Plaster type insulation material was present on several elbow sections of the same pipe system that was covered with the fiberglass. The plaster type insulation was

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 145 of 163

sampled and no asbestos was detected. In the kitchen area outside the Pistol Range corrugated insulation was observed on overhead piping. The material was in poor condition with rips and holes. Analysis revealed the material to be ACM. The amount of ACM present is approximately 8 linear feet.

Along the west side of the basement asbestos containing corrugated insulation material was present in the ceiling cavity of the men's shower room and adjacent area. The total amount present could not be visually estimated. Approximately, 10 linear feet of ACM on overhead pipe insulation was observed in good condition, above the locker area's drop ceiling.

In the Boiler Room suspect insulation material was observed on the Boiler flues. The insulation was located underneath metal sheeting and was accessible near an access panel. Samples were collected and no asbestos was detected.

<u>First Floor</u> – Asbestos containing material on insulation of a vertical pipe riser was observed in the Field Officers and Staff Officers room. The material was in good condition and approximately 15 linear feet of ACM is present.

In the Adjutants office there is a small private bathroom with 9"x 9" floor tile. The material and associated mastic were sampled; analysis revealed that no asbestos was detected.

<u>Second Floor</u> – No asbestos containing materials present.

<u>Third Floor</u> – Inside Room 304 analysis of 9"x9" floor tile revealed the presence of asbestos greater than 1%, thus classifying the tile and associated mastic as ACM. The floor tile was in good condition and approximately 700 square feet was present. Also inside Room 304 and 312 transite like paneling was observed on the inside of the wooden radiator covers. Analysis of the paneling revealed the material to be ACM. The material was in good condition and approximately 4 square feet of asbestos paneling was present at each radiator (two radiators total).

Inside Room 307 analysis of 9"x9" floor tile revealed the presence of trace levels of asbestos (less than 1%) thus it is not considered ACM.

Approximately 25 linear feet of ACM on insulation material of a vertical pipe riser was present in the rear office area of Room 306. The material was in good condition.

<u>Fourth Floor</u> – Rooms along the west side of the floor are split into lower and upper levels. 1'X1' floor tile is present on both levels of the following rooms; HHC 1/107, Co. A 1/27, Co. B1/107, Co. C HHC, CSC 2/07 and 2BDE. Analysis of the floor tile and associated mastic revealed the material to be ACM. The floor tile is in good condition and approximately 16,000 square feet is present.

<u>Fifth Floor</u> – No asbestos containing materials present

In addition to the areas mentioned above the asbestos investigation also included sampling of ceiling plaster, wall plaster and exterior window caulk/glaze from throughout the entire Headhouse and Drill Hall. Analysis of all plaster samples revealed no ACM present. In the Headhouse analysis of window caulk/glaze from windows on the first and second floors revealed the material to be ACM. For the purposes of this investigation, all window caulk/glaze of the Headhouse is classified as presumed ACM.

On the roof of the Drill Hall there are two sets of clerestory windows. Analysis of the caulk material revealed that no asbestos was detected.

Laboratory reports of all asbestos analytical results are provided in Appendix B.

Doc #:NY6:491877.32

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 147 of 163

**ASBESTOS SUMMARY TABLE**

| Location | Type of Material | Condition | Estimated Quantity |
|---|---|---|---|
| Drill Hall Cellar Level (rifle range and fallout shelter area) | Spray on insulation | Poor | 10,000 square feet |
| Main Level (north side storage rooms) | Corrugated Pipe Insulation | Good | 800 linear feet |
| Headhouse Cellar Level Kitchen outside Pistol Range | Corrugated Pipe Insulation | Poor | 8 linear feet |
| Bathrooms on Westside (inside ceiling cavity) | Corrugated Pipe Insulation | Good | 10 linear feet |
| *First Floor* Field Officers and Staff Off. Room | Corrugated Pipe Insulation | Good | 15 linear feet |
| *Second Floor* | NO ACM PRESENT | | |
| Third Floor Room 304 | 9"x 9" Floor Tile | Good | 700 square feet |
| Room 304 and 312 | Transite like paneling inside radiator covers (two radiator covers total) | Good | 8 square feet |
| Room 306 (rear office area) | Corrugated Pipe Insulation | Good | 25 linear feet |
| Head House - Fourth Floor Room labeled HHC 1/107 | 1'x 1' Floor Tile | Good | 2,500 square feet |
| Room labeled Co. A 1/27 | 1' x 1' Floor Tile | Good | 2,500 square feet |
| Room labeled Co. B 1/107 | 1' x 1' Floor Tile | Good | 2,500 square feet |
| Room labeled Co. C HHC | 1' x 1' Floor Tile | Good | 2,500 square feet |
| Room labeled CSC 207 | 1' x 1' Floor Tile | Good | 2,500 square feet |
| Room labeled 2BDE | 1'x 1' Floor Tile | Good | 2,500 square feet |
| Fifth Floor | NO ACM PRESENT | | |

Doc #:NY6:491877.32

| Exterior windows (Cellar to Fifth Floor) | Window caulk/glaze | Good | Approximately 200 windows |

NOTE: The following materials did not contain ACM:
The window caulk/glaze of Clerestory windows on the Drill Hall roof.
Wall and ceiling plaster throughout the entire facility.
Insulation on boiler flues (Headhouse cellar).
Plaster type insulation of elbows and joints of overhead pipes (Headhouse cellar).
9"x 9" floor tile in Adjutant's office (Headhouse).
9"x 9" floor tile in Room 307 (Headhouse).

*The roof membrane was not included in this survey

**LEAD BASED PAINT INVESTIGATION**

An RMD-1 XRF detector was used to analyze painted surfaces for the presence of Lead Based Paint. The EPA definition of Lead Based Paint is paint that contains greater than 1.0 milligram of Lead per square centimeter of surface via XRF testing. Throughout the entire Headhouse and Drill Hall the vast majority of all painted walls, ceilings, radiators and wooden window components (sills, sashes and frames) were identified as containing Lead Based Paint. In the Headhouse the overall condition of painted surfaces is good, with a few exceptions where water damage has caused localized peeling and flaking. Also present in the Headhouse are wood doors, ornate wooden framing, and wainscoting located on each floor and in most rooms. No Lead Based Paint was present in these stained wooden surfaces. No Lead Based Paint was detected on the wood surfaces of the central staircase.

On the north and south sides of the Headhouse building there are staircases that begin at the second floor and terminate at the fifth floor. XRF testing of the painted surfaces of the metal banisters and railings of these staircases was inconclusive. In order to identify the presence of Lead Based Paint on the banisters and railings of these staircases, chip samples were collected and analyzed for lead content via Atomic Absorption method. The EPA definition of Lead Based Paint is paint that contains greater than 0.5% Lead by weight via analysis by Atomic Absorption. Analysis of all paint chip samples from the banisters and railing revealed the paint to be identified as Lead Based Paint.

Laboratory reports of paint chip analysis are provided in Appendix C.

In the Drill Hall Lead Based Paint was present throughout the entire interior. Painted surfaces of the walls located on the east and west sides of the interior space were in generally poor condition with several hundred square feet of surface area that was peeling and chipping. Painted surfaces on the Drill Hall's interior truss, north and south walls and the walls of the storage rooms were in good condition.

A survey of the building's exterior revealed Lead Based Paint on the following materials: painted surfaces of exterior window sills and frames, black metal fence around entire perimeter, black metal fire escapes, and black metal bars covering each first floor

window. Painted surfaces of the exterior doors and walls around the Lexington Avenue vehicle entrance did not contain lead based paint.

Doc #:NY6:491877.32

Case 1.25-cv-07373-GBD     Document 1-1     Filed 09/05/25     Page 150 of 163

**LEAD BASED PAINT SUMMARY**

Surfaces with LBP

- Exterior fire escapes/stairwells
- Exterior perimeter fence
- Exterior window bars (First floor only)
- Exterior side of window frames, sashes and sills
- Banisters and railings of north and south stairwells in Headhouse (2nd to 5th floor)
- All painted radiators
- All interior painted walls and ceilings (with several exceptions noted below)
- All interior sides of painted window frames, sashes and sills (with several exceptions noted below)

Areas that do not contain Lead Based Paint:

**Headhouse**

All interior wood doors, wood framing, wainscoting and other ornate wood surfaces.

<u>Cellar</u> – cement floors, brick walls of corridor, walls and ceiling of entrance foyer to elevator, and ceiling of Men's and Ladies' bathrooms.

<u>First Floor</u> – window sashes and frames of Reception Room, Board of Officers' Room, and Colonel's Room, interior wall partitions of Custodian's Office (Hors'g Equipment Rm) and Line Officer's Room.

Wood surfaces of central staircase.

<u>Second Floor</u> – window sashes and frames of First Colonel's Room Fourth Colonel's Room, Seventh Colonel's Room, and Ninth Colonel's Room, painted wallpaper on partitions of rear room inside Tenth Colonel's Room and ceiling of 11th Colonel's Room.

<u>Third Floor</u> - window sashes and frames of Rooms 302, 307, 308, and 310, interior wall partitions of Rooms 300, 305, 307, 309, and 311, and ceiling of Room 311.

<u>Fourth Floor</u> – hallway stucco walls, hallway ceiling, stucco walls of restaurant's dining room, ceiling of dining room, hallway partition walls at north and south stairwells, Men's and Ladies bathrooms, red paint on shelves, walk-in box and framing components of restaurant's kitchen, and interior partitions of Room 414.

<u>Fifth Floor</u> – window sashes and frames of glass brick style windows throughout the entire floor, walls of Conference Room, Storage Room and Office (formerly squash courts) located along the north side of the floor.

**Drill Hall**

The green paint on the wooden floor material was non-lead based paint. Painted surfaces of the walls and doors around the Lexington Avenue vehicle entrance were non-lead based paint.

**LEAD CONTAMINATION INVESTIGATION (RIFLE RANGE)**

Located below the south side of the Drill Hall is a closed down rifle range. The center and east sections of the rifle range space were converted into a storage area and fall-out shelter in the early 1950s. The section of the rifle range closest to the Head House was converted to a Pistol Range at an unknown time (post 1950s). The Pistol Range was completely closed in 1997 due to lead contamination problems. As part of this investigation dust wipe samples of the Pistol Range floor, Rifle Range/Fall-out Shelter floor, Kitchen floor outside the Pistol Range and Headhouse cellar level hallway floor (outside the kitchen) were collected.

Analysis of the dust wipes from the pistol range floor measured from approximately 1,000 to 73,000 micrograms of lead per square foot (ug/ft$^2$). Results from two dust wipes of the Rifle Range/Fall-out Shelter floor were 9,432 ug/ft$^2$ near the target trap area and 7,343 ug/ft$^2$ near the Fall-out shelter area. A dust wipe from the cellar kitchen floor outside the Pistol Range measured 1,020 ug/ft$^2$. A dust wipe from the cellar hallway floor directly outside the kitchen measured 217 ug/ft$^2$. A dust wipe from the cellar hallway floor away from the kitchen near the main stairwell measured 131 ug/ft$^2$. The EPA/HUD level of acceptable lead content in dust on floors is 40 ug/ft$^2$ for residential buildings. This value has been adopted by the New York City Department of Health as an acceptable level for indoor floors of any facility/building that is open to the public. The results of the investigation reveal extremely elevated levels of lead dust and confirm that lead dust has migrated into the Headhouse's cellar hallway.

Laboratory reports of the dust wipe analyses are provided in Appendix D.

Also, ventilation ductwork contaminated with lead dust is located in the Pistol and Rifle Range areas. In 1997 analysis of one dust wipe from inside a section of exhaust duct revealed lead levels of 210,900 ug/ft$^2$. Approximately 100 linear feet of 3'X2' ductwork was observed. No samples of the ductwork were collected as part of this investigation.

In addition to the contaminated ductwork, many miscellaneous items such as lockers, furniture tools, benches, ammunition, target liner, bull's-eye paper, and fallout shelter supplies have been left behind. There are also three portable vacuums, one of which contains a lead warning label and a 5-gallon bucket of debris with a lead warning label. All of these items must also be identified as being contaminated with lead; thus disposal of these items must follow hazardous waste disposal procedures. In the Pistol Range there are accumulations of bullet fragments along the floor of the target trap area, which also must be disposed of as hazardous waste.

In the Rifle Range/Fall-out shelter area there is an accumulation of sand in the target trap area. No visible bullet fragments were observed in the sand. The sand is bordered by metal paneling and does not connect to the soil below the rifle range. Samples of the sand

Doc #:NY6:491877.32

were collected and analyzed via Toxic Characterization Leachate Procedure (TCLP) for lead content. Analytical results measured 3000 milligrams of Lead per Liter of leachate/water (mg/L) for sand in the lower target trap. The sand of the upper target trap measured 2700 mg/L. The EPA definition of hazardous waste for lead content via TCLP is 5 mg/L. Thus all sand in the target trap area is considered hazardous waste.

Laboratory reports of the TCLP analysis are provided in Appendix E

**OTHER ENVIRONMENTAL ISSUES**

Light fixtures and electrical panels throughout the Headhouse and Drill Hall may contain mercury or PCB oils. In the Drill Hall there are approximately 100 ceiling suspended high intensity light fixtures with possible mercury content. No sampling was conducted as part of this investigation. Future renovation projects will require sampling and proper disposal of any items that contain mercury or PCB oils. During the course of the site survey no transformers or other large electrical components were observed. Other than the light fixtures there were no sources of mercury or PCBs that were observed during the survey. No other hazardous waste materials such as waste oils, unidentified drums or batteries were present.

Sections of the Rifle Range/fallout shelter area have been subject to flooding and ponded water. A broken rainwater drain line was observed. In addition, there may be ground water intrusion from the floor of the rifle range. These conditions may result in microbial contamination and a future indoor air quality problem and should be promptly rectified.

Doc #:NY6:491877.32

FILED: NEW YORK CIVIL COURT - L&T 05/24/2023 07:28 PM    INDEX NO. LT-300293-23/NY [HO]
NYSCEF DOC. NO. 39    RECEIVED NYSCEF: 05/25/2023

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 153 of 163

ABATEMENT COST ESTIMATES

Asbestos

| Type of Material | Estimated Quantity | Cost |
|---|---|---|
| Corrugated Pipe insulation | 850 ln. ft. | $13,000 |
| Window caulk/glaze | 200 to 250 windows | $50,000 |
| Spray on insulation | 10,000 sq. ft. | $150,000 |
| Floor Tile | 17,000 sq. ft. | $85,000 |
| Radiator panels | 10 sq. ft. (2 panels) | $1,000 |
|  | Sub total | $299,000 |
| Air monitoring Cost (@ 20%) |  | $59,800 |
|  | TOTAL | $358,800 |

Lead Based Paint

| Location/Type of Material | Estimated Quantity | Cost |
|---|---|---|
| Exterior metal fence | 6,000 sq. ft. | $48,000 |
| Exterior fire escapes | 2,000 sq. ft. | $16,000 |
| Exterior window bars | 2,000 sq. ft. | $16,000 |
| Drill Hall walls (hall, rifle range and north cellar level) | 100,000 sq. ft. | $1,100,000 |
| Drill Hall roof truss | 10,000 sq. ft. | $100,000 |
| Headhouse north and south staircase railings | 8,000 sq. ft. | $64,000 |
| Headhouse ceilings | 80,000 sq. ft. | $640,000 |
| Headhouse walls | 50,000 sq. ft. | $400,000 |
| Headhouse windows | 200 to 250 windows | $50,000 |
|  | TOTAL | $2,434,000 |

Lead Dust Decontamination/Disposal of Lead Debris the Rifle Range

| Type of Activity | Estimated Quantity | Cost |
|---|---|---|
| Cleaning/Decon of Headhouse Cellar floors | 8,000 sq. ft. | $10,000 |
| Cleaning/Decon of Pistol & Rifle Range floors & surfaces | 40,000 sq. ft. | $100,000 |
| Removal and Disposal of Lead bullet debris of Pistol Range | 1,000 lbs. | $10,000 |
| Removal and Disposal of sand from Rifle Range target traps | 50 cubic yards | $30,000 |
| Removal and Disposal of lead contaminated items (lockers, supplies, furniture, etc.) | 100 cubic yards | $60,000 |
| Removal and disposal of Ventilation ductwork | 200 ln. ft. | $30,000 |
|  | TOTAL | $240,000 |

These cost estimates are budgetary in nature and are based upon analysis of costs associated with full-scale asbestos and lead abatement projects of similar scope that have occurred in the recent past. It should be noted that the estimated costs might be impacted by the economic climate, which may alter in the future.

**CONCLUSION**

Doc #:NY6:491877.32

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 154 of 163

Warren & Panzer's investigation has revealed extensive asbestos and lead issues throughout the entire Seventh Regiment Armory Facility. All of these issues must be addressed through large-scale professional hazardous material abatement projects. At this time, there are no asbestos and lead issues that can be abated by the current management during routine operations and maintenance. The types and scopes of any abatement projects should be decided after the future use of the facility has been determined.

**DISCLAIMER**

This investigation did not utilize destructive sampling techniques. There may be additional hidden asbestos, lead and other hazardous materials present in the facility that might be discovered only during future renovation activities.

Respectfully submitted,

WARREN & PANZER ENGINEERS, P.C.

James Scullin
Project Manager

Chet Bijoor, P.E., DEE
Vice President

EXHIBIT N-4

PHASE II ADDENDUM REPORT

[Attached behind.]

Doc #:NY6:491877.32

EXHIBIT O

VENDOR RESPONSIBILITY QUESTIONNAIRE

[Attached behind]

Doc #:NY6:491877.32

APPENDIX A

STANDARD CLAUSES FOR NEW YORK STATE CONTRACTS

[Attached behind.]

Doc #:NY6:491877.32

**NEW YORK STATE OFFICE OF GENERAL SERVICES**
**PROCUREMENT SERVICES GROUP**

## APPENDIX A

# STANDARD CLAUSES FOR NEW YORK STATE CONTRACTS

**PLEASE RETAIN THIS DOCUMENT**
**FOR FUTURE REFERENCE.**

June, 2006

# <u>TABLE OF CONTENTS</u>

1.  **Executory Clause**
2.  **Non-Assignment Clause**
3.  **Comptroller's Approval**
4.  **Workers' Compensation Benefits**
5.  **Non-Discrimination Requirements**
6.  **Wage and Hours Provisions**
7.  **Non-Collusive Bidding Certification**
8.  **International Boycott Prohibition**
9.  **Set-Off Rights**
10.  **Records**
11.  **Identifying Information and Privacy Notification**
12.  **Equal Employment Opportunities For Minorities and Women**
13.  **Conflicting Terms**
14.  **Governing Law**
15.  **Late Payment**
16.  **No Arbitration**
17.  **Service of Process**
18.  **Prohibition on Purchase of Tropical Hardwoods**
19.  **MacBride Fair Employment Principles**
20.  **Omnibus Procurement Act of 1992**
21.  **Reciprocity and Sanctions Provisions**
22.  **Purchases of Apparel**

June, 2006

## STANDARD CLAUSES FOR NYS CONTRACTS

The parties to the attached contract, license, lease, amendment or other agreement of any kind (hereinafter, "the contract" or "this contract") agree to be bound by the following clauses which are hereby made a part of the contract (the word "Contractor" herein refers to any party other than the State, whether a contractor, licenser, licensee, lessor, lessee or any other party):

**1. EXECUTORY CLAUSE.** In accordance with Section 41 of the State Finance Law, the State shall have no liability under this contract to the Contractor or to anyone else beyond funds appropriated and available for this contract.

**2. NON-ASSIGNMENT CLAUSE.** In accordance with Section 138 of the State Finance Law, this contract may not be assigned by the Contractor or its right, title or interest therein assigned, transferred, conveyed, sublet or otherwise disposed of without the previous consent, in writing, of the State and any attempts to assign the contract without the State's written consent are null and void. The Contractor may, however, assign its right to receive payment without the State's prior written consent unless this contract concerns Certificates of Participation pursuant to Article 5-A of the State Finance Law.

**3. COMPTROLLER'S APPROVAL.** In accordance with Section 112 of the State Finance Law (or, if this contract is with the State University or City University of New York, Section 355 or Section 6218 of the Education Law), if this contract exceeds $50,000 (or the minimum thresholds agreed to by the Office of the State Comptroller for certain S.U.N.Y. and C.U.N.Y. contracts), or if this is an amendment for any amount to a contract which, as so amended, exceeds said statutory amount, or if, by this contract, the State agrees to give something other than money when the value or reasonably estimated value of such consideration exceeds $10,000, it shall not be valid, effective or binding upon the State until it has been approved by the State Comptroller and filed in his office. Comptroller's approval of contracts let by the Office of General Services is required when such contracts exceed $85,000 (State Finance Law Section 163.6.a).

**4. WORKERS' COMPENSATION BENEFITS.** In accordance with Section 142 of the State Finance Law, this contract shall be void and of no force and effect unless the Contractor shall provide and maintain coverage during the life of this contract for the benefit of such employees as are required to be covered by the provisions of the Workers' Compensation Law.

**5. NON-DISCRIMINATION REQUIREMENTS.** To the extent required by Article 15 of the Executive Law (also known as the Human Rights Law) and all other State and Federal statutory and constitutional non-discrimination provisions, the Contractor will not discriminate against any employee or applicant for employment because of race, creed, color, sex, national origin, sexual orientation, age, disability, genetic predisposition or carrier status, or marital status. Furthermore, in accordance with Section 220-e of the Labor Law, if this is a contract for the construction, alteration or repair of any public building or public work or for the manufacture, sale or distribution of materials, equipment or supplies, and to the extent that this contract shall be performed within the State of New York, Contractor agrees that neither it nor its subcontractors shall, by reason of race, creed, color, disability, sex, or national origin: (a) discriminate in hiring against any New York State citizen who is qualified and available to perform the work; or (b) discriminate against or intimidate any employee hired for the performance of work under this contract. If this is a building service contract as defined in Section 230 of the Labor Law, then, in accordance with Section 239 thereof, Contractor agrees that neither it nor its subcontractors shall by reason of race, creed, color, national origin, age, sex or disability: (a) discriminate in hiring against any New York State citizen who is qualified and available to perform the work; or (b)

discriminate against or intimidate any employee hired for the performance of work under this contract. Contractor is subject to fines of $50.00 per person per day for any violation of Section 220-e or Section 239 as well as possible termination of this contract and forfeiture of all moneys due hereunder for a second or subsequent violation.

**6. WAGE AND HOURS PROVISIONS.** If this is a public work contract covered by Article 8 of the Labor Law or a building service contract covered by Article 9 thereof, neither Contractor's employees nor the employees of its subcontractors may be required or permitted to work more than the number of hours or days stated in said statutes, except as otherwise provided in the Labor Law and as set forth in prevailing wage and supplement schedules issued by the State Labor Department. Furthermore, Contractor and its subcontractors must pay at least the prevailing wage rate and pay or provide the prevailing supplements, including the premium rates for overtime pay, as determined by the State Labor Department in accordance with the Labor Law.

**7. NON-COLLUSIVE BIDDING CERTIFICATION.** In accordance with Section 139-d of the State Finance Law, if this contract was awarded based upon the submission of bids, Contractor affirms, under penalty of perjury, that its bid was arrived at independently and without collusion aimed at restricting competition. Contractor further affirms that, at the time Contractor submitted its bid, an authorized and responsible person executed and delivered to the State a non-collusive bidding certification on Contractor's behalf.

**8. INTERNATIONAL BOYCOTT PROHIBITION.** In accordance with Section 220-f of the Labor Law and Section 139-h of the State Finance Law, if this contract exceeds $5,000, the Contractor agrees, as a material condition of the contract, that neither the Contractor nor any substantially owned or affiliated person, firm, partnership or corporation has participated, is participating, or shall participate in an international boycott in violation of the federal Export Administration Act of 1979 (50 USC App. Sections 2401 et seq.) or regulations thereunder. If such Contractor, or any of the aforesaid affiliates of Contractor, is convicted or is otherwise found to have violated said laws or regulations upon the final determination of the United States Commerce Department or any other appropriate agency of the United States subsequent to the contract's execution, such contract, amendment or modification thereto shall be rendered forfeit and void. The Contractor shall so notify the State Comptroller within five (5) business days of such conviction, determination or disposition of appeal (2NYCRR 105.4).

**9. SET-OFF RIGHTS.** The State shall have all of its common law, equitable and statutory rights of set-off. These rights shall include, but not be limited to, the State's option to withhold for the purposes of set-off any moneys due to the Contractor under this contract up to any amounts due and owing to the State with regard to this contract, any other contract with any State department or agency, including any contract for a term commencing prior to the term of this contract, plus any amounts due and owing to the State for any other reason including, without limitation, tax delinquencies, fee delinquencies or monetary penalties relative thereto. The State shall exercise its set-off rights in accordance with normal State practices including, in cases of set-off pursuant to an audit, the finalization of such audit by the State agency, its representatives, or the State Comptroller.

**10. RECORDS.** The Contractor shall establish and maintain complete and accurate books, records, documents, accounts and other evidence directly pertinent to performance under this contract (hereinafter, collectively, "the Records"). The Records must be kept for the balance of the calendar year in which they were made and for six (6) additional years thereafter. The State Comptroller, the Attorney General and any other person or entity authorized to conduct an examination, as well as the agency or agencies involved in this contract, shall have access to the

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 161 of 163

Records during normal business hours at an office of the Contractor within the State of New York or, if no such office is available, at a mutually agreeable and reasonable venue within the State, for the term specified above for the purposes of inspection, auditing and copying. The State shall take reasonable steps to protect from public disclosure any of the Records which are exempt from disclosure under Section 87 of the Public Officers Law (the "Statute") provided that: (i) the Contractor shall timely inform an appropriate State official, in writing, that said records should not be disclosed; and (ii) said records shall be sufficiently identified; and (iii) designation of said records as exempt under the Statute is reasonable. Nothing contained herein shall diminish, or in any way adversely affect, the State's right to discovery in any pending or future litigation.

## 11. IDENTIFYING INFORMATION AND PRIVACY NOTIFICATION. (a) FEDERAL EMPLOYER IDENTIFICATION NUMBER and/or FEDERAL SOCIAL SECURITY NUMBER. All invoices or New York State standard vouchers submitted for payment for the sale of goods or services or the lease of real or personal property to a New York State agency must include the payee's identification number, i.e., the seller's or lessor's identification number. The number is either the payee's Federal employer identification number or Federal social security number, or both such numbers when the payee has both such numbers. Failure to include this number or numbers may delay payment. Where the payee does not have such number or numbers, the payee, on its invoice or New York State standard voucher, must give the reason or reasons why the payee does not have such number or numbers.

**(b)** PRIVACY NOTIFICATION. (1) The authority to request the above personal information from a seller of goods or services or a lessor of real or personal property, and the authority to maintain such information, is found in Section 5 of the State Tax Law. Disclosure of this information by the seller or lessor to the State is mandatory. The principal purpose for which the information is collected is to enable the State to identify individuals, businesses and others who have been delinquent in filing tax returns or may have understated their tax liabilities and to generally identify persons affected by the taxes administered by the Commissioner of Taxation and Finance. The information will be used for tax administration purposes and for any other purpose authorized by law.
 (2) The personal information is requested by the purchasing unit of the agency contracting to purchase the goods or services or lease the real or personal property covered by this contract or lease. The information is maintained in New York State's Central Accounting System by the Director of Accounting Operations, Office of the State Comptroller, 110 State Street, Albany, New York 12236.

## 12. EQUAL EMPLOYMENT OPPORTUNITIES FOR MINORITIES AND WOMEN. In accordance with Section 312 of the Executive Law, if this contract is: (i) a written agreement or purchase order instrument, providing for a total expenditure in excess of $25,000.00, whereby a contracting agency is committed to expend or does expend funds in return for labor, services, supplies, equipment, materials or any combination of the foregoing, to be performed for, or rendered or furnished to the contracting agency; or (ii) a written agreement in excess of $100,000.00 whereby a contracting agency is committed to expend or does expend funds for the acquisition, construction, demolition, replacement, major repair or renovation of real property and improvements thereon; or (iii) a written agreement in excess of $100,000.00 whereby the owner of a State assisted housing project is committed to expend or does expend funds for the acquisition, construction, demolition, replacement, major repair or renovation of real property and improvements thereon for such project, then:

(a)  The Contractor will not discriminate against employees or applicants for employment because of race, creed, color, national origin, sex, age, disability or marital status, and will undertake or continue existing programs of affirmative action to ensure that minority group members and women are afforded equal employment opportunities

without discrimination. Affirmative action shall mean recruitment, employment, job assignment, promotion, upgradings, demotion, transfer, layoff, or termination and rates of pay or other forms of compensation;

(b)  at the request of the contracting agency, the Contractor shall request each employment agency, labor union, or authorized representative of workers with which it has a collective bargaining or other agreement or understanding, to furnish a written statement that such employment agency, labor union or representative will not discriminate on the basis of race, creed, color, national origin, sex, age, disability or marital status and that such union or representative will affirmatively cooperate in the implementation of the contractor's obligations herein; and

(c)  the Contractor shall state, in all solicitations or advertisements for employees, that, in the performance of the State contract, all qualified applicants will be afforded equal employment opportunities without discrimination because of race, creed, color, national origin, sex, age, disability or marital status.

Contractor will include the provisions of "a", "b", and "c" above, in every subcontract over $25,000.00 for the construction, demolition, replacement, major repair, renovation, planning or design of real property and improvements thereon (the "Work") except where the Work is for the beneficial use of the Contractor. Section 312 does not apply to: (i) work, goods or services unrelated to this contract; or (ii) employment outside New York State; or (iii) banking services, insurance policies or the sale of securities. The State shall consider compliance by a contractor or subcontractor with the requirements of any federal law concerning equal employment opportunity which effectuates the purpose of this section. The contracting agency shall determine whether the imposition of the requirements of the provisions hereof duplicate or conflict with any such federal law and if such duplication or conflict exists, the contracting agency shall waive the applicability of Section 312 to the extent of such duplication or conflict. Contractor will comply with all duly promulgated and lawful rules and regulations of the Governor's Office of Minority and Women's Business Development pertaining hereto.

**13. CONFLICTING TERMS.** In the event of a conflict between the terms of the contract (including any and all attachments thereto and amendments thereof) and the terms of this Appendix A, the terms of this Appendix A shall control.

**14. GOVERNING LAW.** This contract shall be governed by the laws of the State of New York except where the Federal supremacy clause requires otherwise.

**15. LATE PAYMENT.** Timeliness of payment and any interest to be paid to Contractor for late payment shall be governed by Article 11-A of the State Finance Law to the extent required by law.

**16. NO ARBITRATION.** Disputes involving this contract, including the breach or alleged breach thereof, may not be submitted to binding arbitration (except where statutorily authorized), but must, instead, be heard in a court of competent jurisdiction of the State of New York.

**17. SERVICE OF PROCESS.** In addition to the methods of service allowed by the State Civil Practice Law & Rules ("CPLR"), Contractor hereby consents to service of process upon it by registered or certified mail, return receipt requested. Service hereunder shall be complete upon Contractor's actual receipt of process or upon the State's receipt of the return thereof by the United States Postal Service as refused or undeliverable. Contractor must promptly notify the State, in writing, of each and every change of address to which service of process can be made. Service by the State to the last known address shall be sufficient. Contractor will have thirty (30) calendar days after service hereunder is complete in which to respond.

**18. PROHIBITION ON PURCHASE OF TROPICAL HARDWOODS.** The Contractor certifies and warrants that all wood products to be used under this contract award will be in accordance with, but not limited to, the specifications and provisions of State Finance Law §165. (Use of Tropical Hardwoods) which prohibits purchase and use of tropical hardwoods, unless specifically exempted, by the State or any governmental agency or political subdivision or public benefit corporation. Qualification for an exemption under this law will be the responsibility of the contractor to establish to meet with the approval of the State.

In addition, when any portion of this contract involving the use of woods, whether supply or installation, is to be performed by any subcontractor, the prime Contractor will indicate and certify in the submitted bid proposal that the subcontractor has been informed and is in compliance with specifications and provisions regarding use of tropical hardwoods as detailed in §165 State Finance Law. Any such use must meet with the approval of the State; otherwise, the bid may not be considered responsive. Under bidder certifications, proof of qualification for exemption will be the responsibility of the Contractor to meet with the approval of the State.

**19. MACBRIDE FAIR EMPLOYMENT PRINCIPLES.** In accordance with the MacBride Fair Employment Principles (Chapter 807 of the Laws of 1992), the Contractor hereby stipulates that the Contractor either (a) has no business operations in Northern Ireland, or (b) shall take lawful steps in good faith to conduct any business operations in Northern Ireland in accordance with the MacBride Fair Employment Principles (as described in Section 165 of the New York State Finance Law), and shall permit independent monitoring of compliance with such principles.

**20. OMNIBUS PROCUREMENT ACT OF 1992.** It is the policy of New York State to maximize opportunities for the participation of New York State business enterprises, including minority and women-owned business enterprises as bidders, subcontractors and suppliers on its procurement contracts.

Information on the availability of New York State subcontractors and suppliers is available from:

NYS Department of Economic Development
Division for Small Business
30 South Pearl St -- 7th Floor
Albany, New York  12245
Telephone:  518-292-5220
Fax: 518-292-5884
http://www.empire.state.ny.us

A directory of certified minority and women-owned business enterprises is available from:

NYS Department of Economic Development
Division of Minority and Women's Business Development
30 South Pearl St -- 2nd Floor
Albany, New York  12245
Telephone: 518-292-5250
Fax: 518-292-5803
http://www.empire.state.ny.us

The Omnibus Procurement Act of 1992 requires that by signing this bid proposal or contract, as applicable, Contractors certify that whenever the total bid amount is greater than $1 million:

(a)  The Contractor has made reasonable efforts to encourage the participation of New York State Business Enterprises as suppliers and subcontractors, including certified minority and women-owned business enterprises, on this project, and has retained the documentation of these efforts to be provided upon request to the State;

(b) The Contractor has complied with the Federal Equal Opportunity Act of 1972 (P.L. 92-261), as amended;

(c) The Contractor agrees to make reasonable efforts to provide notification to New York State residents of employment opportunities on this project through listing any such positions with the Job Service Division of the New York State Department of Labor, or providing such notification in such manner as is consistent with existing collective bargaining contracts or agreements. The Contractor agrees to document these efforts and to provide said documentation to the State upon request; and

(d) The Contractor acknowledges notice that the State may seek to obtain offset credits from foreign countries as a result of this contract and agrees to cooperate with the State in these efforts.

**21. RECIPROCITY AND SANCTIONS PROVISIONS.** Bidders are hereby notified that if their principal place of business is located in a country, nation, province, state or political subdivision that penalizes New York State vendors, and if the goods or services they offer will be substantially produced or performed outside New York State, the Omnibus Procurement Act 1994 and 2000 amendments (Chapter 684 and Chapter 383, respectively) require that they be denied contracts which they would otherwise obtain. NOTE:  As of May 15, 2002, the list of discriminatory jurisdictions subject to this provision includes the states of South Carolina, Alaska, West Virginia, Wyoming, Louisiana and Hawaii. Contact NYS Department of Economic Development for a current list of jurisdictions subject to this provision.

**22. PURCHASES OF APPAREL.** In accordance with State Finance Law 162 (4-a), the State shall not purchase any apparel from any vendor unable or unwilling to certify that: (i) such apparel was manufactured in compliance with all applicable labor and occupational safety laws, including, but not limited to, child labor laws, wage and hours laws and workplace safety laws, and  (ii) vendor will supply, with its bid (or, if not a bid situation, prior to or at the time of signing a contract with the State)*, if known, the names and addresses of each subcontractor and a list of all manufacturing plants to be utilized by the bidder.

Case 1:25-cv-07373-GBD    Document 1-1    Filed 09/05/25    Page 163 of 163

STANDARD CLAUSES FOR NYS CONTRACTS

APPENDIX A

**THIS PAGE IS INTENTIONALLY LEFT BLANK**