UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SEVENTH REGIMENT ARMORY CONSERVANCY,  :
INC.,
                                             :

                       Plaintiff,  :

                                  :

      -against-  :           MEMORANDUM DECISION
                                  :              AND ORDER

HOPE KNIGHT, *in her official capacity as President,*  :
*Chief Executive Officer, and Commissioner of Empire*  :      25 Civ. 7373 (GBD)
*State Development Corporation,*  :

                                  :

                     Defendant.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

       Plaintiff Seventh Regiment Armory Conservancy, Inc. (the "Conservancy") brings this

action against Hope Knight, in her official capacity as President, Chief Executive Officer, and

Commissioner of the Empire State Development Corporation ("ESD"), for violations of the United

States Constitution. The Conservancy is a not-for-profit entity that, pursuant to a lease agreement

with the State of New York (the "Lease"), operates a cultural center for visual and performing arts

within the Park Avenue Armory in the upper east side of Manhattan (the "Armory").

       This action stems from ESD's decision to designate two spaces within the Armory, Room

K and the fifth-floor rehearsal space (the "Rehearsal Room"), to serve as the headquarters of the

Knickerbocker Greys (the "Greys"). This action was taken pursuant to a New York State law

enacted on December 21, 2024, that amended portions of the New York Military Law and the

Urban Development Corporation Act (the "Amendments"). The Conservancy commenced this

action on September 5, 2025. (Compl., ECF No. 1.) The Conservancy's complaint alleges that

the Amendments, as applied, violate (1) the Contracts Clause; (2) the Takings Clause; (3) the

Conservancy's substantive due process rights; and (4) the Conservancy's procedural due process rights. (Compl., ECF No. 1.)

Before this Court is the Conservancy's Proposed Order to Show Cause ("O.S.C.") seeking a preliminary injunction to prevent ESD from entering and finalizing an agreement with the Greys for the exclusive use of Room K and the Rehearsal Room. (Proposed O.S.C., ECF No. 5.) On September 5, 2025, the Conservancy submitted a Memorandum of Law in Support of their Motion for a Preliminary Injunction, (Pl. Mem. L. Supp. Prelim. Inj., ECF No. 8.) ESD responded on September 30, 2025, (Def. Mem. L. Opp. Prelim. Inj., ECF No. 23,) and the Conservancy replied on October 15, 2025, (Pl. Reply Supp. Prelim. Inj., ECF No. 30.) On October 22, 2025, this Court held oral argument on the Conservancy's motion. (10/22/2025 ECF Entry.) Based on a careful review of the parties' submissions and the current record, this Court concludes that the Conservancy is entitled to limited preliminary relief during the pendency of this litigation. Plaintiff's motion for a preliminary injunction is GRANTED.

## I.    FACTUAL BACKGROUND

### A. The Armory

The Armory is an historic New York City and State landmark. The Seventh Regiment of the National Guard, a volunteer militia formed in 1806, built the Armory on land leased from the City of New York between 1879 and 1881. (Robertson Decl., ECF No. 6 ¶ 1.) Since its construction, the Armory has served as both a military facility and cultural hub, hosting musical events, balls, art exhibitions, and royal visits. (*Id.* at ¶ 2.) In 1967, the New York Landmarks Preservation Commission designated the Armory as an historic landmark, finding that the Armory "has a special character, special historical and aesthetic interest and value as part of the

development, heritage and cultural characteristics of New York City." (Sponsors' Memo, ECF No. 7-8, at 3.)

Since 1902, the Armory has also served as the headquarters for the Greys, an afterschool program for children ages six to sixteen. In its 136-year history, over 4,500 New Yorkers have been members of the Greys, including former vice president Nelson Rockefeller, former governor of New York W. Averell Harriman, and former mayor of New York City John Lindsay. (*See* Def. Mem. L. Opp. Prelim. Inj. at 3.) For over 120 years, the Greys have met each Tuesday during the school year between 5:15 p.m. and 6:30 p.m. at their designated space in the Armory's basement. (*Id.*)

## B. The Conservancy's Lease

By the late 1990s, the Armory was in a state of disrepair. *See* Selwyn Raab et al., *ANTIQUE FORTRESS: A Special Report.; Park Ave. Armory Is Losing the Battle Within*, N.Y. Times (Mar. 6, 1998), https://www.nytimes.com/1998/03/06/arts/antique-fortress-a-special-report-park-ave-armory-is-losing-the-battle-within.html. At the time, the Armory was maintained and operated by the New York State Division of Military and Naval Affairs ("DMNA"), the state agency responsible for managing New York's military forces. The public outcry over the Armory's deteriorating physical condition led ESD, acting on behalf of DMNA, to issue a request for proposals in June 2000 seeking submissions from private organizations to oversee the Armory's restoration and renovation. (Lease, ECF No. 7-1, at 1.) In response, the Conservancy submitted a bid for the Armory's restoration project, and in September 2001, ESD officially selected the Conservancy as the developer for the restoration project. (*Id.* at 2.)

In 2004, to facilitate the Armory's restoration, the New York State Legislature enacted Chapter 482 of Laws of 2004, which added section 180-a to the New York Military Law ("Military Law § 180-a") and section 39 to the Urban Development Corporation Act ("UDC Act § 39"). (*See*

*Id.*) These enactments authorized ESD to lease the Armory to a not-for-profit entity for a term of up to ninety-nine years. (Robertson Decl. ¶ 7.)

On November 14, 2006, pursuant to Military Law § 180-a and UDC Act § 39, the Conservancy entered into the Lease. It was a ninety-nine-year agreement with the State for the "restoration and renovation of the Armory for use as a cultural center for visual and performing arts." (*Id.* at ¶ 13.) Through the Lease, the State demised all its "interest in and to the [Armory]" to the Conservancy, excluding only "the DMNA Retained Space and the Shelter Retained Space." (Lease at 6.) The Lease defines the DMNA Retained Space as "that space in the [Armory] which is used and occupied from time to time by the DMNA . . . ." (*Id.*) Similarly, the Lease defines the Shelter Retained Space as "that space in the [Armory] which is used and occupied by" the women's shelter that operated under license from New York City at the time the Lease was executed. (*Id.* at 12.) The Shelter Retained Space and the DMNA Retained Space are currently located on portions of the third and fourth floors of the Armory.

### C. The Conservancy Seeks to Remove the Greys from the Armory

Unlike DMNA or the women's shelter, the Lease does not define any space specifically reserved for—or even mention—the Greys. In fact, on December 15, 2006, following the execution of the Lease, DMNA sent the Greys a notice to vacate and remove all property from the Armory. (2006 Eviction Notice, ECF No. 7-3, at 2.) This notice stated, among other things, that "if [the Greys] desire[] to continue meeting periodically within the Armory, [the Greys] must now make appropriate arrangements with the Conservancy[,] which will set all rules and regulations for access to the Armory hereafter." (*Id.*)

In 2007, the Conservancy granted a one-year license to the Greys that allowed the Greys to maintain access to their usual meeting place in the Armory's basement free-of-charge. (Robertson Decl. ¶ 35.) Over the next twelve years, the Greys and the Conservancy annually

renewed this license, and the two entities co-existed within the Armory. The final license agreement between the Greys and the Conservancy expired on January 30, 2019. (Def. Mem. L. Opp. Prelim. Inj. at 4.)

In March 2022, the Conservancy instructed the Greys to vacate the Armory and remove their belongings from the basement, which the Conservancy contends was necessary to begin construction on a capital improvement project. (Robertson Decl. ¶ 40.) The Greys refused. On November 22, 2022, DMNA's general counsel sent a letter to the Greys, instructing them that the Lease "makes no reference, actual or implied, to support a claim that the Greys have any rights encumbering the lease or that the Conservancy is obligated to provide the Greys with any access to, or space within, the Armory." (2022 DMNA Letter, ECF No. 7-4, at 2.) Undeterred, the Greys continued to occupy the space in the Armory's basement. On January 5, 2023, the Conservancy filed a holdover proceeding in New York County Civil Court seeking a warrant to permanently evict the Greys from the Armory. (Robertson Decl. ¶ 44.)

**D. The Amendments**

On December 21, 2024, during the pendency of the holdover proceeding, Governor Kathy Hochul signed the Amendments into law, which amended several sections of Military Law § 180-a and UDC Act § 39. (*See* ECF Nos. 7-6, 7-7.) The sponsors' memoranda make clear that the Amendments were in response to "attempts to evict . . . cadet corps from their long-standing locations" and designed to "provide a legacy cadet corps program with meeting space and event space at a regimental armory which they have resided in." (Am. Sponsors' Mem., ECF No. 24-4, at 2, 4.) The sponsors further emphasized that "[c]adet corps have a special historical value in the development and expression of New York City's culture and heritage" and "[p]reserving the ability

of cadet corps programs to operate out of their long-standing locations is in the interest of keeping cultural and historical institutions within New York City intact." (*Id.* at 2–3.)

The Amendments attempt to effectuate this purpose by changing the law in six ways. *First,* the Amendments define the term "legacy cadet corps program." N.Y. Mil. Law § 180-a(1)(l) (McKinney 2025).[1] *Second*, the Amendments establish the procedure in which a cadet corps program qualifies as a legacy cadet corps program. *Id.* § 180-a(3)(f).[2] *Third*, the Amendments require the Conservancy to provide, upon application, "cadet corps programs, including a legacy cadet corps program . . . a proper and convenient room or rooms or other appropriate space in the [A]rmory where such posts or chapters may hold regular and special meetings and organizational social events of a private nature . . . provided that such use does not interfere with the use by the [Conservancy]." *Id.* § 180-a(3)(c)(i). Prior to the enactment of the Amendments, this same provision applied only to "associations of veterans." (*See* Am. Section 180-a, ECF No. 7-7, at 3.) *Fourth*, the Amendments except "a legacy cadet corps program use" from any lease governing the operation of the Armory and mandate that a legacy cadet corps program be provided "a separate agreement between the division and the state of New York; such agreement shall be executed once a cadet corps program is determined to be a legacy cadet corps program." N.Y. Mil. Law § 180-a(3)(e). *Fifth,* the Amendments change the portions of the Armory able to be demised to the

---

[1] "'Legacy Cadet Corps Program' shall mean a cadet corps or organized militia program that has accessed or used a regimental armory located within a city that has a population of over one million people for over one hundred years during periods which are not periods of civil or military emergency." NY MIL § 180-a(1)(l) (McKinney 2025).

[2] "A cadet corps program shall qualify as a legacy cadet corps program if such program can sufficiently demonstrate to the urban development corporation that the cadet corps program has used or occupied a regimental armory for over one hundred years. Methods of sufficiently proving use or occupancy shall include, but not be limited to, photos, notarized statements, letters addressed to the program, bank statements, and utility bills. If a cadet corps program qualifies as a legacy cadet corps program, the urban development corporation shall designate them as such and immediately begin to enter into a separate agreement with such program." *Id.* § 180-a(3)(f).

Conservancy under the Lease by specifically reserving space "for use by a legacy cadet corps program pursuant to an agreement between [DMNA] and the state of New York." N.Y. Unconsol. Law, UDA § 39(b) (McKinney 2025). *Finally*, the Amendments require the State to designate a space within the Armory for a legacy cadet corps program that is "sufficient and suitable . . . for the current and uninterrupted operation, provided that it is no less than twelve hundred square feet for their headquarters." *Id.*

Through these changes, the Amendments create two avenues by which a cadet corps program may secure space within the Armory: (1) section 180-a(3)(c)(i) and (2) section 180-a(3)(e). Under section 180-a(3)(c)(i), a cadet corps program, "including a legacy cadet corps program," may apply to the Conservancy for space in the Armory, and the Conservancy is required to provide such space unless doing so would interfere with the Conservancy's use. *See id.* § 180-a(3)(c)(i). By contrast, under section 180-a(3)(e), a cadet corps program applies directly to ESD to be designated as a "legacy cadet corps program." Once designated as a legacy cadet corps program, ESD allocates a portion of the Armory—no less than 1,200 square feet—to the program through a separate agreement. *Id.* § 180-a(3)(e); N.Y. Unconsol. Law § 39(b).

On March 14, 2025, pursuant to § 180-a(3)(e), the Greys applied to ESD to be designated as a "legacy cadet corps program." (Robertson Decl. ¶ 56.) On May 1, 2025, ESD certified that the Greys are a "legacy cadet corps program" under the Amendments. (*Id.* ¶ 57.)

### E. Judge Zellen's Decision in the Eviction Proceedings

On August 20, 2025, after the conclusion of discovery in the state holdover proceeding, Judge Jeffrey S. Zellen issued a Decision and Order granting in part and denying in part both the Conservancy's and the Greys's motions for summary judgment. *Seventh Regiment Armory Conservancy, Inc. v. Knickerbocker Greys*, No. LT-300293-23/NY, 2025 WL 2424432, at *1 (N.Y. Civ. Ct., Aug. 20, 2025). Judge Zellen determined that the Amendments were "clearly and

unambiguously relevant" to whether the Conservancy could evict the Greys from their space in the basement and that the "operative question" was "whether the Legislature could do as it intended." *Id.* at *3–4. Focusing exclusively on section 180-a(3)(c)(i), Judge Zellen found that the Legislature's decision to expand the provision to include cadet corps programs was "entirely in keeping with the [Conservancy's] contract with the State of New York to support 'interpretive and/or educational programs related to the social aesthetic and military history of the building,' precisely because [the Greys] are an 'educational program' and part of the 'military history of the building.'" *Id.* at *4 (quoting Lease at 127). Judge Zellen ultimately held that summary judgment was inappropriate because a factual question remained as to "whether [the Greys'] occupancy of its present space in the Armory interferes with [the Conservancy's] use of the Armory." *Id.* at *6. On August 22, 2025, the Conservancy filed a Notice of Appeal with the New York State Supreme Court Appellate Division, First Department. (*See* Notice of Appeal, ECF No. 24-6 at 1.)

### F. ESD's Designation of Armory Space for the Greys

On September 11, 2025, pursuant to Military Law § 180-a(3)(e) and UDC Act § 39, ESD designated two rooms within the armory as "suitable space" for the Greys headquarters: Room K on the second floor and the Rehearsal Room. (Sept. 11, 2025 Letter, ECF No. 14-1, at 2–5.) In a letter notifying the Greys of this designation, ESD stated that "[p]rior to the Greys obtaining access to the spaces, the Greys and ESD . . . will need to enter into an agreement governing the Greys' [use.]" (*Id.* at 2.) As set out in the Conservancy's supporting declarations, Room K is currently used as an artist in residence studio, and the hallway outside of Room K is frequently used by production staff during performances. (Lonergan Decl., ECF No. 27 ¶ 7.) The Conservancy currently uses the Rehearsal Room for, among other things, artistic planning meetings, production meetings, workshops, production rehearsals, and warmups. (*Id.* ¶ 8.) Room K and the Rehearsal

Room cover approximately 3,325 square feet of space within the Armory. (Pl. Reply Supp. Prelim. Inj. at 2.)

## II.    LEGAL STANDARD

"A preliminary injunction 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 510 (2d. Cir 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). Generally, "the purpose of a preliminary injunction is . . . to preserve the relative positions of the parties" until a determination on the merits of the plaintiff's claims can be made. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *North American Soccer League, LLC v. United States Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018).

The Second Circuit has, however, recognized an exception to the "serious questions" standard. Where, as here, "a preliminary injunction is sought against government action taken in the public interest pursuant to a statutory or regulatory scheme, the less demanding [serious question] standard is inapplicable, and therefore a 'likelihood of success' must be shown." *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 149 (2d Cir. 1999) (citation omitted); *accord Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010) (acknowledging the exception to the general preliminary injunction standard for government action pursuant to a statutory scheme). "This higher standard reflects the deference courts must accord to laws 'developed through reasoned democratic processes.'" *Bronx Household of Faith v. Bd. of Educ. of New York*, 331 F.3d 342, 349 (2d Cir. 2003) (citation omitted).

### III.    A LIMITED PRELIMINARY INJUNCTION IS WARRANTED

### A. The Conservancy Has Sufficiently Demonstrated Irreparable Harm

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction" and "must therefore be satisfied before the other requirements for an injunction can be considered." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80 (2d Cir. 2024) (citations omitted). An irreparable harm "is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which 'money damages cannot provide adequate compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d. Cir. 2002). Moreover, this harm must be "actual and imminent, not remote or speculative." *Id.* The "loss of reputation, good will, and business opportunities" can constitute irreparable harm where those losses are "difficult to establish and measure." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).

In the Second Circuit, irreparable harm is also presumed where the alleged injury "flows from a violation of constitutional rights." *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996); *see also Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). That said, the "mere 'assertion of constitutional injury is insufficient to automatically trigger a finding of irreparable harm.'" *Connecticut State Police Union v. Rovella*, 494 F.Supp.3d 210, 220 (D. Conn. 2020) (citation omitted). Rather, the alleged constitutional deprivation must be "convincingly shown." *Donohue v. Mangano*, 886 F. Supp. 2d 126, 150, 152 (E.D.N.Y. 2012) (holding that the likelihood of success on plaintiff's Contracts Clause claim "[was] so great that irreparable harm [was] inevitably shown"). Accordingly, when a constitutional violation is alleged, "the two prongs of the preliminary injunction threshold merge into one: in order to show

irreparable injury, plaintiff must show a likelihood of success on the merits." *Turley v. Giuliani*, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000).

Here, the Conservancy has convincingly shown that they are likely to suffer irreparable harm in the absence of preliminary relief. At oral argument, counsel for ESD admitted that if preliminary relief is not granted, ESD will seek to execute a lease agreement with the Greys. (Oral Arg. Tr. 60:21–22.) This agreement would move them from their current basement location to Room K and the Rehearsal Room. The Greys would have exclusive control over these spaces, and the spaces would be "unavailable" for use by other groups in the Armory. (*See* Oral Arg. Tr. 66:15–20.) To illustrate the effect this action would have on the Conservancy's operations, the Conservancy submitted written declarations by Conservancy staff and an Artist-in-Residence at the Armory. (*See* Jones Decl., ECF No. 26; Lonergan Decl.; Jacobs-Jenkins Decl., ECF No. 28; Robertson Supp. Decl.) These declarations explain how the loss of these two spaces, particularly the Rehearsal Room, would damage the Conservancy's programming and reputation. For example, losing the Rehearsal Room would force the Conservancy to, among other things, relocate Artists-in-Residence, find and pay for off-site rehearsal space, build temporary warmup space for scheduled productions, and reconfigure performance schedules. (*See* Jones Decl. ¶ 4; Lonergan Decl. ¶¶ 12–30; Robertson Supp. Decl. ¶ 9.) The declarants conclude that the added financial and logistical burden associated with these changes would reduce the Conservancy's overall capacity to develop and present artistic work and "threaten the Armory's standing as a premier venue for groundbreaking performance art." (Lonergan Decl. ¶¶ 9–11; *see also* Robertson Supp. Decl. ¶ 11.)

Further, the declarants state that the loss of Room K would endanger third party contracts that are critical to the Armory's financial health. Under an existing contract with the European

Fine Art Foundation ("TEFAF"), the Conservancy annually grants TEFAF exclusive access to the second floor, including Room K, to host an art fair showcasing fine art and jewelry. (*See* Robertson Supp. Decl. ¶¶ 5–6.) Rebecca Robertson, the Conservancy's President and Executive Producer, claims that losing access to Room K would constitute a material breach of their contract with TEFAF, "resulting in the Conservancy losing a major source of yearly revenue" that would "jeopardize the Conservancy's long-term donor relationships and undermine public recognition of the Armory as a premier cultural destination." (*Id.* ¶ 7.)

The declarants also maintain that any diminutions in the Conservancy's production ability or financial performance would, likewise, impair the Conservancy's ability to offer educational services. "Each year, the Conservancy's arts education program serves 5,000 New York City public school students through over 500 in-school and on-site workshops." (Jones Decl. ¶ 6.) In their declaration, Cassidy Jones, the Conservancy's Chief Education Officer, states that "[f]oundations and private funders that support the Conservancy's arts education programs have pledged support based on current and future levels of participation that would not be possible if the Conservancy loses access to any of its current spaces." (Jones Decl. ¶ 4.) Similarly, Branden Jacobs-Jenkins, an Artist-in-Residence at the Armory, states that the loss of Room K would undermine the artist residency program, limiting the ability of residents to develop commissioned work. (Jacobs-Jenkins Decl. ¶ 6.) Jacobs-Jenkins further declares that the loss of the Rehearsal Room would curtail residents' ability to "fulfill the educational and outreach components of [their] residency agreements." These educational programs are likely to substantially diminish or cease entirely absent preliminary relief.

ESD has not presented any evidence that calls the veracity of these submissions into question.[3] Instead, ESD argues that the Conservancy's choice to seek preliminary injunctive relief on September 5, 2025—rather than when the Amendments were passed in December 2024 or the Greys were designated a legacy cadet corps in May 2025—"erodes its claims of immediate, irreparable, and impending injury." (Def. Mem. L. Opp. Prelim. Inj. at 14.) This argument is unavailing. The Conservancy's as-applied challenge to ESD's execution of the statute was not ripe for judicial decision until there was a "'real, substantial controversy' between [the] parties involving a 'dispute definite and concrete.'" *Marchi v. Bd. of Coop. Educ. Servs. of Albany*, 173 F.3d 469, 478 (2d Cir. 1999) (quoting *Babbitt v. United Farm Works National Union*, 442 U.S. 289, 298 (1979)). The Conservancy's as-applied challenge did not become definite and concrete until the Conservancy became aware of ESD's intentions to grant the Greys exclusive use of Armory spaces covered under the Conservancy's Lease. (*See* Sept. 11, 2025 Letter, at 1–2.) Accordingly, the timing of the Conservancy's motion does not rebut their otherwise substantial showing of irreparable harm.

In sum, this Court finds that, absent preliminary injunctive relief, the Conservancy is likely to suffer irreparable reputational and programming harms that "are difficult to establish and measure." *Register.com, Inc.*, 356 F.3d, at 404.

The Conservancy has also shown a likelihood of success on the merits of at least one of its constitutional claims. Therefore, a presumption of irreparable harm would still be appropriate. *See Jolly*, 76 F.3d, at 482.

---

[3] During oral argument, counsel for ESD repeatedly argued that this Court should not rely on these declarations because they have not had a fair opportunity to reply. (*See* Oral Arg. Tr. 44:9–11, 46:19–20, 53:25–54:1.) But oral argument, which took place a full week after the Conservancy filed these supporting declarations, was ESD's opportunity to respond. ESD's failure to present any evidence—or even make arguments suggesting—that their designation of Room K and the Rehearsal Room was a reasonable decision does not require this Court to disregard evidence to the contrary.

## B. ESD's Designation is Likely a Violation of the Contracts Clause

To establish a likelihood of success on the merits, the Conservancy "need not show that success is an absolute certainty," but only that "the probability of [their] prevailing is better than fifty percent." *Airbnb, Inc. v. City of New York*, 373 F.Supp.3d 467, 480 (S.D.N.Y. 2019) (alteration in original) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)). Additionally, the Conservancy "need not demonstrate a likelihood of success on the merits of every claim—rather, they need only 'show a likelihood of success on the merits of at least one of [their] claims.'" *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019) (alteration in original) (citation omitted). The Conservancy has demonstrated that it is more likely than not to succeed on the merits of their Contracts Clause claim.

### 1.    ESD's Affirmative Defenses

Before reaching the merits of the Conservancy's Contracts Clause claim, this Court must first address ESD's three affirmative defenses. ESD argues that this Court should not reach the merits of the Conservancy's claims because those issues have or will be adjudicated in a parallel state court proceeding. Specifically, ESD recommends that this Court abstain from hearing the case under either *Younger v. Harris*, 401 U.S. 37 (1977) or *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976). (Def. Mem. L. Opp. Prelim. Inj., at 2.) In the alternative, ESD asserts that the doctrine of *res judicata* precludes the Conservancy from relitigating their constitutional claims because they have already been denied relief in the state court holdover proceeding. (*Id.*) Each of these defenses lack merit.

### a.    *Younger* Abstention

First, *Younger* abstention is not applicable. In general, "federal courts are obliged to decide cases within the scope of federal jurisdiction." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72

69, 72 (2013). Under the *Younger* abstention doctrine, however, federal courts may abstain from exercising jurisdiction in three types of proceedings: "(1) ongoing state criminal prosecutions, (2) certain civil enforcement proceedings, and (3) civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions." *Falco v. Justs. of the Matrim. Parts of Sup. Ct. of Suffolk Cnty.*, 805 F.3d 425, 427 (2d Cir. 2015) (quoting *Sprint*, 571 U.S. at 78). ESD states that the Conservancy's "pending proceeding in Civil Court falls squarely within the third *Sprint* prong" because the Conservancy is "seek[ing] injunctive relief relating to the same property that is the subject matter of the underlying state court action." (Def. Mem. L. Opp. Prelim. Inj., at 8 (alteration in original) (quoting *Abbatiello v. Wells Fargo Bank, N.A.*, No. 15-CV-4210 SJF ARL, 2015 WL 5884797, at *4 (E.D.N.Y. Oct. 8, 2015)).)

But this argument—that any disposition of real property implicates *Younger*—does not follow from *Sprint*. The Second Circuit has clarified that *Sprint's* third category concerns only "core state court civil administrative processes, powers, and functions that *allow* the state courts to adjudicate the matters before them and *enforce* their judgments." *Cavanaugh v. Geballe*, 28 F.4th 428, 434 (2d Cir. 2022) (emphasis added) (holding that a federal challenge implicating a state probate court decision did not fall within *Sprint*'s third category). A state holdover proceeding does not align with either of these categories. Moreover, the state holdover proceedings do not resemble the types of orders *Sprint* identified as falling clearly within the third category: civil contempt orders and orders requiring the posting of bonds pending appeal. *See Sprint*, 571 U.S. at 79. Unlike these orders, the state holdover proceedings do not implicate the "core of a [s]tate's judicial system" or "a process that aids the state court's ability to function or force the parties to comply with its orders." *Cavanaugh*, 28 F.4th, at 434 (quoting *Juidice v. Vail*, 430 U.S. 327, 335 (1977)); *see also Milhaven v. Country Vill. Apartment*, No. 19-CV-2384

(KMK), 2020 WL 5663380, at *8 (S.D.N.Y. Sept. 23, 2020) (listing cases that hold landlord-tenant disputes fall outside of *Sprint*'s third category). Accordingly, this Court will not abstain from exercising jurisdiction under *Younger*.

### b. *Colorado River* Abstention

Abstention under *Colorado River* is similarly inappropriate. In *Colorado River,* the Supreme Court established a prudential basis for federal district courts to dismiss "a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration." 424 U.S. at 818. Critically, "a finding that the concurrent proceedings are 'parallel' is a necessary prerequisite to abstention under *Colorado River.*" *Dittmer v. Cnty. of Suffolk*, 146 F.3d 113, 118 (2d Cir. 1998). "Suits are parallel when substantially the same parties are contemporaneously litigating substantially the same issue in another forum." *Id.* (quoting *Day v. Union Mines Inc.*, 862 F.2d 652, 655 (7th Cir. 1988)).

ESD argues that this Court should abstain under *Colorado River* because the "'main issue' raised by [the Conservancy]'s motion—that [the Amendments] violate[] [the Conservancy]'s constitutional rights based upon the 2006 Lease—is parallel to [the Conservancy]'s pending Civil Court proceeding seeking to evict the Greys based upon the same 2006 Lease." (Def. Mem. L. Opp. Prelim. Inj., at 9.) But this argument misapprehends the scope of Judge Zellen's opinion. While Judge Zellen found that the portion of the Amendments expanding the § 180-a(3)(c)(i) procedures to cadet corps programs did not constitute a taking because this provision was consistent with the public goals stated in the Lease, his decision did not touch on the constitutionality of § 180-a(3)(e)—the provision empowering ESD to transfer portions of the Armory from the Conservancy to the Greys. That issue, as well as the constitutionality of ESD's specific decision to designate Room K and the Rehearsal Room, was not before Judge Zellen and

is not referenced in his opinion.[4] Far from parallel, the issues in this proceeding and the state holdover proceeding are factually and legally distinct. Accordingly, this Court will not abstain under *Colorado River*.

### c. *Res Judicata*

Finally, ESD argues that the doctrine of *res judicata*, or claim preclusion, bars the Conservancy's suit because "Judge Zellen entered partial summary judgment against [the Conservancy], finding that Chapter 659 was a valid exercise of legislative authority, and was not inconsistent with the 2006 Lease." (Def. Mem. L. Opp. Prelim. Inj., at 12.) New York law determines the preclusive effect of state court proceedings. *See Exxon Mobil Corp. v. Healey*, 28 F.4th 383, 398 (2d Cir. 2022). Under New York law, "a valid final judgment bars future actions between the same parties on the same cause of action." *Simmons v. Trans Express Inc.*, 170 N.E.3d 733, 736 (N.Y. 2021). New York applies a "transactional analysis approach" to determine "whether an earlier judgment has claim preclusive effect, such that 'once a claim is brought to a final conclusion, *all other claims arising out of the same transaction or series of transactions* are barred, even if based upon different theories or if seeking a different remedy.'" *Id.* (emphasis in original) (quoting *O'Brien v. City of Syracuse*, 429 N.E.2d 1158, 1159 (N.Y. 1981)). This transactional approach considers whether the claims turn on facts that "are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Xiao Yang Chen v. Fischer*, 843 N.E.2d 723, 725 (N.Y. 2005).

---

[4] In fact, Judge Zellen explicitly warned against reading his holding too broadly. After determining that factual questions remained as to the Conservancy's claim of interference, Judge Zellen wrote, "The Court need not determine at this time whether [the Amendments] would require petitioner to simply find other acceptable space in the Armory for [the Greys] in the event [the Conservancy] succeeds at trial, and nothing in this decision should be read as having determined that question." *Seventh Regiment Armory Conservancy, Inc.*, 2025 WL 2424432, at *6 n.5.

Even assuming that ESD is in privity with the Greys, the partial disposition in the state holdover proceeding does not bar the Conservancy's present claims because they are not part of the same transaction or series of transactions that led to the state holdover proceeding. As the Conservancy notes, the state holdover proceeding concerned whether the Conservancy could evict the Greys from the Armory under the license that expired on January 20, 2019, and was brought two years prior to the enactment of the Amendments. (Pl. Reply Mem. Supp. Prelim. Inj., at 5.) By contrast, this suit stems from different facts—ESD's September 11, 2025, designation of Room K and the Rehearsal Room pursuant to the Amendments—and seeks different relief. *See id.* (finding that claim preclusion did not apply in part because the "purposes behind the two" suits were "quite different"). The fact that both these claims concern space in the Armory does not, on its own, make them "related in time, space, origin, or motivation" or "a convenient trial unit." *Id.* As such, *res judicata* does not bar the Conservancy's constitutional claims.

### 2. The Conservancy's Contracts Clause Claim

The Contracts Clause provides that no state shall pass any law "impairing the Obligation of Contracts." U.S. Const. art. 1, § 10. "Although facially absolute, the Contracts Clause's prohibition 'is not the Draconian provision that its words might seem to imply.'" *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 367 (2d Cir. 2006) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240 (1978)). A state always retains the inherent police power to "protect the general welfare of its citizens," *id.*, and "safeguard the vital interests of its people," *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934). This power is "paramount to any rights under contracts between individuals." *Spannaus*, 438 U.S., at 241. That said, "government[s], like private parties, [are] bound by [their] contracts and may not use governmental powers to impair these contracts materially." *Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d 54, 63 (2d Cir. 2020).

18

Thus, to determine whether a law impermissibly impairs contract rights, courts "must examine: (1) [whether] the contractual impairment [is] substantial and, if so, (2) [whether] the law serve[s] a legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, (3) [whether] the means chosen to accomplish this purpose [are] reasonable and necessary." *Id.* at 64 (alterations in original) (quoting *Buffalo Tchrs.*, 464 F.3d at 368).

### a.  Substantial Impairment

ESD's designation of Room K and the Rehearsal Room substantially impairs the Conservancy's Lease with the State. When assessing whether a law substantially impairs a contract, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Malin*, 138 S. Ct. 1815, 1822 (2018); *see also Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997) ("The primary consideration in determining whether the impairment is substantial is the extent to which reasonable expectations under the contract have been disrupted.").

Here, there is no question that removing these two spaces from the property demised to the Conservancy substantially impairs the Lease. By the plain terms of the Lease, the State demised the entire Armory, including Room K and the Rehearsal Room, to the Conservancy, save for the DMNA and Shelter Retained Spaces, for a ninety-nine-year term. *See supra* section I.B.  In exchange for the exclusive use and possession of the demised portions of the Armory, the Conservancy promised to "create and operate . . . a unique destination for the New York Public that offers a combination of the highest quality cultural programming in the setting of a world class restored landmark." (Lease, at 127.)  The Lease does not empower the State to circumvent this exclusive grant by unilaterally transferring to third parties any portions of the Armory it chooses.

19

Further, even assuming *arguendo* that such authority existed under the Lease, ESD's specific designation of Room K and the Rehearsal Room would still seriously hinder the Conservancy's ability to "offer the highest quality cultural programming." *See supra* section III.A. Accordingly, the removal of these two spaces would likely violate the express terms of the Lease and undermine the State's contractual bargain with the Conservancy.

Additionally, the removal of Room K and the Rehearsal Room from the Conservancy's use and possession would likely upset the Conservancy's reasonable expectations under the Lease. Again, the Lease is silent on the State's ability to make subsequent grants of previously demised portions of the Armory. The record before this Court also indicates that the Conservancy extensively uses Room K and the Rehearsal Room, and that these spaces are essential to the Conservancy's educational and artistic work. *See supra* section III.A. Given the lack of evidence to the contrary, it is highly unlikely that either the Conservancy or ESD contemplated the State unilaterally removing spaces that are essential to the Conservancy's operations from the Conservancy's control when they executed the Lease. The removal of Room K and the Rehearsal Room would likely be "wholly unexpected" and therefore substantial. *See Sanitation & Recycling Indus.*, 107 F.3d at 993.

ESD's arguments to the contrary are of no moment. First, ESD claims that Judge Zellen already determined that the Amendments are consistent with the Lease so they could not result in a contractual impairment. (*See* Def. Mem. L. Opp. Prelim. Inj., at 15.) But, again, this argument reads too much from Judge Zellen's opinion. Judge Zellen merely held that expanding the § 180-a(3)(c)(i) procedures to include cadet corps programs was consistent with Conservancy's obligation under the Lease to support "interpretive and/or educational programs related to the social aesthetic and military history of the building." *Seventh Regiment*, 2025 WL 2424432, at *4.

Judge Zellen did not determine whether the Amendments allowed the State to allocate space in the Armory to the Greys that was previously demised to the Conservancy, and he explicitly disclaimed reading such a finding into his opinion. *See id.* at *6 n.5.

ESD next argues that any impairment of the Lease is insubstantial because the space allotted to the Greys is "minimal," and the Greys' and the Conservancy's previous coexistence within the Armory renders any impairment insubstantial. (*See* Def. Mem. L. Opp. Prelim. Inj., at 15–16.) While ESD is correct that Room K and the Rehearsal Room are relatively small compared to the entire Armory, their arguments fail to consider the integral role those spaces play in the Conservancy's operations. *See supra* section III.A. Further, the Greys current occupancy of an approximately 600 square foot space in the Armory's basement bears no relation to whether their future occupancy of an entirely different space would substantially impair the Lease.

Finally, ESD argues that the designation of Room K and the Rehearsal Room do not disrupt the Conservancy's reasonable expectations under the Lease because the Lease "was itself a byproduct of a 2004 legislative enactment," stipulates that the Conservancy's rights are "'subject and subordinate to all future . . . overriding leases,' and mandates [the Conservancy's] compliance with 'any and all applicable present and future, foreseen and unforeseen, laws.'" (Def. Mem. L. Opp. Prelim. Inj., at 16 (quoting Lease §§ 14.01, 30.02).)

These arguments are unconvincing. The fact that the Lease is a byproduct of enabling legislation, does not insulate the State from the Contracts Clause. *See U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 19 (1977) (holding that the State's decision to repeal a bondholder covenant originally created by statute "impaired the obligation of the States' contract"). Additionally, the "overriding lease" language refers to the "Superior Lease" between New York City, as owner in fee simple of the land on which the Armory sits, and the State, as the successors

in interest to the Field Officers of the Seventh Regiment of the National Guard. (*See* Lease at 13.) That language does not, as ESD contends, consider additional subleases the State may grant to new sublessees for previously demised portions of the Armory. (*Id.* § 30.02.) Finally, a single reference in the Lease to the Conservancy's obligation to comply with "foreseen and unforeseen" laws and regulations did not put the Conservancy on notice that ESD might one day unilaterally transfer away two spaces demised to the Conservancy under the Lease that are integral to the Conservancy's operations. *See Donohue v. Cuomo*, 980 F.3d 53, 83 (2d Cir. 2020) (finding that a state's previous attempts to directly negotiate changes to a collective bargaining agreement did not put the employees on notice that the state "might bypass that process and implement its desired changes unilaterally.").

In short, the Conservancy has demonstrated that ESD's unilateral designation of Room K and the Rehearsal Room for the exclusive use of the Greys would substantially impair the Conservancy's contracted property rights under the Lease.

### b. Reasonable and Necessary

ESD contends that even if the Amendments, as-applied, substantially impair the Lease, they do so in service of a legitimate public purpose: "ensuring that a legacy cadet corps program like the Greys, which is deeply rooted in local history and culture, can continue to occupy space in its historical location." (*See* Def. Mem. L. Opp. Prelim. Inj., at 17–18.) But regardless of whether the Amendments were actually passed for a legitimate public purpose, ESD's impairment of the Lease was not reasonable and necessary to effectuate this stated goal.

When determining whether a law is a reasonable and necessary means to effectuate a legitimate public purpose, courts "distinguish between laws that impair private contracts and laws that impair public ones." *Connecticut State Police Union*, 36 F.4th 54, 65 (2d Cir. 2022). "When

a law impairs a private contract, substantial deference is accorded to the legislature's 'judgments as to the necessity and reasonableness of a particular measure.'" *Buffalo Tchrs.*, 464 F.3d, at 369 (citations omitted) (quoting *U.S. Trust Co.*, 431 U.S. at 23). But if, like here, the "state itself is a party to a contract, 'complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the state's self-interest is at stake.'" *Id.* (quoting *U.S. Trust Co.*, 431 U.S, at 26). To determine whether "less deference" is appropriate, a court "ask[s] whether there is 'some indicia' that the state impaired the contract . . . to benefit the state financially, or as a matter of political expediency." *Sullivan*, 959 F.3d, at 65–66 (quoting *Buffalo Tchrs.*, 464 F.3d, at 369–70).

The Conservancy has put forward sufficient evidence of potential self-interest to require the application of "less deference." In the Second Circuit, indicia of self-interest "may be shown through evidence that the contractual impairment is a response to a well-known, long-standing, problem as opposed to a change in circumstances." *Id.* at 67. That is, when a legislature impairs a contract in response to a previously known problem, it raises the specter that the legislature was acting out of political expediency. *See U.S. Trust Co.*, 431 U.S., at 31–32 (holding the repealing of statutory bond covenants to be an unreasonable contractual impairment in part because "the need for mass transportation in the New York metropolitan area was not a new development" and the concerns were "not unknown" when the covenants were originally enacted). Here, the State knew that the Greys were in the Armory when they entered the Lease with the Conservancy nearly twenty years ago. In fact, on multiple occasions, DMNA affirmed the Conservancy's exclusive control of the premises and warned the Greys that they have no rights to any space within the Armory. (*See* 2006 Eviction Notice, at 2; 2022 DMNA Letter, at 2.) If the State had wished for the Greys to remain in the Armory in perpetuity, it could have provided them retained space within

23

the Lease as they had for DMNA and the Shelter. Alternatively, as the Conservancy argues, the State could have designated a space for the Greys at a different State-owned facility. That the State instead chose to impair its long-standing contract with the Conservancy shows "indicia of [self-interest]" that "require[s] the application of 'less deference' scrutiny." *Sullivan*, 959 F.3d, at 67.

The Conservancy, likewise, carries their burden under less deference scrutiny.

> Ultimately, for impairment to be reasonable and necessary under less deference scrutiny, it must be shown that the state did not (1) "consider impairing the . . . contracts on par with other policy alternatives" or (2) "impose a drastic impairment when an evident and more moderate course would serve its purpose equally well," nor (3) act unreasonably "in light of the surrounding circumstances."

*Buffalo Tchrs.*, 464 F.3d, at 371 (quoting *U.S. Trust Co.*, 431 U.S, at 30–31). As explained above, the Conservancy has shown that ESD's designation of Room K and the Rehearsal Room would substantially disrupt their reasonable expectations under the Lease. Further, the Conservancy has shown that this specific disruption, if not enjoined, is likely to cause them irreparable reputational and programing harms. Yet, despite the strength of the Conservancy's showing, ESD has failed to offer a single explanation for why Room K and the Rehearsal Room were reasonable designations for the Greys's headquarters consistent with the Lease. This lack of reasoning is made even more striking by the Conservancy's assertion that they have previously offered ESD and the Greys 1,200 square feet of space in the Armory's basement that would not impair the Conservancy's operations at all. (Oral Arg. Tr. 71:8–9.) If true, it would demonstrate that ESD's designation of approximately 3,000 square feet of space that is essential to the Conservancy's operations was entirely unnecessary. *See Buffalo Tchrs.*, 464 F.3d, at 371. Further, ESD's refusal to explain this decision—or even gesture toward a limiting principle that would cabin its discretion to transfer portions of the Armory away from the Conservancy—is unreasonable under the

circumstances. Therefore, ESD's impairment of the Lease, even if it served a legitimate public purpose, was not reasonable and necessary to effectuate that purpose.

***

In sum, the Conservancy has shown that they are more likely than not to succeed on the merits of their Contracts Clause claim. Because the Conservancy is likely to succeed on at least one of their claims, this Court will not consider the merits of the Conservancy's remaining constitutional claims.

### C. The Balance of Hardships and Public Interest Tip Decidedly in the Conservatory's Favor

Finally, when determining a motion for preliminary relief, a court must also "balance the competing claims of injury[,] . . . consider the effect on each party of the granting or withholding of the requested relief, and pay particular regard [to] the public consequences in employing the extraordinary remedy of preliminary relief." *725 Eatery Corp.*, 408 F.Supp.3d, at 469 (alterations in original) (citation omitted). The balance of the hardships and public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Considering these factors in tandem, the balance of the hardships weighs in favor of granting an injunction. As explained above, the Conservancy's operations and programming would face serious, deleterious effects if ESD removed Room K and the Rehearsal Room from its control. *See supra* section III.A. In contrast, enjoining ESD from entering into an agreement with the Greys for those particular spaces would not result in any additional financial or administrative burdens for the State or the Greys. An injunction would merely preserve the status quo, allowing the case to develop while maintaining the parties' current obligations under the Lease. Further, ESD "does not have an interest in the enforcement of an unconstitutional law." *See New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (quoting *Am. Civil Liberties*

25

*Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)).  The Conservancy's likelihood of success on the merits of its Contracts Clause claim supports the issuance of a limited preliminary injunction.  Preserving the Conservancy's ability to conduct its operations in Room K and the Rehearsal Room during the pendency of this litigation is in the public interest.

## IV.    CONCLUSION

The Conservancy's motion for a preliminary injunction, (ECF No. 5), is GRANTED.  ESD is directed to take no further action to finalize an agreement for Room K and the Rehearsal Room with the Greys, or otherwise disrupt the Conservancy's current use and control of those spaces, before this Court reaches a final decision on the merits. The Clerk of Court is directed to close the motion accordingly.

Dated: New York, New York
      November 25, 2025

SO ORDERED.

GEORGE B. DANIELS
United States District Judge